UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

FRANCISCO SANTOS

                                        Plaintiff,

v.                                                        9:19-cv-1610
                                                          (BKS/TWD)

B. SCHROEDER, et al.,

                                        Defendants.

_____

APPEARANCES:                          OF COUNSEL:

FRANCISCO SANTOS
*Plaintiff, pro se*
13-A-0532
Wende Correctional Facility
P.O. Box 1187
Alden, NY 14004

HON. LETITIA JAMES                    NICHOLAS W. DORANDO, ESQ.
New York State Attorney General       Ass't Attorney General
*Attorney for Defendants*
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

## I.    INTRODUCTION

This matter has been referred for a report and recommendation by the Hon. Brenda K.

Sannes, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c).  At all times relevant, Plaintiff was an incarcerated individual in the custody of the New

York State Department of Corrections and Community Supervision ("DOCCS") at Auburn

Correctional Facility ("Auburn").  In his amended complaint, the operative pleading in this

matter, Plaintiff asserts First Amendment retaliation claims against Corrections Officer ("CO")

Schroeder, CO Kassen, Sgt. Sirvent, Lt. Masner, and Parmiter.  (Dkt. Nos. 50, 51.)  Presently

before the Court is Defendants' motion for summary judgment.  (Dkt. No. 99.)  Plaintiff opposed

the motion and Defendants replied.  (Dkt. Nos. 109, 111.) [1]  For the reasons set forth below, the

undersigned recommends Defendants' motion be granted.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted

if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52

(1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine

issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v.*

*Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A fact is "material" if it "might affect the outcome

of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see*

*Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  The movant may meet this

burden by showing the nonmoving party has "fail[ed] to make a showing sufficient to establish

---

[1]  Despite the Court granting Plaintiff three extensions totaling more than four months to file a response to Defendants' motion, Plaintiff did not timely file a response.  (Dkt. No. 109.)  The Court notes Plaintiff's original response was due March 14, 2023, which the Court extended at Plaintiff's request to May 15, 2023.  (*See* Dkt. Nos. 103, 104.)  Thereafter, Plaintiff made a second request for extension which the Court granted and extended to June 30, 2023.  (*See* Dkt. Nos. 105, 106.)  Again at Plaintiff's request, the Court allowed Plaintiff a third and final extension to respond by July 28, 2023, and made clear no further extensions would be granted for any reason.  (Dkt. No. 108.)  On August 9, 2023, almost two weeks after the Court's final extension deadline, the Court received Plaintiff's opposition to Defendants' motion for summary judgment, which was postmarked August 8, 2023.  (Dkt. No. 109.)  However, in deference to Plaintiff's *pro se* status, the Court has considered his opposition.  (Dkt. No. 110.)

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (alteration and emphasis in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14

F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his

duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen*

*v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks and citation

omitted).

In applying the summary judgment standard, the district court should not weigh evidence

or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619

(2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of

credibility and choices between conflicting versions of the events are matters for the jury, not for

the court on summary judgment.").

## III.    DISCUSSION

On July 21, 2019, Plaintiff was taken to the interfacility visitation room at Auburn. (Dkt.

No. 51-1 at 38.) During visitation, Plaintiff's visitor became upset and placed her head on the

table. *Id.* CO Schroeder approached Plaintiff's table and informed Plaintiff and his visitor of the

facility's rules and regulations prohibiting "lying on, or across tables." (Dkt. No. 99-3 at 6.)

However, according to Plaintiff, CO Schroeder approached the table "in an ag[g]ressive,

unrespectful and with bad[]-faith" manner and uttered a racial slur towards Plaintiff. (Dkt. No.

51-1 at 38.) In response to the interaction between Plaintiff and CO Schroeder on July 21, 2019,

Plaintiff filed a grievance against CO Schroeder dated July 26, 2019, alleging harassment. *Id.*

Due to the nature of the complaint, the grievance was immediately forwarded to Auburn's

Superintendent for investigation. (Dkt. No. 99-4 at 3.) The Superintendent ultimately denied

Plaintiff's grievance due to a lack of evidence. *Id.* at 11.

On August 18, 2019, while CO Schroeder was on duty in the visitation room, Plaintiff

exited the inmates' bathroom carrying a used paper towel. (Dkt. No. 99-1 at 2.) CO Schroeder

ordered Plaintiff to return to the bathroom and properly dispose of the paper towel in compliance with signage posted in the bathroom. *Id.* According to CO Schroeder, Plaintiff ignored his direct order to properly dispose of the paper towel, which prompted him to file a misbehavior report. (Dkt. No. 51-1 at 44.) Pending a disciplinary hearing, Plaintiff spent 19 consecutive days in keeplock before the misbehavior report was dismissed. (Dkt. No. 51-1 at 21, 53, 68; Dkt. No 99-1 at 2.)

Plaintiff subsequently attempted to file another grievance against CO Schroeder regarding the August 18, 2019, incident. *Id.* Plaintiff alleged CO Schroeder's misbehavior report was predicated on false and inaccurate statements to retaliate against Plaintiff for the July 26, 2019, grievance he had filed against CO Schroeder. (Dkt. No. 51-1 at 52.) Although the second grievance was dated September 1, 2019, the Inmate Grievance Program ("IGP") office at Auburn received the grievance sometime between September 15 and September 17, 2019. (Dkt. No. 99-4 at 4.) Upon receiving the September 1, 2019, grievance, Parmiter, the IGP Supervisor, informed Plaintiff via memorandum the grievance was untimely because it was received more than 21 days after the alleged August 18, 2019, incident. *Id.* Parmiter requested Plaintiff provide mitigating circumstances explaining the untimeliness of his grievance. *Id.* On September 26, 2019, Plaintiff responded to Parmiter's request, claiming he properly mailed the grievance on September 1, 2019, via the interfacility mail unit and its delayed arrival was out of his control. (Dkt. No. 51-1 at 67-68.) He further explained immediately after the August 18, 2019, incident, he was placed in keeplock for 19 days, which affected his access to resources. *Id.* at 68. Parmiter ultimately denied Plaintiff's September 1, 2019, grievance because he failed to provide acceptable mitigating circumstances for its untimely filing. (Dkt. No. 99-4 at 5.) There

is no record of Plaintiff appealing the denial of his grievance or filing a separate grievance against Parmiter for failing to accept the grievance.  *Id.*

Defendants now contend summary judgment is warranted because Plaintiff failed to exhaust his administrative remedies.  (Dkt. No. 99-5 at 7-17.)

### A.     Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  42 U.S.C. § 1997e(a).  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *Page v. Haider-Shah*, No. 9:09-CV-68 (FJS/ATB), 2010 WL 6428400, at *4 (N.D.N.Y. Mar. 2, 2010), *report and recommendation adopted*, 2011 WL 1213943 (N.D.N.Y. Mar. 31, 2011).  Inmates must exhaust their administrative remedies even if they are seeking only monetary damages that are not available in prison administrative proceedings.  *Id.*

To properly exhaust his administrative remedies, an inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  The PLRA requires "proper exhaustion," which means an inmate must utilize all steps of the administrative process and comply with "deadlines and other critical procedural rules."  *Woodford*, 548 U.S. at 90-91. Exhaustion is an affirmative defense, and the burden of proof, at all times, remains on the defendant.  *Cooley v. Garland*, No. 9:19-CV-00382 (LEK/ATB), 2023 WL 346242, at *4 (N.D.N.Y. Jan. 20, 2023).

The grievance procedure in New York is three-tiered.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  N.Y. Comp. Codes R. &

Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the facility.  *Id.* § 701.5(c).  An adverse decision from the Superintendent level may be further appealed to the Central Office Review Committee ("CORC").  *Id.* § 701.5(d). Complaints of harassment are handled through an expedited procedure where the grievances are forwarded directly to the Superintendent, after which an inmate must appeal any negative determination to CORC.  *Id.* §§ 701.8(g) & (h), 701.5.

"CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he 'should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.'"  *Ruiz v. Link*, No. 20-CV-0235, 2022 WL 3020254, at *4 (S.D.N.Y. July 29, 2022) (quoting 7 N.Y.C.R.R. § 701.5(d)(3)(i)).  If CORC has received an appeal and fails to rule within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit.  *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

"Under the PLRA, a prisoner need exhaust only 'available' administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016).  There are "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643.  "First, an administrative remedy may be unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.'"  *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 643).  "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.'"  *Id.* (quoting *Ross*, 578 U.S. at 643).  "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from

taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id.* at 124 (quoting Ross, 578 U.S. at 644).

The "test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Sandlin v. Poole*, 575 F. Supp. 2d 484, 488 (W.D.N.Y. 2008) (citation omitted). A plaintiff is estopped from exhausting administrative remedies where "defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures." *Pridgen v. Beatie*, No. 9:16-CV-535 (DNH/CFH), 2018 WL 1402049, at *8 (N.D.N.Y. Jan. 17, 2018). Exhaustion may be excused if plaintiff alleges enough to show ordinary grievance procedures were unavailable because of a reasonable fear of retaliation. *Thomas v. Cassleberry*, No. 03-CV-6394L, 2007 WL 1231485, at *2 (W.D.N.Y. Apr. 24, 2007); *Chaney v. Vena*, No. 9:15-CV-653 (TJM/ATB), 2017 WL 6756645, at *4 (N.D.N.Y. Nov. 29, 2019) ("The fear of retaliation must be 'reasonable' to render the grievance procedure unavailable.'") (citation omitted).

A mere "generalized fear" of retaliation is insufficient to excuse a failure to exhaust administrative remedies. *Davis v. Doe*, No. 9:16-CV-0994 (MAD/DJS), 2017 WL 8640829, at *4 (N.D.N.Y. Dec. 29, 2017); *Thompson v. Kelly*, No. 9:18-CV-1235 (LEK/DJS), 2019 WL 2374119, at *4-5 (N.D.N.Y. Apr. 4, 2019) (plaintiff's allegation he failed to submit a timely grievance complaint because he feared staff would retaliate against him was merely a generalized fear and not a specific threat which could otherwise excuse the exhaustion requirement). However, a specific threat of retaliation can constitute more than a generalized fear. *Hunter v. Rouse*, No. 9:20-CV-65 (LEK/DJS), 2020 WL 8474744, at *4 (N.D.N.Y. Sept. 17, 2020), *report and recommendation adopted*, 2021 WL 101083 (N.D.N.Y. Jan. 12, 2021)

(plaintiff's fear of retaliation was more than a generalized fear where defendant told plaintiff that "if he told 'anyone what happened, the next time [plaintiff] won't walk away.'") (citation omitted); *Galberth v. Durkin*, No. 9:14-CV-0115 (BKS/ATB), 2014 WL 7409915, at *8 (N.D.N.Y. Dec. 31, 2014) (plaintiff's allegation defendant threatened to "beat him within an inch of his life" was sufficient to create more than a generalized fear of retaliation) (citation omitted); *Decolines v. Hollenbeck*, No. 9:20-CV-1502 (MAD/ATB), 2021 WL 4947118, at *4 (N.D.N.Y. Oct. 25, 2021) (plaintiff's allegation officer assaulted him in response to a grievance was a sufficiently specific threat to excuse exhaustion requirements).

Here, Plaintiff alleges Parmiter told him she did not file his grievance dated September 1, 2019, because she "did not feel like doing so." (Dkt. No. 51-1 at 28.) He further claims she told Plaintiff if he "valued his . . . life," he would "not make an[y] further attempts to file this grievance complaint because next time will be more than a 'Keeplock' confinement." *Id.* at 28-29. Parmiter claims "[a]t no time" did she make any "verbal threats to Plaintiff for any reason" nor did she "have any reason to." (Dkt. No. 99-4 at 5.) While tenuous, the Court finds Parmiter's alleged threat sufficient to create more than a generalized fear of retaliation and raises a question of material fact as to whether administrative remedies were available to Plaintiff. *See Hunter*, 2020 WL 8474744, at *4; *Galberth*, 2014 WL 7409915, at *8; *Decolines*, 2021 WL 4947118, at *4. Therefore, the Court recommends denying summary judgment on exhaustion grounds.

Notwithstanding the excusable exhaustion issue regarding Plaintiff's grievances, Plaintiff's First Amendment retaliation claims fail on the merits for the reasons that follow.

### B.    Merits of Plaintiff's First Amendment Retaliation Claims

To prove a First Amendment retaliation claim, "a prisoner must show '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009)).

To demonstrate a prison official took adverse action against him, the plaintiff must show the defendant's retaliatory conduct "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . . Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Id.* (internal quotation marks and citations omitted).

In determining whether there is causal connection between the protected speech and the adverse action, a court may consider a number of factors, including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).  Although "'[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation . . . without more, is insufficient to survive summary judgment." *Roseboro*, 791 F. Supp. 2d at 370 (quoting *Espinal*, 558 F.3d at 129).  Moreover, "[e]ven if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, No. 9:11-CV-1171 (GLS/ATB),

2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (citation omitted); *see Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive . . . a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred.")

Prisoners' claims of retaliation must be examined with skepticism and particular care because they are "prone to abuse since prisoners can claim retaliation for every decision they dislike." *Roseboro*, 791 F. Supp. 2d at 367. (internal quotation marks and citation omitted). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Green v. Phillips*, No. 04-CV-10202 (TPG), 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *See id.*; *see also Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial.") (internal quotation marks and citation omitted). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

### 1. CO Schroeder

Plaintiff's First Amendment retaliation claim against CO Schroeder fails on the merits. It is undisputed Plaintiff's July 26, 2019, grievance against CO Schroeder constitutes protected activity. *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is

a constitutionally protected activity"). "Moreover, the receipt of a false misbehavior report resulting in punishment" has been found to constitute an adverse action. *Keyes v. Venettozzi*, No. 9:18-CV-0372 (GTS/DJS), 2022 WL 991402, at *8 (N.D.N.Y. Mar. 31, 2022); *see also Reed v. Doe No. 1*, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (finding the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in 14 days in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (finding a misbehavior report resulting in SHU confinement constituted an adverse action). As a result, the issue before the Court is whether the causation element of retaliation has been established.

While the Second Circuit has not drawn a bright line defining the maximum time period that can give rise to an inference of causation, it found a period of up to six weeks "fits comfortably within any line [they] might draw." *See Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011). In this case, there was temporal proximity of approximately three to four weeks between when Plaintiff filed the July 26, 2019, grievance against CO Schroeder, and when CO Schroeder issued the August 18, 2019, misbehavior report against Plaintiff. (Dkt. No. 99-3 at 2-3.) With regard to the other considerations, the Court notes excluding the August 18, 2019, misbehavior report, Plaintiff was twice disciplined for disobeying a direct order roughly ten years ago in 2013 and 2014. (Dkt. No. 100 at 19.) Moreover, at Plaintiff's tier hearing for the August 18, 2019, misbehavior report, the hearing officer found Plaintiff not guilty of both charges due to lack of video recordings and staff testimony conflicting with the misbehavior report. (Dkt. No. 99-2 at 40, 44-45; Dkt. No. 51-1 at 45-47.)

CO Schroeder admits on or around July 25, 2019, he received notice Plaintiff filed a grievance against him regarding the July 21, 2019, incident. (Dkt. No. 99-3 at 2.) CO Schroeder also admits on August 18, 2019, he filed a misbehavior report against Plaintiff. *Id.* As detailed above, on that day, Plaintiff exited the inmate bathroom within the visitation room with used paper towels in his hand. *Id.* According to CO Schroeder, this was considered "prohibited conduct" because there was a sign in the bathroom instructing inmates to throw away paper towels. *Id.* at 2-3. CO Schroeder directed Plaintiff to return to the bathroom and throw out the paper towels there. *Id.* at 3. Plaintiff ignored CO Schroeder and instead threw the paper towels out in the visitation room trashcan. *Id.* When CO Schroeder called Plaintiff over to "counsel him about his actions" Plaintiff ignored him and then responded, "this is harassment, and you can add that to your report." *Id.* (internal quotations omitted). CO Schroeder consulted with his area supervisor and stated in his declaration "while Plaintiff's statement led [him] to believe [Plaintiff] was planning to make a claim of retaliation," disobeying direct orders from a CO is prohibited. *Id.* As a result, CO Schroeder issued a misbehavior report to Plaintiff for refusing a direct order and for a facility visiting violation resulting in Plaintiff being keeplocked for 19 days. *Id.*; (Dkt. No. 51-1 at 21, 45-47; Dkt. No. 99-2 at 40, 44-45.) CO Schroeder denies any retaliatory intent and claims to have "issued the inmate misbehavior report solely to address the observed behavior." (Dkt. No. 99-3 at 3.)

Plaintiff does not dispute the fact he disobeyed a direct order from CO Schroeder. Plaintiff testified about the incident as follows:

> Q.    Okay. Now can you just explain to me what happened with the paper towels after you went to the bathroom?
> A.    After I went to the bathroom, well, I had a paper towel in my hand, drying my hands. And more or less as I'm coming up officer started telling me that I got to throw it out. Thinking nothing of it I threw out in the garbage that's

Q.
A.

nearest to him.  There's no difference as to which garbage.
At that point he didn't say specifically which garbage so I
just threw it out on the garbage that was right in front of
him.  At that point he got --.
Q.    Go ahead.
A.    He got hostile and that's when he said no.  I got to grab it
from the garbage can, pick it up and go back to the
bathroom and throw it in the garbage can inside the
bathroom.
Q.    Officer Schroeder told you that?
A.    Yes. Yes, he did.
Q.    Did you do did you do that?
A.    No, I did not do that because, one, that's not within the
authorized policy with D.O.C.  Two, that's inhumane.
Three, who was actually in the visiting room with visitors
out there he's being all hostile.  I'm not going to go into the
garbage can that has other trash unknown just because his
personal desire wanted me to be disgraded (sic) in that
stage.

(Dkt. No. 99-2 at 35-36.)

It is also undisputed Plaintiff was found not guilty of the charges in CO Schroeder's

misbehavior report due to lack of video recording and because staff testimony conflicted with the

misbehavior report, not because the report was intentionally or even unintentionally false.  (Dkt.

No. 51-1 at 46); *LeBron v. Selsky*, No. 905-CV-0172 (GTS/DRH), 2010 WL 1235593, at *5 n.9

(N.D.N.Y. Mar. 31, 2010) (rejecting the plaintiff's First Amendment retaliation claim premised

on an allegedly false misbehavior report and observing that, although the disciplinary conviction

upon which the allegedly false misbehavior report was based was ultimately reversed on appeal,

"no admissible record evidence exist[ed] indicating that the reversal was based on a finding that

the misbehavior report in question was intentionally false or even unintentionally false; rather,

the reversal was based merely on a finding that the disciplinary hearing was incomplete.").

Defendants have demonstrated through admissible evidence CO Schroeder issued the

misbehavior report because Plaintiff disobeyed a direct order, not necessarily based on any

retaliatory motive. (*See* Dkt. No. 99-3 at 2-3); *see also Cooper v. A. Annucci*, No. 9:18-CV-762 (GTS/CFH), 2020 WL 8474802, at *15 (N.D.N.Y. Nov. 9, 2020), *adopted sub nom. Cooper v. DeGraff*, 2021 WL 235946 (N.D.N.Y. Jan. 25, 2021). However, even if CO Schroeder's motive had been retaliatory, he would have still been entitled to summary judgment because he has shown "even without the improper motivation" he would have issued the misbehavior report to Plaintiff for disobeying a direct order. (*See* Dkt. No. 99-3 at 2-3); *Scott*, 344 F.3d at 287-88.

Thus, Defendants have established CO Schroeder would have issued the misbehavior report regardless of any retaliatory animus he may have had against Plaintiff and the retaliation claim fails. *See Brooks*, 2014 WL 1292232, at *18; *Scott*, 344 F.3d at 287-88.

### 2. CO Kassen,[2] Sgt. Sirvent, Lt. Masner,[3] and Parmiter

Plaintiff alleges CO Kassen, Sgt. Sirvent, and Lt. Masner conspired with CO Schroeder to issue the false misbehavior report in retaliation for Plaintiff's July 26, 2019, grievance against CO Schroeder. (Dkt. No. 51-1 at 13-14, 20-22.) Plaintiff claims he submitted a grievance dated September 1, 2019, against CO Schroeder, CO Kassen, Sgt. Sirvent, and Lt. Masner regarding the August 18, 2019, incident "by placing the envelopes containing said grievance in the Facility designated depository mail box located in A-Block for its delivery via the Facility mail process." *Id.* at 26. Parmiter asserts the Auburn grievance office received Plaintiff's grievance dated September 1, 2019, sometime between September 15 and September 17, 2019, approximately 28 days after the alleged August 18, 2019, incident. (Dkt. No. 99-4 at 4.) On September 17, 2019,

---

[2] Defendants incorrectly refer to CO Kassen as CO "Klason" in their motion for summary judgment. (*See* Dkt. No. 99-5 at 7-13; Dkt. No. 73 at 1 n.1; Dkt. No. 56.)

[3] Although Lt. Masner is a named Defendant, Defendants do not directly address the First Amendment retaliation claim against him in their brief. (*See* Dkt. No. 99-5 at 7-13.) The Court assumes this was an oversight and will address the claim against Lt. Masner here.

Parmiter returned Plaintiff's grievance and notified him it was untimely because the office

received it beyond the 21-day timeline as provided in Directive #4040. *Id.* On September 24,

2019, in response to Plaintiff's letter dated September 18, 2019, Parmiter advised Plaintiff via

memorandum to provide the inmate grievance office with mitigating circumstances for the

untimely submitted grievance. *Id.* Parmiter, as the IGP supervisor at Auburn, determined

Plaintiff's subsequent letter dated September 26, 2019, lacked mitigating circumstances to justify

Plaintiff's untimely submission and ultimately denied the grievance. *Id.* at 4-5. As a result,

Plaintiff's grievance dated September 1, 2019, was rejected and "never filed." *Id.* at 5. Plaintiff

did not file any subsequent grievance regarding the denial of his grievance dated September 1,

2019. *Id.*

On September 27, 2019, Plaintiff asserts he saw Parmiter and asked about his grievance

dated September 1, 2019. (Dkt. No. 51-1 at 28.) Parmiter told Plaintiff she did not file the

grievance as she received it "'Two weeks' after" and would not file or process it because she

"did not feel like doing so." *Id.* She further told Plaintiff if he "valued his . . . life," he would

"not make an[y] further attempts to file this grievance complaint because next time will be more

than a 'Keeplock' confinement." *Id.* at 28-29. Plaintiff also claims Parmiter did not file the

grievance dated September 1, 2019, to "cover-up" for CO Schroeder, CO Kassen, Sgt. Sirvent,

and Lt. Masner by preventing the creation of any official record of Defendants' misconduct. *Id.*

at 29.

"Retaliation is not 'reasonably inferred' where a plaintiff's protected speech does not

involve the defendant alleged to have retaliated against him." *Coleman v. Racette*, No. 9:18-CV-

390 (MAD/CFH), 2021 WL 4312392, at *9 (N.D.N.Y. May 27, 2021) (citing *Wright v. Goord*,

554 F.3d 255, 274 (2d Cir. 2009)). "Retaliation claims have been dismissed when they are

supported only by conclusory allegations that the retaliation was based upon complaints against another officer." *Jones v. Fischer*, No. 9:10-CV-1331 (GLS/ATB), 2013 WL 5441353, at \*21 (N.D.N.Y. Sept. 27, 2013); *see also Hare v. Hayden*, No. 09-CV-3135 (RWS), 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."); *Wright*, 554 F.3d at 274 (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about a prior incident involving a different, nonparty corrections officer). However, in some cases, "causation may be established even if a prisoner's protected conduct was not directed at the defendant." *Kotler v. Boley*, No. 21-CV-1630, 2022 WL 4589678, at \*2 (2d Cir. Sept. 30, 2022) (citing *Davis*, 320 F.3d at 354).

> While a plaintiff who "alleges retaliatory adverse action by one officer for a grievance filed against another officer . . . faces a heightened burden of establishing a causal connection," this does not necessarily bar a retaliation claim where there are indications of "a retaliatory purpose - i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances."

*Moreau v. Ellsworth*, No. 9:20-CV-124 (DNH/ATB), 2021 WL 3813172, at \*11 (N.D.N.Y. July 15, 2021), *report and recommendation adopted*, 2021 WL 3793772 (N.D.N.Y. Aug. 26, 2021), *reconsideration denied*, 2021 WL 5332168 (N.D.N.Y. Nov. 16, 2021) (citations omitted).

To the extent Plaintiff asserts CO Kassen, Sgt. Sirvent, Lt. Masner, and Parmiter retaliated against him for filing a grievance against CO Schroeder, Plaintiff has not demonstrated the requisite "indications of 'a retaliatory purpose'" on Defendants' parts. *Moreau*, 2021 WL 3813172, at \*11. Here, Plaintiff claims CO Kassen remarked "So the Mexican knows how to write english, snitching hick" the same day CO Schroeder issued the August 18, 2019, misbehavior report. (Dkt. No. 51-1 at 11.) (internal quotation marks omitted). He also claims Parmiter told Plaintiff if he valued his life, he would "not make an[y] further attempts to file [the

grievance dated September 1, 2019,]" because next time would result in "more than" keeplock confinement. *Id.* at 28-29. Plaintiff does not claim CO Kassen, Sgt. Sirvent, or Lt. Masner made statements expressing they assisted in the issuance of a false misbehavior report because Plaintiff had filed a grievance against CO Schroeder. *See Walker v. Senecal*, No. 9:20-CV-0082 (AMN/CFH), 2023 WL 3322599, at *11 (N.D.N.Y. Jan. 27, 2023), *report and recommendation adopted*, 2023 WL 3051647 (N.D.N.Y. Apr. 24, 2023) ("Plaintiff has not proffered any evidence supporting a retaliatory motive on the part of defendant for the alleged verbal threats beyond stating that the alleged threat was 'in retaliation for the plaintiff's protect[ed] activit[y]' of filing or attempting to file the amended complaint in his civil rights action.") (alterations in original) (citation omitted). Nor does he allege Parmiter stated she did not file Plaintiff's grievance dated September 1, 2019, because of the previous grievance Plaintiff had filed against CO Schroeder. *Id.*

Moreover, Plaintiff's deposition testimony seemingly contradicts his claims as to Parmiter's motive in not filing the grievance dated September 1, 2019. At his deposition, Plaintiff testified Parmiter's motivation for not filing his grievance was not necessarily retaliation in and of itself but rather she was assisting in covering up retaliation by others:

> Q.    Is it your contention that Cheryl Parmiter was retaliating against you for grievances you filed against Officer Schroeder?
> A.    Let's – let's refer that *I would like to refer to as she was assisting cover up the retaliation that was already taking place. There's a difference.*
> Q.    And by -- by -- by that you mean she was refusing to file your grievance?
> A.    Yes.
> Q.    Okay.
> A.    And the threat. And the others. The -- so she was assisting covering up.

(Dkt. No. 99-2 at 51.) (emphasis added).

18

Plaintiff makes a similar argument in his Additional Statement of Material Facts, claiming Parmitel's refusal to file and process his grievance "will help prevent Defendant Schroeder, Kassen, Sirvent and [Masner] . . . from being imposed additional &/or a more severe disciplinary sanction for their retaliatory misconduct." (Dkt. No 109 at 6.) Plaintiff does not attempt to allege or support an argument that Parmiter's refusal to file his grievance in order to cover up for other officers' misconduct amounts to a First Amendment violation. *See Walker*, 2023 WL 3322599, at *9.

In sum, Plaintiff has not demonstrated CO Kassen, Sgt. Sirvent, Lt. Masner, and Parmiter had a motive to retaliate against him for his grievance against CO Schroeder. His conclusory and speculative allegations are insufficient to support "an inference of a causal connection between" the protected conduct and the alleged false misbehavior report and refusal to file a grievance. *See Baskerville*, 224 F. Supp. 2d at 732; *Hare*, 2011 WL 1453789, at *4; *Wright*, 554 F.3d at 274. As Plaintiff fails to show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline[,]" Plaintiff's retaliation claims against CO Kassen, Sgt. Sirvent, Lt. Masner, and Parmiter lack merit and dismissal is recommended. *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996); *Celotex Corp.*, 477 U.S. at 323.

## IV.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 99) be **GRANTED**;

19

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**</u>.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**SO ORDERED.**

Dated: August 22, 2023
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[4]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2010 WL 6428400

2010 WL 6428400
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James Malik PAGE, Plaintiff,
v.
Syed HAIDER–SHAH, Defendant.

No. 9:09–CV–68 (FJS/ATB).
|
March 2, 2010.

**Attorneys and Law Firms**

James Malik Page, pro se.

Roger W. Kinsey, Asst. Attorney General for Defendant.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to Magistrate Judge Gustave J. Di Bianco for Report and Recommendation by Senior District Judge Frederick J. Scullin, Jr., pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). After Magistrate Judge Di Bianco's retirement, the case was reassigned to me by Chief District Judge Norman A. Mordue on January 4, 2010. (Dkt. No. 17).

In this civil rights complaint, plaintiff alleges that defendant Haider–Shah denied plaintiff constitutionally adequate medical care. (Dkt. No. 1). Plaintiff seeks substantial monetary and injunctive relief. Presently before the court is defendant's motion to dismiss the action for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 9). Plaintiff has responded in opposition to the motion. (Dkt. No. 16). For the following reasons, this court agrees with defendant and recommends dismissal of this action for failure to exhaust administrative remedies.

### DISCUSSION

**I.** *Facts and Procedural History*
In a very lengthy complaint, containing twelve numbered causes of action, plaintiff essentially claims that defendant Dr.

Syed Haider–Shah denied plaintiff constitutionally adequate medical care while plaintiff was incarcerated at Marcy Correctional Facility (Marcy) from March 6, 2008 until he was transferred to Mid–State Correctional Facility (Mid–State) on May 27, 2008. (Compl. at 2–12) (Dkt. No. 1).

Plaintiff alleges that he was transferred to Marcy on March 6, 2008, and that he was screened upon his arrival by the Marcy medical department. (Compl. at 2). The screening resulted in a finding that plaintiff was "in good health," his weight was 154, he had no "other illnesses besides his [HIV]," and that the HIV was "fine and stable." *Id.* (brackets in original). Plaintiff claims that after his arrival at Marcy, he "worked-out everyday lifting weights, hitting the heavy bag and running." *Id.*

On March 15, 2008, [1] plaintiff began to feel ill, suffering from chills, fever, and body aches. *Id.* Plaintiff was seen by a nurse at "sick call," who told plaintiff that he had a slight fever and a cold, gave him some cold tablets, and sent him back to his housing unit. (Compl. at 3). Plaintiff states that he did not get any better and went back to sick-call on March 19 or 20, 2008. *Id.* At that time, plaintiff was suffering from body aches, chest pains, and loss of strength. *Id.* The nurse put plaintiff on the list to see the doctor. *Id.*

---

[1]   The complaint states that the date was March 15, **2007,** but this is clearly a typographical error since plaintiff did not arrive until March 6, **2008.** (Compl. at 2).

---

Plaintiff states that as a result, he was examined by defendant Dr. Haider–Shah. [2] Dr. Haider–Shah told plaintiff that he had either "the flu or walking pneumonia" and ordered x-rays and antibiotics. (Compl. at 3). Plaintiff still did not get better and states that, although he went to sick-call "numerous times," he just kept getting worse. *Id.* At one of the sick-call visits, the nurse took plaintiff's weight, [3] gave plaintiff more cold tablets, and put plaintiff on the list to see the doctor again. *Id.* The date is unclear from the complaint, but plaintiff states that when he saw Dr. Haider–Shah the second time, the doctor saw that plaintiff's weight was down to 136 pounds, administered some medical tests, gave plaintiff some "supplements," and made an appointment for plaintiff to see "the HIV/AIDS Specialist" to determine whether plaintiff's HIV infection was causing his current symptoms. (Compl. at 4). Plaintiff was examined by the "Specialist and was given an examination that same day ...." *Id.* The tests showed that plaintiff's "TC4–Cell Count and Viral Load Count" were "both good." *Id.*

According to the "Specialist," plaintiff's HIV infection was not the cause of his symptoms, and that his "Counts were real good." *Id.*

2   No date for this examination is specified in the complaint, however, it appears that plaintiff was examined by the doctor shortly after the nurse put plaintiff on the list.

3   Plaintiff states that his weight went down to 144 pounds. (Compl. at 3).

**\*2** Plaintiff states that he continued to lose weight and became so weak that he could no longer make it to the mess hall to eat. *Id.* Plaintiff saw Dr. Haider–Shah again and told him that he was becoming so weak that even small objects would fall out of his hands. (Compl. at 5). Plaintiff claims that Dr. Haider–Shah examined him and made various observations, including that plaintiff could not apply pressure with his hands, his "incimes [sic]"[4] were very high, his muscles were beginning to waste away, and plaintiff had lost approximately 39 pounds in the last three weeks. *Id.* Dr. Haider–Shah ordered more blood tests and prescribed a medication for plaintiff that was designed to help him gain back some weight. *Id.*

4   Plaintiff could be trying to say that his "enzymes" were very high. Plaintiff appears to be referring to his liver enzymes. (Compl. at 5).

Plaintiff states that the medication did not work, and instead caused stomach pain and facial swelling, forcing plaintiff to stop taking it. *Id.* Plaintiff states that his condition continued to get worse. *Id.* He states that he began falling down, was not able to sleep, and was in pain. *Id.* Plaintiff continued to go to sick-call and complain that he was not getting "proper care and medical treatment." *Id.* Plaintiff states that he persisted in asking Dr. Haider–Shah what was wrong, but that the doctor did not respond to plaintiff's questions. (Compl. at 6). Plaintiff alleges that he lost another six pounds, making a total weight loss of 45 pounds. *Id.* Plaintiff claims that he asked Dr. Haider–Shah to send him to a hospital, but instead, the doctor told him "not to worry that everything was going to be alright" and sent plaintiff back to the dormitory. *Id.*

Plaintiff states that "the following morning" he went to emergency sick-call because he discovered blood in his stool and a sore on his penis. *Id.* Plaintiff saw Dr. Haider–Shah, who ordered a urine sample and allegedly laughed at plaintiff's swollen face.[5] *Id.* Plaintiff states that he told Dr. Haider–

Shah that it was not funny, and that the State Department of Professional Conduct wanted to speak with him regarding plaintiff's illness and what the doctor was doing about it. *Id.* Plaintiff claims that the doctor got angry with him and sent plaintiff out of the office. *Id.*

5   Plaintiff states that his face was swollen due to the medication that Dr. Haider–Shah had prescribed earlier. (Compl. at 6).

Plaintiff alleges that his condition continued to get worse, his system was beginning to "shut down," and there were times that plaintiff could "not function." (Compl. at 7). Plaintiff claims that when he went to sick-call again, he saw the doctor, but he also he overheard a nurse saying that plaintiff was in "terrible shape," and that she did not understand why Dr. Haider–Shah did not send plaintiff to the "Hospital." *Id.* Plaintiff saw Dr. Haider–Shah again on April 3, 2008.[6] *Id.* Plaintiff states that he was still unable to hold objects, walk long distances, and was having trouble getting up in the morning. *Id.* Plaintiff states that he was taking sixty milligrams of morphine twice per day. Plaintiff again asked Dr. Haider–Shah to send plaintiff to the "Hospital" because he believed that the doctor was not "looking out for the plaintiff's best interest." *Id.*

6   This reference is the first time that plaintiff includes a date since in the beginning of the complaint that he saw Dr. Haider–Shah for the first time on March 19 or 20 of 2008. (Compl. at 3–7).

**\*3** Plaintiff claims that on May 21, 2008, Dr. Haider–Shah told plaintiff that he did not know what was wrong with him, did not know how to help the plaintiff, and that he was sorry that he could not help him. (Compl. at 8). Dr. Haider–Shah told plaintiff he was going to order more blood tests. *Id.* Plaintiff states that on the same day, he wrote to the New York State Department of Health and Professional Medical Conduct to report Dr. Haider-Shah's failure to give plaintiff proper medical care. *Id.* Plaintiff states that he was not aware of "all the numerous complaints that were filed against doctor Syed, concerning his failure to give other people and inmates proper medical treatment." *Id.*

Dr. Haider–Shah next examined plaintiff on May 26 or 27, 2008. *Id.* Plaintiff claims that he was chronically ill, could barely walk, was terribly weak, had a high fever, could not sleep, and his liver enzymes were "off the charts." (Compl. at 8–9). Plaintiff told Dr. Haider–Shah that he was not leaving until the doctor did something to help him. *Id.* Plaintiff claims

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 23 of 279
Page v. Haider-Shah, Not Reported in F.Supp.2d (2010)
2010 WL 6428400

that Dr. Haider–Shah called the "clinic officer" to escort plaintiff out of the office, however, for some reason, the officer asked the doctor about plaintiff's condition. Plaintiff claims that Dr. Haider–Shah told the officer that he did not know what was wrong with plaintiff and could not help him. *Id.* At that time, plaintiff claims that a nurse noticed something wrong with plaintiff's eyes. *Id.* After Dr. Haider–Shah examined plaintiff's eyes, he told plaintiff that he was sending plaintiff to Mid–State "because there was a medical Specialist coming there on Monday," and Dr. Haider–Shah wanted the specialist to examine plaintiff. *Id.*

Plaintiff states that he was sent to Mid–State the same day over his objection and request to be sent to a "proper Hospital." *Id* . Plaintiff was examined by a "Specialist" at Mid–State, who took plaintiff off all of his medications. *Id.* On June 3, 2008, plaintiff claims that he was sent to "SUNY University Hospital" by the medical staff at Mid–State because plaintiff's condition "had become Critical and Life Threatening." (Compl. at 10).

Plaintiff claims that when he arrived at the hospital, the doctors told him that he was not going to live long and was "placed on 'Hospic'[sic]." [7] Plaintiff claims that the doctors told plaintiff that defendant Haider–Shah had "waited a long time," and that they did not know if they could help him. (Compl. at 11). Although plaintiff's condition ultimately improved, he claims that Dr. Haider–Shah's failure to send plaintiff to the hospital caused a variety of conditions, including liver failure, pneumonia, cirrhosis, jaundice, heart problems, and muscle atrophy, to name only a few. (Compl. at 12).

[7]     The court assumes that plaintiff means "Hospice."

Plaintiff filed this civil rights complaint on January 21, 2009. (Dkt. No. 1). In his complaint, plaintiff states that he did not file any prison grievances regarding the conduct alleged in the complaint. (Dkt. No. 1 at 2). Plaintiff originally named Dr. Haider–Shah and the Department of Correctional Services (DOCS) as defendants. (Compl. at 1). The complaint contains twelve causes of action, most of which are simply various allegations of deliberate indifference by Dr. Haider–Shah, [8] one of which is an attempt to make a claim against DOCS for the denial of constitutionally adequate medical care, [9] and one of which includes both Dr. Haider–Shah and DOCS. [10] (Compl. at 13–32). On February 3, 2009, Senior Judge Scullin issued an order granting plaintiff's motion to proceed *in forma pauperis,* ordering the service of the complaint on defendant

Haider–Shah, but ordering dismissal of the complaint against DOCS based on Eleventh Amendment immunity. (Dkt. No. 6). Thus, the only remaining defendant is Dr. Haider–Shah.

[8]     Causes of Action Nos. 1–9, 11–12 all refer to various deficiencies in Dr. Haider–Shah's care. (Compl. at 13–26, 30–32).

[9]     Cause of Action No. 10 states that DOCS was named due to its employment of defendant Haider–Shah. (Compl. at 27).

[10]     Cause of Action No. 11 appears to claim that "defendants" showed deliberate indifference, although it actually refers only to Dr. Haider–Shah by name. (Compl. at 30–31).

## II. *Motion to Dismiss*

**\*4** To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007)). *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 93–94 (2007) (citations omitted). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (per curiam).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). Finally, in the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted).

2010 WL 6428400

In his motion to dismiss, defendant Haider–Shah argues that plaintiff has failed to state a claim for cruel and unusual punishment, has failed to exhaust his administrative remedies, and argues that he is entitled to qualified immunity from the assessment of damages. (Dkt. No. 9). Plaintiff argues that the exhaustion requirement should be excused in his case. (Dkt. No. 16–2 at 5–6). This court finds that plaintiff has failed to exhaust his administrative remedies and will thus recommend dismissal of his complaint on that basis.

### III. *Exhaustion of Administrative Remedies*

#### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore,* 2005 U.S. Dist. LEXIS 6070, *12–15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004)). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at *12–13 (citing *Giano,* 380 F.3d at 675).

**\*5** In *Jones v. Bock,* 549 U.S. 199, 218–19 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Woodford,* the Court concluded that the inmates did not properly exhaust their administrative remedies when their grievances were dismissed because the inmates had missed the deadlines set forth in the grievance procedure. *Id.* at 93.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/ her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings in his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Pursuant to these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**\*6** Even after *Woodford,* courts have continued to assume that there are exceptions to the exhaustion requirement, particularly where defendants' conduct is such that they will be estopped from asserting the defense. *See Smart v. Goord,* 04 Civ. 8850, 2008 U .S. Dist. LEXIS 16053, *5– 7 (S.D.N.Y. March 3, 2008) (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (plaintiff claimed, *inter alia,* that prison officials beat him, threatened him, and denied him

2010 WL 6428400

grievance forms)); *Amador v. Superintendents of the Dep't of Correctional Svcs.,* 03 Civ. 650, 2007 U.S. Dist. LEXIS 89648, *14–24 (S.D.N.Y. Dec. 4, 2007) (discussing viability of exceptions to exhaustion after *Woodford v. Ngo* ).

In *Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007), the Second Circuit cited *Woodford,* and also considered whether the defendants' actions would have estopped them from asserting the defense of non-exhaustion. In *Davis v. State of New York,* the Second Circuit continued to utilize this three-part test to determine whether a plaintiff properly exhausted his remedies.[11] *Davis v. State of New York,* 311 Fed. Appx. 397, 399 (2d Cir.2009). In *Shariff v. Coombe,* the district court stated that although there was "some doubt" regarding the "viability" of the Second Circuit's three-part inquiry after *Woodford,* it did not address the issue, finding that the plaintiff had not shown that exhaustion should be excused in any event. *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n7 (S.D.N.Y.2009). *See also Mateo v. Alexander,* 2010 U.S. Dist. LEXIS 11270, *12 n. 3 (S.D.N.Y Feb. 9, 2010) (discussing the lack of a definitive ruling regarding exceptions to exhaustion requirement after *Woodford* ). As discussed below, this court finds that plaintiff has not shown that the exhaustion requirement should be excused, and thus, plaintiff's case should be dismissed regardless of whether exceptions to the exhaustion requirement continue to exist after *Woodford.*

[11]     This court also notes that, based upon the concurring opinion in *Woodford,* it appears that the Second Circuit decisions have **not** been overruled in that respect. In his concurring opinion in *Woodford,* Justice Breyer specifically noted that two circuits, the **Second** Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 548 U.S. at 104 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a ***traditional exception that the statute implicitly incorporates."*** *Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

### B. Application

Plaintiff concedes that he did not file any grievances regarding the medical issues he now raises in this complaint. (Compl. at 2). Instead, plaintiff argues that he was told that the grievance process could not do anything about medical issues. *Id.* Plaintiff complains that the grievance program does not function in the proper manner. He also was worried that he would be harassed or would not be seen by medical personnel if he filed a grievance. *Id.* Plaintiff stated that he told his Housing Officer and his Counselor that he was not receiving the proper medical treatment and was told by his Counselor that he "would look into it." *Id.* In his memorandum in opposition to defendant's motion to dismiss, plaintiff claims that he did not have to exhaust his administrative remedies because his life was in jeopardy, and that if he had exhausted his administrative remedies, he would not be here today. (Pl. Mem. at 5) (Dkt. No. 16–2).

 *7  There is no question that the grievance process was "available." Plaintiff does not state that Dr. Haider–Shah or any other corrections official prevented him from filing a grievance, only that some unspecified individual told him that he could not grieve medical issues. Plaintiff's claim is completely conclusory and without foundation. His mistaken belief that the grievance process would not help him, would have been ineffective, or futile is not sufficient to excuse him from the exhaustion requirement. *Shariff,* 655 F.Supp.2d at 286. His allegation that he mentioned the lack of proper treatment to a Counselor, and was told that he would "look into it," is insufficient to constitute proper exhaustion. *See Macias v. Zenk,* 495 F.3d at 42–44 (informal complaints insufficient for proper exhaustion).

Plaintiff also claims that he did not exhaust his administrative remedies because his life was in jeopardy. However, plaintiff does not explain why exhausting his administrative remedies would have created a greater delay, would have made his medical condition worse, or would have created a greater danger than he was already allegedly facing. In fact, if plaintiff had filed a grievance regarding his medical care, he might have obtained an investigation, and perhaps he could have been treated sooner if appropriate. This action was not filed until January of 2009, while a grievance would have been filed contemporaneously to the care he was receiving. Thus, plaintiff has not established any special circumstances to justify excusing the exhaustion requirement and this action should be dismissed for failure to exhaust administrative remedies.[12]

12

Without making any substantive findings regarding plaintiff's medical care, the court would point out that plaintiff himself states that he first saw defendant Haider–Shah on March 19 or 20, 2008, and that the doctor sent plaintiff to a specialist almost immediately. (Compl. at 3–4). From the allegations in the complaint it appears that between March 19 or 20 and April 3, 2008, Dr. Haider–Shah examined plaintiff approximately eight times. (Compl. at 3–7). Plaintiff was transferred to Mid–State on May 27 or 28, 2008. (Compl. at 9). Plaintiff states that Dr. Haider–Shah was "sorry" that he could not help plaintiff, and he had plaintiff transferred to Mid–State because a specialist was scheduled to be there who could examine plaintiff. (Compl. at 8–9). Plaintiff states he was transferred "the same day" that Dr. Haider–Shah told him he was being transferred. (Compl. at 9). The court does not wish to minimize plaintiff's condition or his rapid deterioration. However, in order to rise to the level of a constitutional violation, the defendant must have been deliberately indifferent to plaintiff's serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, based upon the complaint alone, it is unlikely that plaintiff would have been successful in raising a constitutional claim regarding his medical care.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's motion to dismiss (Dkt. No. 9) be **GRANTED and the complaint be DISMISSED IN ITS ENTIRETY** based on plaintiff's failure to exhaust his administrative remedies.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 6428400

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1213943
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James Malik PAGE, Plaintiff,
v.
Syed HAIDER–SHAH, Physician,
Marcy Correctional Facility, Defendant.

No. 9:09–CV–68 (FJS/ATB).
|
March 31, 2011.

**Attorneys and Law Firms**

James Malik Page, Poughkeepsie, NY, pro se.

Office of the New York State Attorney General, Roger W. Kinsey, AAG, of Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** In a Report–Recommendation dated March 2, 2010, Magistrate Judge Baxter recommended that the Court grant Defendant's motion to dismiss the complaint and dismiss Plaintiff's complaint in its entirety for failure to exhaust his administrative remedies. *See* Dkt. No. 18. Plaintiff filed objections to the Report–Recommendation, essentially raising the same arguments that he presented to Magistrate Judge Baxter and failing to address why the Court should excuse his failure to exhaust his administrative remedies. *See* Dkt. No. 22.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party

files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Despite the conclusory nature of Plaintiff's objections, the Court has reviewed the record *de novo* in light of the issues that Plaintiff raised in those objections. Having completed that review, the Court finds his objections to be without merit.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's March 2, 2010 Report–Recommendation is **ACCEPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion to dismiss is **GRANTED** and Plaintiff's complaint is **DISMISSED;** [1] and the Court further

[1] The Court notes that, after reviewing the entire record in this case, it agrees with Magistrate Judge Baxter's assessment, that, if the Court were to review the complaint on its merits, based on Plaintiff's allegations, it is highly unlikely that he would have been successful on his deliberate indifference claims.

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1213943

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 346242
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Khari Devon COLEY, Plaintiff,

v.

W. GARLAND, et al., Defendants.

9:19-CV-00382 (LEK/ATB)
|
Signed January 20, 2023

**Attorneys and Law Firms**

Michael H. Sussman, Sussman, Watkins Law Firm, Goshen, NY, Jonathan R. Goldman, Sussman and Goldman, Goshen, NY, for Plaintiff.

Mark G. Mitchell, New York State Attorney General, Albany, NY, for Defendants W. Garland, Nathan T. Locke, William Hoffnagle, Joseph R. Granger, Randy Russell.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 *1  Plaintiff Khari Coley commenced this action pro se on April 1, 2019, alleging violations of his Eighth Amendment rights arising out of his confinement at Upstate Correctional Facility. Dkt. No. 1 ("Complaint").[1] On May 8, 2019, the Court issued a Decision and Order granting Plaintiff's IFP application and directing Plaintiff to file an amended complaint to "properly name [the unidentified] individuals as parties" to the action. Dkt. No. 7 ("May Order") at 6. In response to the May Order, Plaintiff filed an amended complaint, Dkt. No. 28 ("First Amended Complaint"), but failed to include his signature. Plaintiff later signed the Amended Complaint, Dkt. No. 31, and shortly thereafter, filed another Amended Complaint, Dkt. No. 34 ("Second Amended Complaint" or "Amended Complaint"), alleging violations of his Eighth Amendment rights including: (1) deliberate indifference to serious medical needs; (2) excessive force; and (3) failure to intervene, against defendants W. Garland, Nathan T. Locke, William Hoffnagle, Joseph R. Ranger, and Randy Russell (collectively, "Defendants").[2]

[1]    Plaintiff is now represented by counsel. Dkt. Nos. 77, 81.

[2]    Plaintiff also filed a motion to appoint counsel, Dkt. No. 30, which the Court denied. Dkt. No. 38.

On January 21, 2020, Defendants filed a motion to dismiss Plaintiff's medical indifference claim for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 57. In a Decision and Order dated September 16, 2020, the Court granted Defendants' motion to dismiss.[3] Dkt. No. 80 ("September Order").

[3]    In its Decision and Order, the Court also denied Plaintiff's motion to amend, Dkt. No. 68, and denied Plaintiff's letter motion for injunctive relief, Dkt. No. 70.

Now before the Court is Defendants' motion for summary judgment, Dkt. No. 93 ("Motion") regarding Plaintiff's two remaining Eighth Amendment claims alleging excessive force and failure to intervene. Defendants have also submitted a statement of material facts. Dkt. No. 93-9 ("Defendants' Statement of Material Facts"). Plaintiff has filed a response to Defendants' statement of material facts, Dkt. No. 100 ("Plaintiff's Response to Defendants' Statement of Material Facts") and a memorandum of law, Dkt. No. 100-1 ("Plaintiff's Memorandum"). Defendants filed a reply. Dkt. No. 101 ("Defendants' Reply"). For the reasons that follow, Defendants' Motion is granted.

**II. BACKGROUND**

**A. Factual Background**

The following facts are taken from Defendants' statement of material facts, Dkt. No. 93-2, and are undisputed unless otherwise noted. Facts unrelated to the current motion are detailed in the Court's September Order. Dkt. No. 80 at 3–5.

At all times relevant to this action, Plaintiff was confined at Upstate Correctional Facility ("Upstate C.F."). Defs.' SMF ¶ 2. At approximately 6:00 PM on October 31, 2016, Correction Officer ("C.O.") Russell was completing security rounds and passed by Plaintiff's cell. Id. ¶ 3. As Russell passed by Plaintiff's cell, he observed that a bed sheet was tied around Plaintiff's neck and that the sheet was secured to the inside of the cell door. Id. ¶ 4. Plaintiff, however, maintains that he never tied anything around his neck during this incident. Pl.'s Resp. to Defs.' SMF ¶ 4.

**\*2** According to Defendants, Russell then ordered Plaintiff to untie "the noose," but Plaintiff did not comply. Defs.' SMF ¶ 5. In response, Russell immediately called for assistance. Id. ¶ 6. Plaintiff contests these facts and denies that this conversation occurred because he asserts that he did not have anything around his neck. Pl.'s Resp. to Defs.' SMF ¶ 5.

Sergeant William Hoffnagle and other security staff responded to Russell's call for assistance. Id. ¶ 7. Hoffnagle ordered staff to enter the cell and free Plaintiff of the bed sheet around his neck. Id. ¶ 8. According to Defendants, after Garland and Locke entered Plaintiff's cell, they assisted Plaintiff to his feet and Garland removed the sheet from Plaintiff's neck. Id. ¶¶ 9–10. Plaintiff, however, disputes that anything was around his neck during this incident. See generally Pl.'s Resp. to Defs.' SMF.

Prison staff applied mechanical restraints to Plaintiff, id. ¶ 11, and Russell retrieved a gurney that the prison staff placed Plaintiff on to transport him to the infirmary. Id. ¶¶ 12–13. Plaintiff was examined in the infirmary and later transported by ambulance to an outside hospital. Id. ¶ 15. Plaintiff did not lose consciousness "during the incident." Id. ¶ 16.

Defendants state that Plaintiff told a mental health professional at Upstate C.F. that his purpose in his attempt to "hang up" was to "avoid a double cell." Id. ¶ 17. According to Defendants, when the prison staff opened the cell to stop Plaintiff from "hang[ing] up," the cell gate pulled the makeshift-noose on Plaintiff's neck and strangulated Plaintiff for a moment. Id. ¶ 18. Plaintiff again disputes that he placed anything around his neck and also denies stating that he admitted that he tried to hang himself. Pl.'s Resp. to Defs.' SMF ¶¶ 17–18.

Rachel Seguin is the Assistant Director of the Inmate Grievance Program ("IGP") of the New York State Department of Corrections and Community Supervision ("DOCCS"). Id. ¶ 20. In her capacity as Assistant Director of IGP, Seguin is the custodian of the records maintained by the Central Office Review Committee ("CORC"), the body that renders final administrative decisions under DOCCS's three-step grievance program. Id. ¶ 21. Seguin searched CORC records and determined that Plaintiff did not file a grievance appeal with CORC related to any issue connected to Plaintiff's claims in this action. Id. ¶ 22. [4]

[4]    Plaintiff disputes that these searches occurred but fails to provide any evidence to the contrary. See Pl.'s Resp. to Defs.' SMF ¶¶ 21–22.

Similarly, Sherri Debyah is an Inmate Grievance Program Supervisor at Upstate C.F. and is responsible for keeping records of grievances filed by inmates at that facility. Id. ¶ 23. At all times relevant to this action, Upstate C.F. had a fully functioning inmate grievance process available. Id. ¶ 24. [5] Based upon her search of the Inmate Grievance Program files, Debyah concluded that the Upstate C.F. Inmate Grievance Program did not contain records of any grievance filed by Plaintiff relating to the issues in the present action. Id. ¶ 25. Additionally, Plaintiff was familiar with the different steps of the inmate grievance process, id. ¶ 26, and had filed grievances at Upstate C.F. about other incidents. Id. ¶ 27.

[5]    Plaintiff disputes that Upstate C.F.'s grievance process functioned properly but fails to specifically point to any issues associated with Upstate C.F.'s grievance process beyond a general citation to Plaintiff's deposition. See Pl.'s Resp. to Defs.' SMF ¶ 24.

### III. STANDARD OF REVIEW

**\*3** Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing a court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not rely on mere conclusory allegations, speculation or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson, 477 U.S. at 252. At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S 133, 150 (2000), and "eschew credibility assessments[,]" Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

Defendants argue there are no genuine disputes of material fact regarding Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"); (2) Plaintiff's assertions are contradicted by the record and thus raise no constitutional violations; and alternatively (3) Defendants are entitled to qualified immunity. Mot. at 5–15.

The PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Johnson v. Killian, 680 F.3d 234, 238 (2d Cir. 2012) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)). "[T]he PLRA exhaustion requirement requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006). In other words, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." Killian, 680 F.3d at 238 (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

*4 Nevertheless, the PLRA "contains its own textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement hinges on the availab[ility] of administrative remedies." Ross v. Blake, 578 U.S. 632, 642 (2016) (quotations omitted). The Supreme Court has identified three scenarios in which an administrative procedure may be deemed unavailable for purposes of PLRA exhaustion. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 643 (citations omitted). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Id. at 643–644. Finally, "the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

In New York State:

DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. Id. § 701.5(a). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. Id. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance and issues a written decision within two working days of the conclusion of the hearing. Id. §§ 701.5(b)(2), (3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. Id. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. Id. § 701.5(c)(3) (ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. Id. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. Id. § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. Id. § 701.5(d)(3)(ii).

Bryant v. Whitmore, No. 14-CV-1042, 2016 WL 7188127, at *4 (N.D.N.Y. Nov. 4, 2016), report and recommendation adopted, Bryant v. Thomas, 2016 WL 7187349 (N.D.N.Y. Dec. 9, 2016).

In the case of "harassment grievances," which are "grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate," New York State regulations establish an expedited procedure by which the grievance clerk forwards the grievance directly to the facility superintendent for action. 7 N.Y.C.R.R. §§ 701.2(e), 701.8(d). The inmate, however, must still initially file the grievance with the prison's grievance clerk in accordance with ordinary procedure. Id. §§ 701.8(a)–(c). The grievance supervisor will then determine whether the grievance raises a bona fide issue of harassment meriting an expedited process. Id. § 701.5(a)(2). Once a grievance is designated a "harassment grievance," the superintendent must respond within a set time frame, and the inmate may appeal directly to the next step if he receives no response within that time frame. Id. §§ 701.8(f)–(g).

Moreover, the Second Circuit has held that factual disputes concerning exhaustion under the PLRA must be determined by courts rather than juries. Messa v. Goord, 652 F.3d 305, 308–09 (2d Cir. 2011) ("[Plaintiff] argues that, unlike other aspects of exhaustion, which he concedes are properly resolved by the court, determining whether an inmate asserts a valid excuse for non-exhaustion is a task for the jury. We are not persuaded."). Likewise, exhaustion is an affirmative defense, and the burden of proof at all times, remains on the defendant. See Ferguson v. Mason, No. 19-CV-927, 2021 WL 862070, at *3 (N.D.N.Y. Jan. 7, 2021), report and recommendation adopted, 2021 WL 531968 (N.D.N.Y. Feb. 12, 2021).

*5 Here, the Court concludes that Defendants have satisfied their burden of proof. Defendants provide testimony from Seguin and accompanying records demonstrating that Plaintiff did not file the required grievance appeal with CORC. Dkt. No. 93-3. Additionally, Defendants also submit testimony from Debyah, the inmate supervisor at Upstate C.F., stating that the prison has no record of grievances filed by Plaintiff related to his claims in this action. Dkt. No. 93-4.

She also supported this testimony by providing a copy of Plaintiff's grievance list from Upstate C.F. Id. at 4.

Furthermore, the Court is unpersuaded that administrative remedies were unavailable to Plaintiff under Ross's first two exceptions. Indeed, Plaintiff testified that he had successfully filed and appealed grievances in the past at Upstate C.F., Dkt. No. 93-2 ("Plaintiff's Deposition") at 102–04, which suggests that the DOCCS grievance process was not a "dead end" or "incapable of use." Lurch v. Bui, No. 19-CV-895, 2020 WL 8450543, at *5 (N.D.N.Y. Dec. 8, 2020), report and recommendation adopted Lurch v. Jones, 2021 WL 392486 (N.D.N.Y. Feb. 4, 2021) ("[T]he Court notes that the record establishes that Plaintiff has filed other grievances and appealed at least one prior grievance denial to CORC. This shows that Plaintiff did not view the filing of grievances as a dead end. It also demonstrates that he clearly understood DOCCS' inmate grievance policy and could navigate it when he wished to pursue a grievance. As such the first two exceptions identified under Ross are not applicable here") (internal citations and quotations omitted); Gonzalez v. Coburn, No. 16-CV-6174, 2017 WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) ("Plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was neither a dead-end or so opaque that Plaintiff could not avail himself of it.").

Similarly, the PLRA's third textual exception is also inapplicable here. Plaintiff argues that his grievances against Defendants never received a response, which is evidence that Defendants "destroyed his grievances and disallowed him from filing grievances." Pl.'s Mem. at 11. Because of this absence of response and presence of alleged interference, Plaintiff argues he should be excused from the PLRA's exhaustion requirement. However, Plaintiff does not provide evidence of Garland or any other Defendant meddling with his grievances that suggests the presence of interference. Id. at 10–13.

The Second Circuit's decision in Cicio v. Wenderlich is instructive. 714 Fed. App'x 96 (2d Cir. 2018). There, the plaintiff argued that the PLRA's exhaustion requirement should be waived because he never received a response to the grievance he purportedly filed. Id. at 97. The Second Circuit noted, "When a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal. Because [the plaintiff] did not exercise his right of appeal, he did not exhaust his available administrative remedies.

Accordingly, the PLRA bars the instant action." Id. at 97–98. The Second Circuit further reasoned, "We also reject Cicio's argument that the non-response to his grievance constituted manipulation, so as to excuse the exhaustion requirement." Id. at 98. Here, like Cicio, it is undisputed that Plaintiff did not file an appeal after his grievances allegedly went unheard by prison staff. And because Plaintiff did not "exercise his right of appeal, he did not exhaust his available administrative remedies," and accordingly, the Court "rejects [Plaintiff's] argument that the non-response to his grievance constituted manipulation, so as to excuse the exhaustion requirement." Cicio, 714 Fed. App'x at 97–98. As a result, because Plaintiff did not comply with DOCCS's grievance process and because he failed to provide evidence that Defendants interfered with his grievances, he has not demonstrated that the Court should waive the exhaustion requirement pursuant to the PLRA's third textual exception.

*6  As a final matter, Plaintiff argues that the exhaustion requirement should be waived because he mailed letters and appealed to other officials outside DOCCS's formal grievance process. Pl.'s Mem. at 12. However, "the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." Timmons v. Schriro, No. 14-CV-6606, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); Simons v. Campos, No. 09-CV-6231, 2010 WL 1946871, at *6 (S.D.N.Y. May 10, 2010) ("Assuming the truth of the Complaint, the plaintiff's oral statements to various officials and his letter to the superintendent fail to satisfy the ...

exhaustion requirement."). Consequently, Plaintiff's informal letters outside DOCCS's grievance process are insufficient under the PLRA's exhaustion regime.

As a result, the Court grants Defendants' motion for summary judgment because Plaintiff has failed to exhaust his administrative remedies under the PLRA. Because the Court grants summary judgment on the basis of failure to exhaust, the Court declines to address Defendants' alternative arguments.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 93) is **GRANTED** because of Plaintiff's failure to exhaust administrative remedies; and it is further

**ORDERED**, that the Clerk close this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2023 WL 346242

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3020254
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael RUIZ, Plaintiff,

v.

P. LINK, J. Reyes, Patrick Squire, Michael Blot,
Deborah Macdonald, and John Does #1-3, Defendants.

No. 20-CV-235 (CS)
|
Signed July 29, 2022

**Attorneys and Law Firms**

Michael Ruiz, Comstock, New York, Pro Se Plaintiff.

Kathryn Martin, Assistant Attorney General, Office of the
Attorney General of the State of New York, White Plains,
New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, District Judge

**\*1** Before the Court is Defendants' motion for summary
judgment. (ECF No. 66.) For the reasons set forth below,
Defendants' motion is GRANTED.

**I. BACKGROUND**

The following facts are based on Defendants' Local Civil
Rule 56.1 Statement, (ECF No. 68 ("D's 56.1 Stmt.")), and
supporting materials, and are undisputed unless otherwise
noted. [1]

[1]    Plaintiff did not file a responsive Rule 56.1
       Statement or any papers in opposition to this
       motion. Local Civil Rule 56.1 requires that
       the party opposing a motion for summary
       judgment submit a counterstatement responding
       to the moving party's statement of material facts,
       indicating which facts are admitted and which
       the opposing party contends are in dispute and
       require a trial. L.R. 56.1(b). Under the Local Rule,
       "[i]f the opposing party ... fails to controvert a
       fact so set forth in the moving party's Rule 56.1
       statement, that fact will be deemed admitted."

Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d
Cir. 2003) (citing L.R. 56.1(c)). *Pro se* litigants
are not excused from this requirement. *SEC v.
Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340,
344 n.4 (S.D.N.Y. 2011). As Defendants served
Plaintiff with the requisite notice pursuant to
Local Civil Rule 56.2, (*see* ECF No. 72), I have
discretion to consider any properly supported facts
in Defendants' Local Civil Rule 56.1 Statement
admitted. (The Court will send Plaintiff copies of
any unpublished decisions cited in this Opinion
and Order.) But granting Plaintiff solicitude, I have
considered his deposition testimony, (ECF No.
71-2 ("P's Depo.")), statements in his complaint
and amended complaint, both of which are sworn
under penalty of perjury pursuant to 28 U.S.C. §
1746, (ECF Nos. 2, 30), and his letter in response
to Defendants' pre-motion letter, (ECF No. 65). *See
Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.
2001) ("[W]hile a court is not required to consider
what the parties fail to point out in their Local
Rule 56.1 statements, it may in its discretion opt
to conduct an assiduous review of the record even
where one of the parties has failed to file such a
statement.") (cleaned up).

**A. Facts**

Plaintiff Michael Ruiz is incarcerated in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"). (D's 56.1 Stmt. ¶ 1.) Plaintiff's
claims arose while he was held at Green Haven Correctional
Facility. (*Id.* ¶ 2.) Plaintiff brings this lawsuit in connection
with an altercation in the prison yard on April 6, 2019 and
the medical treatment he received thereafter. (*Id.* ¶¶ 3-4.)
He alleges excessive force claims against Defendants Link,
Reyes, Squire and Blot, and a claim of deliberate indifference
to medical needs against Defendant MacDonald. [2]

[2]    Defendants move for summary judgment on all
       of Plaintiff's claims on the ground that he failed
       to exhaust his administrative remedies, and in
       the alternative for summary judgment only on
       Plaintiff's deliberate medical indifference claim.
       (*See* ECF No. 67 at 1.) Because I resolve the motion
       on the basis of failure to exhaust administrative
       remedies, I do not describe the specific allegations
       further.

**\*2**  The altercation and medical treatment at issue occurred on April 6, 2019. (Ds' 56.1 Stmt. ¶¶ 3-4.) That same day, Plaintiff was transferred from Green Haven to Sing Sing Correctional Facility. (*Id.* ¶ 22.) While at Sing Sing, Plaintiff filed a grievance, dated April 9, 2019,[3] alleging that on April 6, 2019, correction officers used excessive force against him, and medical staff failed to properly treat him. (D's 56.1 Stmt. ¶ 24; *see* ECF No. 71-6.) The grievance was denied by the Sing Sing Superintendent on July 26, 2019. (D's 56.1 Stmt. ¶ 25; ECF No. 71-7.) Plaintiff testified at his deposition that he did not receive a copy of the Superintendent's denial until October 9, 2019, when he received a memo from Sing Sing's Inmate Grievance Program ("IGP") Supervisor, dated August 30, 2019. (P's Depo. at 79:22-80:13; *see* ECF No. 65-6.) The letter informed Plaintiff that his grievance had been answered on July 26, 2019 and forwarded to Plaintiff at that time; the Supervisor included with the memo a copy of the Superintendent's July 26 denial. (*Id.*) The bottom portion of the Superintendent's denial letter is a form the inmate can fill out if he wishes to appeal; it states, "[R]eturn this copy to your Inmate Grievance Clerk." (ECF No. 71-7.)[4] By the time Plaintiff received the letter and the copy of the Superintendent's denial on October 9, Plaintiff had been transferred out of Sing Sing and was being held in the Special Housing Unit ("SHU") at Elmira Correctional Facility. (Ds' 56.1 Stmt. ¶ 26; P's Depo. at 78:8-19, 78:25-79:21.)[5]

[3]    Defendants state in their Rule 56.1 statement that Plaintiff's grievance is dated April 22, 2019, but that is the date on which the grievance was stamped as received by the facility. (*See* ECF No. 71-6.)

[4]    The form is captioned "Appeal Statement," and below the caption it reads: "If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from your receipt of this notice to file your appeal.\* Please state why you are appealing this decision to C.O.R.C." The asterisk leads to a statement about how to request an exception to the time limit. Below the language quoted above are several lines for the inmate to explain why he is appealing, and then signature lines for the inmate and the Grievance Clerk.

[5]    Plaintiff notes that it is possible he had not previously received the Superintendent's denial because much of the time he was at Sing Sing he was housed in the Office of Mental Health ("OMH") unit after several suicide attempts between June and September of 2019. (P's Depo. at 78:5-19.)

DOCCS records reflect that the Central Office Review Committee ("CORC") never received any appeal of the Superintendent's denial of Plaintiff's grievance. (D's 56.1 Stmt. ¶ 28.) Further, DOCCS records reflect that CORC did not receive any correspondence from Plaintiff at all during 2019 or 2020. (*Id.* ¶ 29; *see* ECF No. 70 ("Seguin Decl.") ¶ 13.) Plaintiff asserted in his deposition that he filled out the appeal form on October 10, 2019 and "forwarded it to CORC ... [b]y mail." (P's Depo. at 80:24-81:4; *see id.* at 82:20-83:7.) Plaintiff did not specify the address to which he mailed the appeal, but stated that he requested and received the address from the law library. (*Id.* at 82:3-19.) Plaintiff did not receive an acknowledgement of receipt or answer from CORC. (*Id.* at 81:5-7.) After several months, he filed this lawsuit. (*Id.* at 81:8-13.)

**B. Procedural History**

Plaintiff filed his original complaint on January 8, 2020, bringing claims under 42 U.S.C. § 1983 against eight Green Haven employees in their individual capacities for violations of the Eighth Amendment. (ECF No. 2.) The case was reassigned to me on February 14, 2020. At a pre-motion conference on August 28, 2020 in anticipation of a potential motion to dismiss, I granted Plaintiff leave to amend his Complaint. (*See* Minute Entry dated Aug. 28, 2020.) The Amended Complaint was filed on September 25, 2020. (ECF No. 44.) Defendants answered on April 8, 2021. (ECF No. 44.)

On May 11, 2021, I held a status conference and set a discovery schedule, (ECF No. 51), which was extended twice, (ECF Nos. 57, 60). At the close of discovery, Defendants filed a pre-motion letter in anticipation of their motion for summary judgment. (ECF No. 64.)[6] I held a pre-motion conference on November 16, 2021 and set a briefing schedule for Defendants' motion. (*See* Minute Entry dated Nov. 16, 2021.) On December 29, 2021, Defendants filed their motion papers. (ECF Nos. 66-71.) Plaintiff's opposition was initially due on January 27, 2022. Approximately one to two weeks before the due date Plaintiff left two phone messages with my chambers, requesting an extension of the briefing schedule and permission to file a motion to obtain counsel. (*See* ECF No. 74.) On January 19, 2022, I entered an Order extending Plaintiff's time to respond to the motion to February 28, 2022,

2022 WL 3020254

and advising him of his right to file a motion asking the Court to seek volunteer counsel. (*Id.*) On March 18, 2022, I received a letter from Plaintiff (dated March 14, 2022), indicating that his opposition was ready, and he just wanted permission to file it late; I granted an extension to April 6, 2022, and noted there would be no further extensions. (ECF No. 76.) On April 28, 2022, after no opposition was received, I deemed the motion fully submitted. (ECF No. 78.)

6    Plaintiff responded by letter dated November 8, 2021, but that letter was not received and docketed until November 24, 2021. (*See* ECF No. 65.)

## II. LEGAL STANDARD

**\*3** Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory

answers, or other materials ...." *Fed. R. Civ. P. 56(c)(1).* Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by *Rule 56(c)*, the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Fed. R. Civ. P. 56(e).*

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). Where, as here, the non-moving party fails to respond to the movant's summary judgment motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (cleaned up). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* (cleaned up) (emphasis omitted).

## III. DISCUSSION

### A. Exhaustion Under the PLRA

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a).* Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA mandates that a plaintiff use "all steps that the agency holds out, and do[ ] so properly" – that is, in accordance with the applicable agency rules. *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (cleaned up). Exhaustion of available administrative remedies "must be complete prior to commencement of suit" and "[t]he fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not

salvage an otherwise premature filing." *Chalif v. Spitzer*, No. 05-CV-1355, 2008 WL 1848650, at \*13 (N.D.N.Y. Apr. 23, 2008) (cleaned up).

**\*4** For inmates in New York State prison, administrative exhaustion requires compliance with DOCCS' three-tiered IGP, in which (1) the inmate must file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence, (2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the inmate must then appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2022); *McGee v. McGready*, No. 16-CV-4187, 2018 WL 2045094, at \*2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, No. 16-CV-8516, 2021 WL 981849, at \*4 (S.D.N.Y. Mar. 16, 2021); *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8. Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(f). If the Superintendent fails to respond within twenty-five days, the inmate may appeal directly to CORC. *Id.* § 701.8(g). If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC. *Id.* § 701.8(h). The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances. *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h). [7] Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

[7] The procedure to appeal to CORC under the normal, non-expedited procedures is the same. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(1)(i).

CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he "should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." *Id.* § 701.5(d)(3)(i). The IGP requires CORC to respond to an appeal within thirty days of receipt. *Id.* § 701.5(d)(3)(ii). If CORC has received an appeal and fails to rule within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit. *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

**B. Plaintiff's Failure to Exhaust**

Defendants have met their burden to demonstrate that Plaintiff failed to follow IGP procedures with regard to his CORC appeal and that CORC never received Plaintiff's appeal. Accordingly, Plaintiff failed to "properly" exhaust administrative remedies prior to filing suit. *See Amador*, 655 F.3d at 96.

Plaintiff testified that once he received the Superintendent's adverse decision on October 9, 2021, he filled out the appeal statement and "forwarded it to CORC ... [b]y mail." (P's Depo. at 80:24-81:4.) He never received confirmation that his appeal was received or any response from CORC, and after a few months he filed this lawsuit. (*Id.* at 81:8-13.)

The IGP required Plaintiff to forward the appeal to the Inmate Grievance Clerk. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(g)-(h). The form at the bottom of the Superintendent's letter also notified Plaintiff that the appeal to CORC had to be transmitted via the Inmate Grievance Clerk. (*See* ECF No. 71-7.) The IGP specifically provides that Plaintiff, having been transferred to a different facility from that in which he originally filed his grievance, should get his appeal to the proper Inmate Grievance Clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2). Nothing in the record indicates that Plaintiff followed this procedure; rather, it appears he tried to mail his appeal directly to CORC, and CORC never received the document. (*See* Seguin Decl. ¶¶ 12-13 (CORC never received appeal of Plaintiff's grievance, nor did it receive any other correspondence from Plaintiff during 2019 or 2020); ECF No. 71-8 (CORC records showing no receipt of appeal)).

**\*5** Accordingly, Plaintiff failed to properly follow the grievance procedure and has failed to exhaust his administrative remedies. *See Valverde v. Folks*, No. 19-CV-8080, 2022 WL 836310, at \*6 (S.D.N.Y. Mar. 21, 2022) ("Plaintiff did not properly comply with [the] prison

grievance procedural rules. Plaintiff ... mailed his appeal statement directly to CORC. However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk."); *Wilkinson v. Banks*, No. 2-CV-361, 2007 WL 2693636, at *6 (W.D.N.Y. Sep. 10, 2007) ("[N]o dispute exists that [the *pro se* plaintiff] did not follow correct procedure in attempting to appeal that grievance to CORC. He did not file his appeal with the Inmate Grievance Clerk as required by the regulations, but rather mailed it directly to CORC.") (cleaned up).

### C. Availability of Administrative Remedies

Although the Supreme Court has deemed exhaustion mandatory, there are circumstances under which administrative remedies may be deemed "unavailable" to an inmate, such that an inmate is not required to exhaust. *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Supreme Court identified three circumstances where administrative remedies may be unavailable. *See id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. "If the defendant has met its burden of establishing the existence and applicability of the grievance policy, the *plaintiff* bears the burden of establishing *de facto* unavailability." *Saeli v. Chautauqua County*, 36 F.4th 445, 453 (2d Cir. 2022) (emphasis in original).

Plaintiff has submitted no opposition to the instant motion and has not argued that administrative procedures were unavailable to him. *See Dowling v. Barkman*, No. 17-CV-647, 2019 WL 7971868, at *5 (N.D.N.Y. Dec. 20, 2019) ("Given Plaintiff's failure to oppose the Motion, no basis appears on the record for concluding that DOCCS' grievance procedure was unavailable to him."), *report and recommendation adopted sub nom. Dowling v. Schleicher*, 2020 WL 103480 (N.D.N.Y. Jan. 8, 2020). Even if that were not the case, the record does not reflect that any of the above-listed circumstances apply.

First, nothing in the record suggests that Plaintiff did not receive a response from CORC because the grievance process was operating as a "dead end" – rather, it appears that CORC never received Plaintiff's appeal because of Plaintiff's failure to send the appeal to the appropriate official. (*See* P's Depo. at 80:24-81:4; Seguin Decl. ¶¶ 12-13; ECF No. 71-8.) Similarly, the record is bereft of evidence that the IGP is unavailable to inmates generally. *See White v. Veile*, 709 F. App'x 35, 38 (2d Cir. 2017) (summary order) (affirming summary judgment for failure to exhaust administrative remedies where plaintiff did not "present[ ] any evidence about the outcomes in the grievance system in general" or "show[ ] that prison officials are consistently unwilling to grant relief").

Second, as set out above, the relevant procedures are not opaque. The IGP clearly sets out the process for appealing a grievance to CORC through the Inmate Grievance Clerk – including the instructions under § 701.6(h)(2) for an inmate who has been transferred from one facility to another to send an appeal to the appropriate facility's IGP Supervisor. Plaintiff testified that he is familiar with the grievance process, (*see* P's Depo. at 18:3-19:6), and the Superintendent's denial stated that the appeal to CORC had to go through the Inmate Grievance Clerk, (*see* ECF No. 71-7).

**\*6** Third, while there is some evidence in the record that Plaintiff sought information from the "law library officer" while he was in the SHU at Elmira and appears to have been given a mailing address for CORC,[8] this fact alone is insufficient to establish that a prison official thwarted his ability to successfully appeal to CORC. Plaintiff has not suggested that he asked how to appeal and was told to mail his appeal to CORC, or that he asked the law library officer for anything other than the address of CORC. There is simply no evidence of machination, intimidation or misrepresentation.

8    Plaintiff testified as his deposition as follows:
       [Q.] So how do you know where to send the grievance appeal? ...
       A. You can actually get the address from the law library that they provide in the facility. They have all the information of addresses, names, stuff like that.
       Q. And is that what you did? You went to the law library?
       A. Yes, ma'am. I was in the special housing unit at the time, so the law library officer will actually come to you and take your request and then return the request by the next day.

(P's Depo. at 82:6-19.)

That the breakdown of the grievance procedure here was due to Plaintiff's failure to follow it, rather than to its unavailability, is highlighted by the fact that when Plaintiff did not receive confirmation that CORC was in possession of his appeal within the forty-five days envisioned by the regulations, instead of following the IGP and writing to Sing Sing's IGP Supervisor – an official with whom he had recently communicated, (*see* P's Depo. at 79:22-80:13, 81:14-21) – to confirm that the appeal was filed, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i), he simply waited a few months and then filed this lawsuit. (P's Depo. at 79:25-80:8, 81:5-13). [9]

[9]    Plaintiff's response to the question whether he ever followed up with CORC – that he "tried checking [the appeal], but it had already been months they hadn't responded, so I proceeded with my civil Complaint," (P's Depo. at 81:8-13) – not only contains no information about what he did to check, but suggests at most that he asked about the status of his appeal at or about the same time that he filed this lawsuit.

In short, "[g]iven the lack of evidence that Plaintiff's appeal to CORC was ever filed, or ever followed up on, it is not that the full scope of administrative remedies was not available to Plaintiff – rather, Plaintiff failed to fully exhaust the administrative remedies available to him." *Houston v. Coveny*, No. 14-CV-6609, 2020 WL 2494439, at *3 (W.D.N.Y. May 14, 2020); *see Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (no "sufficient basis in the record to find that administrative remedies were unavailable" where, among other things, there was "no evidence here that the plaintiff's appeal was actually mailed, intercepted, or ignored" and "DOCCS has no record of any appeal filed with CORC"). [10]

[10]    Having so found, I need not and do not address the merits of Plaintiff's medical indifference claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 83), enter judgment for Defendants, and close the case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 3020254

---

**End of Document**      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 39 of 279
Pridgen v. Beatie, Not Reported in Fed. Supp. (2018)

2018 WL 1402049

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by CLIVE DECOLINES, Plaintiff, v. D. HOLLENBECK, et al., Defendants. Additional Party Names: BJ Alvoie, DA Hallock, JH Anctil, KD St. Mary,   N.D.N.Y.,   October 25, 2021

2018 WL 1402049
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joshua PRIDGEN, Plaintiff,
v.
Officer BEATIE, Defendant.

No. 9:16-CV-535 (DNH/CFH)
|
Signed 01/17/2018

**Attorneys and Law Firms**

JOSHUA PRIDGEN, 13-R-2638, Auburn Correctional Facility, P.O. Box 618, Auburn, New York 13021, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, OF COUNSEL: MICHAEL G. McCARTIN, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Joshua Pridgen ("Pridgen"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983. Pridgen alleges that Defendant Officer Beatie ("Defendant") violated his constitutional rights under the Eighth Amendment. Dkt. No. 1 ("Compl."). An additional defendant was named, but the claims against him have since been dismissed. Dkt. No. 3 at 11-13. [2] Presently before the Court is Defendant's motion for summary judgment. Dkt. No. 25. Pridgen opposed the motion, and Defendant submitted a reply. Dkt. Nos. 39, 40. For the following reasons,

it is recommended that Defendant's motion for summary judgment be granted.

[2]    Throughout this Report-Recommendation, references to page numbers in items that appear on the docket refer to the pagination of the header numbers generated by the Court's electronic filing system, CM/ECF, not to the page numbers the parties assign in the individual documents.

**I. Background**

**A. Facts** [3]

[3]    Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*
N.D.N.Y. Local Rule 7. 1(a)(3) (emphasis in original).
Defendant filed a Statement of Material Facts. Pridgen responded and admits the facts contained in certain paragraphs of Defendant's Statement of Material Facts. Additionally, the parties annexed exhibits to their submissions, without objection

Pridgen v. Beatie, Not Reported in Fed. Supp. (2018)

2018 WL 1402049

related to the authenticity of any documents. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of this motion. See U.S. v. Painting known as Hannibal, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing Daniel v. UnumProvident Corp., 261 Fed.Appx. 316, 319 (2d Cir. 2008) (summary order) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party")). In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in non-moving party's favor. Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

**\*2** The facts are reviewed in the light most favorable to Pridgen as the non-moving party.[4] See subsection II (A) infra. At the time of the incident described in the Complaint, Pridgen was confined at Watertown Correctional Facility ("Watertown C.F."). See Compl. On June 15, 2014, Pridgen and Defendant were involved in a use of force incident. Compl. at ¶ 15. Pridgen claims that at approximately 11:00 P.M., Defendant blocked Pridgen's path as he attempted to exit the living quarters of his dorm and walk downstairs to wash his dishes. Dkt. No. 25-3 at 7. Pridgen alleges that Defendant told him that talking was not permitted after 11:00 P.M., and "smacked the dishes out of [his] hands." Id. at 7-8. Pridgen asserts that he complied with Defendant's directive to return to his bunk. Id. at 8.

[4] The record herein contains few undisputed facts. Pridgen and Defendant disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incidents. Defendant argues that Pridgen's account of the events, presented in his memorandum of law, should not be credited because it contradicts his deposition testimony. See Dkt. No. 40. To the extent that Pridgen's deposition testimony is at odds with his submissions, the Court will follow the rule that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Raskin v. Wyatt Co., 125

F.3d 55, 63 (2d Cir. 1997). The facts recited are for the relevant time period as referenced in the Complaint.

After five minutes, Pridgen went downstairs and asked another officer for a grievance form. Dkt. No. 25-3 at 8. Defendant overheard this conversation, approached Pridgen, and told him that he would "shove the grievance ... up [his] behind." Id. Pridgen maintains that he was attempting to walk away when Defendant punched him in the left eye. Id. Pridgen testified that he stumbled, and when Defendant attempted to grab him, they both fell backward. Id. Pridgen rose to his feet and complied with Defendant's order to place his hands on the wall for a frisk. Dkt. No. 25-3 at 8. Pridgen claims that Defendant then "slammed [him] down the stairs to the ground" and continued to "punch [him] in the same left eye" while unidentified officers held him down. Id. at 9.

After the incident, Pridgen was escorted to the Special Housing Unit ("SHU"). Dkt. No. 25-3 at 9-10. Officers warned Pridgen against reporting the incident. Id. Pridgen asked for a "grievance paper" and claims that he heard the officers "ripping up" his grievance. Id. at 10. Pridgen received a misbehavior report charging him with assaulting staff, violent conduct, violating a direct order, interfering with an employee, creating a disturbance, and violating frisk-procedures. Dkt. No. 25-3 at 17-18. During his Tier III disciplinary hearing related to the ticket, Pridgen pleaded guilty to all charges. Id. Pridgen was confined in the Special Housing Unit at Watertown C.F. for eleven days after the incident. Dkt. No. 25-3 at 43. He did not file a grievance at Watertown. Pridgen was transferred to Upstate Correctional Facility ("Upstate C.F."), where he remained for eighteen months. Id. While Pridgen was at Upstate C.F., other inmates told him that he should not file a grievance because he would suffer retaliation from other officers. Id. at 43-46. Thus, Pridgen also did not file a grievance related to the incident while at Upstate. Dkt. No. 25-3 at 41.

On November 5, 2014, Pridgen pleaded guilty to Assault in the Second Degree in violation of N.Y. Penal Law § 120.05(07).[5] Dkt. No. 25-3 at 20-25; Dkt. No. 25-6; Dkt. No. 25-7. During Pridgen's plea allocution, he admitted that he assaulted and caused physical injury to a corrections officer. Dkt. No. 25-8 at 7. On December 24, 2014, Pridgen was sentenced to five years confinement. Dkt. No. 25-3 at 20; Dkt. No. 25-7. Pridgen did not appeal the sentence. Dkt. No. 39-1 at 9. In his Complaint, Pridgen alleges that Defendant attacked him "without provocation." Compl. at ¶ 5(a).

Case 9:19-cv-01610-BKS-TWD   Document 112   Filed 08/22/23   Page 41 of 279
Pridgen v. Beatie, Not Reported in Fed. Supp. (2018)
2018 WL 1402049

5    The elements of second degree assault under N.Y.
Penal Law § 120.05(7) are: (1) while confined in a
correctional facility, (2) after having been charged
with or convicted of a crime, (3) an individual
causes physical injury to another person, (4) with
intent to cause such injury. See N.Y. Penal Law §
120.05(7).

**\*3** Defendant disputes Pridgen's account and claims that
heard Pridgen speaking loudly with an officer downstairs and
descended the stairway to investigate. Dkt. No. 39-2 at 2.
As Defendant approached the bottom step, Pridgen "came
at [him]" and struck him in the chest causing Defendant to
fall down the stairs. Id. Defendant asserts that Pridgen did
not comply with frisk procedures or respond to instructions.
Id. As a result, Pridgen and Defendant were involved in a
physical struggle. Id.

### B. Procedural History

On May 5, 2016, the Court received the Complaint in the
within action. Dkt. No. 1. Upon review of the Complaint,
the Court directed Defendant to respond to the Eighth
Amendment claim. Dkt. No. 3. On January 19, 2017,
Defendant filed an Answer. Dkt. No. 18. On May 26, 2017,
Pridgen appeared at a deposition. Dkt. No. 25-3. On August
3, 2017, Defendant filed this motion pursuant to Fed. R. Civ.
P. 56, seeking judgment as a matter of law with respect to
Pridgen's' Eighth Amendment claim. Dkt. No. 25. Pridgen
opposed the motion, and Defendant filed a reply. Dkt. Nos.
39, 40.

### II. Motion for Summary Judgment [6]

6    All unpublished decisions cited herein, unless
otherwise indicated, are attached to this Report-
Recommendation.

Pridgen contends that Defendant used excessive force during
the June 15, 2014 incident in violation of the Eighth
Amendment. See Comp., generally. Defendant argues that
Pridgen's Eighth Amendment is barred by Heck v. Humphrey,
512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994),
or, in the alternative, that Pridgen failed to exhaust his
administrative remedies. See Dkt. No. 25, generally.

### A. Legal Standard

A motion for summary judgment may be granted if there is
no genuine issue as to any material fact, it was supported
by affidavits or other suitable evidence, and the moving
party is entitled to judgment as a matter of law. The moving
party bears the burden of demonstrating the absence of
disputed material facts by providing the court with portions
of pleadings, depositions, and affidavits which support the
motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett,
477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Facts are material if they may affect the outcome of the
case as determined by substantive law. Anderson v. Liberty
Lobby, Inc., 477 U.S. 317, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986). All ambiguities are resolved and all reasonable
inferences are drawn in favor of the non-moving party.
Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997). The
party opposing the motion must set forth facts showing a
genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v.
Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348,
89 L.Ed.2d 538 (1986). For a court to grant a motion for
summary judgment, it must be apparent that no rational finder
of fact could find in favor of the non-moving party. Gallo
v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219,
1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342,
344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se
litigant, a court must afford the non-movant special solicitude.
See Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477
(2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," ... that a pro se
> litigant's submissions must be construed "liberally," ... and
> that such submissions must be read to raise the strongest
> arguments that they "suggest," .... At the same time, our
> cases have also indicated that we cannot read into pro se
> submissions claims that are not "consistent" with the pro se
> litigant's allegations, ... or arguments that the submissions
> themselves do not "suggest," ... that we should not "excuse
> frivolous or vexatious filings by pro se litigants," ... and
> that pro se status "does not exempt a party from compliance
> with relevant rules of procedural and substantive law.

**\*4** Id. (citations and footnote omitted); see also Sealed
Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir.
2008).

Case 9:19-cv-01610-BKS-TWD Document 112 Filed 08/22/23 Page 42 of 279
Pridgen v. Beatie, Not Reported in Fed. Supp. (2018)

2018 WL 1402049

## B. Heck v. Humphrey

Defendant argues that Pridgen's excessive force claim is barred by the Heck doctrine because the allegations in the Complaint are "directly inconsistent" with Pridgen's guilty plea to Assault in the Second Degree. Dkt. No. 25-10 at 4-10. In reply, Pridgen argues that the allegations in the Complaint do not suggest that he was innocent of the charges to which he subsequently pleaded guilty, and that he assaulted Defendant only as an attempt to defend himself from Defendant's unprovoked attack. Dkt. No. 39-1 at 5-10.

In Heck v. Humphrey, the Supreme Court of the United States created a jurisdictional prerequisite to civil suits brought under 42 U.S.C. § 1983:

> [i]n order to recover damages for harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance for a writ of habeas corpus.

512 U.S. 477, 486-87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Therefore, when an inmate seeks damages in a § 1983 action, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. Id. at 487, 114 S.Ct. 2364. Where the Heck doctrine applies, a plaintiff "ha[s] no cause of action under § 1983." Poventud v. City of New York, 750 F.3d 121, 130 (2d Cir. 2014).

"Courts in the Second Circuit have held that excessive force claims brought under § 1983 are barred by Heck when the plaintiff-prisoner has pleaded guilty to an offense that includes the element that the defendant-officer was performing a lawful duty at the time of the altercation." Manley v. Grossman, No. 13-CV-1974, 2017 WL 4326541, at *5 (S.D.N.Y. Sept. 27, 2017) (collecting cases).

However, the mere fact that a plaintiff has pleaded guilty to assaulting a law enforcement officer does not necessarily implicate Heck. Courts have held that Heck does not bar § 1983 claims where a reasonable jury could conclude that the defendant used excessive force on the plaintiff during the altercation giving rise to the assault conviction.

Id. "[D]ismissal of the excessive force claim [is] inappropriate [if] there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him." Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) ("The district court mistakenly concluded that, because appellant pled guilty to assaulting the guards and because his injuries were not severe, his claim failed as a matter of law and no reasonable jury could find in his favor.").

In support of his argument that Heck mandates dismissal because Pridgen's sworn deposition testimony is inconsistent with Pridgen's guilty plea, Defendant cites a case from the United States District Court for the Western District of New York ("Western District"), Shapard v. Attea, 08-CV-6146, 2016 WL 5871360 (W.D.N.Y. Oct. 7, 2016). See Dkt. No. 25-3 at 6-7, 11. In Shapard, the plaintiff, an inmate, was involved in an altercation with corrections officers in June 2005. Shapard, 2016 WL 5871360, at *1. Immediately after the incident, the plaintiff wrote a letter to the facility superintendent claiming that he did not assault the officers. Id. at *2. During his Tier III disciplinary hearing, the plaintiff asserted that he was attacked without provocation. Id. at *2. In July 2007, the plaintiff pleaded guilty to assaulting a corrections officer in violation of New York Penal Law § 120.05(7). Shapard, 2016 WL 5871360 at *1. In 2008, the plaintiff commenced an action in federal court alleging that three corrections officers "viciously" assaulted him in retaliation for filing grievances. Id. at *2. In the Complaint, the plaintiff did not deny that he had assaulted one of the officers. Id. During his deposition however, the plaintiff denied assaulting the officers. Shapard, 2016 WL 5871360 at *2. The District Court dismissed the plaintiff's excessive force claims as barred by Heck. Id. at *1.

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 43 of 279
Pridgen v. Beatie, Not Reported in Fed. Supp. (2018)
2018 WL 1402049

**\*5** After Defendant submitted his motion for summary judgment in this case, the Second Circuit vacated the Western District's decision in Shapard and remanded the matter for further proceedings. See Shapard v. Attea (Shapard II), No. 16-3764, 710 Fed.Appx. 15, 2017 WL 4548439 (2d Cir. Oct. 12, 2017) (summary order). On appeal, the plaintiff's counsel argued that "although Shapard believed that he did not assault Officer Attea, the use of force applied by the officers would have been excessive even if he had." Id. at \*2. The Second Circuit held that the inmate's excessive force claims were not barred by Heck because "their favorable adjudication would not 'necessarily imply the invalidity' of his prior assault conviction." Id. at \*2. The Second Circuit reasoned that, "the elements of excessive force and second degree assault under N.Y. Penal Law § 120.05(7) are not incompatible. Id. (citations omitted). The Court further noted that the plaintiff denied assaulting the officer during his deposition and disciplinary hearing, but he did not deny that he assaulted the officer in the complaint. Id. at \*2. Thus, the Second Circuit held that the plaintiff's "plausible claim of excessive force can be reconciled with his assault of Officer Attea, and is therefore not barred by Heck." Id. at \*3. Addressing the inconsistency in the plaintiff's accounts of the incident, the Court held that, "[o]n remand, the district court may take appropriate steps to prevent Shapard from disputing the assault, including limiting his testimony and instructing a jury that he assaulted Officer Attea." Id. at \*2 (citation omitted).

In a recent decision, this Court applied Shapard II to an excessive force case with facts strikingly similar to the case at hand. In Reid v. Marzano, No. 9:15-CV-761 (MAD/CFH), 2018 WL 324243 (N.D.N.Y. Jan. 8, 2018), the plaintiff was convicted of third degree assault as a result of his conduct during an excessive force incident. See Reid, 2018 WL 324243, at \*3. During his disciplinary hearing and deposition, the plaintiff denied assaulting the officer. Id. This Court denied the defendants' motion to dismiss and applied the reasoning set forth in Shapard II holding:

> ... the elements of excessive force are not incompatible with the elements of third degree assault under N.Y. Penal Law § 120.00, and Plaintiff's complaint does not actually deny that he assaulted Officer Marzano. See Dkt. No. 1 at 4. Therefore, the Court finds that Plaintiff's claims against Officer Marzano are not barred by Heck. However, as the Second Circuit noted in Shapard II, the Court may take steps to prevent Plaintiff from disputing his assault conviction, including "limiting his testimony and instructing a jury that he assaulted" Officer Marzano.

Reid, 2018 WL 324243, at \*3 (citing Shapard II, 2017 WL 4548439, at \*3, 710 Fed.Appx. 15).

In the case at hand, like the plaintiff in Shapard, Pridgen pleaded guilty to assault in the second degree. As discussed in Shapard II, the elements of assault in the second degree are not "incompatible" with excessive force. Shapard II, 2017 WL 4548439, at 2, 710 Fed.Appx. 15. Additionally, like the plaintiffs in both Shapard and Reid, in the Complaint, Pridgen claims that he was attacked without provocation, but does not explicitly deny that he also assaulted Defendant. See Compl. Also like the plaintiffs in Shapard and Reid, [7] after filing the Complaint, Pridgen testified in his deposition that he did not assault Defendant. Dkt. No. 25-3 at 15-16. Thus, applying the reasoning set forth by the Courts held in Shapard II and Reid, Pridgen's claims are not barred by Heck because his "plausible claim of excessive force can be reconciled with his assault conviction." Reid, 2018 WL 324243, at \*3 (citing Shapard II, 2017 WL 4548439, at \*3, 710 Fed.Appx. 15). Here, as in Shapard and Reid, the Court is not without options to prevent Pridgen from presenting his conflicting accounts and disputing his assault conviction before a jury.

[7]      "In this case, Plaintiff was also convicted of assault because of his conduct during the incident giving rise to his excessive force claim.2 Additionally, like the plaintiff in Shapard [sic], Plaintiff told a different story during his Tier III disciplinary hearing and his deposition in this case; in both instances, Plaintiff denied assaulting Officer Marzano." Reid, 2018 WL 324243, at \*3.

Accordingly, based upon the holdings in Shapard II and Reid, and for the reasons set forth herein, Pridgen's excessive force claim is not barred by Heck, and it is recommended that Defendant's motion for summary judgment on this ground be denied.

### C. Exhaustion

**\*6** In the alternative to his Heck argument, Defendant contends that the motion for summary judgment must be granted because Pridgen failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 25-10 at 11-15. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for

2018 WL 1402049

claims arising out of his or her incarceration. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also *Woodford v. Ngo,* 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Mauldin v. Kiff,* No. 11-CV-107-A, 2014 W L 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting *Porter,* 534 U.S. at 532, 122 S.Ct. 983). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. *Porter,* 534 U.S. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this district followed a three-part test established by the Second Circuit in *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in *Hemphill,* a plaintiff's failure to exhaust could be excused if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." *Id.* However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." *Ross v. Blake,* —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in *Hemphill,* is no longer consistent with the statutory requirements of the PLRA. *Williams v. Priatno,* 829 F.3d 118, 123 (2d Cir. 2016).

Although the Supreme Court's decision in *Ross* eliminates the "special circumstances" exception promulgated by *Hemphill,* courts must still consider the PLRA's "textual exception to mandatory exhaustion." *Ross,* 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. *Id.* The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or

consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859 (citing *Booth v. Churner,* 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

If it is found that the plaintiff has not exhausted all available administrative remedies, his or her case should be dismissed without prejudice. *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Securities Dealers, Inc.,* 560 F.3d 118, 124 (2d Cir. 2009) (citation omitted). Since "[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw," and "[i]f the time permitted for pursuing administrative remedies has not expired, a prisoner ... can cure the defect by exhausting [the available remedies] and reinstating his suit." *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir. 2003) (amended 2004) (quoting *Snider v. Melindez,* 199 F.3d 108, 111-12 (2d Cir. 1999)).

 **\*7** Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2015). [8]

[8]     First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. *Id.* at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. *Id.* at § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. *Id.* §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. *Id.* § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. *Id.* §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 45 of 279

Pridgen v. Beatie, Not Reported in Fed. Supp. (2018)

2018 WL 1402049

to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### 1. Application

The parties do not dispute that Pridgen failed to exhaust his administrative remedies. Thus, the undersigned must assess only whether administrative remedies were available to Pridgen. In that regard, Pridgen sets forth two plausible arguments to establish that administrative remedies were not available to him. First, Pridgen alleges that he attempted to file a grievance, but that the grievance was thrown out or otherwise destroyed by corrections officers. Dkt. No. 25-3 at 41-43. Next, Pridgen alleges that he did not attempt to file any further grievances due to fear of retaliation. Id. at 44-49.

### a. Allegation that Grievances were Thrown Out by Correction Officers

Administrative remedies may be unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, 136 S.Ct. at 1860. However, it is well-settled that where an inmate does not receive a response to a grievance, the inmate must appeal to the next level of review notwithstanding the lack of response at the first level of review. See Khudan v. Lee, No. 12-CV-8147, 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing the plaintiff's complaint where the plaintiff failed to appeal to the next level of review after failing to receive a response on his filed grievance). Thus, even if an inmate suspects that his grievances were discarded, he or she must still appeal the grievance despite the lack of response at the first level of review. Chiarappa v. Meyers, No. 09-CV-607, 2013 WL 6328478, at *5 ( W.D.N.Y. Dec. 5, 2013) ("[E]ven if plaintiff attempted unsuccessfully to file a grievance in a timely manner, the lack of a response does not relieve him of the requirement to timely appeal the grievance through all three steps of the grievance process."); Belile v. Griffin, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013), report and recommendation adopted by, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in

particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the [Inmate Grievance Program]").

**\*8** Here, Pridgen alleges, with no supporting evidence, that he attempted to file a grievance regarding the incidents alleged in the Complaint, but that the grievance was thrown out by correction officers. Dkt. No. 25-3 at 41-43. Pridgen's only support for this accusation is his own testimony. Even assuming, as the Court must, that Pridgen's allegations are true, he has still failed to demonstrate that administrative remedies were unavailable to him because, after his grievance was destroyed, he failed to appeal his grievance to the next level of review. See Arce v. Keane, No. 01 Civ. 2648, 2004 WL 439428, at *2 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance"). Thus, Pridgen's accusation that correction officers discarded his grievance, alone, does not excuse his failure to exhaust his administrative remedies.

### b. Fear of Retaliation

Pridgen urges the Court to excuse his failure to exhaust because he declined to file a grievance due to his fear of retaliation. Dkt. No. 25-3 at 44-49. Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable. Ross, 136 S.Ct. at 1860, n.3. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. Salmon v. Bellinger, No. 9:14-CV-0827 (LEK/DJS), 2016 WL 4411338, at *5 (N.D.N.Y. July 5, 2016). Estoppel is found where "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" occur showing that defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures. Id. at *5 (quoting Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011)).

Pridgen argues in his response in opposition that he had a "specific fear against defendant Beatie and fellow correction officers which left plaintiff with the understanding of the following equation: grievance = a punch in the eye." See Dkt. No. 39-1 at 12. Pridgen's contention that the grievance procedures were unavailable to him due to his fear of retaliation is belied by his conduct after the incident. Specifically, Pridgen testified that Beatie punched him after he asked for a grievance related to the issue involving the

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 46 of 279

Pridgen v. Beatie, Not Reported in Fed. Supp. (2018)

2018 WL 1402049

dishes. See Dkt. No. 39-1 at 11. Pridgen also testified that on the way to the SHU, officers told him not to report any of his injuries. Dkt. No. 25-3 at 9. However, despite Beatie's behavior and the subsequent warning, once Pridgen arrived in the SHU, he "received" and completed a "grievance paper" and gave the grievance to officers. Id. at 10. Pridgen does not state how any specific threat from Beatie or any other officer impacted his ability to exhaust administrative remedies related to the events that occurred on June 15, 2014. See Aviles v. Tucker, No. 14-CV-8636, 2016 WL 4619120, at *4 (S.D.N.Y. Sept. 1, 2016) (finding grievance procedures were available where the plaintiff offers conclusory allegations of fear and does not substantiate what specific fears or past acts preclude him from advancing in grievance procedures); Harrison v. Stallone, No. 9:06-CV-902 (LEK/GJD), 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement ... If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure.") (citations omitted).

Upon review of the record, the undersigned finds that much of Pridgen's alleged fear is generalized. Indeed, Pridgen offers no evidence establishing that he was threatened by any officers after the June 15, 2014 incident. For example, Pridgen testified that "inmates" at Watertown C.F. told him "generally" that he would suffer retaliation if he filed grievances. Dkt. No. 25-3 at 44-45. While confined at Upstate C.F., Pridgen was not threatened by any officers. Dkt. No. 25-3 at 47. By his own admission, Pridgen denies any actual threats or physical force being used against him which prevented him from taking part in the grievance program. See Salmon, 2016 WL 4411338, at *5 (stating there must be affirmative actions or specific instances of physical assault or threats of retaliation for plaintiff to show unavailability of the grievance process). Insofar as Pridgen suggests that he feared physical retaliation if he were to file a grievance, such a claim is further countered by the fact that the Complaint fails to mention any fear of retaliation.

*9 In conclusion, the undersigned finds that Defendant has met his burden of showing that there is no genuine issue of material fact as to Pridgen's failure to exhaust administrative remedies, and that administrative remedies were available to him. Accordingly, the Court recommends that Defendant's motion be granted on this ground, but that such dismissal be without prejudice. See Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002) (per curiam) (dismissal of a prisoner's complaint for failure to exhaust administrative remedies should be without prejudice).

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 25) be **GRANTED**; and it is further

**RECOMMENDED**, that the Complaint (Dkt. No. 1) be **DISMISSED** in its entirety, without prejudice; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN** FOURTEEN (14) DAYS **WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1402049

---

KeyCite Yellow Flag - Negative Treatment
Distinguished by Aviles v. Tucker, S.D.N.Y., September 1, 2016

2007 WL 1231485
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Victor Keven THOMAS, Plaintiff,

v.

C.O.J. CASSLEBERRY, et al., Defendants.

No. 03-CV-6394L.
|
April 24, 2007.

**Attorneys and Law Firms**

Victor Keven Thomas, Malone, NY, pro se.

Benjamin A. Bruce, New York State Office of the Attorney General, Rochester, NY, for Defendants.

*DECISION AND ORDER*

DAVID G. LARIMER, United States District Judge.

**\*1** This *pro se* prisoner civil rights action is before the Court on remand from the Court of Appeals for the Second Circuit. After this Court granted summary judgment in favor of defendants based on plaintiff Victor Thomas's failure to exhaust his administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), the Second Circuit vacated and remanded with directions to determine, in light of *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), and *Giano v. Goord,* 380 F.3d 670 (2rd Cir.2004), (1) whether plaintiff's fear of retaliation rendered administrative procedures unavailable to him, (2) if such procedures were available, whether defendants are estopped from asserting failure to exhaust as a defense, and (3) whether plaintiff was otherwise justified in not pursuing a grievance in accordance with New York Department of Correctional Services ("DOCS") procedures.

Following remand, both plaintiff and defendants submitted additional filings with this Court addressing the matters raised by the Court of Appeals in its remand order. Defendants have renewed their motion for summary judgment, and plaintiff has filed his own motion for summary judgment.

Having considered those submissions, as well as plaintiff's previously-filed papers, I conclude that plaintiff has demonstrated that ordinary DOCS grievance procedures were not available to him in the aftermath of the incident giving rise to this lawsuit, and that accordingly, the PLRA's exhaustion requirement is inapplicable to Thomas's claims. Defendants' motion is therefore denied. Plaintiff's motion is also denied, since there are genuine issues of material fact concerning the merits of plaintiff's claims.

**DISCUSSION**

In *Hemphill,* the Second Circuit remanded to the district court for consideration of "whether some seemingly available remedies were rendered unavailable by the threats Hemphill received" from the defendants. 380 F.3d at 688. In particular, the court noted that the plaintiff had alleged that, in view of those threats, his only "functionally available" remedy was to write a letter to the facility superintendent; as the court explained, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system...." *Id.*

With respect to estoppel, the court in *Hemphill* also directed the district court to consider whether the defendants' non-exhaustion defense was barred by equitable estoppel. Noting that the plaintiff alleged that one defendant, for example, had told the plaintiff that "[he]'d better drop it," warned that if the plaintiff "pursue[d] this any further," the defendant would bring criminal charges against him, and promised that if the plaintiff sought medical attention for the injuries he had suffered at the hands of the defendant, the defendant would "know about it and ... make your life a living hell throughout this penal system," *id.* at 689, the court stated that "depending on the facts pertaining to each defendant, it is possible that some individual defendants may be estopped, while others may not be." *Id.*

**\*2** As to the third issue-whether plaintiff was justified in not pursuing a grievance-the court in *Hemphill* and *Giano* stated that in some cases, "special circumstances" may render justifiable an inmate's failure to pursue or exhaust DOCS administrative remedies. *Id.; Giano,* 380 F.3d at 676. In both

those cases, for example, the court stated that the plaintiffs' reasonable misinterpretation of DOCS procedural regulations might have constituted such special circumstances. *See also Thomas v. Ashcroft,* 470 F.3d 491, 497 n. 8 (2d Cir.2006) (remanding for consideration of whether plaintiff's blindness rendered justifiable any failure to pursue or exhaust administrative remedies); *Brownell v. Krom,* 446 F.3d 305, 312 (2d Cir.2006) (finding special circumstances justifying noncompliance with PLRA exhaustion requirements because (1) prison officials erroneously refused to investigate circumstances of plaintiff's lost-property claim and frustrated administrative appellate review of this error and (2) after plaintiff subsequently conducted his own investigation into the circumstances surrounding his lost property, he reasonably believed that he could not raise facts that he had unearthed in that investigation in administrative proceedings).

In the case at bar, Thomas alleged in his original response to defendants' summary judgment motion that following the incident at Southport Correctional Facility giving rise to this action, there was a "mini-riot" at Southport, followed by "beatings, shackling and restraint [sic] tactics ... inflicted on the population in general ...," and that "complaints about this action were covered up and few, if any complaints were processed by grievance." Dkt. # 28 at 2. Plaintiff also stated that he "was afraid for [his] life after the incident, and that is the reason why [he] waited until he was released [*i.e.,* transferred] from Southport C.F. until [he] filed this complaint [in this action], less [sic][he] risk coming up missing in their in-famous D-block at the hands of their inmate workers or overzealous staff." *Id.* at 3. In addition, in his post-remand filing, Thomas alleges that "defendant and his [sic] agents, conspired to circumvent and mailing [sic] of [plaintiff's] grievance appeals, in order to procet their actions." Dkt. # 46 ¶ 5.

Although the issue is a close one, I believe that plaintiff has alleged enough to show that ordinary grievance procedures were not available to him because of his reasonable fear of retaliation. His allegations concerning widespread beatings and shacklings shortly after the incident giving rise to this

lawsuit, coupled with his assertion that he was afraid for his life, are corroborated to a degree by the fact that plaintiff waited until he had been transferred from Southport to a different facility before filing the complaint in this action, and suggest that the circumstances were such that " 'a similarly situated individual of ordinary firmness' [would] have deemed [ordinary grievance procedures] available." *Hemphill,* 380 F.3d at 688 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). [1] Defendants' motion for summary judgment on exhaustion grounds is therefore denied.

[1]     My conclusion in this regard renders it unnecessary for the Court to consider whether defendants are estopped from asserting an exhaustion defense, or whether "special circumstances" exist that excuse any failure to exhaust on plaintiff's part.

**\*3** As noted, plaintiff has also moved for summary judgment. The fact that plaintiff's claims are not subject to dismissal on the ground of nonexhaustion of remedies, however, does not mean that plaintiff is necessarily entitled to relief on the merits of his claims. On the record before me, which contains little if any evidence concerning the incidents underlying those claims, summary judgment would clearly be inappropriate at this juncture. Plaintiff's motion is therefore denied as well.

### CONCLUSION

Defendants' motion for summary judgment (Dkt.# 22) is denied.

Plaintiff's cross-motion for summary judgment (Dkt.# 46) is denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1231485

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01610-BKS-TWD   Document 112   Filed 08/22/23   Page 49 of 279
Chaney v. Vena, Not Reported in Fed. Supp. (2017)
2017 WL 6756645

2017 WL 6756645
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nakia CHANEY, Plaintiff,

v.

Gregory M. VENA, et al., Defendants.

9:15-CV-653 (TJM/ATB)
|
Signed 11/29/2017

**Attorneys and Law Firms**

NAKIA CHANEY, pro se.

JUDITH B. AUMAND, ESQ., for defendants Vena and Bell.

JONATHAN M. BERNSTEIN, for defendant Dagostino

### REPORT-RECOMMENDATION

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report-Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In the relevant portion of plaintiff's civil rights complaint, he alleges that defendant D'Agostino refused to provide plaintiff with a suitable mattress to sleep on, while he was incarcerated in the Schenectady County Jail ("SCJ") from October 17, 2014 until May 22, 2015 in violation of his constitutional rights. (Complaint ("Compl.") at 10, 11-12). [1]

[1]      The court will cite to the pages of the complaint as assigned by the court's electronic filing system—CM/ECF.

Presently before the court is a motion for summary judgment filed by Schenectady County Sheriff Dominick D'Agostino. (Dkt. No. 64). Plaintiff has responded in opposition to the motion, defendant D'Agostino has filed a reply, and plaintiff has filed what he has titled a "response" to defendant's memo of law. (Dkt. Nos. 67, 70, 71). For the following reasons, this court finds that the defendant's motion for summary judgment should be granted, and the complaint dismissed in its entirety as against defendant D'Agostino.

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Salahuddin, 467 F.3d at 272.

### II. Exhaustion of Administrative Remedies

#### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. See Giano v. Goord, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*2** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

Grievance programs and procedures in ***county*** facilities are contained in the regulations governing the New York State Commission of Correction, appearing in the chapter entitled "Minimum Standards and Regulations for Management of County Jails and Penitentiaries," in the part specifically entitled "Grievance Program." N.Y. CODE RULES & REGS. tit.9, §§ 7032.1-7032.11. These regulations specifically provide that the chief administrative officer of the correctional facility shall establish and maintain a formal inmate grievance procedure. *Id.* § 7032.1. The regulations provide that the facility shall maintain grievance forms for the inmates to use and shall make those forms readily available to inmates. *Id.* §§ 7032.4(d), 7032.6. The regulations also provide that instructions for filing a grievance shall be included in the facility rules and regulations as required by section 7002.9(a)(15), and that "[e]ach inmate at any facility shall be advised in writing as to the availability of grievance forms upon admission." *Id.* § 7032.4(b), (c).

An inmate must file his grievance within five days of the date of the conduct giving rise to the complaint. *Id.* § 7032.4(d). The chief administrative officer of the facility designates a staff member to act as a grievance coordinator, and the regulations provide that each grievance shall be fully investigated by an individual who was not personally involved in the circumstances giving rise to the grievance.

*Id.* § 7032.4(e), (f). The regulations specify minimum requirements for the type of information that must be gathered during the investigation of the inmate's grievance. *Id.* § 7032.4(g)(1)-(g)(4).

The grievance coordinator must issue a written decision within five business days, containing the "facts and reasons underlying the coordinator's determination," and a copy of the determination must be provided to the inmate. *Id.* at 7032.4(i). The plaintiff may appeal an adverse determination to the chief administrative officer or his designee within two business days of receiving the adverse determination. *Id.* § 7032.4(j). The chief administrative officer renders a decision within five business days, and if the inmate is still not satisfied, he may appeal the adverse decision directly to the Commission of Correction within three business days. *Id.* §§ 7032.4(k), 7032.5.

**\*3** Within three business days after receiving the appeal from the inmate, the chief administrative officer of the facility must mail the appeal to the Commission's Citizens Policy and Complaint Review Council (CPCRC), and the grievance coordinator must provide the inmate with a receipt of mailing. *Id.* § 7032.5(c). The CPCRC has forty-five days within which to issue a written decision. *Id.* § 7032.5(d). In certain circumstances, inmates will be provided assistance at any stage of the proceedings. *Id.* § 7032.9. The chief administrative officer of the facility must keep a centralized record of all grievances, and facility employees are given an orientation on the grievance procedures. [2] *Id.* §§ 7032.10, 7032.11.

[2]     The regulations also provide that if an inmate is released or transferred to another facility prior to the resolution of a grievance, the chief administrative officer "shall cause a determination to be made on such grievance ...", and if the grievance is denied, the chief administrative officer "shall submit the grievance to the [CPCRC] as set forth in section 7032.5 of this Part." 9 NYCRR § 7032.7.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting

2017 WL 6756645

exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, — U.S. ——, 136 S.Ct. 1850, 1857, 195 L.Ed.2d 117 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 Fed.Appx. 577, 580 (2d Cir. 2016) (quoting *Ross*, — U.S. at ——, 136 S.Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill*—availability and estoppel— are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, — U.S. at ——, 136 S.Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 656 Fed.Appx. at 580–81. Defendants bear the burden of proving the affirmative defense of failure to exhaust. *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

### B. Application

In this case, plaintiff concedes that he did not exhaust his administrative remedies.[3] At the time of his booking into SCJ, plaintiff was given the facility rule book, which contains the instructions for filing grievances. (Def.'s Exs. G, K) (Dkt. Nos. 64-8 at 4 (Booking Sheet), 64-12 at CM/ECF 24-26 (Rule Book) & Ex. M. (Lt. Josua Guerin Aff. ¶¶ 1-5) (Dkt. No. 64-14)). However, plaintiff argues that the Grievance Sergeant "refused to allow the plaintiff to file his grievance...." (Pl.'s Response to Summary Judgment ¶ 2) (Dkt. No. 67). In plaintiff's "Answer to Omnibus Discovery," plaintiff states that his grievance was "refused." (Dkt. No. 64-11 at 5). In the complaint, plaintiff states that he did not file a grievance because he "was repeatedly denied a grievance form because the grievance sergeant claimed another inmate already filed a grievance on [the] issue." (Compl. ¶ 4(b) at 3).

[3]     Although plaintiff states in his complaint that he wrote three letters to defendant D'Agostino, but received no reply, it is well-settled that writing letters to superior officers is not a substitute for proper exhaustion of administrative remedies, both before and after *Ross*. See

*McCloud v. Tureglio,* No. 09:07-CV-650, 2008 WL 1772305, at *15 (N.D.N.Y. April 15, 2008) (complaint letters to prison officials did not satisfy exhaustion of grievance process); *Hall v. Bradley,* No. 12-CV-6202, 2015 WL 3964897, at *5 (W.D.N.Y. June 29, 2015) (neither letters to other DOCCS officials, nor conversations with prison officials about the incident satisfy the exhaustion requirement). *See also Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017) (citing (inter alia *Geer v. Chapman*, No. 9:15-CV-952, 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016)), (Rep't-Rec.), *adopted*, 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies.")).

**\*4** In his response to the defendant's summary judgment motion, plaintiff now claims that he did not continue to request a grievance form because the sergeant's "tone" made it clear that he did not wish to continue to discuss the issue, and the sergeant allegedly told plaintiff that the next time he asked for a form, he would be locked in his cell. (Dkt. No. 67 ¶ 13). Plaintiff argues that he "exhausted" his remedies "once he felt threatened by the grievance [sergeant], and "it was determined that plaintiff [would] not receive a grievance." (*Id.* ¶ 16).

Based on *Ross*, the court must now determine whether the grievance process was "available" to plaintiff, given the facts that he has stated.[4] Clearly, the process is technically "available" to plaintiff because there exists a mechanism to file grievances at SCJ. Defendants argue that plaintiff could have filed a grievance, even if one grievance sergeant refused to give plaintiff a grievance form because there are two sergeants in charge of the grievance process, and they work different shifts. The SCJ Inmate Rules and Regulations book confirms that there "is a [Grievance] Sergeant on both active shifts." (Def.'s Ex. J at CM/ECF p.26) (SCJ Rule Book at 34).

[4]     As stated above, "estoppel" based on official action impeding exhaustion, is now part of the "availability" analysis. Therefore, the court will consider both of plaintiff's reasons to excuse his failure to exhaust under the umbrella of "availability."

The fear of retaliation must be "reasonable" to render the grievance procedure "unavailable." *Harrison v. Stallone*, No.

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

9:06-CV-902, 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) (citing *Thomas v. Cassleberry*, No. 03-CV-6394, 2007 WL 1231485, at *1-2, 2007 U.S. Dist. LEXIS 30129, at *3-6 (W.D.N.Y. April 24, 2007)). Plaintiff's statement that the Sergeant's "tone" made plaintiff fear "retaliation," is not a "reasonable" fear of retaliation. If such an allegation rendered the process unavailable, it would be quite simple for inmates to circumvent the grievance procedure by making a conclusory statement that the officer's "tone" was aggressive or threatening. Thus, in itself, plaintiff's allegation that he felt "threatened" by the Sergeant's tone of voice does not excuse plaintiff from completing the grievance process. Plaintiff's claim that the sergeant vaguely threatened to lock plaintiff in "his" cell is also fails to rise to the level of a "reasonable" fear of retaliation. Inmates are always locked in their cells, and plaintiff does not allege that the sergeant made any other "threats" of physical harm or false charges to accompany that statement. Thus, plaintiff's fear of "retaliation" is insufficient to excuse the exhaustion requirement.

Plaintiff's other reason for failing to file a grievance requires more consideration. In his complaint, plaintiff claims that he was denied a grievance "form" because another inmate's grievance raising the mattress issue had been denied. (Compl. ¶ 4(b)). In his answers to defendant's interrogatories, plaintiff states that the Grievance Sergeant did not "accept" his grievance because the other inmate's grievance on the same issue had been denied. (Dkt. No. 64-11 at 2) (Interrogatory Ans. Nos. 8-11). Plaintiff states that he complained to the officers on the unit and to a grievance sergeant whose names plaintiff does not remember. Plaintiff then states that he complained to Grievance Sergeant "Nick named Russia,"[5] and then repeats that his grievance was not "accepted." (*Id.*)

[5]     The court assumes that plaintiff intends to say that the sergeant was "nicknamed" Russia.

**\*5** Defendants have attached a copy of the other inmate's grievance to their Reply. (Dkt. No. 70 Ex. A). A review of the grievance shows that in October of 2014, Inmate Tracy Hunter filed a grievance complaining about various issues, including the thickness of the mattresses upon which the inmates were required to sleep. (Dkt. No. 70-1 at 10). Inmate Hunter's grievance was investigated and denied at the facility level as well as by the CPCRC, "sustain[ing] the action taken by the facility administration." (Dkt. No. 70-1 at 3). The letter from the CPCRC is dated March 23, 2015. (*Id.*) The decision of Sergeant Greg Cufari, who signs as the Grievance Coordinator Schenectady County Sheriff's Department, states

in relevant part, that Inmate Hunter complained about the mattresses at the facility because of a law suit "detailing the same complaint ... which is outlined in this grievance." (*Id.* at 4). Sergeant Cufari then states that Inmate Hunter had been at SCJ for almost one year before ever complaining about the mattresses, and it was Sergeant Cufari's opinion that "Inmate Hunter is attempting to follow the same frivolous suit for a quick pay day." (*Id.* at 5).

The SJC Inmate Rule Book states that if the Grievance Sergeant cannot resolve the inmate's problem "informally," after the inmate has discussed the issue with his Floor Officer and his supervisor, "and provided that [the] complaint is a grievable matter, a grievance form ***will be provided***." (Dkt. No. 64-12 at 26). After completing the form, the inmate returns the form to the Grievance Sergeant.[6] (*Id.*) It appears that providing the form to the inmate is the responsibility of the Grievance Sergeant, who also makes the determination of whether the problem is grievable.

[6]     In his response to the defendant's motion, plaintiff states that "all grievances are types [sic] up by the grievance sgt. If he decides to give an inmate a grievance at his discretion." (Dkt. No. 67 ¶ 10). The rules are contrary to plaintiff's statement, as is the grievance filed by Inmate Hunter. The Rule Book states that inmates obtain the grievance form from the sergeant, but the inmate completes the form and returns it to the sergeant. Inmate Hunter's grievance is clearly handwritten. (Dkt. No. 70-1 at 6-10). In fact, the form states that it is to be "*(Completed by the grievant)*." (*Id.* at 6) (Italics in original). Plaintiff's apparent inaccuracy or "embellishment" does not change this court's opinion regarding exhaustion.

While it is undisputed that a problem with plaintiff's mattress is a grievable issue, plaintiff claims that his grievance was not "accepted" because he was told that Inmate Hunter's grievance on the same issue had been denied. The court notes that the rationale for the denial of Inmate Hunter's mattress grievance lends itself to supporting plaintiff's allegations. If the officer who investigated Inmate Hunter's grievance believed that the claim was "frivolous," and that the grievance was filed in response to an article that Inmate Hunter read about a law suit against another facility, then it is reasonable to assume that when plaintiff asked about filing a grievance relating to mattresses,[7] he could have been told that it would be futile to file the grievance. If the Grievance Sergeant

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 53 of 279

Chaney v. Venne, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

refused to "accept" [8] such a grievance and denied plaintiff the grievance form, then it is arguable that administrative remedies were not "available" to the plaintiff in that situation. The same result was possible regardless of which grievance sergeant plaintiff asked.

[7]     Since the rules specify that an inmate must explain what he wants to grieve so that the Grievance Sergeant can make the determination whether the problem is "grievable," then plaintiff would have to tell the Grievance Sergeant that he wished to file a grievance about his mattress before the Grievance Sergeant gave plaintiff the grievance form.

[8]     Plaintiff uses the words "accept" and "denied," when it is clear that he did not write a grievance. In addition, if the grievance sergeant did not give plaintiff the form, and no grievance was filed, then the grievance was not "denied." However, this court has interpreted plaintiff's statements to mean that he was denied the opportunity to write and file a grievance by the sergeant.

**\*6**  The court notes that very recently the Second Circuit has discussed an inmate's claim that administrative remedies were "unavailable" because he was in disciplinary housing and the officers refused to give him grievance forms. *See Kearney v. Gebo,* —— Fed.Appx. ——, 2017 WL 5256820 (2d Cir. Nov. 13, 2017). In *Kearney,* the court held that even if the officers refused to give the plaintiff grievance forms, the New York State regulations expressly allowed grievances to be filed on any kind of paper. Moreover, plaintiff Kearney had written letters of complaint to the Inspector General and to the Commission of Correction, showing that he had both paper and writing implements. *Id.* at ——, 2017 WL 5256820 at \*2. Thus, the court found that the grievance procedure was "available" to Kearney. *Id.*

This case is distinguishable from *Kearney* based on the evidence in the record. SCJ is a County Facility which has its own specific rules for filing grievances, [9] stated in its Rule Book, which rules are consistent with the New York Rules and Regulations cited above. The Grievance Sergeant makes the determination of whether the inmate's problem is "grievable," and only then, is the inmate given a grievance form to complete. The inmate must return the completed form to the Grievance Sergeant who is responsible for collecting the grievances and making the initial determination. (*See* Def.'s Ex. K, Rule Book at p.34) ("after completing the form,

return it to a Grievance Sergeant.... Within five (5) days of the receipt of the grievance, **the Grievance Sergeant shall issue a written determination.**" (emphasis added)).

[9]     New York State Correctional Facilities are governed by Title 7 of the NYCRR, while County Jails are governed by Title 9 of the NYCRR.

If the Grievance Sergeant believed that plaintiff's complaint was "frivolous" because he was already aware of such a claim by Inmate Hunter, he may have refused plaintiff's request for a grievance form and could have told plaintiff that such a claim was not acceptable because it had already been found to be frivolous and denied. Thus, whether the grievance was filed on a grievance form or if plaintiff had written it on any other sheet of paper, the Grievance Sergeant would still have been responsible for collecting the grievance and making the initial determination. [10] If the Grievance Sergeant refused to accept the grievance, the rules do not provide plaintiff with any other option for having the grievance heard.

[10]     The rules also provide that the Grievance Sergeant first attempts to resolve "the problem informally." (Def.'s Ex. K, Rule Book at 34). The rules leave the inmate's grievance completely in the hands of the Grievance Sergeant.

This court is ***not*** making a finding that the Grievance Sergeant refused plaintiff's grievance or his attempt at obtaining forms to file the grievance. However, plaintiff's allegations and the evidence submitted show that there is a question of fact regarding the "availability" of administrative remedies for plaintiff's grievance. The question of whether plaintiff was misled or impeded by the Grievance Sergeant cannot be decided based on the documents submitted alone. Therefore, this court cannot recommend granting summary judgment in favor of defendant D'Agostino based upon a failure to exhaust.

### III. Personal Involvement

#### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 54 of 279

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

involved in a constitutional deprivation, and thus be subject to individual liability.

**\*7** A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)), *rev'd on other grounds, Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk*, 859 F.Supp.2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F.Supp.2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at \*8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

### B. Application

Defendant D'Agostino has submitted an affidavit in which he states that he never created a policy or custom of providing inmates with inadequate mattresses. (D'Agostino Aff. ¶ 2). Defendant D'Agostino also states that "at no time" while plaintiff was incarcerated at SCJ in 2014 and 2015, was defendant D'Agostino aware that plaintiff did not receive a new mattress or that anyone denied plaintiff a new mattress. (*Id.* ¶ 3). Defendant D'Agostino states that he was not aware that plaintiff had any medical condition or other issue that would have warranted supplying plaintiff with a new mattress, and that the defendant "had no involvement in denying Plaintiff a new mattress or supplying Plaintiff with an alleged inadequate mattress." (*Id.*)

In his complaint, plaintiff alleges that he wrote letters to defendant D'Agostino, but he never received a response. (Compl. at 11-12). Plaintiff further states in his complaint that defendant D'Agostino "need[s]" to inspect the mattresses at his facility and provide mattresses that "he" would sleep on. (Compl. at 14). In his answer to the defendant's interrogatories, plaintiff states that he sent letters to defendant D'Agostino, but adds that he "had direct contact with [D']Agostino during his tour/walk through about the mattress and he told me to talk [to] the floor officer who directed me to the grievance sgt.[ ]...." (Def.'s Ex. J at p.2, ¶ 5). In another document, entitled "Plaintiff's Answer to Omnibus Discovery," plaintiff states that he "spoke" with defendant D'Agostino "as Sgt. Nicknamed Russia refused to accept my grievance." (Def.'s Ex. J at p.3 ¶ 2). In his response to defendant's motion for summary judgment, plaintiff states that defendant D'Agostino should be "held accountable for all incidents within his facility." (Dkt. No. 67 ¶ 15).

Clearly, the plaintiff's statements, implying that defendant D'Agostino must be "held accountable" for the incidents in his facility merely restate the doctrine of respondeat superior, which is not applicable in section 1983 actions. Plaintiff's additional statement that defendant D'Agostino should be inspecting the mattresses at his facility to make sure that they are acceptable is also not sufficient to establish personal involvement by the Sheriff.

**\*8** Even if the court accepts the fact that defendant D'Agostino failed to respond to letters of complaint sent by plaintiff, this conduct alone would still be insufficient to establish personal involvement. *Thompson v. Pallito*, 949 F.Supp.2d 558, 575-76 (D. Vt. 2013) (citing cases). If merely writing an unanswered letter to a superior officer were sufficient to establish personal involvement, it would "contravene the black-letter principle that § 1983 does not allow for respondeat superior liability." *Id. See also Jones v. Rock*, No. 9:12-CV-447, 2013 WL 4804500, at \*16 (N.D.N.Y. Sept. 6, 2013) (letters to superior officers insufficient to establish personal involvement). *Cf. Guillon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), inmates who allege that they sent a complaint or grievance letter to a prison official are entitled to have the court draw that reasonable inference for *pleading purposes*).

Personal involvement will be found if the supervisory official "receives **and** acts on a prisoner's grievance or otherwise

Chaney v. Vena, Not Reported in Fed. Supp. (2017)
2017 WL 6756645

Case 9:19-cv-01610-BKS-TWD   Document 112   Filed 08/22/23   Page 55 of 279

reviews and responds to a prisoner's complaint." *Johnson v. Wright*, 234 F.Supp.2d 352, 363-64 (S.D.N.Y. 2002) (emphasis added) (citing inter alia *Ramos v. Artuz*, No. 00 Civ. 149, 2001 WL 840131, at \*8-10 (S.D.N.Y. July 25, 2001) (personal liability established where prison official "sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff")). In addition, personal involvement will be established if the official actually reviews plaintiff's "ongoing" grievance and fails to "remedy the wrong." *See e.g. Sanchez v. Graham*, No. 9:12-CV-1646, 2016 WL 5854551, at \*7 (N.D.N.Y. Sept. 12, 2016), (Rep't-Rec.), *adopted*, 2016 WL 5852511 (N.D.N.Y. Oct. 6, 2016); *Young v. Choinski*, 15 F.Supp.3d 172, 192-93 (D. Conn. 2014) (citing inter alia *Vega v. Artus*, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (personal involvement established where an officer reviewed a grievance about an ongoing violation and the supervisor was authorized to remedy the violation directly)).

However, personal involvement will not exist if the superior officer receives a complaint, but delegates the response and/or investigation to a subordinate. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997). In this case, plaintiff claims in his response to defendant's motion that he had "direct contact" with the Sheriff, and that defendant D'Agostino told plaintiff to speak with the floor officer. However, plaintiff has never alleged when this alleged conversation with D'Agostino took place, nor has he ever indicated when he wrote letters to the defendant. Plaintiff only alleges in his complaint that he wrote letters to defendant D'Agostino and had not received any response as of May 15, 2015—shortly before filing the instant complaint. (Compl. at p.12). Such vague allegations are insufficient to establish personal involvement. *See Guillory v. Cuomo*, 616 Fed.Appx. 12, 14 (2d Cir. 2015) (affirming sua sponte dismissal when plaintiff did not allege when and where the letters to defendant Cuomo were sent, what they said, or how they were sent).

Even assuming the truth of plaintiff's statement, defendant D'Agostino's alleged advice to plaintiff to address his issues to the floor officer, is equivalent to referring plaintiff's letter of complaint to a subordinate for investigation. The fact that defendant D'Agostino directed plaintiff to subordinates for obtaining relief does not create personal involvement in the alleged violation that plaintiff was attempting to remedy. *See Smith v. City of New York*, No. 14 Civ. 5927, 2017 WL 2172318, at \*8 (S.D.N.Y. May 16, 2017) (granting summary judgment based on a lack of personal involvement because "mere complaints made to supervisory defendants are not

enough to establish supervisory liability) (citing *Faulk v. New York City Dep't of Corrections*, No. 08 Civ. 1668, 2014 WL 239708, at \*10 (S.D.N.Y. Jan. 21, 2014) (granting summary judgment where plaintiff alleged only that he spoke to the warden several times about his grievances)).

**\*9** Although plaintiff also states that he "spoke" with defendant D'Agostino, "as" the Sergeant refused to accept plaintiff's grievance, this statement is vague and to conflict with plaintiff prior statement in which he claims that when he spoke to defendant D'Agostino, the Sheriff told plaintiff to speak with the floor officer. (Def.'s Ex. J at 2-3). The fact that plaintiff may have spoken to defendant D'Agostino about his grievance is insufficient to show that defendant D'Agostino was personally involved in violating plaintiff's constitutional rights, given plaintiff's statement that D'Agostino told plaintiff how he needed to go about complaining about his mattress. *Faulk, supra.* Thus, this court finds that plaintiff has failed to allege the requisite personal involvement to sustain a section 1983 action against defendant D'Agostino. [11]

[11]   Because I have found a lack of personal involvement by defendant D'Agostino, I need not address defendant's claim of qualified immunity.

## IV. Cross-Claims

Defendant D'Agostino has moved for dismissal of the cross-claims asserted by defendants Vena and Bell, Niskayuna Police Officers. (*See* Dkt. No. 23, ¶ 52). Defendants Vena and Bell allege that any injuries or damages sustained by plaintiff as a result of the incident described in plaintiff's complaint "were sustained in whole or in part by reason of the negligence and culpable conduct of the co-defendants." (*Id.*) Defendants Vena and Bell also seek apportionment of liability. (*Id.*)

Plaintiff has brought this claim pursuant to 42 U.S.C. § 1983, claiming that defendants violated his federal constitutional rights. [12] Section 1983 does not provide an express right to contribution or indemnification. *Taifer v. Catherines Stores Corp.*, No. 06 Civ. 2976, 2008 WL 7728651, at \*3 (S.D.N.Y. May 28, 2008) (citing *Carrion v. City of New York*, No. 01 Civ. 2255, 2002 WL 31107747, at \*3 (S.D.N.Y. Sept. 23, 2002) (citations omitted); *Hayden v. Hevesi*, No. 05-CV-0294E, 2007 WL 496369, at \*4 (W.D.N.Y. Feb. 12, 2007)). In addition, under New York law, indemnification

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 56 of 279

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

is only available when there is either an express or implied agreement between the parties. *Id.*

12    Plaintiff briefly mentions the New York State Constitution, but the case is essentially brought under section 1983.

In this case, defendant D'Agostino, Sheriff of Schenectady County was named as a defendant in connection with conditions of confinement at SCJ, while defendants Vena and Bell, Niskayuna Police Officers were named in connection with an allegedly unconstitutional search during plaintiff's arrest. (Compl. *generally*). The only remaining claim against defendant D'Agostino was in relation to his claimed denial of a constitutionally adequate mattress. This issue is completely unrelated to the claims against defendants Vena and Bell, and there is certainly no indication of any agreement with these unrelated officers, who do not even work for the same municipality. In addition, defendants Vena and Bell have failed to respond to defendant D'Agostino's motion, notwithstanding the great amount of time that has passed since its filing on June 1, 2017. Thus, the court can only assume that defendants Vena and Bell do not oppose dismissal of their frivolous cross-claims. Based on the law, and the failure of the defendants to oppose defendant D'Agostino motion, this court recommends that any cross-claims filed by defendants Vena and Bell be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant D'Agostino's motion for summary judgment (Dkt. No. 64) be **GRANTED**, and the complaint dismissed in its entirety as against defendant D'Agostino based on a lack of personal involvement, and it is

**RECOMMENDED**, that defendant D'Agostino's motion for summary judgment as relates to cross-claims filed by defendants Vena and Bell (Dkt. No. 64) be **GRANTED**, and any such cross-claims be **DISMISSED.**

 **\*10**  Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6756645

**Footnotes**

2017 WL 8640829
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dennis Douglas DAVIS, Plaintiff,

v.

Joe DOE Correctional Officer, et al., Defendants.

Civ. No. 9:16-cv-0994 (MAD/DJS)

|

Signed December 28, 2017

|

Filed 12/29/2017

**Attorneys and Law Firms**

DENNIS DOUGLAS DAVIS, 16-A-1016, Sullivan Correctional Facility, Box 116, Fallsburg, New York 12733, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, OF COUNSEL: CHRISTOPHER J. HUMMEL, ESQ., The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** On June 28, 2016, *pro se* Plaintiff Dennis Douglas Davis commenced this action pursuant to 42 U.S.C. § 1983, asserting claims arising from his confinement at Great Meadow Correctional Facility ("Great Meadow") in the custody of the Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 2, Compl. Following an initial review of the Complaint, counsel for Gary Woodruff, the then-sole named Defendant, submitted documents to assist Plaintiff in identifying the John Doe Defendant, and Plaintiff amended his complaint to include an additional defendant, Correction Officer R. Livingston. Dkt. Nos. 10, 19, 24, 26, & 27. Presently before this Court is the Motion for Summary Judgment of Defendants Livingston and Woodruff ("Named Defendants"), Dkt. No. 35, Defs.' Mot. Summ. J., which Plaintiff has opposed.[1] Dkt. No. 39, Pl.'s Resp. The Named Defendants contend that Plaintiff has failed to exhaust his administrative remedies, and that Plaintiff has failed to establish a failure to intervene claim against Defendant Woodruff. Dkt. No. 35-6, Defs.' Mem. of Law.

The Court finds that the Named Defendants have established that Plaintiff has failed to exhaust his administrative remedies and therefore recommends that the Named Defendants' Motion be **granted**. In addition, as discussed below, the Court recommends that Plaintiff's claims against the still unidentified Defendant be **dismissed** *sua sponte*.

[1]     Defendant Joe Doe has not appeared in this action because Plaintiff has not identified this individual; accordingly, he has not been served with a Summons and remains unnamed.

**I. LEGAL STANDARD**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*2** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning

Davis v. Doe, Not Reported in Fed. Supp. (2017)

2017 WL 8640829

whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. EXHAUSTION

### A. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).[2]

[2]    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). The Named Defendants

properly raised the affirmative defense in their Answer to the Amended Complaint. Dkt. No. 34 at ¶ 14.

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

### B. Plaintiff's Failure to Exhaust Administrative Remedies

 **\*3** In this case, Plaintiff admits that he did not exhaust his administrative remedies relative to his claims. Dkt. No. 39-1, Pl.'s Mem. of Law, at p. 1. At the time of the relevant events of this action, Great Meadow had a grievance program to which inmates had full access. Dkt. No. 35-5, Decl. of Jeffery Hale, dated Aug. 2, 2017, at ¶¶ 4-9. Plaintiff never filed a grievance regarding his claims. *Id.* at ¶¶ 11 & 12, Ex. A.

Instead of utilizing the grievance procedure, Plaintiff submitted a disciplinary appeal form to Commissioner Annucci regarding a Tier 3 Superintendent's Hearing, a copy of which he includes with his opposition. Pl.'s Mem. of Law, at pp. 1 & 12. He also states that he was interviewed by Todd Johnson, a representative of the Office of the Inspector General regarding the facts alleged in this action. *Id.* at p. 1. This interview was not conducted at Plaintiff's request, but on the officials' initiative. *Id.* Plaintiff also states that he was called to the infirmary without his request to have

**Davis v. Doe, Not Reported in Fed. Supp. (2017)**

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 59 of 279

2017 WL 8640829

photographs taken of his face and body after the assault, and that the attending Sergeant and three or four other corrections officers informed him that they were aware of the assault. *Id.* Plaintiff therefore asks that the Court "determine if administrative remedy was already in progress by staff and authorities collectively." *Id.* at p. 2.

The parties' submissions establish that Plaintiff did not exhaust his administrative remedies. The above-described interactions, indicating that prison officials were likely aware of the nature of Plaintiff's complaint, are insufficient to constitute "proper exhaustion." *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) ("Alerting the prison officials as to the nature of the wrong for which redress is sought, does not constitute 'proper exhaustion.' ") (internal citation omitted). "Regardless of whether ... informal complaints put the prison officials on notice of his grievance '*in a substantive sense*,' ... to satisfy the PLRA a prisoner must also *procedurally* exhaust his available administrative remedies." *Id.* at 43. The Court will discuss below whether Plaintiff's contentions may state a valid excuse for his failure to exhaust his administrative remedies.

### C. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.[3]

[3]    The Second Circuit previously set forth a three-part inquiry for when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted

in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The Second Circuit has stated that "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016).

**\*4**  In his opposition papers, Plaintiff contends that he did not follow the exhaustion procedure because (1) he feared retaliation; (2) he believed that utilizing the grievance procedure would be futile; and (3) he did not understand the purpose of the grievance procedure. Pl.'s Mem. of Law, at pp. 1 & 2. None of his arguments, however, are sufficient to raise an issue of material fact as to the availability of administrative remedies that would excuse his failure to exhaust.

Plaintiff first alleges that he did not submit a grievance at Great Meadow because he feared that the staff would retaliate against him for pursuing a charge against them. *Id.* Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. *Ross v. Blake*, 136 S. Ct. at 1860, n.3. Plaintiff's claims, however, amount to nothing more than a "generalized fear of retaliation," which is insufficient to excuse a failure to exhaust. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[P]laintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance."); *see also Rodriguez v. Cty. of Suffolk*, 2014 WL 3531897, at *5 (E.D.N.Y. June 30, 2014) ("Courts tend to find mere 'generalized fear' when no actual threat was made.") (internal citation omitted). As the Second Circuit has stated, "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004). Here, Plaintiff has merely stated a "generalized fear of retaliation," without allegations of any specific threats or other actions that would prevent him from filing a grievance. As such, Plaintiff's fear of retaliation is insufficient to excuse his failure to exhaust.

Davis v. Doe, Not Reported in Fed. Supp. (2017)

2017 WL 8640829

Similarly, Plaintiff's contention that he believed it would be more effective to file a complaint in court is unavailing. Plaintiff states that he believed that the grievance program was applicable to "typical" or "minor grievances," and that "[i]n short, Plaintiff Davis had assumed that a serious or major offense by a staff member of the institution upon an inmate, demanded a direct channel to an outside authority." Pl.'s Mem. of Law, at p. 2. The case law is clear that "[p]risoners are required to exhaust their administrative remedies 'even if they believe that administrative remedies would be ineffective or futile.' " *Harrison v. Goord*, 2009 WL 1605770, at *4 (S.D.N.Y. June 9, 2009); *see also Woodford v. Ngo*, 548 U.S. at 89-90 (stating that "exhaustion requirements are designed to deal with parties who do not want to exhaust," including those who "conclude—correctly or incorrectly—that exhaustion is not efficient in that party's particular case.").

Finally, Plaintiff states that he "was not familiar with the prerequisite procedure of the DOCCS Inmate Grievance Program." Pl.'s Mem. of Law, at p. 2. Plaintiff acknowledged receiving information regarding the grievance program during orientation and expressed a basic understand of the grievance program; he does not contend that he lacked access to the administrative remedies. Dkt. No. 35-2, Aff. of Christopher J. Hummel, dated Aug. 16, 2017, Ex. A, Dep. of Dennis Douglas Davis, dated May 5, 2017, at pp. 74-75. Rather, Plaintiff's less than complete understanding of the purpose of the administrative remedies does not render them not "capable of use." *Ross v. Blake*, 136 S. Ct. at 1859.

 **\*5** Plaintiff has not provided any evidence that could satisfy any of the three circumstances that could excuse failing to exhaust under *Ross*. Plaintiff does not demonstrate, or allege, that the grievance procedure operated as a dead end in that officers were unable or unwilling to provide relief, or that the administrative scheme was so opaque that it was incapable of use. *Ross v. Blake*, 136 S. Ct. at 1853-54. Nor does Plaintiff allege that prison officials 'misled, threatened, or otherwise deterred' him from utilizing the IGP." *Hooks v. Howard*, 2010 WL 1235236, at *7 (N.D.N.Y. Mar. 30, 2010).

Accordingly, for the foregoing reasons, the Court finds that Plaintiff has not established an issue of material fact as to the availability of administrative remedies. The Court therefore recommends that the Named Defendants' Motion be **granted** based upon Plaintiff's failure to exhaust. [4]

[4]    Because the Court recommends that the Named Defendants' Motion be granted based upon

Plaintiff's failure to exhaust his administrative remedies, it does not reach the Named Defendants' contentions regarding the merits of Plaintiff's failure to intervene claim.

As to Plaintiff's claims against the John Doe Defendant, I recommend these claims be **dismissed** for a number of reasons: (1) Plaintiff's failure to comply with a court order under FED. R. CIV. P. 16(f);[5] (2) Plaintiff's failure to prosecute under FED. R. CIV. P. 41(b) and N.D.N.Y. L.R. 41.2(a); and (3) Plaintiff's failure to serve within 90 days under FED. R. CIV. P. 4(m). I also note that even if Plaintiff had properly named the John Doe Defendant, it would be of no consequence because, as noted above, Plaintiff has failed to exhaust his administrative remedies.

[5]    In connection with assisting Plaintiff in identifying the John Doe Defendants, the District Judge ordered Plaintiff to "take reasonable steps through discovery to identify him and, if identified, seek to amend the complaint to add this individual as a defendant in this action." Dkt. No. 10.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Named Defendants' Motion for Summary Judgment (Dkt. No. 35) be **GRANTED** and that Plaintiff's claims against the Named Defendants be **DISMISSED**; and it is further

**RECOMMENDED**, that Plaintiff's claims against Defendant Joe Doe be **DISMISSED** *sua sponte*; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[6] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human*

**Davis v. Doe, Not Reported in Fed. Supp. (2017)**

2017 WL 8640829

*Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

6        If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 8640829

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01610-BKS-TWD   Document 112   Filed 08/22/23   Page 62 of 279

Thompson v. Kelly, Not Reported in Fed. Supp. (2019)
2019 WL 2374119

2019 WL 2374119
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jarrod Christopher THOMPSON, Plaintiff,

v.

Nurse KELLY, et al., Defendants.

Civ. No. 9:18-CV-1235 (LEK/DJS)
|
Signed 04/04/2019

**Attorneys and Law Firms**

JARROD CHRISTOPHER THOMPSON, Plaintiff, Pro Se,
17-A-3501, Hale Creek ASACTC, P.O. Box 950, Johnstown,
NY 12095.

HON. LETITIA JAMES, Assistant Attorney General, OF
COUNSEL: NICHOLAS LUKE ZAPP, ESQ., New York
State Attorney General, The Capitol, Albany, NY 12224,
Attorney for Defendant Kelly.

**REPORT-RECOMMENDATION AND ORDER**

Daniel J. Stewart, U.S. Magistrate Judge

 **\*1** *Pro se* Plaintiff Jarrod Christopher Thompson brings this
civil rights action, pursuant to 42 U.S.C. § 1983, alleging that
Defendants were deliberately indifferent to his medical needs
in violation of the Eighth Amendment. Dkt. No. 2, Compl.
On initial review of the Complaint pursuant to 28 U.S.C.
§§ 1915(e) & 1915A, the District Court permitted Plaintiff's
claims against the individual Defendants to proceed, and
dismissed Plaintiff's claim against DOCCS. Dkt. No. 10.
Currently before the Court is Defendant Kelly's Motion to
Dismiss, filed pursuant to Federal Rule of Civil Procedure
12(b)(6), on the grounds that (1) Plaintiff failed to exhaust his
administrative remedies prior to commencing this action, and
(2) Plaintiff's deliberate indifference claim fails as a matter of
law. Dkt. No. 15-1, Def.'s Mem. of Law. Plaintiff has filed an
opposition to the Motion. Dkt. No. 17, Pl.'s Opp.

**I. STANDARD OF REVIEW**

On a motion to dismiss, the allegations of the complaint must
be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322

(1972). The trial court's function "is merely to assess the legal
feasibility of the complaint, not to assay the weight of the
evidence which might be offered in support thereof." *Geisler
v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980). "The issue is
not whether a plaintiff will ultimately prevail but whether the
claimant is entitled to offer evidence to support the claims."
*Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (*overruled on
other grounds by Davis v. Scherer,* 468 U.S. 183 (1984)).

"Generally, in determining a 12(b)(6) motion, the court
may only consider those matters alleged in the complaint,
documents attached to the complaint, ... matters to which
the court may take judicial notice[,]" as well as documents
incorporated by reference in the complaint. *Spence v.
Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997)
(citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d
Cir. 1991)); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949
F.2d 42, 47 (2d Cir. 1991) (citing FED. R. CIV. P. 10(c)).
Moreover, "even if not attached or incorporated by reference,
a document 'upon which [the complaint] *solely* relies and
which is *integral to the complaint*' may be considered by
the court in ruling on such a motion." *Roth v. Jennings,* 489
F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc.
v. Sum Holding L.P.,* 949 F.2d at 47). However, "even if a
document is 'integral' to the complaint, it must be clear on
the record that no dispute exists regarding the authenticity or
accuracy of the document." *Faulkner v. Beer,* 463 F.3d 130,
134 (2d Cir. 2006). "It must also be clear that there exists no
material disputed issues of fact regarding the relevance of the
document." *Id.*

The court is bound to give the plaintiff the benefit of every
reasonable inference to be drawn from the "well-pleaded"
allegations of the complaint. *See Retail Clerks Intern. Ass'n,
Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 754
(1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.
2008). Nevertheless, "the tenet that a court must accept as true
all of the allegations contained in a complaint is inapplicable
to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678
(2009). Therefore, "[t]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do
not suffice." *Id.* (citation omitted).

 **\*2** A motion to dismiss pursuant to Rule 12(b)(6) may not be
granted so long as the plaintiff's complaint includes "enough
facts to state a claim to relief that is plausible on its face."
*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft
v. Iqbal,* 556 U.S. at 697 (citing *Twombly*). "A claim has
facial plausibility when the plaintiff pleads factual content

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 63 of 279

Thompson v. Kelly, Not Reported in Fed. Supp. (2019)

2019 WL 2374119

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. at 679-80.

## II. FACTS [1]

[1]     The facts here are derived from Plaintiff's Complaint and are stated in the light most favorable to him.

On September 15, 2017, Plaintiff arrived at Franklin Correctional Facility. Compl. at p. 5. He told a nurse that he had a heart problem, and she took his vitals. *Id.* Plaintiff claims he received no help at sick call, and was only told he was scheduled to see a doctor soon. *Id.* On October 10, 2017, Plaintiff had more severe symptoms, and Nurse Kelly gave him cough syrup, and other nurses repeatedly told him he would be seeing a doctor the following week. *Id.* Plaintiff suffered a mild heart attack and had to be flown to Albany Medical Center, and received surgery on January 10, 2018. *Id.* Plaintiff now has to take medicine every day and will have to for the rest of his life; he brings an Eighth Amendment deliberate indifference claim and seeks monetary compensation. *Id.* at pp. 5 & 7.

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendant moves for dismissal on the basis that Plaintiff failed to exhaust his administrative remedies prior to commencing this action. Def.'s Mem. of Law at pp. 3-7. The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake,* 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 93 (2006).

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett,* 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. at 524); *see also Neal v. Goord,* 267 F.3d

Thompson v. Kelly, Not Reported in Fed. Supp. (2019)

2019 WL 2374119

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 64 of 279

116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516.

**\*3** Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir. 1999). Once raised, the defendant bears the burden of proving that administrative remedies have not been exhausted. *Howard v. Goord,* 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999) (citations omitted). The party opposing the affirmative defense "may delay the ultimate determination as to its validity until trial by showing that there is a genuine issue of material fact to be determined." *Id.* (citations omitted).

Typically, this inquiry is fact specific and would not be appropriate for resolution on a motion to dismiss. However, "[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *McCoy v. Goord,* 255 F. Supp. 2d 233, 249 (S.D.N.Y. 2003) (citing *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74-75 (2d Cir. 1998)). Thus, if it is apparent from the face of Plaintiff's Complaint that he failed to exhaust his administrative remedies prior to bringing this action, then a Rule 12(b)(6) motion may be the proper vehicle to raise the defense.

Plaintiff submitted a *pro forma* complaint typically utilized by *pro se* inmates seeking to vindicate their rights pursuant to 42 U.S.C. § 1983. Therein, he indicated that there is a grievance procedure at his facility, and that he did not file a grievance about the events described in the Complaint at any correctional facility. Compl. at p. 6. Taking Plaintiff's statements in his Complaint as true, it would appear from the face of the Complaint that he had not completed the administrative remedies available to him prior to bringing this civil action; thus, Defendant may properly raise this affirmative defense by way of her Motion to Dismiss.

### 1. Plaintiff's Failure to Exhaust Administrative Remedies

In this case, Plaintiff admitted in his Complaint that he did not file a grievance regarding the events alleged in the Complaint. Compl. at p. 6. Plaintiff argues in his opposition to the Motion that he "assumed that going to sick call every single week after being told [he] would see a doctor would be considered taking the appropriate measures." Pl.'s Opp. However, the PLRA requires "proper exhaustion," which means using all steps

of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo,* 548 U.S. at 93. To the extent Plaintiff contends that by going to sick call he put corrections staff on notice of his allegations, such informal means of grieving do not satisfy the PLRA's exhaustion requirement. *See Davis v. Doe,* 2017 WL 8640829, at 3 (N.D.N.Y. Dec. 29, 2017); *see also Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir. 2007) ("Alerting the prison officials as to the nature of the wrong for which redress is sought, does not constitute 'proper exhaustion.' ") (internal citation omitted). "Regardless of whether ... informal complaints put the prison officials on notice of his grievance 'in a substantive sense,' ... to satisfy the PLRA a prisoner must also procedurally exhaust his available administrative remedies." *Macias v. Zenk,* 495 F.3d at 43. As such, Plaintiff's actions taken in going to sick call do not satisfy the PLRA's exhaustion requirements. *See Crook v. Sanchez,* 2014 WL 7399313, at *14 (E.D.N.Y. Feb. 12, 2014) (holding that writing to medical did not satisfy the exhaustion requirement, and collecting cases with similar findings).

**\*4** Accordingly, Plaintiff did not exhaust his administrative remedies. The Court will discuss below whether Plaintiff's contentions may provide a valid excuse for his failure to exhaust.

### 2. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may be excused if remedies were unavailable to the inmate. *Ross v. Blake,* 136 S. Ct. at 1858. "An inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Supreme Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

In his Opposition, Plaintiff contends that he did not follow the exhaustion procedure because (1) he believed that using the grievance procedure would be futile, and (2) he feared

Thompson v. Kelly, Not Reported in Fed. Supp. (2019)

2019 WL 2374119

Case 9:19-cv-01610-BKS-TWD   Document 112   Filed 08/22/23   Page 65 of 279

retaliation. Pl.'s Opp. Plaintiff describes that "through [his] experience dealing with the grievance program [he] felt that nothing would come of it." Pl.'s Opp. The case law is clear that "[p]risoners are required to exhaust their administrative remedies 'even if they believe that administrative remedies would be ineffective or futile.'" *Harrison v. Goord,* 2009 WL 1605770, at \*4 (S.D.N.Y. June 9, 2009); *see also Woodford v. Ngo,* 548 U.S. at 89-90 (stating that "exhaustion requirements are designed to deal with parties who do not want to exhaust," including those who "conclude – correctly or incorrectly – that exhaustion is not efficient in that party's particular case."). As such, Plaintiff's contention that he believed nothing would come of filing a grievance is unavailing.

Plaintiff also alleges that he did not submit a grievance because he feared corrections staff would retaliate against him. Pl.'s Opp. Under *Ross,* threats or other intimidation by prison employees may render administrative remedies unavailable. *Ross v. Blake,* 136 S. Ct. at 1860, n.3. Plaintiff alleges in his Complaint that he did not file a grievance because he feared mistreatment; he filed a grievance about a package and the package room began denying his packages after that. Compl. at pp. 6-7. He elaborates in his Opposition that after he filed a grievance about a package, he never received the package; "nothing favorable came of that grievance," and his next six packages were all refused by the facility. Pl.'s Opp. Significantly, this allegedly occurred in "early 2018," Pl.'s Opp., while Plaintiff alleges Nurse Kelly's alleged indifference occurred in September and October of 2017, and so could not have been the basis for not filing a grievance against Kelly.

"Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable." *Rodriguez v. Cross,* 2017 WL 2791063, at \*8 (N.D.N.Y. May 9, 2017) (citing *Ross v. Blake,* 136 S. Ct. at 1860, n. 3). As the Second Circuit has stated, "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill v. New York,* 380 F.3d 680, 688 (2d Cir. 2004). Here, Plaintiff has merely stated a "generalized fear of retaliation," without allegations of any specific threats or other actions that would prevent him from filing a grievance. *See Brown v. Napoli,* 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[P]laintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance."); *see also Rodriguez v. Cty. of Suffolk,* 2014 WL 3531897, at \*5 (E.D.N.Y. June 30, 2014) ("Courts tend

to find mere 'generalized fear' when no actual threat was made.") (internal citation omitted). Indeed, here, Plaintiff does not allege that "he was subjected to any specific, affirmative threats of retaliation." *Bookman v. Lindstrand,* 2018 WL 3121688, at \*10 (N.D.N.Y. Feb. 14, 2018); *see also Rodriguez v. Cty. of Suffolk,* 2014 WL 3531897, at \*5. In any event, "Plaintiff's prior experience filing grievances is not a well-founded basis for him to fear retaliation from filing a grievance relative to the present incident." *White v. Dishaw,* 2017 WL 4325770, at \*3 (N.D.N.Y. June 20, 2017). As such, Plaintiff's fear of retaliation is insufficient to excuse his failure to exhaust. [2]

[2]    Plaintiff also submits a separate letter regarding recent occurrences regarding his medical care that he believes to be retaliatory, although he does not assert what he believes the retaliation was in relation to. Dkt. No. 18. The Court notes that, to the extent Plaintiff intends the letter to explain his fear of retaliation in relation to his failure to exhaust, it appears to relate solely to actions taken after Plaintiff's time to file a grievance expired, and thus would not serve to provide an excuse for his failure to exhaust.

**\*5** Plaintiff has therefore not made allegations that could satisfy any of the three circumstances that could excuse failing to exhaust under *Ross.* Accordingly, the Court finds that Plaintiff has not exhausted his administrative remedies, and that the failure to exhaust was not excusable. The Court therefore recommends that Defendant Kelly's Motion be granted based on Plaintiff's failure to exhaust. [3]

[3]    Because the Court recommends that Defendant Kelly's Motion be granted based upon Plaintiff's failure to exhaust his administrative remedies, it does not reach her contentions regarding the merits of Plaintiff's deliberate indifference claim. Def.'s Mem. of Law at pp. 8-11. However, were the Court to reach this issue, it would recommend denying the Motion. Giving deference to Plaintiff's *pro se* status, "the Court is unable to conclude at this early stage–and on the basis of the Complaint alone–that the Defendant[ ] [was] not deliberately indifferent to [Plaintiff's] serious medical needs. The Court must await further development of the facts." *Silvera v. Conn. Dep't of Corr.,* 726 F. Supp.

Thompson v. Kelly, Not Reported in Fed. Supp. (2019)

2019 WL 2374119

2d 183, 192 (D. Conn. 2010) (citing *Chance v. Armstrong,* 143 F.3d 698, 703-04 (2d Cir. 1998)).

### B. John Doe Defendants

As to Plaintiff's claims against the four unnamed Nurse Doe Defendants, the Court recommends dismissing these claims as well. Plaintiff's claims against these Defendants cannot proceed for the same reason as his claim against the named Defendant: he has failed to exhaust his administrative remedies. As such, these claims suffer from the same defect and are subject to dismissal. *See Bush v. Danziger,* 2006 WL 3019572, at *3 (S.D.N.Y. Oct. 23, 2006) (dismissing *sua sponte* claims against John Doe Defendants because claims would be barred on the same basis as claims against moving defendants); *Ali v. Ramos,* 2018 WL 1353210, at *1, n.1 (S.D.N.Y. Mar. 14, 2018) (considering *sua sponte* dismissing the Complaint against a John Doe defendant, and noting that such would be appropriate because the plaintiff had an opportunity to be heard through responding to the named defendant's motion to dismiss); *Preterotti v. Lora,* 2016 WL 6810883, at *9 (Oct. 6, 2016).

### IV. CONCLUSION

**WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion to Dismiss (Dkt. No. 15) be **GRANTED** and that Plaintiff's claims against Defendant Kelly be **DISMISSED**; and it is further

**RECOMMENDED**, that Plaintiff's claims against Nurse Doe Nos. 1-4 be **DISMISSED** *sua sponte;* and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to the action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [4] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[4]     If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2374119

---

**End of Document**     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 8474744
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Tylik HUNTER, Plaintiff,

v.

A. ROUSE, ORC Counselor; Greene Correctional
Facility and C. Putnam, Correction Officer;
Greene Correctional Facility, Defendants.

9:20-CV-65 (LEK/DJS)
|
Filed 09/17/2020

**Attorneys and Law Firms**

TYLIK HUNTER, Plaintiff Pro Se, 18-B-0977, Coxsackie
Correctional Facility, Box 999, Coxsackie, New York 12051.

OF COUNSEL: NICHOLAS LUKE ZAPP, ESQ., Assistant
Attorney General, HON. LETITIA JAMES, Attorney
General for the State of New York, Attorney for Defendants,
The Capitol, Albany, New York 12224.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

 **\*1**  *Pro se* Plaintiff Tylik Hunter brings this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that Defendants
used excessive force in violation of his Eighth Amendment
rights and denied him his First Amendment right to free
exercise of religion. Dkt. No. 1, Compl. On initial review of
the Complaint pursuant to 21 U.S.C. §§ 1915(e) & 1915A, the
District Court permitted Plaintiff's claims against Defendants
Rouse and Putnam to proceed, and dismissed Plaintiff's claims
against Defendant Gonzales. Dkt. No. 10, pp. 5-6. Presently
before the Court is a Motion to Dismiss from Defendants
Rouse and Putnam, filed pursuant to FED. R. CIV. P. 12(b)
(6), on the grounds that (1) Plaintiff failed to exhaust his
administrative remedies prior to commencing this action, and
(2) Plaintiff's First Amendment Free Exercise claim fails as a
matter of law. Dkt. No. 17-1, Defs.' Mem. of Law. Plaintiff
has filed an opposition to the Motion. Dkt. No. 19, Pl.'s Opp.

**I. FACTUAL BACKGROUND** [1]

[1]    The facts here are derived from Plaintiff's
Complaint and are stated in the light most favorable
to him.

Plaintiff was incarcerated at Greene Correctional Facility
when, at an unspecified date and time, Plaintiff claims
Defendants "threw [him] up on the wall" and "beat and
stomped on [him] while hand-cuffed." Compl. at p. 4. [2] Then,
Defendant Putnam "sprayed a half can of ma[c]e all over
[Plaintiff's] hair and face." *Id.* During this incident, Plaintiff
asserts Defendants "snatched [his] kufi off [his] head and
spit on it," then "began stepping on [his] kufi." *Id.* Plaintiff
is presently incarcerated at Coxsackie Correctional Facility
where he filed his Complaint. *See generally id.*

[2]    Citations to the Complaint are made to the
pagination assigned by the Court's CM/ECF
system.

**II. STANDARD OF REVIEW**

In considering a Motion to Dismiss under Rule 12(b)(6) of the
Federal Rules of Civil Procedure, the Court must "accept all
'well-pleaded factual allegations' in the complaint as true."
*Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020)
(quoting *Ashcroft v. Iqbal*, 556 U.S. 661, 679 (2009)). Mere
legal conclusions, on the other hand, are not entitled to this
assumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. at 679;
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
"While legal conclusions can provide the framework of a
complaint, they must be supported by factual allegations.
When there are well-pleaded factual allegations, a court
should assume their veracity and then determine whether they
plausibly give rise to an entitlement to relief." *Ashcroft v.
Iqbal*, 556 U.S. at 679. The Court must also "construe all
reasonable inferences that can be drawn from the complaint
in the light most favorable to the plaintiff." *Arar v. Ashcroft*,
585 F.3d 559, 567 (2d Cir. 2009).

While the factual allegations alleged in the Complaint need
not be detailed, they still "must be enough to raise a right to
relief above the speculative level," and "nudge[ ] [Plaintiff's]
claims across the line from conceivable to plausible," *Bell
Atlantic Corp. v. Twombly*, 550 U.S. at 555 &570. "[O]nly
a complaint that states a plausible claim for relief survives
a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. at 679.
"Determining whether a complaint states a plausible claim
for relief will ... be a context-specific task that requires

2020 WL 8474744

the reviewing court to draw on its judicial experience and common sense." *Id.* "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." *Lynch v. City of New York*, 952 F.3d at 75 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 556).

**\*2** "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments they suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). Nevertheless, a complaint from a *pro se* plaintiff must still "state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009)).

### III. DISCUSSION

#### A. Exhaustion under the Prison Litigation Reform Act

Defendants move for dismissal, in part, on the ground that Plaintiff failed to properly exhaust his administrative remedies prior to commencing this action. Defs.' Mem. of Law at pp. 3-7.

##### *1. The Grievance Process*

The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of

the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016); *see Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, the defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at \*3 (E.D.N.Y. Dec. 28, 1999).

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. 7 N.Y.C.R.R. § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the CORC makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

**\*3** An expedited procedure exists for grievances regarding alleged harassment; this procedure also requires that the grievant receive a response from CORC in order to exhaust. 7 N.Y.C.R.R. § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a *bona fide* case of harassment. *Id.* at §§ 701.8(b) & (c).

##### *2. Plaintiff's Failure to Exhaust his Claims*

In this case, it is undisputed that Plaintiff did not file a grievance regarding the facts alleged in his Complaint and therefore did not exhaust his administrative remedies. Compl. at p. 2. Plaintiff concedes in his Complaint that there is a grievance procedure in place at Coxsackie C.F., but that he did not file a grievance. Compl. at pp. 2-3.

### 3. Whether Plaintiff's Failure to Exhaust his Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court stated in *Ross*, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. Plaintiff bears the burden of establishing that the grievance procedures were unavailable within the meaning of *Ross*. *Martin v. Wyckoff*, 2018 WL 7356771, at *5 (N.D.N.Y. Oct. 16, 2018), *report and recommendation adopted*, 2019 WL 689081 (N.D.N.Y. Feb. 19, 2019).

Plaintiff alleges in his Complaint that he did not file a grievance because he feared retaliation from Defendants. Compl. at p. 3 "Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable." *Thompson v. Kelly*, 2019 WL 2374119, at *4 (N.D.N.Y. Apr. 4, 2019), *report and recommendation adopted*, 2019 WL 2371607 (N.D.N.Y. June 5, 2019) (internal quotation marks omitted) (citing *Ross v. Blake*, 136 S. Ct. at 1860, n.3). This "inquiry is an objective one[.]" *Adams v. O'Hara*, 2019 WL 652409, at *5 (N.D.N.Y. Feb. 15, 2019) (footnotes omitted). "The fear of retaliation must be 'reasonable' to render the grievance procedure 'unavailable.' " *Chaney v. Vena*, 2017 WL 6756645, at *4 (N.D.N.Y. Nov. 29, 2017), *report and recommendation adopted*, 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (citations omitted); *Galberth v. Durkin*, 2014 WL 7409915, at *7 (N.D.N.Y. Dec. 31, 2014); *see Thomas v. Cassleberry*, 2007 WL 1231485, at

*2 (W.D.N.Y. Apr. 24, 2007). However, a mere "generalized fear of retaliation" is insufficient to excuse a failure to exhaust. *Davis v. Doe*, 2017 WL 8640829, at *4 (N.D.N.Y. Dec. 29, 2017), *report and recommendation adopted*, 2018 WL 1582230 (N.D.N.Y. Mar. 27, 2018); *see Thompson v. Kelly*, 2019 WL 2374119, at *4; *Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[P]laintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance concerning these matters.").

**\*4** Here, Plaintiff alleges more than a generalized fear of retaliation. In his Complaint, Plaintiff alleges Defendant Rouse told him that if he told "anyone what happened, the next time [Plaintiff] won't walk away." Compl. at p. 3. This is a specific threat of retaliation from Defendant Rouse to Plaintiff. *Galberth v. Durkin*, 2014 WL 7409915, at *8 (holding Defendants' threats that Plaintiff would be beaten within an inch of his life if he told anyone about the alleged assault was more than a generalized fear of retaliation and excused Plaintiff's failure to exhaust). Consequently, based on the record before the Court at this stage of the case and viewing the allegations in the light most favorable to Plaintiff, his specific allegations that he feared retaliation were sufficiently reasonable to render administrative remedies unavailable. *See Thomas v. Cassleberry*, 2007 WL 1231485, at *2 ("[P]laintiff has alleged enough to show that ordinary grievance procedures were not available to him because of his reasonable fear of retaliation.").

Defendants rely on *Salmon v. Bellinger*, 2016 WL 4411338 (N.D.N.Y. July 5, 2016), *report and recommendation adopted*, 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016), and *Pridgen v. Beatie*, 2018 WL 1402049 (N.D.N.Y. Jan. 17, 2018), to establish Plaintiff's fear of retaliation was simply a generalized fear and thus insufficient to render the grievance procedure unavailable. Defs.' Mem. of Law at pp. 6-7. However, these cases are distinguishable from the present matter in two ways. First, they were both decided on a motion for summary judgment, which entailed a different standard of review and a more developed record. Second, the plaintiffs' fear of retaliation in *Salmon* and *Pridgen* was determined to be generalized because occurrences after the specific threats were made by the defendants contradicted the plaintiffs' allegations of fear.

In *Salmon*, the inmate-plaintiff alleged an assault by the officer-defendant and claimed he made a specific threat that he would retaliate against him if the plaintiff filed a grievance. *See Salmon v. Bellinger*, 2016 WL 4411338, at *4. The

2020 WL 8474744

plaintiff was then transferred and stated his reason for not filing a grievance at the new facility was that he thought the officers at his previous and current facilities might be communicating with each other, and that the officers at the new facility might retaliate on behalf of the defendant. *See id.* at *5. The court found plaintiff's fear at the new facility to be "nothing more than a 'generalized fear of retaliation[.]' " *Id.* (citing *Brown v. Napoli*, 687 F. Supp. 2d at 297). While discussing the plaintiff's claim that defendant made a specific threat to retaliate against him, however, the court stated that such a claim "would be sufficient to create an issue of material fact as to whether administrative remedies were available" at his previous facility. *Id.* at *4.

In *Pridgen*, the plaintiff argued his fear of retaliation was justified to excuse his failure to exhaust because the defendant and other corrections officers gave him the impression that filing a grievance would get him a punch in the eye. *See Pridgen v. Beatie*, 2018 WL 1402049, at *8. He also alleged he was specifically told by officers not to report his injuries. *Id.* Despite these threats, however, the plaintiff still attempted to file a grievance. *See id.* Consequently, the court found the plaintiff's contention that the grievance process was unavailable to him because of this fear of retaliation was "belied by his conduct after the incident." *Id.*

It is therefore recommended that Defendants' motion based on failure to exhaust be denied at this time. This does not, however, preclude a later finding that Plaintiff did not exhaust on a subsequent dispositive motion after some discovery has occurred.

### B. Free Exercise of Religion Claim

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). "A prisoner's First Amendment rights, however, are '[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system.' " *Gilliam v. Baez*, 2017 WL 476733, at *4 (S.D.N.Y. Feb. 2, 2017) (quoting *Ford v. McGinnis*, 352 F.3d at 588). "Accordingly, a prisoner's free exercise claims are 'judged under a reasonableness test less restrictive than ordinarily applies to alleged infringements of fundamental constitutional rights.' " *Id.* (quoting *Ford v. McGinnis*, 352 F.3d at 588).

**\*5** "To prevail on a First Amendment claim, a plaintiff must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest." *Barnes v. Furman*, 629 Fed. Appx. 52, 55 (2d Cir. 2015).[3] There is a substantial burden "where 'the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Thomas v. Waugh*, 2015 WL 5750945, at *10 (N.D.N.Y. Sept. 30, 2015) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). Specifically, "[t]he relevant question in determining whether [Plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [Plaintiff's religious] practice...." *Ford v. McGinnis*, 352 F.3d at 593-94. Furthermore, "[t]he government's interference with plaintiff's exercise of religion must be 'more than an inconvenience,' and must rise to the level of 'burden[ing] a belief central to plaintiff's religious doctrine.' " *Shapiro v. Cmty. First Servs., Inc.*, 2014 WL 1276479, at *10 (E.D.N.Y. Mar. 27, 2014) (alterations in original) (quoting *Alameen v. Coughlin*, 892 F. Supp. 440, 448 (E.D.N.Y. 1995)). "If the plaintiff satisfies the burden of showing that 'the disputed conduct substantially burden[ed] his sincerely held religious beliefs,' then the defendant 'bear[s] the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct.' " *McLeod v. Williams*, 2020 WL 2512164, at *4 (S.D.N.Y. May 15, 2020) (alterations in original) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). Still, "the burden remains with the prisoner to 'show that these [penological] concerns were irrational.' " *Ford v. McGinnis*, 352 F.3d at 595 (alterations in original) (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)); *Salahuddin v. Goord*, 467 F.3d at 275.

3    "[T]he Second Circuit has not decided whether the substantial burden test continues to apply [in a free exercise claim], but has nonetheless required that a prisoner 'show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *McLeod v. Williams*, 2020 WL 2512164, at *3 (S.D.N. Y May 15, 2020) (quoting *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014)). Because we have no further guidance from the Second Circuit as to whether the substantial burden requirement still applies, and neither party disputes its applicability in this case, the Court will address the substantial burden element.

Defendants contend that Plaintiff does not allege his beliefs were substantially burdened when, as Plaintiff asserts, Defendants pulled his kufi off his head and proceeded to spit and step on it. Defs.' Mem. of Law at pp. 8-9. While Plaintiff does not specifically allege in his Complaint that these actions substantially burdened his religious beliefs, the Court believes his claim is nevertheless sufficient to survive a Motion to Dismiss.

Plaintiff has stated he is Muslim and wears his kufi because of his religion. Pl.'s Opp. He has also asserted facts that plausibly suggest his sincerely held religious beliefs were substantially burdened insofar as he was denied his chosen method of religious practice, the wearing of his kufi, by Defendants' actions. *Id.* Thus, it would be premature to dismiss his claim without permitting further discovery on the matter to determine its viability. *See McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004) ("Dismissing McEachin's complaint without requiring an answer from defendants, or permitting further discovery to determine, for example, whether denying McEachin properly blessed food ... significantly impeded his religious observance, makes it impossible to evaluate the validity of his First Amendment claim."); *Malik v. City of New York*, 2015 WL 3345317, at *12 (S.D.N.Y. Aug. 15, 2015), *report and recommendation adopted*, 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012) ("Malik's allegations that he practices Islam and that [the officers] ripped up and destroyed his sacred Quran states a legally sufficient claim under ... the Free Exercise Clause...."); *Thomas v. Waugh*, 2015 WL 5750945, at *10 (holding that plaintiff asserted facts sufficient to plausibly suggest on a motion to dismiss his sincerely held religious beliefs were substantially burdened by defendant's refusal to permit him to wear a larger head covering to honor both his Jamaican heritage and Jewish faith); *JCG v. Ercole*, 2014 WL 1630815, at *23 (S.D.N.Y. Apr. 24, 2014), *report and recommendation adopted*, 2014 WL 2769120 (S.D.N.Y. June 18, 2014). Furthermore, Defendants have offered no legitimate penological objective that might justify their conduct. *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989) ("[I]t [is] incumbent upon prison officials to make such a showing in order to prevail on a motion to dismiss."); *JCG v. Ercole*, 2014 WL 1630815, at *23 (holding that while the plaintiff offered few details in support of his assertion that the defendants denied him access to religious services, his complaint was sufficient to survive a motion to dismiss, "particularly given that Defendants offer[ed] no legitimate penological objective that might justify such a denial.").

*6 Defendants also assert that Plaintiff's claim warrants dismissal because he did not allege the kufi was related to his religious beliefs, nor identify a date or time the incident occurred, or for how long he was deprived of his Free Exercise rights. Defs.' Mem. of Law at pp. 8-9. However, in construing this *pro se* plaintiff's Complaint liberally on a Motion to Dismiss, the Court finds Plaintiff's factual allegations to be "enough to raise a right to relief above the speculative level." *Torres v. Carry*, 672 F.Supp.2d 338, 342 (S.D.N.Y. 2009) (quoting *Atlantic Bell Corp. v. Twombly*, 550 U.S. at 555).

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion to Dismiss (Dkt. No. 17) be **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [4] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

4          If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2020 WL 8474744

**Hunter v. Rouse, Slip Copy (2020)**

2020 WL 8474744

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 101083
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Tylik HUNTER, Plaintiff,
v.
A. ROUSE, et al., Defendants.

9:20-CV-0065 (LEK/DJS)
|
Signed 01/12/2021

**Attorneys and Law Firms**

Tylik Hunter, Coxsackie, NY, pro se.

Nicholas Luke Zapp, New York State Attorney General, Albany, NY, for Defendants.

## DECISION AND ORDER

Lawrence E. Kahn, U.S. District Judge

## I. INTRODUCTION

**\*1** Pro se Plaintiff Tylik Hunter filed a complaint in this action on January 17, 2020, asserting claims pursuant to 42 U.S.C. § 1983 against several employees of Greene Correctional Facility ("Greene C.F."). Dkt. No. 1 ("Complaint"). On initial review of the Complaint pursuant to 21 U.S.C. §§ 1915(e) and 1915A, this Court permitted Plaintiff's claims against A. Rouse and C. Putnan to proceed and dismissed Plaintiff's claims against M. Gonzales. Dkt. No. 10 ("April 2020 Order"). On June 11, 2020, Rouse and Putnan filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 17 ("Motion"); 17-1 ("Defendants' Memorandum of Law"). On September 17, 2020, the Honorable Daniel J. Stewart, U.S. Magistrate Judge, recommended that the Motion be denied. Dkt. No. 21 ("Report-Recommendation"). For the reasons that follow, the Court adopts the Report-Recommendation in its entirety.

## II. BACKGROUND

The facts are detailed in the April 2020 Order and the Report-Recommendation, familiarity with which is assumed. To summarize briefly, Plaintiff alleges that Defendants, at an unspecified date and time, beat him, sprayed him with mace, and "snatched [his] kufi off [his] head," spit on it, and stepped on it. Compl. at 4. Plaintiff asserts First Amendment

free exercise and Eighth Amendment excessive force claims against Rouse and Putnan. See id. at 4–5; April 2020 Order at 4.

Defendants move for dismissal on the grounds that Plaintiff failed to exhaust administrative remedies prior to commencing this action, and that Plaintiff's Free Exercise claim fails as a matter of law. See Defs.' Mem. of Law. Magistrate Judge Stewart recommended denying Defendants' motion to dismiss, finding that exhaustion is excused and that Plaintiff sufficiently alleged a Free Exercise claim. See R. & R. at 6–13. Neither party has filed objections. Docket.

## III. STANDARDS OF REVIEW

### A. Report-Recommendation

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

### B. Federal Rule of Civil Procedure 12(b)(6)

**\*2** To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Fed. R. Civ. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b) (6) only where it appears that there are not "enough facts to

state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (citing Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. See id. at 678–79.

## IV. DISCUSSION

As neither party has filed objections, the Court reviews the Report-Recommendation for clear error and finds none.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 21) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No 17) is **DENIED**; and it is further,

**ORDERED**, that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2021 WL 101083

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2014 WL 7409915
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gregory GALBERTH, Plaintiff,
v.
C. DURKIN, Sergeant, Clinton
Correctional Facility, et al., Defendants.

No. 9:14–CV–0115 (BKS/ATB).
|
Signed Dec. 31, 2014.

**Attorneys and Law Firms**

Gregory Galberth, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Joshua E. McMahon, Assistant Attorney General, of Counsel, Office of the New York State Attorney General, Albany, NY, for Defendants.

### *ORDER*

BRENDA K. SANNES, District Judge.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Andrew T. Baxter, duly filed on the 8th day of December, 2014. Following fourteen (14) days from the service thereof, the Clerk has sent me the file. No objections were filed to the Report–Recommendation.

After careful review of all of the papers herein, including the Magistrate Judge's Report—Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety;

2. The defendants' motion to dismiss (Dkt. No. 30) is GRANTED only to the extent that plaintiff bases his claims on the Fourteenth Amendment;

3. The defendant's motion to dismiss (Dkt. No. 30) is DENIED IN ALL OTHER RESPECTS; and

4. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants used excessive force on him on three occasions in violation of his Eighth and Fourteenth Amendment rights. (Complaint ("Compl.") (Dkt. No. 1). Plaintiff requests a substantial amount of compensatory and punitive damages. (Compl. at 25). [1]

[1] Because it is difficult to determine the pagination of the complaint, this court will cite to the page numbers assigned by the court's electronic case filing system (CM/ECF).

Presently before the court is the defendants' motion to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff has filed two responses in opposition to the defendants' motion, and has requested additional time to submit a further response. (Dkt.Nos.35, 36, 38). For the following reasons, this court will recommend denying the defendants' motion to dismiss, except as it relates to any excessive force claims based upon the Fourteenth Amendment. Because the court is recommending denial of the defendants' motion, it will also deny plaintiff's request to file an additional memorandum in opposition to the motion.

### DISCUSSION

**I. *Facts*** [2]

[2] The court must interpret plaintiffs allegations to raise the strongest arguments that they suggest. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). Plaintiff's

papers are disjointed, and the court has stated the facts so that they make the most sense.

**A. "First" Incident**

Plaintiff alleges that on three different occasions, while plaintiff was incarcerated at Clinton Correctional Facility ("Clinton"), the defendants used excessive force against him. Plaintiff states that he suffers from mental illness and is "in and out" of the "O.B.S. Mental Health Units" ("OBS").[3] (Compl. at 7). He states that the "first incident"[4] occurred on May 15 and 16, 2011, while plaintiff was in an OBS cell. (*Id.* at 8). Plaintiff claims that on May 15th, he complained to defendant Plumbly about the quality and the amount of food that plaintiff was served. (*Id.*) As plaintiff was trying to explain his problem with the food, defendant Plumbly became "hostile," slammed the "feed up hatch," and then called for "a sergeant and another officer." (*Id.* at 9).

[3]     OBS may refer to an "observation" cell, where plaintiff would be placed for observation when he was having a mental problem.

[4]     Although plaintiff refers to the "first incident," it involves two instances in which the defendants used excessive force on him.

**\*2** Plaintiff states that as the other officers approached plaintiff's cell, defendant Plumbly opened the door of the cell and began to beat plaintiff in the rib cage and lower back. (*Id.*) Officer Plumbly then "body slammed" plaintiff onto the steel bed, got on top of him, and began to choke him, while saying: "I'm tired of your shit." (*Id.* at 9–10). Plaintiff claims that his hands were being held by the "other officers," who were also hitting plaintiff in his right leg. (*Id.* at 10). The sergeant[5] was wearing a ring and hit plaintiff in the face and across the forehead, causing pain. (*Id.*) Plaintiff states that defendant Plumbly continued to choke plaintiff, and then, as plaintiff was turned to face the wall, the officers "took turns" beating him in the head, back, ribs, and right leg. (*Id.*) Plaintiff states that after the officers left his cell, two near-by inmates told plaintiff that they heard "everything," and that plaintiff should call them as witnesses "when the time comes." (*Id.* at 11).

[5]     The sergeant was apparently defendant Bisso. Plaintiff does not mention the name of the sergeant until he is describing the May 16 th incident. (Compl. at 12).

Plaintiff alleges that on May 16th, he reported the May 15 th incident to the "medication nurse" and the "medical, med nurse." Plaintiff claims that "she" reported the incident to "A L.T."[6] Plaintiff alleges that he was told by defendant Bisso that he would be taken to the Clinton Facility Clinic. (Compl. at 12). Defendant Bisso allegedly gave orders to defendant Sears and "an unknown officer" to take plaintiff out of his cell and place him in an "Interview Room," where defendant Sears, Bisso, and the unknown officer beat plaintiff again by pushing his face into the wall and hitting him in the rib cage. (*Id.*) Defendant Bisso allegedly told the other officers not to hit plaintiff in the face because they would be taking pictures in the clinic. (*Id.*)

[6]     Plaintiff may be trying to say that the nurse reported this incident to "a lieutenant."

Plaintiff was then escorted to the clinic, where he reported his injuries, but was afraid to tell Nurse Bob Fitzgerald what "really happened" because the defendants were in the examining room, and defendant Bisso told plaintiff that "we break bones you better not tell on us."[7] (*Id.* at 13).

[7]     Plaintiff states that "some days later," he reported his injuries to a different male nurse (Mr. Ericson), who plaintiff saw on a "sick call visit." (Compl. at 13).

**B. Second Incident**

Plaintiff alleges that on November 5, 2011, he was in a Clinton "hospital Dry Cell" for inserting a tub of cream up his rectum. (Compl. at 14). Plaintiff claims he was also having thoughts of hurting himself. Plaintiff states that he recognized defendant Bisso "and became fearful." A mental health medication nurse came to take plaintiff's vital signs, but plaintiff grabbed the thermometer and tried to swallow it.[8] (*Id.*) Plaintiff then started to stab himself in the arm with the same thermometer. (*Id.* at 14–15). Plaintiff states that officers opened the cell door, took the thermometer away from plaintiff and applied handcuffs. (*Id.* at 15).

[8]     The date of the incident is unclear because plaintiff states that he was in OBS on November 5, 2011, but the mental health nurse came to take plaintiff's vital signs "[o]n that same day or the next day Nov 5, 2011." (Compl. at 14). If he was in OBS on November 5, "the next day" would have

been November 6. However, the discrepancy is irrelevant for purposes of this recommendation.

However, plaintiff claims that, as defendant Russell was applying the handcuffs, he "started bending [plaintiff's] ankles in a [breaking] position causing pain." Then another officer bent plaintiff's legs toward his back, also in a "breaking" position, during which plaintiff screamed in pain and begged the officers to stop hurting him. (*Id.*) Plaintiff claims that at least one near-by inmate could see what was happening. Plaintiff was then "dragged" off the hospital floor down to the emergency room clinic. (*Id.*)

**\*3** Plaintiff claims that defendant Bisso ordered an officer to take plaintiff out of the cell, and when plaintiff complained that he could not walk, defendant Bisso said: "When they get through with you[,] you won't be able to walk...." (*Id.* at 16). Defendants Barnes and Tuller "took control" of plaintiff and took him to the Emergency Room Clinic, where they met defendant Sergeant Durkin, who plaintiff alleges "took part in the torturing." (*Id* .) Plaintiff alleges that he was tortured with what felt like a steel hand cuff that defendants Barnes and Tuller drove into plaintiff's ankle, causing him "excruciating pain." (*Id.*) Plaintiff claims that defendant Durkin laughed and held smelling salts up to plaintiff's nose while they were torturing him so that he would not faint from the pain, while telling plaintiff that they could "do this all day." (*Id.* at 17). Plaintiff claims that defendant Durkin "ordered" defendants Barnes and Tuller to "continuously drive the steel cuff into [plaintiff's] ankle as he screamed out in pain." (*Id.*)

Plaintiff claims that this conduct "went on for some time," until defendant Durkin told the officers to force plaintiff to stand. (*Id.*) When plaintiff could not do so, one of the officers twisted both of plaintiff's wrists at the same time so that he would stand for the pictures. (*Id.* at 18). Plaintiff states that by this time, he could barely breathe, and his lungs felt as if they were going to collapse. (*Id.*) Plaintiff claims that Nurse Bob Fitzgerald [9] could see some of the torture because he was right outside the room, and he came into the room "at some point" before the defendants finished torturing plaintiff. (*Id.*) Plaintiff claims that Nurse Fitzgerald finally told the defendants to allow plaintiff to lay down on the examination table, hooked plaintiff up to a heart monitor, and called an outside hospital. (*Id.*)

[9]    Nurse Fitzgerald has not been named as a defendant.

### C. Third Incident

Plaintiff states that on November 7, 2011, he was still in the OBS cell, where he had been placed after "losing control[ ]" on November 5, 2011. (*Id.* at 19). Plaintiff alleges that defendant Plumbly asked plaintiff to put his hands out of the feed up hatch, but plaintiff was afraid to do so because he feared for his life and feared that he would be beaten again. (*Id.*) Based on this fear, plaintiff asked defendant Plumbly "why." Defendant Plumbly became hostile and angry, slammed the hatch down and went to get defendant Sears. (*Id.*)

Defendants Plumbly and Sears then entered plaintiff's cell and began to beat him in the head, slap him across the face, choke him, and hit him on the right side of his lower back. (*Id.* at 20). Plaintiff claims that defendant Plumbly told plaintiff that he would beat him within an inch of his life, and that plaintiff could "tell who you want, my word is like Gold around here." (*Id.*) Plaintiff claims that defendant Plumbly also called plaintiff a vulgar name.

**\*4** Plaintiff alleges that he was "unable to file [a] Grievance" because he feared for his life. In addition to being called vulgar names, plaintiff claims that he has been discriminated against, harassed, assaulted, and drugs have been placed in his food and water. (*Id.*) Plaintiff appears to speculate that this alleged harassment by staff has resulted as the aftermath of an un-described incident that occurred at Green Haven in 2004. Plaintiff claims that after this "incident," he was told that, if he told the Superintendent what "they" did to him, "they" would haunt him every where he went. (*Id.* at 21). Plaintiff states that ever since the "incident" at Green Haven in 2004, he has been "haunted from prison to prison," harassed, assaulted, and his life has been threatened several times, causing mental and emotional injury. (*Id* .) Plaintiff then states that "the court understands why he was unable to griev. the first and third incidents ... He was also in and out of the OBS Mental Health Unit in every prison he has been in ...." (*Id.*)

Plaintiff has listed seven "causes of action." (Compl. at 22–24). The first cause of action is against defendant Durkin for his involvement in the Eighth and Fourteenth Amendment violations. (*Id.* at 22). The second cause of action is against defendant Bisso (*Id.*); the third and fourth causes of action are against defendant Russell (*Id.* at 22–23); the fifth cause of action is against defendants Barnes and Tuller, for their "malicious" assault and torture (*Id.* at 23); the sixth cause of action is against defendants Plumbly, Bisso, and Sears (*Id.*

at 24); and the seventh cause of action is against defendants Plumbly and Sears. (*Id.*)

## II. *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

 **\*5** In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York Times, Co.,* 328 F.3d 50, 57 (2d Cir.2003) (citing *inter alia County Vanlines, Inc. v. Experian Info. Solutions, Inc.,* 205 F.R.D. 148, 154 (S.D.N.Y.2002) (taking judicial notice of NLRB decisions)). *See also Combier Kapel v. Biegelson,* 242 F. App'x 714, 715 (2d Cir.2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the administrative record of an IDEA case); *In re Howard's Exp., Inc.,* 151 F. App'x 46, 48 (2d Cir.2005)

(taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Services, LLC,* No. 3:12–CV–1066, 2013 WL 3299708, at \*6 (D.Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

## III. *Exhaustion of Administrative Remedies*

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state procedural rules, including meeting appropriate deadlines. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion is a prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Second Circuit specifically held that completion of the administrative review process includes receiving the decision on the final appeal of a grievance **prior to** filing the federal action.

 **\*6** The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse

decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[10] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

[10]    *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford,* it has noted in more recent cases, that the exhaustion requirement may be excused, as have other district courts.[11] *See, e.g., Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007) (using the three-part inquiry); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009) (recognizing that there may be exceptions to

the exhaustion requirement); *Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011) (using the three-part inquiry); *Carlson v. Parry,* No. 06–CV–6621, 2013 WL 5354517, at *9–10 (W.D.N.Y. Sept.24, 2013) (recognizing that the exhaustion requirement may be excused); *Morrison v. Hartman,* 898 F.Supp.2d 577, 581 (W.D.N.Y.2012) (same).

[11]    This court also notes that, based upon the concurring opinion in *Woodford,* it appears that the Second Circuit decisions have *not* been overruled in that respect. In his concurring opinion in *Woodford,* Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 548 U.S. at 104 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates." Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

**B. Application**

In this case defendants argue that plaintiff admits that he failed to exhaust his administrative remedies with respect to the first and third incident. (Def.s' Mem. of Law at 5–10). They also argue that plaintiff has failed to allege that the remedies were "unavailable," that he was prevented from exhausting, or that "special circumstances" existed which would excuse his failure to exhaust. (*Id.*) This court cannot agree that plaintiff's alleged failure to exhaust is clear. Plaintiff states that "the court understands why he was unable to griev. [sic] the first and third incidents." (Compl. at 21). While this statement appears to concede that he did not exhaust his administrative remedies with respect to the first and third incidents, on the same page, he appears to claim that he was threatened and mentally ill.

**\*7** The court also notes that on the third page of the complaint, plaintiff answered "yes" to the question of whether he presented the facts relating to his complaint in grievance program. (Compl. at 3). He states that "the Grievance process was ***completed*** on [sic] Second and Third Incidents," but

that "not all of the facts" were presented relative to the first incident. (*Id.*) (emphasis added). Thus, it is unclear whether the statement cited by defendants is a concession by plaintiff that he failed to exhaust. Defendant argues that a motion to dismiss pursuant to Rule 12(b) (6) is appropriate when the failure to exhaust is "apparent from the face of the complaint." (Def.s' Mem. of Law at 8) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 249 (S.D.N.Y.2003)). However, based on the inconsistency in plaintiff's complaint, and the following discussion regarding whether exhaustion should be excused even if he did fail to exhaust, this court cannot find that a motion to dismiss is appropriate.

Defendants argue that "[c]onspicuously absent" from the complaint is any claim that he is exempt from exhaustion for any of the "enumerated" reasons in *Hemphill.* (Def.s' Mem. of Law at 9). The failure of an inmate to file an internal grievance may be excused where the inmate establishes that he was threatened, and that the threat was "sufficient to render grievance procedures unavailable." *Snyder v. Whittier,* 428 F. App'x at 91. Whether a threat was sufficient to render grievance procedures unavailable involves an objective inquiry as to whether "a similarly situated individual of ordinary firmness would have deemed [the procedure] [un]available." *Carlson v. Parry,* No. 06–CV–6621, 2013 WL 5354517, at *9–10 (W.D.N.Y. Sept.24, 2013) (quoting *Hemphill v. New York,* 380 F.3d at 688) (alterations in original).

A generalized fear for the inmate's personal safety or fear of retaliation is insufficient to render the grievance procedures unavailable. *See Brown v. Napoli,* 687 F.Supp.2d 295, 297 (W.D.N.Y.2009). This "generalized fear" is insufficient because "[i]f every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims." *Harrison v. Stallone,* No. 9:06–CV–902, 2007 WL 2789473, *6 (N.D.N.Y.2007). In order to render the grievance procedure "unavailable," the fear of retaliation must be "reasonable." *Id.* (citing *Thomas v. Casseleberry,* No. 03–CV–6394, 2007 U.S. Dist. LEXIS 30129, at *3–6, 2007 WL 1231485 (W.D.N.Y. Apr. 24, 2007). In *Thomas,* the court found that plaintiff's allegations concerning widespread beatings at Southport Correctional Facility and his claim that he was "personally" threatened by defendants if he did not "drop it," were sufficient to create a "reasonable fear of retaliation," rendering the grievance procedure unavailable to plaintiff and excusing his failure to exhaust. *Id.* at *3.

**\*8** In this case, plaintiff alleges more than a generalized fear of retaliation. In connection with the first incident, plaintiff alleges that he was told "we break bones you better not tell on us." (Compl. at 13). Plaintiff states that defendant Plumbly told him that he would be beaten within an inch of his life, and that plaintiff could tell who he wanted, because Plumbly's word was "like Gold around here." (Compl. at 20). In the next paragraph, plaintiff states that he was unable to file a grievance "for fear of his life." (*Id.*) Plaintiff claims that his life has been threatened several times, and that the court "can understand why he was unable to" file a grievance with respect to the first and third incidents. [12]

> [12] The court also understands that plaintiff's statements are inconsistent and that if he truly feared for his life, he would not have exhausted his claims regarding any of the incidents. However, this is a motion to dismiss, and the court must accept the statements plaintiff makes as true. Questions regarding the facts may be determined on a subsequent dispositive motion after some discovery has taken place.

Finally, plaintiff appears to allege that his mental health status has kept him from properly exhausting his administrative remedies. Plaintiff's actual mental health diagnoses are not clear. Courts have declined to use a plaintiff's physical or mental condition to excuse the exhaustion requirement unless his condition made him "physically or mentally unable to comply with the grievance process." *See Johnson v. New York City Dep't of Correct,* No. 13 Civ. 6799, 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) (granting a motion to dismiss for failure to exhaust by schizophrenic inmate) (quoting *Bennett v. James,* 737 F.Supp.2d 219, 227–28 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)). In *Johnson,* the court declined to find that plaintiff's mental condition excused his failure to exhaust because the plaintiff did not allege that his schizophrenia interfered with his ability to utilize the grievance process, and there were no facts in the record, indicating that his mental condition rendered him unable to file a grievance during the relevant time. *Id.*

The court must keep in mind that the burden of showing that plaintiff did not exhaust his remedies lies with defendants. *Key v. Toussaint, supra.* In this case, plaintiff has at least attempted to allege that his mental condition prevented him from filing his grievances. Whether that allegation is meritorious cannot be determined solely by reviewing the

complaint. The court notes that plaintiff's two attempts at responding to the defendants' motion to dismiss raise some questions as to his ability to express himself. (Dkt.Nos.36, 36). Thus, this court will not recommend dismissal for failure to exhaust administrative remedies at this time. The court does not preclude a later finding that plaintiff did not exhaust, after some discovery, and a properly supported summary judgment motion.

## IV. *Excessive Force*

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillan,* 503 U.S. 1,9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

**\*9** In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be ' "inconsistent with the contemporary standards of decency.' " *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). ' "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has

identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

### B. Application

Defendants' motion to dismiss addresses only the merits of the claims arising from the "second" incident, based on the defense argument that plaintiff failed to exhaust the claims relating to the first and third incidents. Thus, this court will only address the second incident and will find that plaintiff's claims regarding the first and third incidents may go forward at this time. Defendants argue that plaintiff does not meet either the objective or the subjective prong of the Eighth Amendment analysis. (Def.s' Mem. of Law at 12–16).

There are two parts to the second incident. Plaintiff concedes that he "lost control" on November 5, 2011. Admittedly, he grabbed a thermometer and tried to swallow it, and then subsequently started to stab himself in the arm. (Compl. at 14). It is clear that such conduct could require the guards to subdue plaintiff and place handcuffs on him to prevent any further injury to himself. Plaintiff alleges that defendants Russell and Hamelin entered his cell, pinned him down and applied handcuffs. (Compl. at 15). Plaintiff claims that the officers then bent plaintiff's ankles and legs into a "breaking" position, while plaintiff was screaming out in pain, begging them to stop hurting him. (*Id.*) Sergeant Bisso allegedly ordered defendants Russell and Hamelin to take plaintiff out of the cell, and as plaintiff was screaming in pain because he could not walk, told plaintiff that when "they get through with you[,] you won't be able to walk." (*Id.* at 16). Plaintiff was then "dragged" off the second floor, down to the emergency room clinic. (*Id.* at 15)

**\*10** Defendants cite cases, holding that de minimis force, together with a lack of injury do not rise to the level of an Eighth Amendment violation. However, although handcuffs must be reasonably tight to be effective, and lack of a continuing injury beyond temporary discomfort is fatal to an Eighth Amendment claim, it is also true that overly tight handcuffing can constitute excessive force. *Milo v. City of New York,* No. 14–CV–1172, 2014 WL 5933091, at \*6 (E.D.N.Y. Nov.14, 2014) (citing *Lemmo v. McCoy,* No. 08–CV–4264, 2011 WL 843974, at \*5 (E.D.N.Y.2011); *Lynch ex rel. Lynch v. City of Mt. Vernon,* 567 F.Supp.2d

459, 468 (S.D.N.Y.2008)). In *Lynch,* the court stated that in evaluating the reasonableness of handcuffing, the court must consider whether the handcuffs were unreasonably tight, whether the defendants ignored the plaintiff's statements that the handcuffs were too tight, and the degree of injury to the wrists. *Lynch,* 567 F.Supp.2d at 468 (multiple citations omitted).

In this case, plaintiff claims more than just tight handcuffing. He alleges that while placing the handcuffs on plaintiff, the defendants were bending his ankles and his legs back to the point where he claimed that he could not walk to the emergency room as a result. [13] Plaintiff claims that when he told defendant Bisso that he could not walk, defendant Bisso made a threatening comment. Plaintiff then claims that he was dragged off of the second floor. The court in *Lynch* was considering a motion for summary judgment and would have been able to analyze the required factors after the parties had engaged in some discovery regarding the incident. While it is possible that this plaintiff may not succeed on a motion for summary judgment, based on either a lack of continuing injury, or on a de minimis use of force, plaintiff's allegations appear to be sufficient to withstand a motion to dismiss.

[13]  Plaintiff refers to this as a "breaking position." This term is not clear to the court, and plaintiff may be having trouble expressing himself. This would be another reason to allow some discovery regarding the incidents that plaintiff describes.

The second part of the incident involves defendants Barnes, Tuller, and Durkin. Plaintiff claims that these defendants "took control" of plaintiff when he got to the emergency room. Plaintiff alleges that defendant Durkin took part in "torturing" plaintiff. (Compl. at 16). Plaintiff claims that defendants Barnes and Tuller drove something that felt like a steel cuff into plaintiff's ankle, and then held smelling salt up to his nose so that he would not faint from the pain, while telling him that they could "do this all day." (*Id.* at 16–17) Although defendants claim that plaintiff has not alleged "malicious intent," plaintiff's description of the entire incident, beginning with the word "torture," and ending with the allegation that the defendants implied that they could make the pain last all day is certainly indicative of malicious intent. Plaintiff claims that this conduct, which does not appear to be related to any reasonable basis, "went on for some time." (*Id.* at 17).

Plaintiff also alleges that defendant Durkin ordered plaintiff to stand for the photographs to be taken, and when he could

not stand, the other officers twisted plaintiff's wrists in order to force him to stand. (*Id.* at 17–18). Plaintiff also appears to claim that by the time he was forced to stand, the smelling salts made his lungs feel like they were going to collapse. (*Id.*) While the court does find that there are inconsistencies in plaintiff's complaint, and as stated above, his allegations may not withstand a motion for summary judgment, plaintiff has made sufficient allegations to withstand a motion to dismiss.

## V. *Fourteenth Amendment*

### A. Legal Standards

**\*11**  Under the appropriate circumstances, a plaintiff may base an excessive force claim on the Fourth, Eighth, or Fourteenth Amendments. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The court specifically found that the two primary sources of a plaintiff's rights are the Fourth Amendment (unreasonable seizure of a free citizen) and the Eighth Amendment (cruel and unusual punishment applied to convicted prisoners). *Id.* at 394–95. Claims of excessive force against pre-trial detainees have been analyzed under the Fourteenth Amendment. *Richardson v. Providence,* No. 09–CV–4647, 2011 WL 3701887, at \*6 (E.D.N.Y. Aug. 22, 2011) (citation omitted).

### B. Application

Defendants argue that to the extent that plaintiff bases this action on substantive due process under the Fourteenth Amendment, it must be dismissed. (Def.s' Mem. of Law at 16–17). Plaintiff in this case is a convicted inmate, and thus, his allegations of excessive force arise under the Eighth Amendment. To the extent that the plaintiff makes claims of Fourteenth Amendment violations, these may be dismissed. [14]

[14]  The court notes that the standard for excessive force used in either analysis is the same. *Richardson v. Providence,* 2011 WL 3701887, at \*6 n. 2 (citations omitted).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 30) be **GRANTED** only to the extent that plaintiff bases his claims on the Fourteenth Amendment, and it is

2014 WL 7409915

**RECOMMENDED,** that the defendants' motion to dismiss (Dkt. No. 30) be **DENIED IN ALL OTHER RESPECTS,** and it is

**ORDERED,** that plaintiff's motion for an extension of time to respond to the defendants' motion (Dkt. No. 38) is **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Dec. 8, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 7409915

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4947118
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Clive DECOLINES, Plaintiff,

v.

D. HOLLENBECK, et al., Defendants.

9:20-CV-1502 (MAD/ATB)
|
Signed 10/25/2021

**Attorneys and Law Firms**

CLIVE DECOLINES, 17-A-2433, Upstate Correctional Facility, P.O. Box 2001, Malone, New York 12953, Plaintiff, pro se.

OF COUNSEL: BRENDA T. BADDAM, AAG, OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, The Capitol, Albany, New York 12224-0341, Attorney for Defendants.

**DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**\*1** Plaintiff Clive Decolines ("Plaintiff") commenced this action *pro se* on December 7, 2020, against Defendants D. Hollenbeck, DA Hallock, JH Anctil, BJ Alvoie, and KD St. Mary ("Defendants") and, pursuant to a Decision and Order from this Court issued on January 7, 2021, two of Plaintiff's claims survived. *See* Dkt. Nos. 1, 7. On March 22, 2021, Defendants moved for summary judgment on the remaining two claims, arguing that they should be dismissed because Plaintiff failed to exhaust administrative remedies prior to commencing this action. *See* Dkt. No. 17. Following Plaintiff's response in opposition to the motion and Defendants' reply, Magistrate Judge Andrew T. Baxter issued a Report-Recommendation on June 15, 2021, which recommended that Defendants' motion be denied. *See* Dkt. No. 27. On July 8, 2021, Defendants filed an objection to Magistrate Judge Baxter's Report-Recommendation. *See* Dkt. No. 30. Presently before this Court is Defendants' motion for summary judgment. Dkt. No. 17. As set forth below, this Court adopts Magistrate Judge Baxter's Report-Recommendation and denies Defendants' motion for summary judgment.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Chambers*, 43 F.3d at 36-37 (quotation and other citation omitted). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). Further, "[i]f the party opposing summary judgment is proceeding *pro se*, the court must read his opposition papers 'liberally and interpret them to raise the strongest arguments that they suggest.' " *Rodriguez v. C.O. Reppert*, No. 14-CV-671,

2016 WL 11483439, *2 (W.D.N.Y. Sept. 28, 2016) (quoting *Morrison v. Parmele*, 892 F. Supp. 2d 485, 487 (W.D.N.Y. 2012)). "This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment." *Govan*, 289 F. Supp. 2d at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a pro se party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**\*2** Defendants argue that they are entitled to summary judgment because Plaintiff failed to fully exhaust administrative remedies available to him prior to commencing this action. *See* Dkt. Nos. 17, 26, 30. The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted). The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford*, 548 U.S. at 90-103.

As Magistrate Judge Baxter correctly pointed out, until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether the defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake* 578 U.S. 632, 639-40 (2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 Fed. Appx. 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* removed the judicial discretion of the "special circumstances" exception, the other two factors in *Hemphill* of availability and estoppel remain relevant. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.*; *see also Riles*, 656 Fed. Appx. at 580.

The Supreme Court in *Ross* stated that an administrative procedure is "unavailable" when (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643-44. If prison administrators "thwart" inmates from taking advantage of the grievance process through "machination, misrepresentation, or intimidation," the administrative remedies are "unavailable," and the inmate is excused from the exhaustion requirement, regardless of which "official" prevented the inmate from filing the grievance. *Id.* at 644. Where an inmate plausibly alleges that his failure to file a grievance was due to threats of physical harm by facility staff, there exists a material question of fact as to whether the defendant officers may rely upon the inmate's non-exhaustion as an affirmative defense. *See, e.g., Hemphill*, 380 F.3d at 688 (remanding for determination of availability of administrative remedies where an officer threatened to retaliate against the plaintiff if he filed a complaint); *Adams v. O'Hara*, No. 9:16-CV-527, 2018 WL 5728040, *6-7 (N.D.N.Y. July 24, 2018); *Morrison v. Hartman*, No. 07-CV-6633L, 2010 WL 811319, *3 (W.D.N.Y. Mar. 3, 2010); *Lunney v. Brureton*, No. 04 CIV 2438, 2007 WL 1544629, *9 (S.D.N.Y. May 29, 2007) (collecting cases).

**\*3** Defendants correctly point out that a " 'generalized fear of retaliation,' ... is not sufficient to excuse the failure [of an inmate] to exhaust his administrative remedies." *Grant v. Kopp*, No. 17-CV-1224, 2019 WL 368378, \*7 (N.D.N.Y. Jan. 3, 2019) (quoting *Bookman v. Lindstrand*, No. 15-CV-1542, 2018 WL 3121688, \*10–11 (N.D.N.Y. Feb. 14, 2018)). However, Plaintiff alleges reasonably specific allegations that he was threatened and assaulted because of his prior filing of a grievance, which was ripped up before him, and his failure to keep his "mouth shut".

Defendants rely primarily on three cases (*McNab*, *Pridgen* and *Grant*) to support their contention that Plaintiff's fear was merely a generalized fear of retaliation and thus not sufficient to excuse his failure to exhaust. *See* Dkt. No. 30. However, the facts of *McNab*, *Pridgen* and *Grant* are distinguishable to those alleged in the present case. [1] In *McNab*, the court held that the plaintiff failed to exhaust his administrative remedies, noting that he failed to appeal the denial of his informal grievance in accordance with the applicable procedural rules. *McNab v. Doe*, 686 Fed. Appx. 49, 51 (2d Cir. 2017). Defendants cite the portion of the opinion that concludes that "none of the actions allegedly taken by the defendants actually prevented [plaintiff] from submitting his complaint letter[,]" but fail to recognize the significance of this. *Id.* In *McNab*, the plaintiff reported the grievance in a "letter of complaint" received by Deputy Superintendent for Security Services Robert I. Morton, which was followed by an investigation, and follow-up letters to the Inspector General and other officials, but the plaintiff never initiated a formal grievance under the grievance process. *McNab v. New York*, No. 12-CV-26, 2015 WL 13744629, \*7 (N.D.N.Y. Dec. 7, 2015). Furthermore, the plaintiff affirmatively stated that the officers' behavior designed to "harass and intimidate him" would not "stop plaintiff from going further" with his grievance. *Id.* at \*2. From this, it is clear that the plaintiff in *McNab* was not so intimidated as to have the grievance process "unavailable" to him since he did complain to officials in the facility without fear of retaliation, but he simply failed to file a formal grievance.

[1]   Evidence and all reasonable inferences are construed in Plaintiff's favor as the non-moving party. *See, e.g.*, *Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013).

In *Pridgen*, the plaintiff alleged he was assaulted, threatened, placed in the Special Housing Unit ("SHU") for eleven days, and "heard" officers "ripping up" the "grievance paper"

he had given to the officers to file. *Pridgen v. Beatie*, No. 16-CV-535, 2018 WL 1402049, \*2 (N.D.N.Y. Jan. 17, 2018). After being released from the SHU, the plaintiff was transferred to another correctional facility where he remained for eighteen months, where he could have timely filed a grievance but failed to do so because he said that other inmates told him he would suffer retaliation from other officers if he did. *Id.* The plaintiff in that case did not indicate that the officers at the new facility intimidated him into not filing a grievance. *Id.* In the instant case, Plaintiff was also transferred to another facility after being released from the SHU; however, as Magistrate Judge Baxter points out, the transfer was well after the time to pursue administrative remedies had elapsed. *See* Dkt. No. 27. Furthermore, as the court in *Hunter* noted while distinguishing the facts in that case, the plaintiff in *Pridgen* did attempt to file a grievance and his "contention that the grievance process was unavailable to him because of this fear of retaliation was 'belied by his conduct after the incident.' " *Hunter v. Rouse*, No. 20-CV-65, 2020 WL 8474744, \*4 (N.D.N.Y. Sept. 17, 2020) (quoting *Pridgen*, 2018 WL 1402049, at \*8).

**\*4** Defendants also cite to *Grant* in support of their position. As with *McNab* above, however, the plaintiff in *Grant* was not deterred from filing a grievance by alleged conduct of the officers involved. *Grant*, 2019 WL 368378, at \*2 (holding that "[a]lthough plaintiff testified that a prison official told him on one occasion to 'leave it alone' and that papers in his cell were either missing or in disarray at some unspecified point, the absence of any specific, affirmative threats of retaliation—particularly when these generalized threats did not actually prevent[ ] plaintiff from successfully utilizing the grievance procedure—leads [the court] to conclude that plaintiff has failed to meet his burden of production with respect to unavailability").

Alleged threats and violence are sufficient to excuse the failure to exhaust administrative remedies when they are "such that a person of ordinary firmness would be deterred from using the facility's internal grievance process." *Hepworth v. Suffolk Cty.*, No. 2:02-CV-6473, 2006 WL 2844408, \*5-6 (E.D.N.Y. Sept. 29, 2006); *see also Hunter*, 2020 WL 8474744, at \*3-4. The court in *Hunter* held that a statement to the plaintiff that if he told "anyone what happened, the next time [the plaintiff] won't walk away" was a sufficiently specific threat of retaliation to excuse the plaintiff from failing to exhaust his administrative remedies. *Hunter*, 2020 WL 8474744, at \*4. Similarly, in the instant case, Plaintiff alleges that one of the officers said "you like

writing grievances" prior to an assault and one told him "you should've kept your mouth shut n----r you wouldn't be going [through] this" while Plaintiff was being assaulted. Dkt. No. 25 at ¶ 8; *see also* Dkt. Nos. 22, 27. This experience would "deter a prisoner of 'ordinary firmness' from filing an internal grievance," and Plaintiff implies it did actually deter him from filing a grievance while in the SHU at Upstate Correctional Facility. *See* Dkt. Nos. 22, 25; *see also Hemphill,* 380 F.3d at 689.

Having reviewed Magistrate Judge Baxter's June 15, 2021, Report-Recommendation, the record, and the applicable law, the Court concludes that Magistrate Judge Baxter correctly recommended that the Court should deny Defendants' motion for summary judgment.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 27) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 17) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 4947118

---

**End of Document**                                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1292232
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Emanuel M. BROOKS Jr., Plaintiff,

v.

P. ROCK et al., Defendants.

No. 9:11–cv–1171 (GLS/ATB).
|
Signed March 28, 2014.

**Attorneys and Law Firms**

Emanuel M. Brooks Jr., Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Emanuel M. Brooks Jr. commenced this action against defendants P. Rock, P. Chase,[1] T. LaValley, R. Paquette–Monthie,[2] and Eric Gutwein[3] alleging a host of civil rights violations pursuant to 42 U.S.C. § 1983. (*See generally* Compl., Dkt. No. 1.) Following the dismissal of some claims, (Dkt. No. 17), defendants moved for summary judgment dismissing the complaint in its entirety. (Dkt. No. 42). Brooks also moved for preliminary injunctions and the appointment of counsel. (Dkt.Nos.54, 58.) In a Report–Recommendation (R & R) dated January 17, 2014, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted, and that Brooks' motions be denied. (Dkt. No. 60.) Pending is Brooks' "Motion of Appeal and Objection to [Decision]," which, as explained below, is liberally construed as both an objection to the R & R and request for leave to amend. (Dkt. No. 62.) For the reasons that follow, the R & R is adopted in its entirety, and leave to amend is denied.

1. Brooks named "P. Chaste" in his complaint, (Compl. at 1, 2), but it is apparent that the proper spelling of that individual's name is Chase, (Dkt. No. 42, Attach.3).

2. While the complaint names "R. Paquette" and "Monthie" as separate defendants, (Compl. at 1, 2), they are one in the same: Roberta PaquetteMonthie. (Dkt. No. 42, Attach.12.)

3. Brooks named "Eric Mutuein" as a defendant in his complaint. (Compl. at 1, 2.) It is clear, however, that he intended to name Eric Gutwein as a party defendant. (Dkt. No. 42, Attach.14.)

### II. *Background*

Brooks, an inmate in the custody of the New York Department of Corrections and Community Supervision (DOCCS), was housed at Clinton Correctional Facility for the first time period relevant to his complaint. (Dkt. No. 42, Attach. 5 at 4; Compl. at 5.) While at Clinton, Brooks contends that Rock opened a door, which hit him extremely hard in the forehead, refused him speedy medical attention for his head injury, and falsely charged him with misbehavior. (Compl. at 5.) Chase, who found Brooks not guilty of the charges lodged by Rock, (Defs.' Statement of Material Facts (SMF) ¶ 39, Dkt. No. 42, Attach. 16), allegedly threatened Brooks that he was "going to get [him] at the next [correctional facility]," (Compl. at 5).

Thereafter, Brooks was transferred to Coxsackie Correctional Facility. (Dkt. No. 42, Attach. 5 at 4.) Brooks claims that LaValley arranged for his transfer to Coxsackie, despite his request to be transferred to Sing Sing Correctional Facility, in retaliation for filing a grievance regarding Rock. (Compl. at 6.) While at Coxsackie, Brooks was cited for misbehavior by Paquette–Monthie, (Dkt. No. 42, Attach. 13 at 8); Brooks claims that the misbehavior report was filed in retaliation for his complaint about Rock while at Clinton, (Compl. at 7.) According to Brooks, Gutwein, who presided at Brooks' disciplinary hearing on the Coxsackie misbehavior report, (Dkt. No. 42, Attach. 14 ¶ 5), improperly denied Brooks' requests to produce certain witnesses and evidence, found him guilty of the charged conduct, and sentenced him to six months in the special housing unit along with six months loss of good time, (Compl. at 7–8.)

This action was filed on September 30, 2011. (*See generally* Compl.) In October 2012, following several delays

2014 WL 1292232

attributable to Brooks before service of process occurred, (Dkt No. 7 at 7–10; Dkts. Nos. 9, 12, 13, 15, 16, 17), defendants moved to dismiss pursuant to Rule 12(b)(6), (Dkt. No. 31). In response, Brooks sought leave to amend. (Dkt. No. 36.) The court converted defendants' motion to dismiss to a motion seeking summary judgment and denied Brooks' motion for leave to amend for failure to comply with the Local Rules of Practice, but explained that "[i]f, after resolution of the summary judgment motion, [he] still wish[ed] to amend his complaint, he [could do so] in the proper form." (Dkt. No. 38 at 9–10.) In May 2013, defendants filed their motion for summary judgment consistent with the court's conversion of their earlier-filed motion to dismiss. (Dkt. No. 42.) Before that motion for summary judgment was considered by the court, Brooks filed the aforementioned motions for appointment of counsel and preliminary injunctions. (Dkt.Nos.54, 58.)

**\*2** In a January 17, 2014 R & R, Judge Baxter recommended that defendants' motion for summary judgment be granted.[4] (Dkt. No. 60 at 60.) As pertinent here, Judge Baxter determined that: (1) issues of fact precluded summary judgment regarding Brooks' exhaustion of administrative remedies with respect to his claims against Rock; (2) Brooks failed to exhaust his administrative remedies with respect to his claims against Chase and LaValley; and (3) despite his failure to exhaust with respect to Chase and LaValley, all claims, against all defendants, were subject to dismissal on the merits. (*Id.* at 7.)

[4]     Notably, Judge Baxter considered new facts that were first submitted by Brooks in his motion seeking leave to amend even though they were "not technically part of the complaint." (Dkt. No. 60 at 51–60.)

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–7 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error.[5] *See id.*

[5]     "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 WL 149049, at \*6.

### IV. *Discussion*

As an initial matter, the court must make sense of Brooks' submission, which he has titled "Motion of Appeal and Objection to [Decision]." (Dkt. No. 62.) The only references made to the R & R in that filing concern Brooks' contention that defendants "[l]ied in the summary [j]udg[ ]ment [when] they all testified and stated that ... plaintiff never file[d] a grievance or at[tempted] to exhaus[t] his [administrative remedies]." (*Id.* at 1–2, 10.) The balance of Brooks' submission contains allegations, made for the first time, that defendants, DOCCS, and potentially other unnamed individuals,[6] failed and/or refused to protect him from a conspiracy-related to an incident that occurred on December 2, 2013 at Clinton-to murder him "in further [retaliation]." (*Id.* at 2–13.) In light of the new allegations, Brooks requests a "Motion of discover," "Motion for permanent order of restrain," "Motion for chain of custody," and a "Tellephone an commer emergency Confrence." (*Id.* at 8, 9.) Bearing in mind Brooks' *pro se* status, the court treats his assertion that defendants are dishonest regarding his exhaustion of administrative remedies as an objection to the R & R, and it considers the remainder of Brooks' submission as a motion seeking leave to amend his complaint.[7]

[6]     Brooks writes "I'am adding defendant to my existing prior civil suit," yet he seems to assert new wrongdoing only on the part of DOCCS for "fail[ing] to protect and refus[ing] to put [him] in midstate A.P.P.U. under federal [p]rotection." (Dkt. No. 62 at 3.) Elsewhere, Brooks refers to "new defendants added." (*Id.* at 5 .)

[7]     Buried within his submission, Brooks "request[s] to fill Amendent Complaint have discovery In new defendants added." (Dkt. No. 62 at 5.) Construing this statement liberally, as the court must, *see Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006), it can safely be assumed that Brooks seeks leave to amend.

### A. *Objection*

While it appears that Brooks' objection is specific, and, thus, is deserving of *de novo* review, *see Almonte,* 2006 WL 149049, at *6–7, even if the court accepts as true his allegation that defendants "lied" in support of their argument that he failed to exhaust his administrative remedies, (Dkt. No. 62 at 1–2, 10), that fact would not impact Judge Baxter's ultimate recommendation of dismissal. Indeed, despite the finding that Brooks failed to exhaust with respect to some of his claims, the R & R recommends dismissal of all claims on the merits, (Dkt. No. 60 at 7, 60), a reality that Brooks overlooks entirely. Nonetheless, the court has carefully reviewed the R & R for clear error and finds none. As such, the R & R is adopted in its entirety.

**B. *Leave to Amend***

**\*3** Defendants argue that leave to amend should be denied because: (1) the new allegations "have absolutely nothing to do with the incidents in [Brooks' c]omplaint, or the named defendants"; (2) Brooks failed to submit a proposed amended pleading in compliance with Local Rule 7.1(a)(4); and (3) a late amendment "would prejudice the right of the current defendants to a speedy conclusion of this action." (Dkt. No. 63 at 2.) The court agrees that Brooks should not be granted leave to amend.

At the outset, the court is cognizant of the fact that Brooks has had no prior opportunity to file an amended pleading. This is so despite the fact that this action has been pending for well over two years. Indeed, the posture of this case is somewhat peculiar in that the summons and complaint were not served upon defendants until nearly one year after commencement. (Dkt.Nos.17–20, 23–25.) The wheels of justice have churned at an admirable pace since; nonetheless, given the natural progression of this litigation, a significant amount of time has elapsed. Before filing an answer, defendants moved to dismiss, and later, after the court's conversion of that motion, augmented the record and filed a summary judgment motion. (Dkt.Nos.31, 38, 42.) The court is also mindful that discovery has not commenced.

Brooks was previously informed that if, after resolution of the summary judgment motion, he still wished to amend his complaint, he had to do so by making "a motion to amend in the proper form." (Dkt. No. 38 at 10.) Despite the explicit nature of the court's prior order, Brooks' latest request, which is based on facts that did not occur until December 2013, (Dkt. No. 62 at 5, 6), is not in proper form. *See* N.D.N.Y. L.R. 7.1(a)(4) (requiring, among other things, that a party seeking

leave to amend "must attach an unsigned copy of the proposed amended pleading to its motion papers").

More fundamentally, however, Brooks' latest allegations are not sufficiently related to his underlying claims to warrant amendment under Fed.R.Civ.P. 15. *See Jolley v. Meachum,* 210 F.3d 354, 2000 WL 427276, at *1 (2d Cir.2000) ( "As for the claims that were unknown to [the plaintiff] at the time he filed his original complaint, we agree with the district court's determination that these claims were not sufficiently related to [the plaintiff]'s original claim, and therefore they could not be added to his original complaint."); *Smith v. Yonkers Police Dep't,* 152 F.3d 920, 1998 WL 433005, at *1 (2d Cir.1998) (holding that the district court did not abuse its discretion in denying a motion to amend made five years after commencement of the action that sought to allege "a claim wholly unrelated to [the original pleading]"); *Jones v. Fischer,* No. 9:11–cv–774, 2013 WL 4039377, at *2 n. 6 (N.D.N.Y. Aug. 7, 2013) (explaining that new factual allegations, raised for the first time along with objections, would be disregarded where those "allegations have nothing whatsoever to do with claims that were asserted in the [operative pleading]"). Indeed, the only link between the new allegations that DOCCS has failed to protect Brooks from a murder conspiracy and defendants is his wispy assertion that defendants are participating in that failure or refusal to protect Brooks "in *further* [retaliation]." (Dkt. No. 62 at 3 (emphasis added).) Liberally read, this suggests that defendants' new alleged failure to protect Brooks is because of the same grievances that were at the center of his original retaliation claims. The highly tenuous relationship between the new and original allegations is insufficient to serve as a basis for leave to amend, particularly when coupled with the significant lapse of time between the facts alleged in the complaint, which occurred in 2011, (Compl. at 5, 12–20), and Brooks' claim about an incident that occurred in December 2013, (Dkt. No. 62 at 5–6). *See Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574, at *10 (W.D.N.Y. June 25, 2012). Accordingly, leave to amend is denied.

**V. *Conclusion***

**\*4 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's ReportRecommendation (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

ORDERED that Brooks' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

ORDERED that Brooks' motion for the appointment of counsel (Dkt. No. 58) is **DENIED;** and it is further

ORDERED that Brooks' motions for preliminary injunctions (Dkt.Nos.54, 58) are **DENIED** as moot; and it is further

ORDERED that Brooks' motion for leave to amend his complaint (Dkt. No. 62) is **DENIED;** and it is further

ORDERED that the Clerk close this case; and it is further

ORDERED that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 42). This matter was referred for Report and Recommendation on May 22, 2013 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

On October 31, 2012, defendants filed a motion to dismiss plaintiff's civil rights action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 31). Plaintiff responded (Dkt. No. 36) and defendants filed a reply (Dkt. No. 37). By Decision and Order dated March 29, 2013, this court converted the Rule 12(b)(6) motion to one for summary judgment, and provided the parties with an opportunity to file supplemental papers. (Dkt. No 38). On May 20, 2013, defendants filed a complete motion for summary judgment (Dkt.Nos.42, 43), but also continued to rely on papers submitted in connection with the prior Rule 12(b)(6) motion. Plaintiff has opposed the motion for summary judgment (Dkt. No. 52); he has also filed two motions for preliminary injunctions, one of which included a motion for appointment of counsel (Dkt.Nos.54, 58), to which defendants have responded (Dkt.Nos.57, 59).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be granted on most of the grounds raised therein, and that plaintiff's complaint be dismissed in its entirety. In light of this recommendation, this court also recommends that plaintiff's motion for appointment of counsel be denied and his motions for preliminary injunctions be found moot.

### BACKGROUND

On and before June 15, 2011, plaintiff was confined by the New York Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton") in Danemora, in the northeastern corner of New York. Plaintiff alleges that, on that date, Correction Officer ("C.O.") P. Rock "bust open" the door to the bathroom that plaintiff was using, causing the door to hit him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5). [1] Although plaintiff was injured, defendant Rock refused to take plaintiff for immediate medical attention; and plaintiff did not receive any medical care until two days later. (*Id.*).

[1] Because plaintiff's complaint does not have consecutive pagination or consistent paragraph numbering, the court will refer to the page numbers assigned by the CM–ECF system in the document header.

**\*5** C.O. Rock prepared a misbehavior report, charging plaintiff with smoking in the bathroom, a copy of which was served on plaintiff at 7:00 a.m. on June 16th. (*Id.;* Dkt. No. 36 at 67). Plaintiff attached to his complaint a letter, dated June 15th, addressed to Superintendent LaValley, complaining about C.O. Rock's conduct earlier that day. (Dkt. No. 1 at 12). Plaintiff claims that he also filed a formal grievance with respect to the incident involving defendant Rock and later submitted appeals when he received no response to his initial grievance. (Compl., Dkt. No. 1 at 3–4, 13–20).

Lt. Chase [2] conducted a disciplinary hearing and found plaintiff not guilty on the misbehavior report filed by C.O. Rock. Plaintiff alleges that defendant Chase stated that, although he could not "get me at this facility [,] ... he was going to get me at the next one." (Compl., Dkt. No. 1 at 5). Plaintiff further alleges that, although he had requested a transfer to the Sing Sing Correctional Facility ("Sing Sing"), Supt. LaValley had plaintiff promptly transferred to

Coxsackie Correctional Facility (Coxsackie), in retaliation for the complaint against C.O. Rock, which plaintiff submitted to defendant LaValley. (Compl., Dkt. No. 1 at 6, 7; Dkt. No. 36 at 40).

2       Plaintiff incorrectly refers to defendant Peter **Chase** as "P. **Chaste.**" The court will use this defendant's correct name.

On July 7, 2011, shortly after his arrival at Coxsackie, Counselor PaquetteMonthie issued plaintiff a misbehavior report for placing telephone calls to his wife from other facilities, in violation of an order of protection issued in connection with an earlier prosecution of plaintiff. (Compl., Dkt. No. 1 at 7; Dkt. No. 31–2 at 2). Plaintiff alleges that defendant Paquette–Monthie wrote the misbehavior report in retaliation for plaintiff's complaint about C.O. Rock at Clinton. (Compl., Dkt. No. 1 at 7). In exhibits attached to his response to the Rule 12(b)(6) motion, plaintiff claimed that Counselor Paquette–Monthie told him that she initiated the disciplinary charges against him at Coxsackie because he filed a complaint against a friend of hers at Clinton Annex. (Dkt. No. 36 at 31, 37, 40).

Defendant Eric Gutwein[3] presided over plaintiff's disciplinary hearing at Coxsackie. (Disc. Hrg. Tr. at 1, Dkt. No. 42–15). Plaintiff alleges that Hearing Officer Gutwein, participating in the retaliatory conspiracy against plaintiff because of his complaints at Clinton, denied plaintiff's many requests for witnesses and additional evidence, found plaintiff guilty of the charges, and sentenced him to six months in the Special Housing Unit ("SHU") and a six-month loss of good time. (Compl., Dkt. No. 1 at 7–8).

3       The complaint lists the hearing officer as Eric Mutuein (Compl., Dkt. No. 1 at 2), but this court will use his correct name herein.

Liberally construed, plaintiff's complaint alleges that his constitutional rights under the First, Eighth, and Fourteenth Amendments were violated because (1) he was subjected to cruel and unusual punishment by defendant Rock when she allegedly hit him in the head with the bathroom door; (2) he was improperly denied prompt medical care by defendant Rock; (3) he was retaliated against for filing complaints and grievances by defendants Rock, Chase, LaValley, Paquette–Monthie,[4] and Gutwein in connection with the initiation and adjudication of disciplinary charges at Clinton, his transfer to Coxsackie, and the initiation and adjudication of disciplinary

charges at Coxsackie; and (4) he was denied due process in connection with the adjudication of the disciplinary charges at Coxsackie.[5] Plaintiff demands damages, as well as injunctive relief, including the termination of the defendants by DOCCS, a formal apology from the defendants, a transfer to the prison of his choice, and protection from further retaliation at DOCCS. (Compl., Dkt. No. 1 at 10–11).

4       The complaint names as defendants R. Paquette, Counselor and Monthie, "Councelor [sic] Supervisor." As noted, the counselor who initiated the disciplinary charges against plaintiff is named Roberta Paquette–Monthie. Ms. Paquette–Monthie's supervisor, who testified at plaintiff's disciplinary hearing, but was not at work the day the misbehavior report was issued, is Supervising Correction Counselor Chenel. (Disc. Hrg. Tr. at 8, 52). Supervising Correction Counselor Chenel has not been served in this action.

5       To avoid dismissal of his due process claims under *Heck v. Humphrey,* 512 U.S. 477 (1994), plaintiff filed a *Peralta* waiver relinquishing any due process claims with respect to his loss of good time. (Dkt.Nos.7, 9, 12, 13, 15–17). *See Peralta v. Vasquez,* 467 F.3d 98, 105–106 (2d Cir.2006).

**\*6** Defendants have challenged each of plaintiff's claims and have filed numerous declarations contesting many of plaintiff's factual allegations. In moving for summary judgment with respect to the claims against defendants Rock, Chase, and LaValley, defendants contend that plaintiff failed to exhaust his administrative remedies because, *inter alia,* he never filed a formal grievance with respect to any of these defendants at Clinton. (Defs.' Mem. of Law at 14–16, Dkt. No. 42–17).

Defendant Rock denies that she hit the plaintiff with a bathroom door on June 15, 2011, and she alleges that plaintiff did not request medical attention on that date, nor did he appear to require medical attention. (Rock Decl. ¶¶ 8–12, Dkt. No. 42–2). Plaintiff was seen by the medical staff at Clinton on June 17th and complained of a headache relating to being hit on the head by a mess hall door two days earlier. There was no evidence of a bump, swelling, or bruising, and plaintiff was treated with Ibuprofen and given a bag of ice. (Michalek Decl. ¶ 5, Dkt. No. 42–9). C.O. Rock was unaware of any complaint or grievance filed against her by plaintiff, and denies knowing defendant Paquette–Monthie or causing her

2014 WL 1292232

to issue a misbehavior report against plaintiff at Coxsackie. (Rock Decl. ¶¶ 14–17).

Defendant Chase, who found plaintiff not guilty on the disciplinary charges filed by C.O. Rock, denies ever threatening plaintiff, and had no knowledge that he filed any complaint or grievance against defendant Rock. Lt. Chase asserts that he did nothing to cause defendant Paquette–Monthie–whom he does not know-or anyone else, to retaliate against plaintiff. (Chase Decl. ¶¶ 7–14, Dkt. No. 42–3). Clinton Supt. LaValley also denies knowing defendant Paquette–Monthie or doing anything to induce her to file a misbehavior report against plaintiff at Coxsackie. Defendant LaValley asserts that he had no involvement in plaintiff's transfer to Coxsackie; that transfer was handled by the DOCCS Deputy Superintendent for Programs pursuant to a prior request by plaintiff for an "area of preference" transfer. (LaValley Decl. ¶¶ 7–15, Dkt. No. 42–4).

DOCCS Counselor Paquette–Monthie filed a misbehavior report against plaintiff at Coxsackie after learning, through her intake interview of plaintiff and information in his file, that he had been contacting his wife by telephone. Such contact violated an order-of-protection issued against plaintiff and contravened prior direct orders from the staff at Sing Sing that plaintiff should stop calling his wife. Defendant Paquette–Monthie denies knowing defendants Rock, Chase, or LaValley at Clinton, and states that she did not file the misbehavior report for retaliatory purposes. (Paquette–Monthie Decl. ¶¶ 6–15, Dkt. No. 42–12).

Defendant Gutwein, who presided over the disciplinary hearing at Coxsackie also denied knowing defendant Rock, or knowing that she had been the target of a prior complaint by plaintiff. Defendant Gutwein claims that he made his documented decisions regarding the evidence allowed at the hearing, the ultimate determination of plaintiff's guilt, and the punishment imposed, based on the merits, and not because of any retaliatory motive. (Gutwein Decl. ¶¶ 5–34, Dkt. No. 42–14).

**\*7** The court concludes that there are material issues of fact as to whether plaintiff exhausted his administrative remedies relating to his claims against defendant Rock, but no issues of fact as to whether he failed to properly exhaust claims with respect to defendants Chase and LaValley. However, this court recommends dismissal of all of plaintiff's claims on the merits, because no rational fact finder could conclude that the

defendants violated plaintiff's various constitutional rights, as he alleges.

## *DISCUSSION*

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56*; *Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006)*. "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)*. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994)*.

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)*. If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord, 467 F.3d at 273*. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)*. However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc ., 369 U.S. 654, 655 (1962)*; *Salahuddin v. Goord, 467 F.3d at 272*.

### II. Exhaustion of Administrative Remedies

Defendants contend that, notwithstanding plaintiff's claims to the contrary, he failed to initiate the grievance process, in a timely and proper manner, with respect to his complaints against defendants Rock, Chase, and LaValley of Clinton Correctional Facility. Defense counsel argues that, even if plaintiff had filed a timely grievance with respect to these defendants, he failed to exhaust his administrative remedies by not pursuing an appeal to the Central Office Review Committee (CORC). (Defs.' Mem. of Law at 14–16).

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 94 of 279
Brooks v. Rock, Not Reported in F.Supp.3d (2014)
2014 WL 1292232

The court concludes that there are issues of fact material to whether plaintiff has exhausted his administrative remedies with respect to the claims against defendant Rock, which may not be resolved on summary judgment. However, no reasonable fact finder could conclude that the plaintiff filed timely grievances relating to his claims against defendants Chase regarding the disciplinary charges initiated at Clinton, or against defendant LaValley with respect to plaintiff's transfer from Clinton to Coxsackie. Accordingly I will recommend that those claims be dismissed on summary judgment based, *inter alia,* on plaintiff's failure to exhaust administrative remedies.

### A. Applicable Law

**\*8** The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [6] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. [7] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

6    *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

[7]

See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

## B. Analysis

**\*9** Defense counsel attempts to rebut plaintiff's allegation that he filed a timely initial grievance with respect to his claims against defendants Rock, Chase, and LaValley, purported copies of which are attached to the complaint. (Defs.' Mem. of Law at 14–16). Clinton Superintendent LaValley declared that his office had no record of receiving any letter from plaintiff raising the allegations contained in the complaint in this action, and had no recollection of receiving any such letter, including those attached to the complaint. (LaValley Decl. ¶ 5–6). Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton, found no documentation in her files indicating that plaintiff ever submitted a formal grievance at Clinton regarding plaintiff's allegations against defendants Rock, Chase, and LaValley. (Brousseau Decl. ¶¶ 8–11, Dkt. No. 42–6). Defense counsel contends that the documentation provided by plaintiff in his complaint contained no "acknowledg[ ]ment from any recipient that his document was received in a timely manner so as to comply with DOCCS grievance procedures." (Defs.' Mem. of Law at 14). Counsel also points out inconsistencies in plaintiff's claims regarding the submission of his initial grievance, including the fact that the "Affidavit of Service," attached to his complaint (Dkt. No. 1 at 18) swears that he placed a grievance regarding defendant Rock in a mailbox at Clinton on June 26, 2011–two days after plaintiff was transferred out of that facility, according to DOCCS transfer records. (Defs.' Mem. of Law at 16).[8]

[8]

According to DOCCS records, plaintiff was moved from Clinton Annex to Downstate Correctional Facility on June 24, 2011; then to Coxsackie on June 27, 2011; and on to Upstate Correctional Facility on July 22, 2011. (LaValley Decl. ¶ 11 & Ex. B, Dkt. No. 42–5 at 4; Brousseau Decl. ¶ 8).

In his response to defendants' summary judgment motion, plaintiff has filed additional documentation regarding some of his complaints to DOCCS about the alleged violations of his constitutional rights by defendant Rock at Clinton. (Dkt. No. 52–11 at 4, 7, 13, 21). The newly-disclosed records include a memorandum, purportedly signed by Supt. LaValley, acknowledging receipt of a communication from plaintiff on June 17, 2011–two days after plaintiff claims he

submitted his original letter of complaint about defendant Rock to the Clinton Superintendent (Dkt. No. 52–11 at 4–5). In the absence of any reply from defendants questioning the authenticity of the memorandum, this would seem to confirm plaintiff's allegation that he sent the letter dated June 15th to defendant LaValley, even if that complaint about defendant Rock would not qualify as a formal grievance for exhaustion purposes.[9]

[9]

As plaintiff appears to acknowledge, a letter of complaint to the facility superintendent would not qualify as a formal grievance required to exhaust administrative remedies, unless the informal complaint produced a resolution favoring the inmate. *See, e.g., Goodson v. Silver,* 9:09–CV–494 (GTS/DRH), 2012 WL 4449937 at \*9 & n. 20 (N.D.N.Y. Sept. 25, 2012) (district courts have interpreted *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001), to mean that an inmate's efforts to resolve a matter through informal channels satisfies the exhaustion requirement only if the efforts resulted in the matter being concluded in the inmate's favor) (collecting cases); *Shomo v. Goord,* 9:04–CV–707 (LEK/DEP), 2007 WL 2693526, at \*9 (N.D.N.Y. Sept. 11, 2007) (courts have repeatedly held that complaint letters to the DOCCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements) (collecting cases).

Plaintiff also filed a July 18, 2011 memorandum from N. Ratliff, then the IGP Supervisor at Clinton, acknowledging receipt, from plaintiff, of a "complaint dated 7/14/11/6/24/11," which would appear to refer, in part, to plaintiff's "Affidavit of Service," notarized July 14, 2011 and addressed, *inter alia,* to Ratliff, regarding a grievance about defendant Rock. (Dkt. No. 52–11 at 7, 14).[10] Plaintiff's papers in opposition to the summary judgment motions include two slightly different complaints directed to N. Ratliff and the Inmate Grievance Committee regarding defendant Rock, each dated June 26, 2011. (Dkt. No. 52–11 at 8–9, 15–16). Given that N. Ratliff's memorandum reference a "complaint" dated, *inter alia,* June 24–the day plaintiff was th moved out of Clinton-it is not entirely clear which version of plaintiff's "complaint" Ratliff received or how and when she received it. However, a rational fact finder could conclude that, contrary to the assertion by Tara Brousseau, a complaint against defendant Rock from plaintiff was received at Clinton, notwithstanding the uncertainty regarding the dates. The

memorandum from N. Ratliff returned plaintiff's "complaint" because he was no longer housed at Clinton and because an inmate is supposed to file grievances in the facility where he is confined, even if it relates to conduct at another institution. Neither party has submitted any information as to whether plaintiff thereafter submitted a grievance regarding the earlier events at Clinton to officials at the DOCCS institutions to which he was transferred or that he sought an extension of the deadline for submitting an initial grievance.

10 The copy of the July 14th Affidavit of Service has two receipt stamps from DOCCS-one dated 9/1/2011 and the other of which has the date obscured. It appears that a copy of the Affidavit of Service was sent to other DOCCS officials in Albany in September 2011. In the absence of a reply from defendants questioning the authenticity of the document, and construing the facts in favor of the non-movant, as I must, the court will assume that N. Ratliff at Clinton received a copy of the Affidavit of Service at some time between July 14, when the affidavit was notarized, and July 18, 2011, when N. Ratliff sent the confirming memorandum to plaintiff.

**\*10** There are some discrepancies in plaintiff's various claims about his submission(s), to DOCCS, of a grievance about the alleged violations of his rights at Clinton. In some statements, including his recent response to the declaration of Tara Brousseau, plaintiff claims that he submitted a grievance about defendant Rock to the IGP supervisor at Clinton on June 15, 2011, and that the letter that he sent to Supt. LaValley on the same date was a copy of the grievance. (Dkt. No. 52–9 at 2).[11] In other statements, including his "Affidavit of Service," plaintiff asserts that he filed an initial grievance at Clinton on or about June 26, 2011, which is also the date on several versions of the complaints against defendant Rock that plaintiff filed with his complaint and his response to the summary judgment motion. (Dkt. No. 52–11 at 8–9, 14–18). However, there are also discrepancies between the documents recently filed by plaintiff and some of the statements of DOCCS witnesses regarding plaintiff's submission of complaints-i.e., Supt. LaValley's claim that his office never received any of the letters attached to plaintiff's complaint and Tara Brousseau's declaration that Clinton IGP never received a grievance from plaintiff about defendant Rock.

11 Nothing on the face of plaintiff's June 15, 2011 letter to Supt. LaValley indicates that a copy was submitted to grievance officials. (Dkt. No. 52–11 at 5).

Under applicable regulations,[12] an inmate must file a formal grievance within 21 days of an alleged occurrence, although he may make a request for additional time within 45 days of the occurrence, which may be granted in the discretion of the IGP supervisor upon a showing of mitigating circumstances. If the plaintiff properly submitted an initial grievance on June 15, June 24, or June 26, 2011, it would have timely-i.e., within 21 days of the alleged incident involving defendant Rock. If the first grievance was submitted around July 14, 2011, it would have been beyond the 21–day deadline, but within the 45–day period during which the plaintiff could have requested additional time to file, based upon mitigating circumstances. Even if, after his transfer from Clinton, plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly, the failure of the IGP Supervisor to advise plaintiff of his ability to ask for an extension made the possibility that the grievance procedures were not made reasonably available to plaintiff. *See, e.g., Mandell v. Goord,* 9:06–CV–1478 (GTS/DEP), 2009 WL 3123029, at \*10–11 (N.D.N.Y. Sept. 29, 2009) (where DOCCS officials tersely rejected plaintiff's grievance as untimely, without advising the plaintiff that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the grievance was needed, it is arguable that material questions of fact exist as to whether administrative remedies were available to the plaintiff or whether the defendants should be estopped by their conduct from relying on the non-exhaustion defense).

12 *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a) ("[a]n inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence"), 701.6(g)(1)(b) ("[t]he IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[;] ... [a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence).

**\*11** It is entirely possible that a finder of fact tasked with weighing the relative credibility of plaintiff and the DOCCS witnesses might conclude, in the face of the inconclusive documentary evidence, that plaintiff did not properly submit

a timely initial grievance regarding defendant Rock's alleged violation of plaintiff's rights at Clinton. However, given that the court should not make credibility determinations in connection with a summary judgment motion, and that the defendants have the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance about defendant Rock or whether his failure to do so should be excused under *Hemphill* standards.

Defendants contend that, even if plaintiff properly filed a timely initial grievance against defendant Rock that was ignored by DOCCS officials, he failed to exhaust his administrative remedies because he never filed an appeal with CORC. (Defs.' Mem. of Law at 15). The Assistant Director of the DOCCS IGP program states, in his declaration, that he found no evidence in the CORC files indicating that plaintiff ever filed a grievance appeal with CORC concerning the alleged events at Clinton Annex. (Hale Decl. ¶¶ 8–11, Dkt. No. 42–7).

Courts have consistently held that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g. Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–547, 2003 WL 962534, at *4 (N.D.N.Y. Mar. 11, 2003) (Sharpe, M.J.). [13]

[13] The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g)(1)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20 (GTS/GHL), 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level(s), including the CORC, in order to properly complete the grievance process. *Accord, Murray*

*v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. Mar. 31, 2010).

Plaintiff, however, has submitted documentation indicating that, after receiving no response to the initial grievance he claimed to have filed, he submitted "appeals" to the Superintendent at Clinton and to the IGP Supervisor and the Director of the IGP in Albany. A copy of plaintiff's purported "appeal" to Supt. LaValley, dated July 26, 2011, was attached to his complaint (Dkt. No. 1 at 13), although he has filed no additional documents acknowledging receipt of this "appeal." Copies of a further "appeal" addressed to the Director of the IGP in Albany and an IGP supervisor, part of which is dated "6–26–11" and part of which was dated 8–26–11," were also appended to the complaint (Dkt. No. 1 at 14–17), along with the "Affidavit of Service" notarized on July 14, 2011 (Dkt. No. 1 at 18). Plaintiff submitted, with his response to the summary judgment motion, a letter dated September 6, 2011, from the offices of the Director of IGP in Albany (Karen Bellamy), acknowledging receipt of correspondence from plaintiff dated July 14, 2011. (Dkt. No. 52–11 at 13). As noted earlier, plaintiff's "Affidavit of Service" notarized on July 14th has receipt stamps indicating that DOCCS received a copy of it on September 1, 2011. The letter from Karen Bellamy's office returns plaintiff's correspondence, advising him that "you must submit your grievance or appeal directly to IGRC at the facility." (Dkt. No. 52–11 at 13).

*12 Plaintiff's response to the summary judgment motion also attaches a memorandum from the IGP Supervisor at Upstate dated September 14, 2011, acknowledging receipt of "complaints/letters of appeal ... with written dates of 6/26/2011 and 7/27/2011." (Dkt. No. 52–11 at 21). As noted above, one of plaintiff's alleged grievance appeals is dated June 26, 2011; there does not appear to be any submission from plaintiff dated July 27, 2011 in the record. The letter from Upstate, where plaintiff was confined at the time, returned plaintiff's documents as "untimely" because they related to alleged occurrences on "6/14/11 [and] 6/15/11"- the dates of the incident with defendant Rock at Clinton. (*Id.*). The Upstate IGP Supervisor relied on the regulations summarized in note 12 above, which require an initial complaint to be filed within 21 days of the alleged occurrence unless an extension request is made within 45 days of the occurrence and is granted by the IGP supervisor. (*Id.*).

While the documentation with respect to plaintiff's alleged "appeals" is far from conclusive, it supports his claim that, when he received no response to his purported initial grievance, he properly mailed an "appeal" to the

Superintendent of the facility where the grievance was allegedly ignored. [14] When his appeal to the Superintendent was also allegedly ignored, plaintiff attempted to file an appeal with CORC by sending it to the Director of IGP in Albany. When the Director's Office advised plaintiff that his complaint or appeal needed to be filed with the IGRC at the facility where he was confined, plaintiff apparently did so. However, the IGP supervisor at Upstate treated his submission as an original complaint-not an appeal that should be forwarded to CORC-and found that it was untimely based on the deadlines applicable to initial complaints.

[14]    N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(h)(2) provides:

An inmate transferred to another facility may continue an appeal of any grievance. If the grievant wishes to appeal, **he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed** within seven calendar days after receipt. The IGP supervisor will refer it to the facility grievance clerk for processing.

(emphasis supplied).

While the applicable regulations set time limits for filing appeals based on receipt of the written decision at an earlier stage, they do not set definitive deadlines for filing appeals when no response is ever received. See N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(1) (an appeal to the Superintendent must be filed within seven calendar days **after the receipt of the IGRC's written response")** (emphasis added); 701.5(d) (1)(I) (an appeal to CORC must be submitted, through the grievance clerk, **"within seven calendar days after receipt of the superintendent's written response")** (emphasis added); 701.6(h)(2) (quoted in note 14 above). Plaintiff's "appeals" could not, as a matter of law, be deemed untimely; or at least, the uncertainty with respect to the deadlines might excuse a late appeal under the *Hemphill* standards. [15] The court concludes that there are issues of fact that are material to the question of whether plaintiff properly pursued the administrative appeals necessary to exhaust his claims with respect to defendant Rock.

[15]    Absent an extension, which would require the written consent of the grievant, N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(g)(1) (b)(ii)(2), the IGRC is required, during the first step of the grievance process, to schedule a hearing within 16 calendar days after receipt of the grievance.

N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b) (2)(ii). At the second step of the process, the Superintendent is supposed to render a decision within 20 calendar days from the receipt of an appeal. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(3)(I), (ii). Arguably, if an inmate has not consented to an extension and the IGRC has not scheduled a hearing within 16 days, or a superintendent has not rendered a decision within 20 days, the inmate would then have only seven days to appeal to the next level, unless he requested an extension supported by mitigating circumstances. *See, e.g.,* Goodson v. Silver, 2012 WL 4449937, at *6 (discussing how to calculate the deadline for filing an appeal to CORC in a case where the Superintendent failed to respond to a harassment grievance). However, a number of contingencies, other than an inmate-approved extension, could alter such deadlines. In this case, the plaintiff was transferred from Clinton less than 16 days after the "occurrence" which was the subject of the alleged grievance. When an inmate's confinement status precludes his timely appearance at an IGRC hearing, an unspecified delay in the resolution of the first stage of the grievance process is contemplated-to determine whether the inmate wants to postpone his hearing or have it proceed in his absence. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii)(a). If a grievance against a DOCCS employee is determined by a superintendent to be a "harassment" grievance, the process and the deadlines change. *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.8. Given the uncertainty of the deadlines for filing appeals when an inmate, particularly one who is transferred to another facility, receives no response to a grievance, this court cannot conclude, in the context of a summary judgment motion, that plaintiff's appeals were untimely for exhaustion purposes or that any untimeliness should not be excused under *Hemphill* and its progeny.

The various documents filed by plaintiff do not reflect that he made any written complaints about retaliation in connection with the adjudication of his disciplinary charges at Clinton by defendant Chase, or his transfer to Coxsackie, for which plaintiff blames defendant LaValley, until his submission to IGP in Albany—part of which was dated "6–26–11" and part of which was dated "8–26–2011." (Dkt. No. 52–11 at 17–20). It is clear that the portion of the submission dated

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 99 of 279
Brooks v. Rock, Not Reported in F.Supp.3d (2014)
2014 WL 1292232

June 26th is backdated because it purports to be an appeal of the grievance plaintiff states that he filed on approximately the same date and it references events, including plaintiff's misconduct charge at Coxsackie on July 7, 2013 (Paquette–Monthie Decl. ¶¶ 6–7, 11–12), which occurred well after June 26th. As noted above, the documents submitted by plaintiff indicate that his submission was not received in the office of the IGP Director in Albany until early September 2011. The court concludes that no reasonable fact finder could conclude that plaintiff filed an initial grievance with respect to the conduct of defendants Chase and LaValley until August 26, 2011, which is considerably longer than 21 or 45 days after the relevant "occurrences"-the adjudication of the misbehavior report at Clinton on June 22, 2011 (Chase Decl. ¶ 5) or plaintiff's transfer out of Clinton, which occurred on or about June 24, 2011 (LaValley Decl. ¶ 7 & Ex. B). Accordingly, the court concludes that these claims against defendants Carr and LaValley may be dismissed, on summary judgment, because of plaintiff's failure to exhaust his administrative remedies by filing a timely initial grievance.

### III. Eighth Amendment Claims

**\*13** Plaintiff alleges that defendant Rock violated his Eighth Amendment rights in two ways on June 15, 2011, by inflicting cruel and unusual punishment when she hit him in the head with the bathroom door, and by refusing to allow him to get immediate medical treatment for his purported injuries. As discussed above, C.O. Rock denies that she opened the bathroom door or caused it to hit plaintiff in the head, and she alleges that plaintiff did not request medical care or appear to require it. Plaintiff was seen, at his request, two days later by the Clinton medical staff, who found no evidence of bruising or swelling on plaintiff's head and treated him with Ibuprofen and a bag of ice.

Notwithstanding these factual disputes, the court concludes that, even accepting plaintiff's version of the relevant events, no reasonable fact finder could conclude that his Eighth Amendment rights were violated by defendant Rock. Accordingly, for the following reasons, this court recommends dismissal of those claims.

### A. Excessive Force

#### 1. Applicable Law

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. Hudson v. McMillian,

503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v.. Artuz, 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " Whitely v. Albers, 475 U.S. 312, 327 (1986) (citation omitted); Hudson, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir.2003).

#### 2. Analysis

**\*14** In connection with defendants' summary judgment motion, plaintiff and C.O. Rock present very different versions of the events of June 15th. Plaintiff alleges that, on the day before the incident, C.O. Rock threatened to "put her size 7 shoe up my Muslim ass." (Compl ., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7, Dkt. No. 52–6). Defendant

2014 WL 1292232

Rock denies ever threatening plaintiff. (Rock Decl. ¶ 13). Defendant Rock alleges that, on June 15th, plaintiff had been in the bathroom for approximately 15 minutes, and that other inmates needed to use the bathroom. (Rock Decl. ¶ 6). Plaintiff states that he obtained permission from C.O. Rock to use the bathroom and had been in the room for only five minutes. (Pl.'s Reply to Rock Decl. ¶ 9). Plaintiff claims that C.O. Rock "bust open" the door to the single male bathroom in the mess hall, hitting him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7). C.O. Rock states that she knocked on the door and directed plaintiff to come out; she denies that she opened the door or hit plaintiff with the door. (Rock Decl. ¶¶ 6, 8–9).

In support of defendants' initial Rule 12(b)(6) motion, counsel contended that plaintiff's allegations regarding the June 15, 2011 incident in the Clinton mess hall established, at worst, that defendant Rock was negligent in causing a bathroom door to strike plaintiff in the head. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 13, Dkt. No. 31–4). A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. (*Id.,* citing *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a Section 1983 claim)). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at * 13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997)) (liability in a § 1983 excessive force action cannot be founded on mere negligence) (collecting cases)).

The court concludes that, even under plaintiff's version of the relevant events, a reasonable fact finder could not conclude that defendant Rock used force against plaintiff maliciously and sadistically, to cause harm. Whether plaintiff was in the bathroom for five minutes or 15 minutes, C.O. Rock had a good-faith penological basis to investigate why plaintiff had stayed in the bathroom long enough to deny access to other inmates who needed to use the facilities. Because plaintiff was on the other side of the bathroom door, defendant Rock could not have known that he was positioned in such a way that the door would hurt plaintiff if she opened it forcefully. While "busting open" the door may have created some risk that the person inside might be hit by the door, this is, at most, negligence that clearly does not rise to the level of wanton

or malicious conduct. *See, e.g., White v. Drake,* 9:10–CV–1034 (GTS/DRH), 2011 WL 4478921, at *1, 9 (N.D.N.Y. Sept. 26, 2011) (the allegation that defendant kicked plaintiff's cell door from the outside while plaintiff was inside his cell, causing injury to plaintiff nose and jaw, are insufficient to establish an intentional or malicious effort to injure plaintiff, as necessary to state an excessive force claim under the Eighth Amendment); *Bilan v. Davis,* 11 Civ. 5509, 2013 WL 3940562, at *6 (S.D.N.Y. July 31, 2013) (an officer struck plaintiff only after the conflict between the officers and a non-party inmate spilled over to where plaintiff was standing; in the absence of allegations that the force used against him was intentional and wanton, plaintiff's excessive force claim must fail) (Rept. & Recommendation), *adopted,* 2013 WL 4455408 (S.D.N.Y. Aug 20, 2013).

**B. Denial of Medical Care**

**1. Applicable Law**

**\*15** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation

2014 WL 1292232

or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*16** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

### 2. Analysis

While plaintiff claims that defendant Rock violated his Eighth Amendment rights by failing to allow him to obtain immediate medical care after the incident on June 15th, he acknowledges that he was seen by the prison medical staff two days later. (Compl., Dkt. No. 1 at 5). [16] In connection with defendants' initial Rule 12(b)(6) motion, counsel argued, *inter alia,* that plaintiff failed to allege that the brief delay in his treatment caused any significant harm to him, thus failing to satisfy the objective prong of the deliberate indifference standard. (Mem. in Support of Rule 12(b) (6) Mot. at 22– 23). It is clear from the parties' submissions relating to defendants' summary judgment motion that C.O. Rock and plaintiff disagree as to whether he requested and/or required medical attention on June 15th. However, no reasonable fact finder could conclude, based on the irrefutable facts, that the brief delay in plaintiff's treatment significantly increased the risk of serious adverse health consequences to him, as required to establish a deliberate indifference claim.

[16]    In support of the summary judgment motion, defendants document that plaintiff could have sought and obtained medical attention prior to June 17th by taking advantage of sick call procedures from his cell. (Devlin–Varin Decl., Dkt. No. 42– 10). Plaintiff responded, in conclusory fashion, that prior efforts to get medical attention were thwarted by the Clinton staff. (Pl.'s Reply to Devlin–Varin Decl. ¶¶ 5, 6, Dkt. No. 52–5; Pl.'s Reply to Michalek Decl. ¶ 4, Dkt. No. 52–4). In any event, because plaintiff could seek prompt, necessary medical treatment once he returned to his cell, C.O. Rock would not have been subjectively aware that her failure to send plaintiff for immediate medical attention would subject him to a risk of serious harm from a prolonged delay in care, even if she had known that the bathroom door had struck plaintiff in the head. *Farmer v. Brennan,* 511 U.S. at 844; *Salahuddin v. Goord,* 467 F.3d at 281. Thus, no reasonable fact finder would conclude that plaintiff could establish the subjective prong of the deliberate indifference standard.

*Evans v. Manos* cogently summarizes how a prison inmate's claim for a delay in medical treatment should be evaluated under the Eighth Amendment:

"Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "

2014 WL 1292232

*Evans v. Manos,* 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) (citations omitted). The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eighth Amendment claim relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter,* 316 F.3d at 188–89, n. 14, n. 15. The Court in Smith also observed, in the post-trial context, that, "although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter,* 316 F.3d at 188.

**\*17** As noted, when plaintiff was examined by the Clinton medical staff on June 17th, they observed no visible bump, swelling, or bruising on his head, and he was treated with only Ibuprofen and a bag of ice. (Michalek Decl. ¶ 5; 6/17/11 Ambulatory Health Record ("AHR"), Dkt. No. 43 at 4). Plaintiff claims he did have a visible bruise and swelling, which is why the medical staff gave him ice. (Pl.'s Reply to Michalek Decl. ¶ 5). Subsequent medical records document only a few complaints by plaintiff of the lingering headaches, dizziness, shaking, and smelling odors, which he attributed to the blow to the head he allegedly received at Clinton on June 15, 2011. (Michalek Decl. ¶¶ 6, 11; 7/18/11 AHR, Dkt. No. 43 at 6; 8/16/11 AHR, Dkt. No. 43 at 9). The medical staff found no follow-up treatment was necessary with respect to his complaints about a head injury, other than dispensing Tylenol to plaintiff on August 16, 2011. (*Id.*).

Plaintiff apparently contests the accuracy of subsequent medical records at several DOCCS facilities, which reflect no evidence of any significant long-term effects of the alleged incident on June 15th, claiming that "he has expressed to medical staff in each facility of all the ongoing pain and suffering he has been force [sic] to live with due to all of the injuries he sustained from past and present incident...." (Pl.'s Reply to Michalek Decl. ¶ 6) .[17] He also challenges the quality of his medical care after leaving Clinton.[18] As noted above, differences of opinion between a prisoner and prison officials regarding appropriate medical treatment do not, as a matter of law, constitute deliberate indifference. Moreover, Plaintiff's conclusory claims of serious ongoing health problems that he attributes to the June 15th incident at Clinton do not create an issue of fact in the face of

the overwhelming documentary medical evidence to the contrary.[19]

[17] Plaintiff has also filed copies of sick call requests that he purportedly submitted in August and September 2011, complaining of ongoing symptoms relating to the alleged blow to his head on June 15, 2011 at Clinton and a 2009 assault in Sing Sing. (Dkt. No. 52–11 at 45–51).

[18] Plaintiff has filed documents relating to complaints and grievances regarding his medical care between September and November 2011. (Dkt. No. 52–11 at 52–54).

[19] *See also Brown v. White,* 9:08–CV–200, 2010 WL 985184, at \*8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

In any event, plaintiff still has offered no evidence to rebut defendants' well—documented position that the two-day delay before plaintiff saw the medical staff at Clinton about his very subjective and relatively minor medical complaints did not involve a significant risk of degeneration of his medical condition or require him to endure extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236. Thus, the court concludes that no reasonable fact finder could conclude that plaintiff can establish the objective element of a deliberate indifference claim. *See, e.g., Vansertima v. Department of Corrections,* 10 CV 3214, 2012 WL 4503412, at \*2, 6 (E.D.N.Y. Sept. 28, 2012) (plaintiff allegedly suffered a nose bleed and an injury to his head "causing sever[e] pain" as a result of hitting his face on the seat in front of him when the prison bus in which he was riding stopped suddenly; given that plaintiff was seen by the medical staff within one or two days after the incident and his subsequent complaints

involved relatively infrequent nose bleeds and intermittent headaches, plaintiff cannot show any "adverse medical effects or demonstrable physical injury" that resulted from what was in any case at most—a two delay in treatment). [20]

[20]    *See also Brown v. White,* 2010 WL 985184, at *9–10 (inmate who suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness during a three-month delay in requested medication and other treatment did not suffer a serious deprivation of medical care); *Evans v. Manos,* 336 F.Supp.2d at 260 (W.D.N.Y.2004) (subjective claims of pain, unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet medical need); *Hanrahan v. Menon,* 9:07–CV–610 (FJS/ATB), 2010 WL 6427650, at *8–9 (N.D.N.Y. Dec. 15, 2010) (plaintiff's complaints of primarily subjective mental health symptoms do not rise to the level that would make the two-month delay in plaintiff's medication a serious deprivation) (ReportRecommendation), *adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd,* 470 F. App'x 32 (2d Cir. May 18, 2012).

## IV. Retaliation

**\*18**   Plaintiff's theory is that, in response to plaintiff's complaint against defendant Rock for hitting plaintiff with a bathroom door and then denying him medical care, five DOCCS employees from two separate and geographically distant prisons conspired to retaliate against him in various ways. This court recommends the dismissal of plaintiff's retaliation/conspiracy claims against each defendant, based on the lack of a causal connection between plaintiff's protected conduct and any "adverse action" taken against him, the absence of "personal involvement," and/or, as previously discussed, plaintiff's failure to exhaust his administrative remedies.

### A. Applicable Law

#### 1. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett*

*v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. [21] *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or

verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

21    Conclusory allegations, lacking any factual foundation, are also insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland,* 450 F. App'x 15, 19 (2d Cir.2011) (citing *Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002). Plaintiffs alleging a civil rights conspiracy must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

**\*19** A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### 2. Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell,* 9:04–CV–724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662 (2009).

### B. Analysis

Defense counsel argues that the retaliation claims should be dismissed because there was no causal connection between plaintiff's protected conduct and the alleged adverse actions against him, and because some defendants were not personally involved in any adverse action against plaintiff. Those arguments require a close examination of the record regarding each defendant. *Toole v. Connell,* 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

### 1. Defendant Rock

**\*20** To the extent plaintiff alleges that defendant Rock retaliated against him by filing a false misbehavior report because he submitted a complaint to Supt. LaValley about the June 15, 2011 incident in the Clinton mess hall, plaintiff clearly cannot establish the required causal connection between his protected conduct and C.O. Rock's alleged adverse action. Plaintiff's initial complaint to Supt. LaValley (Dkt. No. 52–11 at 5), explicitly refers to the misbehavior report written by defendant Rock, and so was clearly written after the correction officer made clear to plaintiff that she intended to initiate disciplinary action against him. The letter which purportedly confirms that Supt. LaValley's office received plaintiff's letter of complaint states that the communication was not received until June 17, 2011 (Dkt. No. 52–11 at 4), after plaintiff was served with the

2014 WL 1292232

misbehavior report, on June 16th at 7:00 a.m. (Dkt. No. 36 at 67). Clearly, plaintiff's complaint to the Superintendent about C.O. Rock could not have been "a substantial or motivating factor" that caused her to issue the misbehavior report, as would be necessary to support a retaliation claim. *Bennett v. Goord,* 343 F.3d at 137.

Plaintiff also alleges that, because of the complaint he wrote against defendant Rock, she caused others to retaliate against him-defendant Chase, in connection with the June 22, 2011 adjudication of the disciplinary charges she filed at Clinton; Supt. LaValle, in connection with plaintiff's transfer to Coxsackie on June 24th; defendant Paquette–Monthie, in connection with the misbehavior report she filed against plaintiff at Coxsackie on July 7, 2011; and defendant Gutwein, in connection with the adjudication of the disciplinary charges at Coxsackie later in July 2011. As discussed elsewhere herein, plaintiff's retaliation claims with respect to the adjudication of the misbehavior report at Clinton (on which plaintiff was acquitted), and his transfer from Clinton (which plaintiff initiated), clearly lack merit and should also be dismissed because plaintiff did not exhaust his administrative remedies.

Plaintiff's retaliation claim with respect to the misbehavior report at Coxsackie are also not viable. Although he did not make this allegation in his original complaint, plaintiff claimed, in response to the defendants' initial Rule 12(b)(6) motion and their later summary judgment motion, that C.O. Rock bragged to him, on June 14, 2011, that she would not suffer any consequences if plaintiff 'wr[o]te her up" because she had "family" in Clinton and at DOCCS—presumably in the central office-in Albany. (Dkt. No. 36 at 29; Dkt. No. 52 at 6). However, plaintiff does not otherwise counter defendant Rock's sworn declaration that she was not aware of any complaint plaintiff wrote about her conduct on June 15th, which plaintiff admits was never investigated by DOCCS (Dkt. No. 52–11 at 6, 19). (Rock Decl. ¶¶ 13–14). And, for the reasons set forth below, no reasonable fact finder could conclude that plaintiff can overcome C.O. Rock's sworn statements that she did not know, or communicate with, defendant Paquette–Monthie, or otherwise direct anyone at Coxsackie to pursue a false misbehavior report against plaintiff. (Rock Decl. ¶¶ 14–17).

## 2. Defendant Chase

**\*21** As noted above, plaintiff failed to exhaust his administrative remedies with respect to any retaliation claims relating to Lt. Chase's adjudication of the disciplinary charges

at Clinton or plaintiff's transfer from Clinton. In any event, defendant Chase's acquittal of defendant on the misbehavior report clearly is not an "adverse action" which could support a retaliation charge.

The complaint alleges that, when he could not "get" plaintiff at Clinton, C.O. Chase threatened to "get," *i.e.,* retaliate against, plaintiff at the next facility. In response to the defendants' Rule 12(b)(6) motion and/or the instant summary judgment motion, plaintiff attributed further damaging admissions to Lt. Chase: first, that he talked about the order of protection against plaintiff, which was the impetus for the later disciplinary charges at Coxsackie (Dkt. No. 36 at 30; Pl.'s Reply to Chase Decl. ¶¶ 6–7, 9–10, Dkt. No. 52–7); and second, that he threatened to block plaintiff's transfer to Coxsackie (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 113, Dkt. No. 52 at 9; Pl.'s Reply to Chase Decl. ¶ 12).

Plaintiff's claims about Lt. Chase's admissions, which became more selfserving from the time plaintiff filed the initial complaint to the times he was defending his complaint against substantive defense motions, are, in the court's view, inherently implausible. It seems unlikely that defendant Chase would retaliate against an inmate based on a complaint against another officer in which he was not implicated. [22] Lt. Chase acquitted plaintiff of disciplinary charges that he was smoking in the bathroom at Clinton because C.O. Rock did not actually see plaintiff smoking; she only smelled cigarette smoke on his person and in the room as he was leaving. (Chase Decl. ¶ 7; Dkt. No. 52–11 at 1–3). Given that the circumstantial evidence presented by C.O. Rock probably constituted "some" "reliable evidence" sufficient to uphold a conviction on a prison disciplinary charge, [23] it seems highly likely that defendant Chase would have convicted plaintiff had he truly wanted to retaliate against him for his complaints against defendant Rock. Moreover, if, as plaintiff suggests in response to the Rule 12(b) (6) motion, Lt. Chase knew about plaintiff's violations of the order of protection and intended to extract revenge against plaintiff, he could have initiated additional disciplinary charges before plaintiff was transferred. If Lt. Chase had the power and the retaliatory motivation to block plaintiff's transfer from Clinton to Coxsackie, then why did that transfer actually take place?

[22]    *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 106 of 279
Brooks v. Rock, Not Reported in F.Supp.3d (2014)
2014 WL 1292232

one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

23      *See Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) and other cases cited below with respect to the due process standards applying to disciplinary proceedings.

In his sworn declaration, Lt. Chase states that he never threatened plaintiff; he had no knowledge of any complaints by plaintiff against C.O. Rock; and he had no knowledge as to why or when plaintiff was to be transferred out of Clinton (where Lt. Chase worked). Defendant Chase further alleges that he did not personally know, or have any contact with defendant Paquette–Monthie; he never gave any direction to anyone else regarding a misbehavior report issued to plaintiff at Coxsackie; and he did not otherwise take any action to retaliate against plaintiff. (Chase Decl. ¶¶ 8–14).

**\*22** The only support for plaintiff's allegation that Lt. Chase harbored a retaliatory motive because of plaintiff's complaints against C.O. Rock and played some role in the later filing of disciplinary charges against plaintiff in a different prison are the purported admissions which plaintiff attributes to defendant Chase. As noted, those supposed admissions are inherently implausible and have become increasingly elaborate and self serving as this case has progressed. Plaintiff's unsupported and highly improbable claims about Lt. Chase's admissions are not sufficient to overcome defendant Chase's sworn declaration, and no reasonable fact finder could conclude that he retaliated against the plaintiff. *See, e.g .,* *Allah v. Greiner,* 03 Civ. 3789, 2006 WL 357824, at \* 1, 3, 5–6, 7, 9 (S.D.N.Y. Feb. 15, 2006) (prisoner's allegations that virtually all of the defendants made specific admissions that they retaliated against him, were implausible and discredited by the defendants' sworn affidavits, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims) [24] ; *Jeffreys v. City of New York,* 426 F.3d at 554 ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare

circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted)).

24      The district court in *Allah v. Greiner* found that plaintiff's allegations were sufficient to create issues of fact with regard to the prisoner's claim of retaliation against one defendant because the defendant (Totten) had a plausible motive to retaliate against the plaintiff for a grievance specifically naming Totten and because Totten's explanation for the allegedly retaliatory act was internally inconsistent and in conflict with other evidence. *Id.* at \*4.

### 3. Defendant LaValley

The complaint alleges that plaintiff sent Clinton Superintendent LaValley an initial complaint about defendant Rock; but that, rather than investigate, defendant LaValley worked with C.O. Rock and Lt. Chase to retaliate against plaintiff. Plaintiff also appears to allege that defendant LaValley caused him to be transferred to Coxsackie, where he would be subjected to further retaliation by Counselor PaquetteMonthie. (Dkt. No. 1 at 6). In response to the defendants' summary judgment motion, plaintiff filed a letter apparently acknowledging receipt, by Supt. LaValley's office, of plaintiff's initial complaint, which, according to the letter, was "referred to Captain D. Holdridge for review and appropriate action ." (Dkt. No. 52–11 at 4).

As discussed above, plaintiff failed to administratively exhaust any retaliation claim involving the adjudication of the disciplinary charges at Clinton or his transfer from Clinton. Furthermore, plaintiff's claims that defendants Rock and Chase retaliated against him in connection with the misbehavior report at Clinton are devoid of merit for the reasons set forth above. In any event, if defendant LaValley failed to follow up on plaintiff's complaint about C.O. Rock or he delegated responsibility for addressing the complaint to a subordinate, he would not have been "personally involved" in any violation of plaintiff's rights by defendant Rock. *See, e.g.,* *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y .2006) (the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility); *Sealey v. Giltner,* 116 F.3d 47, 51

(2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

**\*23** With respect to plaintiff's transfer out of Clinton, plaintiff admittedly initiated the process by requesting an "area of preference" transfer. (LaValley Decl. ¶ 7 & Ex. A, Dkt. No. 42–5 at 2; Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 115). Plaintiff complains, however, that he should have been transferred from Clinton, in far Northern New York, to Sing Sing, near plaintiff's family in Westchester County, rather than to Coxsackie, which is south of Albany-much closer to Westchester County than Clinton, but not as close as Sing Sing. (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶¶ 115–16). While "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights[,]" "[a] prisoner has no liberty interest in remaining at a particular correctional facility...." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). In any event, Supt. LaValley's declaration states, and plaintiff has not rebutted, that he had no personal involvement in plaintiff's transfer to Coxsackie, because transfers of prisoners from Clinton were overseen, in the normal course of business, by the Deputy Superintendent for Programs. (LaValley Decl. ¶¶ 8–13; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8).

Finally, to the extent the complaint suggests that defendant LaValley conspired with others at Coxsackie to retaliate against him, plaintiff provides no evidence whatsoever to counter Supt. LaValley's declaration that he did not know Counselor Paquette–Monthie, and that he did nothing to retaliate against plaintiff in connection with the filing of disciplinary charges against him at that separate facility. (LaValley Decl. ¶¶ 13–15; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8). Based on the authority cited above, it is clear that a claim of retaliation based on mere speculation by an inmate that a particular defendant was somehow involved in allegedly retaliatory action by others at a separate facility cannot survive summary judgment. In any event, as discussed below, plaintiff's claims of retaliation against the Coxsackie defendants are subject to dismissal on other grounds.

### 4. Defendants Paquette–Monthie and Gutwein
Defendants' initial Rule 12(b)(6) motion plaintiff's retaliation claims against Counselor Paquette–Monthie and Hearing Officer Gutwein argued that plaintiff did not plead any specific facts to support his bald speculation that the Clinton

defendants enlisted the Coxsackie defendants to pursue retaliatory disciplinary charges against him. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 12). Plaintiff responded to this motion with the self-serving claim that defendant Paquette–Monthie told him that she issued the misbehavior report against him because she "filed a complaint against her friend at Clinton Annex." (Dkt. No. 36 at 31, 37, 40). [25] During the July 2011 disciplinary hearing, plaintiff tried to cross-examine defendant Paquette–Monthie about her allegedly biased and vengeful motivation for filing the misbehavior report against him, and asked questions about statements she supposedly made during prior interviews of plaintiff; but, he never made any reference to the counselor's alleged statement that she was initiated the charges because plaintiff had filed a complaint against a friend of hers. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, Dkt. No. 42–15). Nor did plaintiff claim that Counselor Paquette–Monthie made this admission in the various complaints and grievance "appeals" he purportedly submitted in August 2011 (Dkt. No. 52–11 at 6, 17–20, 22–23, 27–28), or in his original complaint filed in this action in September 2011 (Dkt. No. 1). [26]

[25]    Plaintiff speculated that Counselor Paquette–Monthie previously worked in the sex offender program at Clinton Annex, and presumably met C.O. Rock while at Clinton. (Dkt. No. 36 at 36, 37).

[26]    Plaintiff attached, to his response to the Rule 12(b)(6) motion, documents purportedly submitted in state court proceedings in October 2011, one of which referenced Counselor Paquette–Monthie's alleged statement that she filed the misbehavior report against plaintiff because he filed a complaint against a friend of hers. (Dkt. No. 36 at 19). Even if this document is authentic and was not backdated, as some of plaintiff's submissions clearly are, it is apparent from the record that plaintiff belatedly claimed that Counselor Paquette–Monthie made this admission in furtherance of self-serving legal tactics, well after the disciplinary hearing at Coxsackie and after plaintiff filed his complaint in this action.

**\*24** In her sworn declaration, defendant Paquette–Monthie states that she did not personally know, and never had any contact with, defendants Rock and Chase at Clinton. She insists that she issued the misbehavior report against plaintiff, not to retaliate against him, but in good faith, based on the evidence. (Paquette–Monthie Decl. ¶¶ 11–15).

2014 WL 1292232

Defendant Gutwein similarly denies any effort to retaliate against plaintiff, and swears that he was not directed by anyone to find plaintiff guilty of the disciplinary charges against him at Coxsackie. Hearing Officer Gutwein also states that he did not know C.O. Rock from Clinton, and was unaware of any complaint or grievance plaintiff may have filed against her. (Gutwein Decl. ¶¶ 24–33).

Based on the authority cited in note 22 above, it is unlikely that defendants Paquette–Monthie and Gutwein would be motivated to retaliate against plaintiff for a complaint or grievance in which they were not implicated, particularly when the target of the complaint worked at a separate and geographically distant correctional facility. The sworn declarations establishing that the Clinton and Coxsackie defendants did not know each other or have any contact, utterly refute plaintiff's speculation that they colluded to initiate false disciplinary charges against him. The only support plaintiff offers for the implausible conspiracy theory underlying the retaliation claim against the Coxsackie defendants is the alleged admission of Counselor Paquette–Monthie that she issued the misbehavior report because plaintiff had complained about a friend of hers at Clinton Annex. Given that plaintiff did not offer this self-serving alleged admission while confronting Counselor Paquette–Monthie at the disciplinary hearing, or in his grievance appeals which referenced the Coxsackie defendants, or even in his initial complaint in this action, the court finds that the purported admission does not create an issue of fact that could lead any reasonable fact finder to conclude that defendants Paquette–Monthie and Gutwein conspired to retaliate against plaintiff. *See, e.g., Allah v. Greiner,* 2006 WL 357824, at * 1, 3, 5–6, 7, 9; *Jeffreys v. City of New York,* 426 F.3d at 554.

In any event, the court concludes that plaintiff's retaliation claims against defendants Paquette–Monthie and Gutwein would be subject to dismissal because they would have taken the same actions with respect to the misbehavior report against plaintiff even if they had known of complaints or grievances filed by plaintiff against defendant Rock. See, e.g., *Lowrance v. Achtyl,* 20 F.3d 529, 534–35 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because the plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny); *Smith v. Woods,* 2006 WL 1133247, at * 10 (the record evidence establishes that the hearing officer could, and indeed would, have reached the same disciplinary

hearing decision (and imposed the same penalties) despite any such complaints or grievances by plaintiff-*i.e.,* based upon the evidence as presented to him at plaintiff's disciplinary hearing decision).

**\*25** The basis of the disciplinary charge against plaintiff was that he violated an order of protection that precluded him from, *inter alia,* all communications and contact, including by "telephone[,]" with his wife and daughters, "except for visits to state correctional facility and correspondence." (Gutwein Decl. ¶ 6 & Ex. A, Dkt. No. 14–15 at 3). Based on the order of protection, plaintiff had been directed to stop calling his wife by DOCCS staff at Sing Sing, and was not allowed to add his wife to his authorized call list (Dkt. No. 42–15 at 4–5); but plaintiff apparently circumvented that limitation by listing, under the name of an aunt, the telephone number at the home where his wife came to reside. (Disc. Hrg. Tr. at 2, 7, 9, 21–22, 56–58).

During his initial interview with Counselor Paquette–Monthie at Coxsackie, and during the disciplinary hearing, plaintiff acknowledged that he had telephonic contact with his wife from other DOCCS facilities before he was transferred to Coxsackie, at the number listed under his aunt's name on his emergency contact list. [27] (Disc. Hrg. Tr. at 7, 9, 12, 18, 19–20). He disputed the disciplinary charges because he believed that he should not be charged with misconduct by Coxsackie officials for calls he made to his wife from other institutions. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 52–53, 56). Plaintiff also asserted that the exception for "correspondence" in the order of protection should be interpreted to include telephonic contact, notwithstanding the explicit, prior prohibition in the order against communications by telephone. (Disc. Hrg. Tr. at 17, 18, 20, 23, 44–45, 49). Plaintiff claimed that his wife, who was willing to speak with him by phone, and the District Attorney and Judge who caused the order of protection to be entered, would agree that telephonic contact was permissible, notwithstanding the clear language of the order of protection. [28] (Disc. Hrg. Tr. at 6–7, 23, 39, 57–58, 61).

27    Defendant Paquette–Monthie and her supervisor testified at the disciplinary hearing that DOCCS phone records confirmed that plaintiff had, indeed, made calls to the number at which plaintiff admitted his wife could be reached. (Disc. Hrg. Tr. at 19, 59–60; Dkt. No. 42–15 at 6–13). Plaintiff was

allowed to inspect those phone records during the hearing. (Disc. Hrg. Tr. at 67, 69).

28     The Order of Protection was apparently modified, on October 28, 2011, after the disciplinary hearing, to allow telephonic contact. (Dkt. No. 36 at 66). However, this reinforces that the Order of Protection in place at the time of the telephonic contact that resulted in the misbehavior report against plaintiff clearly did not authorize contact by phone.

The court finds that, although plaintiff made several frivolous arguments that he should be found not guilty, "he admitted to engaging in the conduct that formed the basis of the misbehavior report." *Lowrance v. Achtyl,* 20 F.3d at 534–35. Accordingly, I would recommend that summary judgment be granted in favor of the Coxsackie defendants on plaintiff's retaliation claim, based, *inter alia,* on *Mt. Healthy* and its progeny.

## V. Due Process

### A. Legal Standards

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

**\*26** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable

evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

### B. Analysis

The complaint alleges that, in conducting the disciplinary hearing at Coxsackie and finding plaintiff guilty, defendant Gutwein was motivated by a desire to retaliate against plaintiff for his complaint against defendant Rock at Clinton. Plaintiff also alleges that Hearing Officer Gutwein also improperly denied plaintiff's requests to call key witnesses or obtain documents that would have established his innocence. (Dkt. No. 1 at 7). In plaintiff's prior motion to amend his complaint, which this court denied (Dkt. No. 38 at 7, 9–10), he attempted to supplement his due process claim by alleging that (1) the misbehavior report was deficient because it did not specify the institution from which plaintiff made the offending phone calls to his wife (Dkt. No. 36 at 34); (2) defendant Gutwein improperly disallowed certain questions plaintiff wanted hearing witnesses to answer (Dkt. No. 36 at 33); and (3) plaintiff's assistant was not allowed to contact certain witnesses on his behalf (Dkt. No. 36 at 36). Although not technically part of the complaint, the court will address these allegations.

Defendants, apparently conceding that the disciplinary sanctions imposed on plaintiff at Coxsackie implicated a liberty interest, argue that the plaintiff was afforded all of the process to which he was due at the hearing conducted by defendant Gutwein. (Defs.' Mem. in Support of Rule 12(b)

2014 WL 1292232

(6) Mot. at 16–20). The court agrees that, based on the record of the disciplinary hearing, no reasonable fact finder could conclude that plaintiff's due process rights were violated or that the outcome of the proceeding would have been any different if he had been allowed to call and question the witnesses and present the documents that he requested.

### 1. Misbehavior Report

**\*27** The July 7, 2011 misbehavior report charged plaintiff with violating prison rules 107.20 (False Statements or Information); 106 .10 (Refusing Direct Order); and 121.12 (Phone Program Violation) for making telephone calls to his wife in violation of an order of protection and contrary to direct orders from an officer at Sing Sing, which he managed to do by misleadingly listing his aunt's name as an emergency contact, but at an address and phone number where his wife resided. (Dkt. No. 42–15 at 2). Plaintiff alleges that defendant Paquette–Monthie's misbehavior report provided inadequate notice of the charges because it did not specify the facility from which he made telephone calls to his wife.

The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citation omitted)). However, the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor Paquette–Monthie's misbehavior report was based on plaintiff's admissions that he had previously been calling his wife, and the report noted the date in 2009 when plaintiff changed his emergency contact information so he could reach his wife by phone, despite prior orders that he not do so. (Dkt. No. 42–15 at 2). The misbehavior report includes considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). The fact that the misbehavior report did not specify the institution(s) from which plaintiff impermissibly called his wife did not impede him from establishing that he made no such calls from Coxsackie and pursuing the defense, albeit a frivolous one, that he could not be charged at Coxsackie for conduct

committed at prior facilities. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 53, 56).

### 2. Witnesses and Exhibits

During the hearing, plaintiff requested the following witnesses on his behalf: defendant Paquette–Monthie; her supervisor; plaintiff's wife; the District Attorney and the judge who were involved with the Order of Protection; plaintiff's wife's lawyer; plaintiff's criminal defense lawyer; and a staff member from the Office of Mental Health. (Gutwein Decl. ¶ 8; Disc. Hrg. Tr. at 4–8). The hearing officer called only Counselor Paquette–Monthie and Supervising Counselor Chenel to testify, and both were questioned extensively by plaintiff, although defendant Gutwein screened many of plaintiff's questions. (Gutwein Decl. ¶¶ 9–10; Disc. Hrg. at 8–43, 43–61).

**\*28** Plaintiff, in his motion to amend the complaint, alleged that Hearing Officer Gutwein "would not allow me to question witnesses with questions that proved I was being ret[a]liated for no reasons but for[ ] filing a complaint against the coun[s]elor['s] friend C.O. P. Rock." (Dkt. No. 36 at 33). Hearing Officer Gutwein allowed the witnesses to answer some, but not all questions by which plaintiff tried to establish that Counselor Paquette–Monthie filed the misbehavior report against him because of her "bias" and motive for "revenge." But, plaintiff never sought to ask any question as to whether the counselor initiated the charges because plaintiff had filed a prior complaint against C.O. Rock or any other friend at Clinton. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, 54, 55).[29]

> [29]     Plaintiff asked Supervising Counselor Chenel, with respect to the misbehavior report against him, "was there any complaint initially by any outside services ... or was there anything written from another facility, uh,—retaliate or anything like that?" Hearing Officer rephrased the questions: "to you knowledge was there any outside contact with regard to the Order of Protection being violated?" and Supervising Counselor Chenel answered "No." (Disc. Hrg. Tr. at 54).

The mere fact that plaintiff's questions for witnesses had to be filtered through the hearing officer did not violate due process. *See Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976) (inmates are not entitled to the right to confront and crossexamine witnesses at a disciplinary hearing). The plaintiff's tone during the entire disciplinary

hearing was argumentative, and many of his proposed questions reflected a dogged, but unfocused effort to induce Counselor Paquette–Monthie to admit she was, for whatever reason, biased against the plaintiff. During the disciplinary hearing, defendant Paquette–Monthie clearly testified that she initiated the charges against plaintiff because of the perceived seriousness of his misconduct, and "was not playing any dirty politics ... behind the scenes." (Disc. Hrg. Tr. at 26, 28). The hearing officer reasonably denied many of the plaintiff's other questions about the counselor's alleged bias because they were repetitive and bordered on harassment. In any event, it is clear from defendant Paquette–Monthie's declaration (¶¶ 12–17, Dkt. No. 42–12), that if plaintiff had actually tried to ask her at the hearing whether she was retaliating against him at the behest of C.O. Rock or others from Clinton, she would have flatly denied it. Thus, plaintiff cannot establish prejudice, because even if defendant Gutwein had disallowed such questions (which, again, plaintiff never asked), allowing Counselor Paquette–Monthie to answer would have not favored plaintiff or changed the outcome of the hearing. [30]

[30]    *See Clark v. Dannheim,* 590 F.Supp.2d at 429–31 (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases). Toward the end of the hearing, plaintiff requested that witnesses Paquette–Monthie and Chenel be recalled for further questioning; but he would not explain what new questions he wanted to ask these witnesses. (Disc. Hrg. Tr. at 63–66). Hearing Officer Gutwein denied plaintiff's request to recall these witnesses because plaintiff failed to articulate any additional information that they could provide that would not be redundant of their lengthy, prior testimony. (Disc. Hrg. Tr. at 66, 71–72; Dkt. No. 42–15 at 93). Defendant Gutwein's stated reasons for not recalling these witnesses were reasonably related to a correctional goal and did not, based on the authority cited below, violate due process. In any event, because plaintiff never articulated how recalling these two witnesses would have helped him or changed the outcome of the disciplinary hearing, he cannot establish that he was prejudiced by the hearing officer's ruling.

Plaintiff's request to call his wife and a number of people involved in the prior case that resulted in the order of protection, was premised on his claim that these witnesses would put the order in "context" and clarify that plaintiff was, in fact, allowed to speak with his wife by telephone. (Disc. Hrg. Tr. at 6–7, 22, 23, 39, 57–58, 61). Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence). An inmate's due process rights are violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte v. Real,* 471 U.S. at 497.

**\*29** Hearing Officer Gutwein denied plaintiff's request to call his wife as a witness, because to do so would violate the order of protection. Defendant Gutwein also declined to call the other witnesses involved with the prior order of protection because their testimony would not be relevant. (Disc. Hrg. Tr. at 61–63; Dkt. No. 42–15 at 95–96). [31] As noted above, the order of protection explicitly precluded plaintiff from having telephonic or other communications with his wife, and created an exception that allowed only prison visits and "correspondence." (Dkt. No. 42–15 at 3). Given the clarity of the order of protection, and the prior order of a DOCCS official that plaintiff refrain from telephone contact with his wife, calling other witnesses to "explain" or put into "context" the order of protection would have been unnecessary and irrelevant. Accordingly, Hearing Officer Gutwein did not violate plaintiff's due process rights by refusing to call these witnesses. [32]

[31]    On July 20, 2011, Hearing Officer Gutwein provided plaintiff with copies of form 2176 explaining, in writing, the reasons for his refusal to call each witness. Plaintiff demanded that the hearing officer state on the record his reasons for refusing to call the District Attorney involved with the prior order of protection, and defendant Gutwein did not due so. (Disc. Hrg. Tr. at 62–63). On July 21, 2011, when the hearing resumed, plaintiff complained that he could not read script,

2014 WL 1292232

and the hearing officer orally explained his reasons to deny plaintiff's new request to recall witnesses Paquette–Monthie and Chenel on the record, apparently because the 2176 forms prepared that morning were handwritten in script. (Disc. Hrg. Tr. at 70–72). Once he announced his problems with reading script, plaintiff did not renew his request that the hearing officer orally explain the reasons for not calling the District Attorney, which were written in script on form 2176 the day before. (*Id.*). In his prior rulings on various questions plaintiff posed to the witnesses, the hearing officer made clear that the various persons involved in the prior order of protection had nothing relevant to offer with respect to the pending charges. (*See, e.g.,* Disc. Hrg. Tr. at 23, 40, 49). In any event, as long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing, even if state law requires a contemporaneous finding. *Duffy v. Selsky,* 95 CIV. 0474, 1996 WL 407225, at * 10 (S.D.N.Y. Jul. 18, 1996) (the Supreme Court has held that the proffer of the explanation for not calling a witness need not be contemporaneous with the hearing) (citing *Ponte v. Real,* 471 U.S. at 497).

32    Given that these witnesses had no relevant information to offer, plaintiff's complaint that his assistant was not allowed to interview these witnesses also fails to support a due process claim.

Plaintiff requested that his medical and mental health records be produced at the hearing, claiming they would indicate that his wife was listed as his emergency contact and that, therefore, he had permission from DOCCS staff at Clinton to call his wife. [33] (Disc. Hrg. Tr. at 7, 59). In fact, plaintiff's position that his emergency contact information contained the address and phone number where his wife could be reached was repeatedly placed on the record during the hearing, and was accepted by the witnesses and the hearing officer. (Disc. Hrg. Tr. at 9, 12, 18–19, 29, 36, 37, 56–57, 60, 72–73). However, the DOCCS witnesses and hearing officer documented that the name plaintiff associated with that emergency contact information was that of his aunt, not his wife, and viewed this as evidence that plaintiff was misleading DOCCS staff so he could make calls to his wife, despite orders to the contrary. (*Id* .)

33    Plaintiff initially requested witnesses from the health units, but he did not persist in that request after Counselor Paquette–Monthie and Supervising Counselor Chenel testified. (Disc. Hrg. Tr. at 7, 61). Hearing Officer Gutwein nonetheless prepared copies of form 2176 explaining that these witnesses would not be called because the proposed testimony would not be relevant. (Dkt. No. 42–15 at 94–95).

Plaintiff, while apparently conceding that he used his wife's address and phone number, but not her name, in his emergency contact information (Disc. Hrg. Tr. at 7; Dkt. No. 36 at 35), argued that he disclosed, to Counselor Paquette–Monthie at Coxsackie, that his aunt subsequently moved from that residence and his wife moved in. (Disc. Hrg. at 12–13, 37, 56–57, 60). However, plaintiff was charged, not with misleading defendant Paquette–Monthie at Coxsackie, but with misleading staff at other DOCCS facilities by listing his wife's contact information under his aunt's name. (Disc. Hrg. Tr. at 2; Inmate Misbehavior Report, Dkt. No. 48–15 at 2). Plaintiff's position on this point is a variation on his frivolous defense that he could not be charged at Coxsackie for misconduct he previously committed at a prior institution. (Disc. Hrg. Tr. at 37). Accordingly, when Hearing Officer Gutwein ruled that documentary or testimonial evidence from DOCCS health units about plaintiff's emergency contact information was not relevant (Disc. Hrg. Tr. at 10; Dkt. No. 42–15 at 94–95), he was pursuing a legitimate correctional goal of avoiding redundant and irrelevant evidence, and did not violate plaintiff's due process rights. *See, e.g., Clyde v. Bellnier,* 9:08–CV–909 (JKS), 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (no due process violation arose when the hearing officer failed to provide documents that did not exist or that were not relevant to the defense). [34]

34    The court notes that Hearing Officer Gutwein provided plaintiff with copies of requested documents discussed during the hearing, and once adjourned the hearing so plaintiff could get a copy of a document he claimed he needed to continue questioning a witness. (Disc. Hrg. Tr. at 31, 66–71).

### 3. Sufficiency of the Evidence

**\*30** As discussed in section IV B 4. above, plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him, and his "defenses" were frivolous. The testimony of Counselor Paquette–Monthie (*see, e.g.,* Disc. Hrg. Tr. at 9, 18–19, 21–22) and

Supervising Counselor Chenel (*see, e.g.,* Disc. Hrg. Tr. at 46, 49, 56–57, 59–60), along with the supporting documents (Dkt. No. 42–15 at 2–14), provided far more support for defendant Gutwein's guilty finding than the "some" "reliable evidence" standard requires to satisfy due process. (Disc. Hrg. Tr. at 72–73; Dkt. No. 42–15 at 98–99). [35]

[35]    The hearing office stated the basis for his finding on the disciplinary charges both in writing and on the record at the hearing. (*Id.*).

### 4. Hearing Officer Bias

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The unsupported allegations that defendant Gutwein conspired with the other defendants to retaliate against plaintiff in connection with the disciplinary proceedings at Coxsackie (discussed above) are insufficient to establish that he was a biased hearing officer. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of

bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d at 47). The transcript of the disciplinary hearing demonstrates that Hearing Officer Gutwein displayed great patience in dealing with plaintiff's argumentative demeanor and his persistence in pursuing frivolous lines of witness questioning. Given the weight of the evidence supporting plaintiff's guilt and the fact that defendant Gutwein's various rulings regarding witnesses and documentary evidence clearly comported with due process, no reasonable fact finder could conclude that he was an unconstitutionally biased hearing officer.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 42) be **GRANTED** on the grounds stated herein, and that plaintiff's complaint be **DISMISSED** in its entirety; and it is further

 **\*31  RECOMMENDED,** that plaintiff's motions for preliminary injunctions (Dkt. Nos.54, 58) be **DENIED AS MOOT;** and it is further

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 58) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Jan. 17, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1292232

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by  Ransom v. Lee,  C.D.Cal.,  April 20, 2017

2006 WL 846272
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Shawn GREEN Plaintiff,
v.
W.E. PHILLIPS, T.G. Eagen, G. Guiney, W.
Russett, T.H. Kiernan, L. Goidel, F. Sarles, D.
Huttel, J. Tardio, and D. Osselman, Defendants.

No. 04 Civ. 10202(TPG).
|
March 31, 2006.

OPINION

GRIESA, J.

**\*1** *Pro se* plaintiff Shawn Green alleges that the defendants violated his First, Eighth and Fourteenth Amendment rights when he was a prisoner at the Green Haven Correctional Facility. Green has submitted an amended complaint that the court will treat as a motion to amend the complaint. This motion is granted.

The defendants have moved to dismiss the original complaint. The court will treat the motion to dismiss as a motion to dismiss the amended complaint. The motion to dismiss the amended complaint is granted and the case is dismissed.

## THE COMPLAINT

Plaintiff, currently a prisoner at Attica Correctional Facility, filed this suit against various guards, nurses, and officers at Green Haven Correctional Facility for violations of his constitutional rights while he was an inmate there. The following facts are taken from both the original complaint and the proposed amended complaint. References to "the complaint" will be understood to refer to claims in either or both of these documents.

*Retaliation*

On March 24, 2004 eleven inmates, including Green, began a hunger strike in the Green Haven Special Housing Unit. Green alleges that defendant W.E. Phillips, a Green Haven employee, retaliated against him for exercising his constitutional rights. Green claims that Phillips ordered defendant T.H. Kiernan, a guard, to make a misbehavior report against plaintiff and that this was in retaliation for going on the hunger strike and for "submitting grievances, complaints, etc." The nature of the grievances and complaints is not described. Green alleges that after Phillips ordered Kiernan to do so, Kiernan issued the misbehavior report charging that plaintiff refused a direct order and created a "visibility obstruction". Green also claims that Kiernan had his own retaliatory motives for issuing the report, since Green had filed a grievance against him and his coworkers a few weeks before the hunger strike began. Green does not describe the grievance that Green allegedly filed against Kiernan.

Green next alleges that defendant W. Russett, a disciplinary proceeding hearing officer, misconstrued evidence to find plaintiff guilty of the charges in the aforementioned misbehavior report:

> Defendant W. Russett, disciplinary proceeding hearing officer, was aware defendant Phillips gave order for report and misconstrued testimonial evidence contradictive to report allegations the kiernan seen sign, at least, the previous day and order had not been directed toward plaintiff. Subsequently, plaintiff was found guilty of charges.

Green next alleges that he appealed and that defendant G. Guiney affirmed Russett. Green does not allege anything about the findings or decision of either Russett or Guiney.

Green next alleges that defendant L. Goidel refused to file numerous grievances that plaintiff submitted regarding the alleged retaliation and conspiracy described above. Green alleges that as a consequence, he was prevented from suing because he could not satisfy the administrative exhaustion requirement in the Prison Litigation Reform Act, 42 U.S.C § 1997e(a). Green further claims that defendant T.G. Eagen,

who appears to be a supervisor at Green Haven, was notified of Goidel's refusal and would not remedy it despite knowledge of an "unconstitutional custom at Green Haven". Of course, despite these alleged hindrances, Green has filed this action.

**\*2** Green alleges that the actions of Phillips, Kiernan, Russett, Guiney, and Goidel were pursuant to a conspiracy to deprive him of his constitutional rights. He also appears to allege that the conduct of the hearing officers and supervisors was related to the conspiracy as well.

*Deliberate Indifference to Plaintiff's Medical Problems*
Green next alleges that certain defendants were deliberately indifferent to a serious medical need. Plaintiff was diagnosed with diabetes at Green Haven in November 2003. Plaintiff makes allegations against D. Huttel and F. Sarles, whom he does not identify beyond stating that they were employees at Green Haven. Specifically, plaintiff alleges that Huttel and Sarles, "knew plaintiff were a diabetic prior to strike, yet disregarded an excessive risk to his health and safety once strike begun."

Green also alleges that defendants J. Tardio and D. Osselman, nurses at Green Haven, while giving Green his daily insulin injection, were informed of his request for medical attention due to the strike but "disregarded the excessive risk to his health and safety."

*Discriminatory and Unequal Treatment*
Finally, plaintiff alleges a number of acts that he describes as lacking a rational basis. He argues that these allegations demonstrate violations of the rights granted to him under the equal protection clause of the Fourteenth Amendment:

- He alleges that Huttel and Sarles did not contact the medical department after learning of the hunger strike, allegedly in violation of prison rules.

- He alleges that he was not given any medical attention after informing Tardio and Osselman that he had not eaten in seventy-two hours, in violation of prison rules. He further alleges that Osselman gave medical attention to another inmate during the strike. He also alleges that he suffered from various physical ailments during the strike.

- He again alleges his claims that Goidel intentionally withheld his grievances from being processed.

- He alleges that Phillips "selectively ordered disciplinary rules be imposed against plaintiff (and others similarly situated participating in hunger strike) with intentions of punishment for the exercise of constitutional rights and maliciously to injure" and that Phillips conspired with Kiernan to do so.

- Finally, he alleges that Phillips would not active a hunger strike team in violation of prison rules.

*Relief*
Plaintiff seeks declaratory and injunctive relief as well as damages against each defendant. Specifically, he seeks a declaratory judgment that defendants be demoted or removed from their posts and that Kiernan's misbehavior report be reversed. Green also seeks an injunction requiring the installation of grievance boxes in Green Haven and a logging system for the grievances filed in those boxes.

DISCUSSION

A court must dismiss a case pursuant to Rule 12(b)(6) where a plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Where a lawsuit alleges violations of constitutional rights, however, a plaintiff may not rely on conclusory statements that his rights were violated. Even under the liberal reading that should be given to a *pro se* plaintiff's complaint, that complaint must still "allege sufficient facts indicating a deprivation of constitutional rights." *Locicero v. O'Connell,* No. 04 Civ. 7708, 2006 U.S. Dist. LEXIS 8958, at \*9 (S.D.N.Y. Mar. 7, 2006).

*Retaliation*
**\*3** In order for a prisoner to properly plead a claim of retaliation, a plaintiff must allege that the conduct that was the basis for the retaliation was "constitutionally protected" and that the protected conduct was a "substantial or motivating factor" in the retaliatory action. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Since retaliation claims can be easily fabricated, a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity. *See Brown v. Middaugh,* 41 F.Supp.2d 172, 191 (N.D.N.Y.1999); *Harris v. Keane,* 962 F.Supp. 397, 405 (S.D.N.Y.1997). When a prisoner files a grievance against prison officials, he is engaging in constitutionally protected

2006 WL 846272

conduct. *Graham,* 89 F.3d at 80. As to the hunger strike, in the present case there has been no attempt to define the extent to which a prison hunger strike may be constitutionally protected. Nonetheless, the court will assume for the sake of argument that prison personnel do not have a right to retaliate against a prisoner who has been on a hunger strike, in the sense that retaliation is used in the cases.

Plaintiff asserts that the misbehavior report against him was in retaliation for his participation in the hunger strike and for filing grievances and complaints. The complaint must be read as claiming that the accusations in the misbehavior report were fabricated and false.

According to the cases, plaintiff is expected to allege in his complaint facts which can reasonably be expected to be within his knowledge and which give substance to the claim of retaliation by means of a concocted misbehavior report.

Plaintiff asserts that there was retaliation by Phillips in part because of plaintiff filing grievances and complaints. But plaintiff does not allege whom these complaints and grievances were against (except that one was against Kiernan), what they were about, or why they would motivate Phillips to direct Kiernan to fabricate a misbehavior charge against plaintiff.

As to the hunger strike, plaintiff does not provide any details of the strike, such as what is was about, how long it lasted, or why Phillips and/or Kiernan would wish to retaliate against plaintiff because of the strike.

Green claims that the misbehavior report charged him with refusing a direct order and with a visibility obstruction. Central to his case is that the charges were not made in good faith but to retaliate for plaintiff's exercise of his rights. Thus the requirement of particularity in pleading means that plaintiff should describe the misbehavior charges in some reasonable detail and should plead in the complaint a definite denial of the truth of those charges. Valid charges of misbehavior are inconsistent, to say the least, with the idea of allegations motivated by a desire to retaliate against plaintiff for the exercise of his rights.

Plaintiff has failed to plead anything approaching what is required. He does not say what the misbehavior report asserted about the disobeyed order-who gave it or what the order was. There is no meaningful description of what was charged by way of "visibility obstruction." It is true that

plaintiff alleges that there was some evidence in his favor at the hearing. But this does not constitute a sufficient pleading of a description of what the misbehavior report charged and a definite assertion that those charges were false.

**\*4** Plaintiff claims that the disciplinary hearing officer, Russett, and the appeal officer, Guiney, were all part of the conspiracy to retaliate against plaintiff. As to the hearing, as already noted, plaintiff alleges that there was some evidence in his favor. Plaintiff does not allege that there was no evidence *against* him. So presumably there was. Plaintiff makes no mention of such evidence. Plaintiff does not allege anything about Russett's findings other than that he found plaintiff guilty of the charges in the misbehavior report. Plaintiff does not allege that he was punished as a result or what punishment he received.

As to Guiney, plaintiff merely states that Guiney "affirm plaintiff appeal after reviewing disciplinary proceeding." This allegation, of course, does not explain what Guiney found, or why it was incorrect, if it was incorrect.

The basic theory of the complaint is that Phillips initiated a conspiracy, which produced a concocted misbehavior charge against plaintiff, made by Kiernan, followed by a baseless finding of guilt by the hearing officer, Russett, ending in another baseless finding by the appeal officer, Guiney. Presumably, if this occurred, evidence against plaintiff would have been manufactured along the way. It is on its face highly unlikely that such things occurred. Plaintiff has not provided even a modicum of particulars to lend credence to his unusual theory.

Plaintiff therefore fails to "plead with some particularity how an action was in retaliation for the plaintiff having filed grievances." *Brown,* 41 F.Supp.2d at 191. Under these circumstances, the retaliation claim against these defendants must be dismissed. *Harris,* 962 F.Supp. at 405 (dismissing a retaliation claim where plaintiff "failed to allege whether the particular Defendants even knew about Plaintiff's grievances and, beyond any conclusory statements, why there would be any retaliation .").

*Medical Issues* [1]

[1]    There is some question of whether plaintiff has exhausted his administrative remedies for the medical indifference claims as required by the PLRA. Because these claims ultimately fail as

2006 WL 846272

pleaded, the court will assume for the sake of deciding this motion that the grievances described in the complaint included claims regarding plaintiff's medical care and that he thus satisfied the exhaustion requirement.

Plaintiff alleges that he was not given proper medical attention during the hunger strike as was necessary given his diabetes, and asserts a violation of the Eighth Amendment.

Plaintiff can assert a claim under the Eighth Amendment if he can plead facts that would demonstrate that the defendants were deliberately indifferent to his serious medical needs. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Deliberate indifference has both objective and subjective components. First, a plaintiff must prove that the alleged deprivation was, in objective terms, "sufficiently serious." *Id.* The "sufficiently serious" standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.2d 62, 66 (2d Cir.1994) (quotation omitted). The plaintiff must then prove that the defendant was had a sufficiently culpable state of mind. *Id.* "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

**\*5** Plaintiff alleges that Huttel and Sarles "knew plaintiff were a diabetic prior to strike, yet disregarded an excessive risk to his health and safety" once the strike began. But the allegation is insufficient since it fails to assert that Huttel and Sarles actually damaged plaintiff's health.

Plaintiff makes two allegations against Tardio and Osselman, two nurses at Green Haven. First, plaintiff makes the conclusory allegation that while giving plaintiff his daily insulin injection, Tardio and Osselman were told of his request for medical attention due to the hunger strike but "disregarded the excessive risk to his health and safety." Plaintiff's second allegation against Tardio and Osselman is that they refused to weigh him after he informed them that he hadn't eaten in seventy-two hours and asked to be weighed, and that he was "never given any medical attention." Plaintiff alleges that this was in violation of health policies related to hunger strikes. As a result of this alleged indifference, plaintiff claims to have suffered "headaches,

sweating, confusion, disorientation, weakness, hypotension and tremors during strike."

It should be noted that plaintiff chose to go on the hunger strike. The symptoms plaintiff allegedly suffered are to be expected by someone who does not eat for three days. Second, these symptoms do not rise to the level of a "sufficiently serious" condition, i.e., "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37 F.2d at 66. Moreover, regarding the subjective portion of an Eighth Amendment claim, plaintiff does not plead any facts that would demonstrate that Tardio or Osselman subjectively believed there was a substantial risk of harm to plaintiff. [2]

[2] The court also notes that plaintiff's claim that he was "never given any medical attention" would appear to be in conflict with his other allegation that he received a daily insulin injection for his diabetes from Tardio and Osselman.

Accordingly, the Eighth Amendment claims against Huttel, Sarles, Tardio and Osselman are dismissed.

*Denial of Access to Courts*

A word should be said about the allegations against Goidel and Eagen. Plaintiff alleges that Goidel refused to file numerous grievances regarding the alleged retaliation, conspiracy and discrimination already discussed. Plaintiff also alleges that Eagen is liable under a theory of "supervisor liability" because he was notified of the situation and would not remedy it, despite "learning of [an] unconstitutional custom" of such refusals at Green Haven. As a result of these actions, plaintiff alleges, he was denied access to the courts.

To state a claim for denial of access to the courts under § 1983, an inmate must demonstrate that a defendant's "deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* No. 00 Civ.2042, 2001 U.S. Dist. LEXIS at *12 (S.D.N.Y. Mar. 29, 2001). Here, plaintiff has been heard in this court, so the claim against Goidel and Eagen is dismissed.

*Fourteenth Amendment*

Finally, Plaintiff has asserted claims against all defendants, alleging disparate treatment in violation of the Equal Protection Clause of the Fourteenth Amendment. There is simply no substance to these claims and they do not require discussion.

2006 WL 846272

CONCLUSION

 **6**  Plaintiff's motion to amend the complaint is granted. For the reasons explained above, the case is dismissed pursuant to Rule 12(b)(6).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 846272

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1133247

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Smith v. Collins,  S.D.N.Y.,  October 1, 2015

2006 WL 1133247

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jeff SMITH, Plaintiff,

v.

Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Kelly L. Munkwitz, Esq., Asst. Attorney General, of
Counsel, Department of Law, Albany, NY, for Defendants.

## DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights action
pursuant to 42 U.S.C. § 1983. By Report-Recommendation
dated March 17, 2006, the Honorable George H.
Lowe, United States Magistrate Judge, recommended that
defendants' motion for summary judgment be granted, and
that plaintiff's motion for partial summary judgment be
denied. (Docket No. 51). The plaintiff has filed objections to
the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff
has objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly, it
is ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

Plaintiff's motion for partial summary judgment is DENIED.
and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd, United
States District Judge, pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c) of the Rules of Practice for this Court.
In this *pro se* civil rights action brought under 42 U.S.C. §
1983, Jeff Smith ("Plaintiff") alleges that five employees of
Upstate Correctional Facility-Deputy Superintendent Robert
K. Woods, Captain Joseph R. Belarge, Sergeant G.J.
O'Donnel, Food Service Administrator Richard Antonelli,
and Correction Officer Wayne Holt ("Defendants")-violated
his rights under the First, Fourth, Eighth, and Fourteenth
Amendments by (1) retaliating against him for having
previously filed a complaint, (2) subjecting him to an
unreasonable search and seizure, (3) subjecting him to a
damaged bunk bed while he was housed in the Upstate
Correctional Facility Special Housing Unit, and (4) taking
away his "good time" credits without affording him due
process. (Dkt. No. 5 [Plf.'s Am. Compl.].) [1]

[1]     Given my duty to liberally construe a *pro
se* plaintiff's civil rights complaint, I construe
Plaintiff's Amended Complaint as including a claim
that various Defendants violated Plaintiff's rights
under the Fourth Amendment to be free from
unreasonable searches and seizures. *See Phillips
v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We
leave it for the district court to determine what
other claims, if any, [the plaintiff] has raised. In
so doing, the court's imagination should be limited
only by [the plaintiff's] factual allegations, not
by the legal claims set out in his pleadings.")
[citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s
Am. Compl., alleging that Defendants Woods and
Holt "violat[ed] plaintiff's 4th ... Amendment[ ]

2006 WL 1133247

rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]        A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21

*(1972) (per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court may construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]   *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]   *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and*

that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]   Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

6    See *Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7    Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8    See *Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649,

664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. 9    Of course, an affidavit may be conclusory because its assertions are too general. 10    However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." 11    Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

9    See Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10    See, e.g., *Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging

2006 WL 1133247

remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by

admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a] [2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other

2006 WL 1133247

two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint"* in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]   (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]   (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]   (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]   (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]   (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]   (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37

[Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20] (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

[21] (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. [22]

[22] (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. [23] In pertinent part, the letter stated,

[23] (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. [24]

[24] (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. [25]

[25] (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. [26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." [27] In addition, the last page of the letter states:

26    (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

27    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.
It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. 28

28    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. 29 In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

29    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. 30 The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." 31

30    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

31    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. 32 The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." 33

32    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

33    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." 34

34    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

[35]     (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *DEAD* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself. [36]

[36]     (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

*7 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]     (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]     (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]     (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40]     (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]     (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]     (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]     (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement];

2006 WL 1133247

Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

44    (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping

an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

45    (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

46    (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

Plaintiff's Misbehavior Report,
Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3)

soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

[47] (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48] (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family member without the consent or approval of the Superintendent or his designee. [51]

[49] (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) See also 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50] (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) See also 7 N.Y.C.R.R. § 270.02[B][14][v].

[51] (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or

services" from Inmate Alcivar's daughters].) See also 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52] (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53] (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54] (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

55    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1
      Statement, asserting this fact]; Dkt. No. 42, Part 1,
      ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No.
      42, Part 23 at 46-48 [Munkowitz Decl., attaching
      transcript of Plaintiff's deposition, in which he
      discusses the appeal]; Dkt. No. 38, Part 3 at 46,
      68 [exhibits to Plaintiff's motion for summary
      judgment, attaching his appeal and Mr. Selsky's
      affirmance].)

56    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz
      Decl., attaching transcript of Plaintiff's deposition,
      in which he discusses his one-page appeal and
      acknowledges that it did not complain about any
      lack or denial of witnesses]; Dkt. No. 38, Part 3 at
      46, 68 [exhibits to Plaintiff's motion for summary
      judgment, attaching his appeal and Mr. Selsky's
      affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a
discretionary review of Plaintiff's SHU sentence.[57] Based
upon this review, Plaintiff's SHU time was reduced from 90
days to 75 days.[58] However, Plaintiff's good time loss was
unaffected by the discretionary review.[59]

57    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1
      Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶
      3 1 [Plf.'s Response, admitting part of this fact, not
      specifically controverting the rest of this fact, and,
      in any event not citing any admissible evidence in
      support of any denial of this fact]; Dkt. No. 37, Part
      8, ¶ 8 [Belarge Aff.].)

58    (Id.)

59    (Id.)

Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August
31, 2002, Defendant Woods met with Defendant Belarge
to discuss Plaintiff.[60] Defendant Belarge then met with
Defendant O'Donnell to discuss Plaintiff.[61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1
      Statement, asserting this fact]; Dkt. No. 42, Part 1,

¶ 37 [Plf.'s Response, not specifically controverting
this fact, and, in any event not citing any admissible
evidence in support of any denial of this fact]; Dkt.
No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37,
Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23
at 35-37 [Munkowitz Decl., attaching transcript of
Plaintiff's deposition, asserting that such a meeting
took place between Defendants Woods and Belarge
at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1
      Statement, asserting this fact]; Dkt. No. 42, Part
      1, ¶ 3 8 [Plf.'s Response, admitting this fact];
      Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No.
      42, Part 22 at 35-37 [Munkowitz Decl., attaching
      transcript of Plaintiff's deposition, asserting that
      such a meeting took place between Defendants
      Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance
of Plaintiff's misbehavior report on August 31, 2002) were
held according to standard procedure at Greene C.F.[62]
Specifically, the purpose of the meetings was to discuss how
to investigate whether Plaintiff had violated prison rules.[63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1
      Statement, asserting this fact]; Dkt. No. 42, Part 1,
      ¶ 39 [Plf.'s Response, not specifically controverting
      that the pre-misbehavior report meeting between
      Defendants Woods and Belarge, and the pre-
      misbehavior report meeting between Defendants
      Belarge and O'Donnell, were held according to
      standard procedure at Greene C.F., and, in any
      event not citing any admissible evidence in support
      of any denial of this fact]; Dkt. No. 37, Part
      3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9
      [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden
      Aff., disclaiming any knowledge about an alleged
      unlawful meeting between Defendants Woods,
      Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1
      Statement, asserting this fact]; Dkt. No. 42, Part
      1, ¶¶ 37-39 [Plf.'s Response, not specifically
      controverting this fact, and, in any event not
      citing any admissible evidence in support of
      any denial of this fact]; Dkt. No. 37, Part 3, ¶
      13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9
      [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden
      Aff., disclaiming any knowledge about an alleged

unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

[64]　(Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

[65]　(Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66]　(Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial

of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]　(Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]　(Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pilypchak,* 389 F.3d

2006 WL 1133247

379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See* Gill, 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); Gill, 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d.Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have

been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers.[69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]  *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing.[70] Plaintiff's letter did not mention Defendant Antonelli.[71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing.[72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing.[73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 133 of 279
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

70    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

71    (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

72    (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    (See, supra, Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

**B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim**

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth

Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am".) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint.[76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim.[77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...."[78]

[76]    *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

[77]    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am"

even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am".)

[78]    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11**  The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984).[79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube."[80] Indeed, Plaintiff appears to recognize this point of law.[81]

[79]    *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

[80]    *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

[81]    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and

2006 WL 1133247

seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

[82]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

[83]    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

[84]    *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not

established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### 1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [85] in September of 2002 as a result of

2006 WL 1133247

sleeping on a defective bed. [86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need. [87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint, [88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need. [89]

[85]   "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

[86]   (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

[87]   *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

[88]   (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard

conditions there, which included his allegedly defective bunk].)

[89]   (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90]   (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]   *(See, supra,* Statement of Fact No. 29.)

 **\*13**  More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92]   (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]   *(Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different

SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02]** *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02]** *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94] (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds.[95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95] *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

**2. Deliberate Indifference**

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3, 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it.[96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times.[97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96] (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97] *(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints.[98] Any assertion by Plaintiff that Defendants

Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]    *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October

24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101]   Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]    *(See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under §

1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations

omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]  (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]  (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding

2006 WL 1133247

that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

[104]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]   (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]   (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]   (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]   (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

Case 9:19-cv-01610-BKS-TWD Document 112 Filed 08/22/23 Page 141 of 279
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their threshold burden with regard to this issue.[109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[111]

[109]    *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ...

upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]    *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]    *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group

of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have

personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant

official would have understood that his or
her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations
omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the
issue of whether *a reasonable person would have known* he
was violating such a clearly established right, this "objective
reasonableness" [113] test is met if "officers of reasonable
competence could disagree on [the legality of defendant's
actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see
also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757,
764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921
F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court
explained,

[112]  *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d
647, 654 (2d Cir.1993); *Prue v. City of Syracuse,*
26 F.3d 14, 17-18 (2d Cir.1994).

[113]  *See Anderson v. Creighton,* 107 S.Ct. 3034,
3038 (1987) ( "[W]hether an official protected
by qualified immunity may be held personally
liable for an allegedly unlawful official action
generally turns on the 'objective reasonableness
of the action.' ") (quoting *Harlow,* 457 U.S. at
819; *Benitez v. Wolff,* 985 F.2d 662, 666 (2d
Cir.1993) (qualified immunity protects defendants
"even where the rights were clearly established,
if it was objectively reasonable for defendants to
believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample
protection to all but the plainly incompetent or those who
knowingly violate the law.... Defendants will not be immune
if, on an objective basis, it is obvious that no reasonably
competent officer would have concluded that a warrant should
issue; but if officers of reasonable competence could disagree
on this issue, immunity should be recognized.
*Malley,* 475 U.S. at 341. Furthermore, courts in the
Second Circuit recognize that "the use of an 'objective
reasonableness' standard permits qualified immunity claims
to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764
(citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992]
[citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's
motion papers and response papers, I will assume, for the

sake of argument, that Plaintiff is claiming he had, among
others, the following rights: (1) a right to have Defendant Holt
take control of Inmate Alcivar's legal materials when Plaintiff
offered those materials to Defendant Holt, and to later
acknowledge his failure to take control of those materials;
(2) a right to have Defendant Woods personally visit Plaintiff
in his "cube," and not launch a disciplinary investigation
against him, following Plaintiff's notes to Defendant Woods;
(3) a right to have Defendants Belarge and O'Donnell
not open or read Plaintiff's correspondence to and from
Inmate Alcivar's two daughters, following Plaintiff's notes to
Defendant Woods; (4) a right to have Defendant Antonelli
recuse himself based on the (alleged) fact that Plaintiff
and Defendant Antonelli, one week before the disciplinary
hearing, had an "encounter" regarding the conditions of
the equipment in the prison mess hall; and (5) a right to be
either transferred to a new cell in SHU, or provided with
a new bunk bed in SHU, *immediately* upon making an oral
complaint about his bunk bed to Defendants Woods, Belarge,
O'Donnell, Antonelli and/or Holt (or upon the observations of
that bunk bed by those Defendants).

**\*20**  As an initial matter, it is unclear to me that any of
these rights were "clearly established" in the summer and fall
of 2002 (or are clearly established now). In any event, even
if these rights were clearly established, it appears entirely
reasonable to me for Defendants to have concluded that their
treatment of Plaintiff did not violate these rights (or any
rights). Simply stated, I can find no *evidence* in the record that
Defendants Holt, Woods, Belarge, O'Donnell or Antonelli
did anything wrong. At the very least, officers of reasonable
competence could have disagreed as to the lawfulness of
Defendants' actions..

As a result, even if the Court does not dismiss all of
Plaintiff's claims for the reasons stated earlier in this Report-
Recommendation, I recommend that the Court dismiss all of
Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for
partial summary judgment–which (at best) contains arguments
regarding the issues discussed above–is without merit. I reach
this conclusion for the independent reason that Plaintiff's
Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2)
generally does not contain any citations to the record; and, to
the extent that Rule 7.1 Statement does contain citations to
the record, the record generally does not actually support the
facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the*

*moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*") [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 991402
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Yolanda KEYES, Administratrix of the
Estate of Francisco DeJesus; Herron
Emerenciano; and Rashad Scott, Plaintiffs,
v.
Donald VENETTOZZI, Director Special Housing and
Inmate Discipline; Michael Dixon, Sergeant; Jeffery
Rock, Lieutenant; Earl Bell, Deputy Superintendent of
Security; Jerry Kowalowski, Recreation Program Leader;
and Richard Houck, Transfer Coordinator, Defendants.

9:18-CV-0372 (GTS/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

HALLIE E. MITNICK, ESQ., MEGAN WELCH, ESQ.,
PRISONERS' LEGAL SERVICES OF NY, Counsel for
Plaintiffs, 114 Prospect Street, Ithaca, NY 14850.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, ERIK B. PINSONNAULT, ESQ., Assistant
Attorney General, Counsel for Defendants, The Capitol,
Albany, NY 12224.

## **DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this prisoner civil rights
action filed by Yolanda Keyes (as administratrix of the estate
of Francisco DeJesus), [1] Herron Emerenciano, and Rashad
Scott ("Plaintiffs") against Special Housing and Inmate
Discipline Director Donald Venettozzi, Sergeant Michael
Dixon, Deputy Superintendent of Security Earl Bell, Sergeant
Jeffery Rock, Recreation Program Leader Jerry Kowalowski,
and Transfer Coordinator Richard Houck ("Defendants"), is
Defendants' motion for summary judgment. (Dkt. No. 69.)
For the reasons set forth below, Defendants' motion is granted
in part and denied in part.

[1]    The Court notes that, for the ease of reading, it will
still refer to Francisco DeJesus as a plaintiff in this
action.

## I. RELEVANT BACKGROUND

### A. Plaintiffs' Amended Complaint
Generally, Plaintiffs' Amended Complaint alleges that
Defendants violated their due process rights and took various
adverse actions against them at Clinton Correctional Facility
("Clinton") in 2015 and 2016 as a result of Plaintiffs' election
(by fellow prisoners) to Clinton's Inmate Liaison Committee
("ILC") following the well-publicized escape of two inmates
(Richard Matt and David Sweat) from Clinton's Honor
Block. (Dkt. No. 17 [Pls.' Am. Compl.].) Five claims in the
Amended Complaint survived the Court's Decision and Order
of September 23, 2019: (1) a First Amendment retaliation
claim by Plaintiff DeJesus against Defendants Dixon and
Rock; (2) a First Amendment retaliation claim by Plaintiff
Emerenciano against Defendants Kowalowski and Bell; (3) a
First Amendment retaliation claim by Plaintiff Scott against
Defendant Houck; (4) a Fourteenth Amendment due process
claim by Plaintiff Emerenciano against Defendants Bell and
Venettozzi; and (6) a supervisory liability claim by Plaintiffs
against Defendant Venettozzi. (Dkt. No. 40, at 50.)

### B. Undisputed Material Facts on Defendants' Motion
###  for Summary Judgment
Before reciting the undisputed material facts on Defendants'
motion, the Court observes that, in addition to their Rule 7.1
Response, Plaintiffs have submitted what they characterize as
a "Statement of Additional Facts" that "are either undisputed
or at least supported by sufficient record evidence that the
jury could accept them...." (Dkt. No. 73, Attach. 1, at 9-22.)
Of course, no Statement of *Undisputed* Additional Facts is
permitted under the District's Local Rules of Practice. *See*
N.D.N.Y. L.R. 56.1(b) ("In addition, the opposing party's
Response may set forth any assertions that the opposing party
contends are in dispute in a short and concise Statement of
Additional Material Facts *in dispute* ....") (emphasis added).
Furthermore, many of Plaintiffs' additional factual assertions
are immaterial to the resolution of the issues presented
by Defendants' motion. *Id.* (permitting a "Statement of
Additional *Material* Facts in Dispute....") (emphasis added).
However, to the extent Plaintiffs actually assert additional
material facts not in dispute, the Court will take them
into consideration in its below recitation of the undisputed
material facts.

**\*2** The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiffs or denied by them without appropriate record citations in their response thereto. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 73, Attach. 1 [Pls.' Rule 7.1 Resp.].)

Defendant Dixon's Misbehavior
Report Against Plaintiff DeJesus

1. At some point before January 27, 2016, Defendant Dixon received from the staff at Clinton both a copy of both a letter authored and sent by Plaintiff DeJesus to the State Commission on Corrections ("SCOC") and a direction to investigate the letter (at least in part) for a possible violation of disciplinary rules by Plaintiff DeJesus. [2]

[2]    The Court notes that, although Plaintiffs dispute "in part" this statement of material fact, they cite to no admissible record evidence controverting it.

2. During his investigation into the matter, Defendant Dixon interviewed Plaintiff DeJesus.

3. During this interview, Plaintiff DeJesus reiterated the same assertions that he had included in his letter to the SCOC.

4. Based upon the letter that Plaintiff DeJesus had sent to the SCOC, his remarks made to Defendant Dixon during his interview, and Defendant Dixon's consultation with Defendant Rock, Defendant Dixon issued a misbehavior report against Plaintiff DeJesus dated January 27, 2016, charging him with violations of Disciplinary Rules 102.10 and 107.11.

5. On February 1, 2016, Defendant Rock began to conduct Plaintiff DeJesus' Tier III disciplinary hearing. Defendant Rock was the only Defendant who conducted Plaintiff DeJesus' Tier III disciplinary hearing.

6. Defendant Rock completed this hearing on February 12, 2016, finding Plaintiff guilty of both charges.

7. On June 3, 2016, Defendant Venettozzi reversed the decision that had been issued by Defendant Rock after the completion of the Tier III hearing on February 12, 2016. [3]

[3]    The Court notes that the Superintendent's hearing reversal resulted in the expunction of both charges against Plaintiff DeJesus.

8. Defendant Venettozzi electronically signed the document memorializing the reversal of Defendant Rock's decision.

Defendant Kowalowski's Misbehavior
Report Against Plaintiff Emerencio

9. Defendant Kowalowski is currently employed by the New York State Department of Corrections and Community Supervision ("DOCCS") as a Recreation Program Leader Two ("RPL Two").

10. Excluding a brief stint between early 2016 through July 2016, when he served as a Recreation Program Leader Three ("RPL Three") at Upstate Correctional Facility ("Upstate"), Defendant Kowalowski has held the position of RPL Two at Clinton since approximately 2004 or 2005.

11. During one of the ILC's meetings at Clinton in or around October 2015, some ILC members had expressed their disagreement with a policy that requires inmates to lay on the ground when an altercation occurs in the prison yard. [4]

[4]    The Court deems this fact to be undisputed because Plaintiffs have failed to provide a specific record cite in support of their partial dispute of this fact. *See* N.D.N.Y. L.R.(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established ... Each denial shall set forth a specific citation to the record where the factual issue arises."); *see also, e.g.*, *Rizzo v. Health Rsch., Inc.*, 12-CV-1397, 2016 WL 632546, at \*2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at \*1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at \*2, n.6 (S.D.N.Y. Oct. 17, 2000)

("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts ... [A] vague cite to all of the exhibits is simply unacceptable.").

**\*3** 12. During the ILC meeting, Plaintiff Emerenciano expressed concerns about problems the policy could lead to at the prison.[5]

[5]    The Court notes that Defendant Kowalowski (who was present at the meeting) has testified that he heard Plaintiff Emerenciano say that "it would only take one inmate to stand up during a similar situation in the future, and that there will be another 'eighty-three' as a result." Defendant Kowalowski interpreted this use of the term "eighty-three" as a reference to a prison riot that had occurred at Clinton in 1983. However, Plaintiff Emerenciano has testified that he never said such a thing and had not even known of the 1983 riot at the time.

13. After this ILC meeting, the administration instructed Defendant Kowalowski to issue a misbehavior report against Plaintiff Emerenciano for making threats.[6] Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano dated October 2, 2015, charging him with violating Disciplinary Rules 102.10 and 104.12.

[6]    The Court deems this fact to be undisputed by Plaintiffs because Plaintiffs' Rule 7.1 Response begins with the word "Undisputed," and then attempts to provide more "specific[s]" about the above asserted fact. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit' "); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider each statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' ").

14. On October 8, 2015, Defendant Bell conducted Plaintiff Emerenciano's Tier III disciplinary hearing at Upstate.

15. At Plaintiff Emerenciano's Tier III disciplinary hearing, Defendant Bell served as the hearing officer.

16. Defendant Bell found Plaintiff Emerenciano guilty of the charges set forth in the misbehavior report that Defendant Kowalowski had issued.

17. On November 30, 2015, the Acting Director of the Special Housing and Inmate Disciplinary Program, Corey Bedard, reviewed and modified Plaintiff Emerenciano's Special Housing Unit ("SHU") confinement time from 270 days to 180 days, with 90 of those days being suspended. On April 16, 2016, Defendant Venettozzi reversed the outcome of the Tier III disciplinary hearing that had occurred on October 8, 2015.

### Defendant Houck's Transfer of Plaintiff Scott

18. Defendant Houck is employed by DOCCS as a classification analyst in its Office of Classification and Movement ("OCM").

19. Defendant Houck works at the DOCCS' offices located in Albany, New York, and not at Clinton.

20. In his role as a classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. Defendant Houck receives reviews from individual correctional facilities, processes those reviews and decides these transfers. Specifically, Defendant Houck receives reviews when a correctional facility sends an electronic copy of a transfer referral through one of two possible methods. First, some of the inmate "transfer referrals are scheduled at the facility, possibly due to a change in security, or due to an inmate's preference." Second, some of the inmate transfer referrals are "unscheduled transfer reviews from facilities for other reasons, including medical or mental health reasons." However, before Defendant Houck receives a transfer referral from a DOCCS facility, three DOCCS employees—the Offender Rehabilitation Coordinator ("ORC"), Supervising Offender Rehabilitation Coordinator ("SORC"), and the Deputy Superintendent of Programs working at that facility —ordinarily must approve the transfer referral. Furthermore, ordinarily, Defendant Houck receives several hundred transfer referrals each month.

**\*4** 21. On October 7, 2015, Plaintiff Scott underwent what is known as a "preference lateral transfer" review at Clinton.

22. Plaintiff Scott had indicated a preference to be transferred to the Sullivan hub.

23. On or about October 27, 2015, Plaintiff Scott was transferred from Clinton to Green Haven Correctional Facility ("Green Haven").

# I. RELEVANT LEGAL STANDARDS

## A. Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [7] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[7] As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

## B. Standard Governing Claims Under 42 U.S.C. § 1983

Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive right in and of itself, but rather serves as the statutory vehicle by which individuals can seek redress in federal court for alleged violations of federal statutory or constitutional rights. It is well established that state prisoners are protected by Section 1983 and may bring claims based on their deprivation of rights while subject to confinement. *Cooper v. Pate*, 378 U.S. 546, 546 (1964). In a case where a prisoner is suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose: first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### 1. Standard Governing Retaliation Claims Under the First Amendment

**\*5** To establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary fitness from exercising ... [his or her] constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). Notably, "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381. With respect to the existence of a causal connection between the plaintiff's alleged protected conduct and the defendant's alleged adverse action, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was in close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp.2d 353, 370 (S.D.N.Y. 2011) (quoting *Espinal*, 558 F.3d at 129).

However, "[e]ven if [a] plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, 11-CV-1171, 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (Sharpe, C.J.); *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (italics omitted).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennet v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). As a result, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872. Therefore, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Green v. Phillips*, 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing *Brown v. Middaugh*, 41. F. Supp.2d 172, 191 [N.D.N.Y. 1999]). Furthermore, a plaintiff must provide non-conclusory allegations in support of his or her retaliation claim. *Green*, 2006 WL 846272, at *3; *see Williams v. Goord*, 111 F. Supp.2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claims appear insubstantial.") (internal quotation marks and citation omitted).

Finally, allegations set forth in support of retaliation claims "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006).

### 2. Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause protects an individual's procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020). With regard to an individual's procedural due process rights, a prisoner "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Therefore, to establish a procedural due process claim, a plaintiff must show two elements: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001).

**\*6** With regard to the first element, generally, "[p]rison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Burroughs*, 325 F. Supp.3d at 275. To constitute an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." *Id.* at 276. The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship. *Id.* Generally, confinements in SHU for a period up to 101 days under normal conditions will not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions. *Id.* The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." *Sealey v. Giltner*, 187 F.3d 578, 585 (2d Cir. 1999).

With regard to the second element, generally, the amount of process given to a plaintiff depends on three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### 3. Standard Governing Supervisory Liability Claims Under the First and Fourteenth Amendments

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d

880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation). Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]) (other citation omitted). More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). As for who did what, the Second Circuit has defined "personal involvement" to include both direct participation (i.e., the personal participation by a person who has knowledge of the facts that make their conduct illegal) and indirect participation (i.e., the ordering or helping of others to conduct themselves in an unlawful manner). *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). This means that "a defendant in a Section 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison officer where the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing any five factors:

> **\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy

> the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*. *See Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) (stating that the decision in *Iqbal* caused conflict with the Second Circuit about the continued vitality of the supervisory liability test, but declining to rule on the issue because it did not apply to the facts of the case). [8] It was unclear in the Second Circuit, up until recently, how the *Iqbal* decision would affect the *Colon* test. [9]

[8]
> In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for confinement based on religion, race, and/or national origin, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal*, 556 U.S. at 676.

[9]
> In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the Circuit implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer*, 738 F.3d 509, 513 n.3 (2d Cir. 2013), the Circuit expressed no view on the extent to which *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement. *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing

supervisory liability, it may have limited the *Colon* factors (so as to permit the use of only the first and third factors listed above). *Rasheen v. Adner*, 356 F. Supp.3d 222, 233-34 (N.D.N.Y. 2019).

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) ("*Tangreti*"). "'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676). Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly. *Tangreti*, 983 F.3d at 618.

Since *Tangreti* was decided in December 2020, courts in this Circuit have interpreted it in the same way: that the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*. *See, e.g.*, *Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Colon* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that each government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate, through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook*, 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

**\*8** "[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Rasheen v. Adner*, 356 F. Supp.3d 222, 235 (N.D.N.Y. 2019). Where the defendants are supervisory officials, "a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435 [2d Cir. 2003].)

## II. ANALYSIS

### A. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' First Amendment Retaliation Claims Against Them

#### 1. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Dixon

It is well settled that an inmate's filing of grievances while participating on an ILC and writing of complaints to the SCOC constitute constitutionally protected activity. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected conduct); *Vega v. Artus*, F. Supp.2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities ... constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

Moreover, the receipt of a false misbehavior report resulting in punishment and/or the receipt of a transfer to a different facility have been found to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the

"filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp.2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

As a result, the issue before the Court is whether the causation element of a retaliation claim has been established. Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Dixon issued a misbehavior report against DeJesus for retaliatory purposes. (Dkt. No. 69, Attach. 2, at 6-9 [Defs.' Mem. of Law].) [10] According to Defendant Dixon, he neither attended any ILC meetings nor served on the IGRC at the relevant time period (i.e., 2015 through 2016), during which Plaintiff DeJesus made complaints of assault and harassment by DOCCS staff. (*Id.* at 7-8.)

[10]     Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office, and not the numbers on the documents themselves.

**\*9** More specifically, Defendant Dixon argues that he received a copy of the letter-complaint that Plaintiff DeJesus had sent to the SCOC, and was directed to investigate whether Plaintiff DeJesus had violated any prison disciplinary rules. (Dkt. No. 69, Attach. 6, at 2 [Dixon Decl.].) As part of his investigation, Defendant Dixon interviewed Plaintiff DeJesus, and Plaintiff DeJesus repeated the same assertions that he had made in his letter to the SCOC. (*Id.*) At the conclusion of his investigation, Defendant Dixon believed that Plaintiff DeJesus "constituted a threat ... to the safety and operation of the facility." (*Id.*) Specifically, Defendant Dixon believed that the letter written to SCOC had indicated that Plaintiff DeJesus "would take action against any [DOCCS] staff member who attempted to discipline [him] for future misconduct." (*Id.*) Before issuing the misbehavior report to Plaintiff DeJesus, Defendant Dixon consulted with both a member of the IGRC and Clinton's "tier hearing lieutenant" to determine if Defendant Dixon was correctly perceiving a threat from Plaintiff DeJesus. (*Id.* at 2-3.) [11] Both individuals informed Defendant Dixon that Plaintiff DeJesus' actions warranted the issuance of a misbehavior report. (*Id.*)

[11]     The Court notes that this "tier hearing lieutenant" was Defendant Rock (Dkt. No. 69, Attach. 10, at 78.)

Not surprisingly, Plaintiff DeJesus disputes Defendant Dixon's version of events. Plaintiff DeJesus argues that Defendant Dixon issued him a misbehavior report "expressly upon the nature and content of his complaint letter [sent] to the SCOC," and his statement that he would pursue legal action if his protected conduct resulted in unlawful retaliation. (Dkt. No. 73, at 19-20 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that it is undisputed that Defendant Dixon issued a misbehavior report to Plaintiff DeJesus for "filing grievances and writing complaints to the SCOC and imposing disciplinary sanctions and placing him in [k]eeplock confinement as retaliation for [filing] those grievances, all of which resulted in his summary removal from the ILC and loss of an opportunity to appear early before the merit parole board for release consideration." (*Id.* at 18-24.)

According to Defendant Dixon's inmate misbehavior report against Plaintiff DeJesus dated January 27, 2016, Plaintiff DeJesus was interviewed in the IGRC office about the letter complaint he had sent to the SCOC regarding DOCCS officers Benware and Favreau. (Dkt. No. 69, Attach. 18.) Furthermore, according to the misbehavior report, Plaintiff DeJesus had written that "any attempt to discipline him will result in a '[c]ivil [a]ction' against [DOCCS officers Benware and Favreau]." (*Id.*) As a result, according to the misbehavior report, Defendant Dixon charged Plaintiff DeJesus with making threats and engaging in verbal harassment, and ordered that he "keeplocked," because Defendant Dixon had found that Plaintiff DeJesus' statements constituted a "clear threat to the operation of 40-1 building where he is housed as well as the safety of [DOCCS] [o]fficers Benware and Favreau." (*Id.*)

Generally, no violation of Rules 102.10 and 107.11 occurs when a prisoner tells a corrections officer that the prisoner will file a lawsuit against the corrections officer, unless the lawsuit is patently frivolous. *Compare Davidson v. Lee*, 104 F.3d 352, at \*1 (2d Cir. 1996) (denying defendants' motion for summary judgment where "Wood's [misbehavior] report arguably supports Davidson's allegation as it refers to Davidson's threat of litigation—'I'm going to sue you and your family'—therefore indicating that Davidson's propensity for filing lawsuits may have been a factor the defendants considered in filing the reports.") *and Amaker v. Goord*, 06-CV-0490, 2012 WL 4718661, at \*7 (W.D.N.Y. Aug. 16, 2012) ("[T]he hearing

2022 WL 991402

officer found '[i]ndicating you intend to sue is not a violation of 102.10' ....") *with Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *7, n.11 (N.D.N.Y. Nov. 29, 2011) ("[F]iling a court action that is frivolous is not constitutionally protected activity.").

Here, based on the current record, the Court is unable to find that the lawsuit referenced by Plaintiff DeJesus was patently frivolous. The Court respectfully disagrees with Defendant Rock's understanding that Plaintiff DeJesus was saying that he would sue even if he were charged with a disciplinary violation "for good cause." (Dkt. No. 69, Attach. 14, at 81.) To the contrary, Plaintiff DeJesus expressly conditioned the filing of a lawsuit on "any *fabrication* of contraband; drugs; weapons, etc." (Dkt. No. 69, Attach. 19, at 8 [emphasis added].)

**\*10** Under the circumstances, the Court finds that a jury could reasonably find that there was a causal connection between Plaintiff DeJesus' protected speech (i.e., his statement that he would pursue future legal action against officers Benware and Favreau if they continued to discipline him) and the adverse action taken by Defendant Dixon (i.e., his filing of the misbehavior report against Plaintiff DeJesus that resulted in his keeplock confinement).

For all these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Dixon.

### 2. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Rock

Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Rock took any adverse action against DeJesus and that, if he did so, the adverse action was caused by DeJesus' protected speech. (Dkt. No. 69, Attach. 2, at 9-10 [Defs.' Mem. of Law].) More specifically, Defendants argue that no evidence exists that Defendant Rock conspired with any other Defendants, or served as a biased hearing officer at Plaintiff DeJesus' Tier III disciplinary hearing. (*Id.*) Defendants also argue that the admissible record evidence indicates that Defendant Rock was not involved in the investigation into Plaintiff DeJesus' alleged misbehavior before being appointed hearing officer. (*Id.*) Finally, Defendants argue that Defendant Rock was unaware of Plaintiff DeJesus' discipline history, because he was never mentioned in any of Plaintiff DeJesus' prior grievances made

against officers Benware and Favreau, he never served in an active capacity at the ILC meetings, and no other Plaintiffs testified to interacting with (or even meeting) Rock. (*Id.*)

Plaintiffs respond that Defendant Rock acted with a retaliatory motivation when he improperly punished Plaintiff DeJesus for engaging in protected conduct. (Dkt. No. 73, at 24 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that "[i]t is clear from the content of the misbehavior report, which Defendant Rock upheld and condoned, that 'but for' Mr. DeJesus' protected activities the misbehavior report would not have been issued [sic]." (*Id.*)

Defendant Rock served as the presiding hearing officer for Plaintiff DeJesus' Tier III disciplinary hearing. According to his declaration, when Defendant Rock was scheduled to serve as a hearing officer, he would not partake in any substantive pre-hearing discussions with DOCCS staff. (Dkt. No. 69, Attach. 5, at 3 [Rock Decl.].) At the conclusion of Plaintiff DeJesus' Tier III disciplinary hearing, Defendant Rock found Plaintiff DeJesus guilty of the charges contained within the misbehavior report issued by Defendant Dixon. (*Id.*) More precisely, Defendant Rock determined that, by threatening future legal action, Plaintiff DeJesus "was trying to preemptively identify future conflicts with [DOCCS] staff as retaliation and to potentially deter staff from doing their jobs." (*Id.*)

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not seen yet." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t would be improper for prison officials to decide the disposition of a case before it was heard.").

**\*11** Granted, "prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* On a motion for summary judgment, an inmate's subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis*, 891 F.2d at 47; *Clyde v. Schoellkopf*, 714 F. Supp.2d 432, 437-38 (W.D.N.Y. 2010).

Here, it is uncontroverted that that Defendant Dixon consulted with Defendant Rock before he issued the misbehavior report to Plaintiff DeJesus. (Dkt. No. 69, Attach. 10, at 78.) According to Defendant Dixon, Defendant Rock "concurred with [his] interpretation" that, in Plaintiff DeJesus' letter to SCOC, his threat of future "civil action," constituted a "threat[ ] [against] two officers in the operation of the dorm," thereby warranting the issuance of a misbehavior report. (*Id.* at 78.) Moreover, liberally construed, Plaintiff DeJesus' retaliation claim against Defendant Rock alleges retaliation not simply by failing to recuse himself as the hearing officer (due to his involvement in the charging decision) [12] but by conspiring with Defendant Dixon to charge him without adequate grounds. (Dkt. No. 1, at ¶¶ 13, 67, 83, 183, 185.)

[12]    The Court notes that "both DOC[C]S regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer." *Silva v. Sanford*, 91-CV-1776, 1994 WL 455170, at *12 (S.D.N.Y. Aug. 18, 1994); *see also Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976) ("[N]o person who has *participated* in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a ... Superintendent's Proceeding relating to those acts." [emphasis added]).

For these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Rock.

### 3. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Kowalowski

Defendants argue that Plaintiff Emerenciano has failed to provide any evidence establishing that any adverse action taken by Defendant Kowalowski against Emerenciano was caused by Emerenciano's protected speech. (Dkt. No. 69, Attach. 2, at 10 [Defs.' Mem. of Law].) Instead, Defendants argue that Plaintiff Emerenciano could only "surmise" that Defendant Kowalowski "probably had to retaliate against [him]" because of a prior grievance that Plaintiff Emerenciano had submitted against Defendant Kowalowski. [13] (*Id.*)

[13]    The Court notes that Plaintiff Emerenciano had submitted a grievance against Defendant

Kowalowski because Kowalowski had not placed Emerenciano on the ILC callout list. (Dkt. No. 69, Attach. 17, at 53-54 [Emerenciano Tr.].) In the same grievance, Plaintiff Emerenciano also requested that Defendant Kowalowski be removed from his role as the ILC civilian representative. (*Id.*)

In response, Plaintiffs argue that the evidence establishes as follows: (1) Plaintiff Emerenciano engaged in protected conduct when he was voicing and relaying his constituents' concern at the ILC meeting regarding a newly-imposed prison yard policy that had been implemented by Defendant Bell; (2) Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano for engaging in that protected conduct; and (3) Plaintiff Emerenciano's protected conduct directly caused Defendant Kowalowski to issue the misbehavior report. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].)

 **\*12**  During a Clinton ILC meeting in or around October 2015, Plaintiff Emerenciano and his fellow ILC members expressed disagreement with a newly implemented policy implemented by Defendant Bell that required inmates to remain seated on the prison yard ground when an altercation occurs. [14] (Dkt. No. 73, Attach. 13, at 1-2.) In particular, inmates expressed the collective frustration that this new policy required them to either lay down or sit on the ground for approximately 20 to 30 minutes if any sort of altercation between inmates occurred in the prison yard, and as a result, be exposed to the potentially severe weather for an unnecessarily long period of time. (*Id.*) For example, at the ILC meeting, Plaintiff Emerenciano discussed a previous fistfight (where no weapons were involved) that had occurred between two inmates in Clinton's North Yard. (*Id.*) After DOCCS officers had broken-up the fistfight and escorted the two involved inmates off the yard, the other inmates (who were not involved in the altercation) in the yard were required to sit "in the cold [and] mud" for approximately 25 minutes. (*Id.*) At the ILC meeting, Plaintiff Emerenciano communicated to Sergeant Hutti, Clinton's Yard Sergeant, that the inmates were left feeling frustrated and angry that day. (*Id.* at 1-2.) In addition, Plaintiff Emerenciano informed Sergeant Hutti that, in the approaching winter months, inmates may be less willing to comply with this new policy given the cold weather. (*Id.* at 2.) Plaintiff Emerenciano stated that one inmate's decision to not comply with this policy may create a "chain reaction" in other inmates—a conflict that he wished to avoid. (*Id.*)

14    Defendant Kowalowski attended this ILC meeting as the "civilian staff advisor." (Dkt. No. 73, Attach. 13, at 1.)

Approximately 45 minutes after the ILC meeting had ended, when Plaintiff Emerenciano had already returned to his cell, four DOCCS officers placed him in keeplock restraints and escorted him to SHU. (*Id.*) After spending almost three hours in SHU, Plaintiff Emerenciano was informed that he was being transferred to Upstate later that same day. (*Id.*) On October 2, 2015, Plaintiff Emerenciano was transferred from Clinton to the SHU at Upstate. (Dkt. No. 73, Attach. 15.) On October 5, 2015, Plaintiff Emerenciano was served a misbehavior report issued by Defendant Kowalowski. (*Id.*) According to this misbehavior report, at the ILC meeting, "[Plaintiff Emerenciano] stated that if [the policy requiring inmates to remain on the ground of the prison yard] continues we will have another 83 ...." (Dkt. No. 69, Attach. 25, at 1.)

Under these circumstances, the Court finds that there is a genuine dispute of material fact as to the second element of a claim for retaliation. While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," "false accusations contained in a misbehavior report can rise to the level of a constitutional violation ... where the false accusation is based on something more, such as 'retaliation against the prisoner for exercising a constitutional right.' " *Tafari v. McCarthy*, 714 F. Supp.2d 317, 372 (N.D.N.Y. 2010) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 [2d Cir. 1997]). In other words, in the context of a retaliation claim, there is no question that a falsified misbehavior report constitutes an adverse action. *See Gill*, 389 F.3d at 381 (holding that a plaintiff's allegations that defendants issued false misbehavior reports against him was sufficient to allege adverse action).

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. According to Defendant Kowalowski's deposition testimony, the basis for his issuing of a misbehavior report against Plaintiff Emerenciano was Emerenciano's reference to a prison riot that had occurred at Clinton in 1983. (Dkt. No. 69, Attach. 13, at 139-142, 146 [Kowalowski Tr.].) Specifically, Defendant Kowalowski testified that, during the ILC committee meeting, Plaintiff Emerenciano stated that the newly implemented prison yard policy could lead to frustration among the inmates, which may ultimately lead to a riot (similar to the riot at Clinton Correctional Facility in 1983). (*Id.*)

Plaintiff Emerenciano argues that he made no such reference to the 1983 Clinton prison riot, and therefore Defendant Kowalowski's falsified misbehavior report constituted an adverse action. (Dkt. No. 73, at 25-26 [Pls.' Opp'n Mem. of Law].) In fact, Plaintiff Emerenciano testified that he was "unaware of any incident [at Clinton] in 1983" until Defendant Kowalowski issued him the misbehavior report. (Dkt. No. 69, Attach. 17, at 52 [Emerenciano Tr.].) Additionally, other members—Inmate Leon, Inmate Rashawn Scott, Inmate David Maxwell, Inmate Selah, Inmate Newman, Inmate Matos—of the ILC committee testified to the fact that they did not recall hearing Plaintiff Emerenciano remark to an "83." (Dkt. No. 69, Attach. 26, at 11, 14-15, 18, 20-21, 24-25, 29-30.) Instead, Plaintiff Emerenciano argues that, given his role on the ILC committee, he was merely informing DOCCS staff of the inmates' growing frustration regarding the prison yard policy, and proposing possible solutions for the future. (Dkt. No. 73, at 26-27 [Pls.' Opp'n Mem. of Law].) Finally, of at least some materiality is the fact that Plaintiff Emerenciano had previously filed a grievance against Defendant Kowalowski.

**\*13**  For all of these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Kowalowski.

### 4. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Bell

Defendants argue Plaintiff Emerenciano has failed to provide evidence showing "one particular thing" that would motivate Defendant Bell to retaliate against him. (Dkt. No. 69, Attach. 2, at 14 [Defs.' Mem. of Law].)

Plaintiff Emerenciano responds (persuasively) that has adduced admissible record evidence from which a reasonable juror could find that (1) Emerenciano had engaged in constitutionally protected conduct by voicing generalized inmate concern over the newly implemented prison yard policy to Defendant Kowalowski, and (2) he suffered an adverse action by being charged with a disciplinary violation by Defendant Kowalowski, and was found guilty at his Tier III disciplinary hearing and then punished by Defendant Bell. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].) Less clear, however, is whether Plaintiff Emerenciano has shown a causal connection between his protected conduct and the adverse action by Defendant Bell.

Generally, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453798, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 [2d Cir. 2009]). Here, Plaintiff Emerenciano must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).

Defendant Kowalowski has testified that, after the ILC meeting at which Plaintiff Emerenciano had allegedly mentioned the 1983 Clinton riot, Kowalowski informed Defendant Bell of the remarks that Plaintiff Emerenciano had made. (Dkt. No. 69, Attach. 13, at 140-41 [Kowalowski Tr.].) However, Plaintiff Emerenciano has not provided any admissible evidence supporting a reasonable finding that Defendant Bell had somehow been aware of the fact that Defendant Kowalowski had been lying, and/or that any portion of his misbehavior report had been falsified (an issue that still remains in dispute). In addition, before the taking of the adverse action at issue, Plaintiff Emerenciano had never filed any grievances against Defendant Bell, and had had no interaction with him. (Dkt. No. 69, Attach. 17, at 15-16 [Emerenciano Tr.].) At best, Plaintiff Emerenciano has provided only conclusory allegations that Defendant Bell acted with a retaliatory motivation when he found him guilty at Emerenciano's Tier III disciplinary hearing.

The Court would add only that a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from the conclusion ... could be deduced." *Hill v. Superintendent*, 472 U.S. 445, 455 (1987). "[I]t is well-established that a correction officer's misbehavior report may constitute reliable evidence of guilt." *Chavez v. Gutwein*, 20-CV-0342, 2021 WL 4248917, at *12 (S.D.N.Y. Sept. 17, 2021) (citing Jensen v. Mullin, 14-CV-1337, 2016 WL 5394744, at *4 [N.D.N.Y. Sept. 27, 2016]). Here, the Court need not scrutinize Defendant Bell's reliance on certain pieces of evidence at Plaintiff Emerenciano's Tier III disciplinary hearing, because it is the hearing officer's responsibility, not the Court's, to make determinations regarding a witness's credibility. *See Hill*, 472 U.S. at 455 (explaining that application of the "some evidence" standard does not require that the Court conduct an independent assessment of the credibility of the witnesses).

*14 For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Bell.

### 5. Plaintiff Scott's First Amendment Retaliation Claim Against Defendant Houck

Defendants argue that Plaintiff Scott has failed to show that, before Defendant Houck authorized Scott's facility transfer, Houck had been aware of Scott's exercise of his constitutional rights. (Dkt. No. 69, Attach. 2, at 14-17 [Defs.' Mem. of Law].) According to Defendants, it was Plaintiff Scott himself who had requested the facility transfer. (*Id.* at 16.) Therefore, Defendants argue that Plaintiff Scott has not shown that there was a causal connection between Defendant Houck's approval of Plaintiff Scott's facility transfer request and Scott's communication with media outlets and elected officials who were seeking information on the 2015 prison escape of inmates David Sweat and Richard Matt. (*Id.*)

Plaintiffs respond that Defendant Houck retaliated against Plaintiff Scott by abruptly facilitating his transfer from Clinton to the Green Haven hub. (Dkt. No. 73, at 29-32 [Pls.' Opp'n Mem. of Law].) According to Plaintiffs, Defendant Houck retaliated against Plaintiff Scott because Scott had communicated with outside entities, including the media and the *New York Times*, about the living conditions at Clinton. (*Id.* at 29.) More precisely, Plaintiffs argue that a jury could reasonably conclude, based on the nature and timing of Plaintiff Scott's transfer that, Defendant Houck retaliated against him by having him summarily removed from both the ILC and Clinton. (*Id.*)

It is well established that a prison official may not transfer an inmate in retaliation for the exercise of a constitutional right. *Smith v. Greene*, 06-CV-0505, 2010 WL 985383, at *8 (N.D.N.Y. Feb. 3, 2010) (Baxter, M.J.) (citing *Davis v. Kelly*, 160 F.3d 917, 920 [2d Cir. 1998]) report-recommendation *adopted by* 2010 WL 985388 (N.D.N.Y. Mar. 16, 2010) (Suddaby, J.).

Plaintiff Scott has adduced admissible record evidence from which a rational jury could find that he engaged in constitutionally protected conduct when he communicated with reporters from the *New York Times* to discuss the overall environment and alleged mistreatment and abuse of incarcerated individuals by DOCCS staff at Clinton during the aftermath of the 2015 prison escape. Plaintiff Scott has also

adduced admissible record evidence from which a rational jury could find that he suffered adverse action by being transferred from Clinton to the Green Haven hub.

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. To establish a causal connection between protected conduct and an adverse action, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff." *Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *6 (N.D.N.Y. Dec. 22, 2005) (internal quotation marks omitted). When evaluating whether a causal connection exists between the protected conduct and the adverse action, a court may consider the following: "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." *Vega v. Artus*, 610 F. Supp.2d 185, 207 (N.D.N.Y. 2009).

**\*15** To establish the third element of his retaliation claim, Plaintiff Scott relies primarily on the shortness of time between his making a transfer request and receiving a transfer (which was less than a month). [15] (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) Moreover, Plaintiff Scott argues that a jury could reasonably accept his testimony that "he did not want to go to the Green Haven hub, nor that he ever expected such a swift transfer that would prevent him completing his ILC term at Clinton." (*Id.*)

[15]     In his role as a DOCCS classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].) At the beginning of each month, Defendant Houck receives several hundred transfer referrals from the DOCCS facilities. (*Id.* at 3.)

Defendant Houck receives electronic reviews from individual correctional facilities, and based on these reviews, classifies inmates based on a security level. [16] (Dkt. No. 69, Attach. 11, at 20-21 [Houck Tr.].) Defendant Houck received Plaintiff Scott's facility transfer request on which he indicated that he wanted to be transferred to the Sullivan hub for programming purposes. (Dkt. No. 69, Attach. 30, at 4.) According to Defendant Houck, DOCCS staff at Clinton approved Plaintiff Scott's transfer request on October 9, 2015. [17] (Dkt. No. 69, Attach. 11, at 60 [Houck Tr.].) On October 26, 2015, Plaintiff

Scott was transferred from Clinton to the Green Haven hub. (Dkt. No. 69, Attach. 31.)

[16]     The Court notes that inmates are reviewed on semi-annual basis for a potential facility transfer. (Dkt. No. 69, Attach. 7, at 3 [Houck Decl.].) This review includes an interview of the inmate. (*Id.*)

[17]     Before Defendant Houck receives a transfer referral from a correctional facility, three DOCCS employees must ordinarily approve the referral: the offender rehabilitation coordinator ("ORC"), the supervising offender rehabilitation coordinator ("SORC"), and the deputy superintendent of programs. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].)

However, although Plaintiff Scott had *requested* to be transferred to the Sullivan hub, there was no guarantee that DOCCS would have been able to accommodate his request. Simply put, Plaintiff Scott overlooks the fact that he had no right to be confined to an institution of his choosing. *See Davis*, 160 F.3d at 920 ("A prisoner has no liberty interest in remaining at a particular correctional facility.").

Generally, the most desirable DOCCS "hubs" (amongst inmates) are located in the downstate area of New York. [18] (*Id.* at 5.) As a result, these hubs have the longest waiting list for inmates seeking a transfer to them. [19] (*Id.*) Therefore, when an inmate requests to be transferred to a facility in any of the three downstate hubs, Defendant Houck selects a facility based on that inmate's preference, the availability of bed space at those facilities, and the relevant security concerns. (*Id.*) Ultimately, the goal of overseeing an inmate's facility request is to have the inmate transferred to the facility that is closest to his or her preferred location (subject to the available bed space and security considerations). (*Id.*) Finally, an inmate plays no part in making the final determination regarding which facility he or she is transferred to. (*Id.*)

[18]     The Court notes that the most desirable DOCCs hubs include the Sullivan hub, the Green Haven hub, and the New York City hub. (Dkt. No. 69, Attach. 7, at 5 [Houck Decl.].)

[19]     According to Defendant Houck, the wait time for inmates seeking a transfer to the Green Haven hub ordinarily takes approximately one year. (Dkt. No. 69, Attach. 11, at 56 [Houck Tr.].) However, the

2022 WL 991402

Sullivan hub experiences wait times approximately up to two years because of its small maximum-security orientation. (*Id.* at 56-57.)

**\*16** Moreover, the Court is not persuaded by Plaintiff Scott's argument that he "[n]ever expected such a swift transfer that would prevent him from completing his ILC term at Clinton." (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) The Court notes that Plaintiff Scott could have submitted his facility transfer once his ILC term had ended (and not before) if he wished to serve-out the remaining portion of his term on the ILC, or at least specified the time that he wanted to be transferred. Given the other evidence in the case, it is of no consequence that Plaintiff Scott was transferred less than thirty days after submitting his request, because it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." *Cooper v. Annucci*, 18-CV-0762, 2020 WL 8474802, at \*14 (N.D.N.Y. Nov. 9, 2020) (Hummel, M.J.) (quoting *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at \*11 [N.D.N.Y. June 7, 2018].) Indeed, Plaintiff Scott could only "surmise" that his transfer was made in retaliation based on the relative speed at which his transfer had been processed. (Dkt. No. 69, Attach. 13, at 76 [Scott Tr.].) Such speculation, of course, is insufficient to create a genuine dispute of material fact. *See Henson v. Gagnon*, 13-CV-0590, 2015 WL 9809874, at \*12 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.) ("[C]onclusory statements are not sufficient to support causation in retaliation claims; the claims must be supported by specific facts."), *report and recommendation adopted by*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).

Finally, Plaintiff Scott argues that DOCCS is prohibited from transferring an inmate to another facility while that inmate is serving on the IGRC. [20] (*Id.* at 30-31.) The Court finds this argument to be unconvincing, because, as Plaintiff Scott himself correctly points out, he was not a member of the IGRC at the time of his transfer to the Green Haven hub.

[20]   The Court notes that 7 N.Y.C.R.R. § 701.4 details the procedures for removing an inmate from his or her role on the IGRC.

For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Scott's First Amendment retaliation claim against Defendant Houck.

**B. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Due Process Claims Against Them**

**1. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Bell**

In their response to Defendant's motion for summary judgment, Plaintiffs have not opposed Defendants' request for judgment on Plaintiff Emerenciano's due process claim against Defendant Bell. (Dkt. No. 73, at 7, n.2 [Pls.' Opp'n Mem. of Law].) For these reasons, and the reasons stated in Defendants' memoranda of law, the Court grants Defendants' motion for summary judgment on this claim.

**2. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Venettozzi**

Defendants argue that the Court must grant summary judgment on Plaintiff Emerenciano's due process claim against Defendant Venettozzi, because Emerenciano has failed to establish Venettozzi's personal involvement in the alleged incidents giving rise to the violation of Emerenciano's due process rights. (Dkt. No. 69, Attach. 2, at 18-19 [Defs.' Mem. of Law].)

Plaintiffs respond that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights, because the evidence shows that Defendant Venettozzi modified the Tier III disciplinary hearing officer's determination. (Dkt. No. 73, at 35-36 [Pls.' Opp'n Mem. of Law].) Moreover, the Second Circuit's ruling in *Tangreti*, Plaintiffs urge the Court to reconsider its dismissal of their supervisory claim against Defendants Annucci and Kirkpatrick based on their deliberate indifference. (*Id.*)

The Court will address Plaintiffs' arguments out of order, beginning with the argument urging reconsideration of the Court's Decision and Order of September 23, 2019. When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusions reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). Such a motion is

"not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]' " *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 41 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 [2d Cir. 1998].)

**\*17** In support of Plaintiffs' sole argument for reconsideration (that, "even before *Tangreti*[,] the Second Circuit had indicated that there are cases where deliberate indifference is so egregious that it rises to and can satisfy a requisite unlawful discriminatory intent"), they fail to provide the Court with any new controlling decisions or data that it had overlooked in initially deciding the matter on Defendants' motion to dismiss. (Dkt. No. 73, at 36 [Pls.' Opp'n Mem. of Law].) In other words, Plaintiffs merely provided the Court with argument that it had already considered on the motion to dismiss. For this reason, Plaintiffs' motion for reconsideration is denied as to the supervisory liability claims against Defendants Annucci and Kirkpatrick.

Turning to Plaintiffs' other argument (that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights), the Court begins by observing that, in his role as the DOCCS' Director of Office of Special Housing and Inmate Discipline, Defendant Venettozzi oversees the appeals submitted by inmates stemming from their disciplinary hearing determinations. (Dkt. No. 69, Attach. 12, at 23-24 [Venettozzi Tr.].) Although Defendant Venettozzi's office does not supervise the disciplinary hearing officers, it does contact the hearing officer if an inmate appeals the hearing determination. (*Id.* at 24.) Among the DOCCS employees assigned to the Office of Special Housing and Inmate Discipline are support staff, two Correctional Facility Operations Specialists, one Lieutenant, one Captain, one Assistant Director, and one Director. (*Id.* at 25.) Defendant Venettozzi could not recall the approximate number of disciplinary hearing reviews (i.e., appeals) that his office handled, but believed it was more than eight thousand per year. (*Id.* at 30.)

Defendant Venettozzi had a limited understanding of the ILC and the nature of its meetings. (*Id.* at 39-40.) Defendant Venettozzi also expressed a general unfamiliarity with the inmate grievance process, and at his deposition could not recall receiving any formalized training on it.[21] (*Id.* at 41.) Defendant Venettozzi was also unfamiliar with IGRC Directive Number 4040 that detailing the prohibition on

officer reprisals against inmates for filing grievances. (*Id.* at 47.)

21    The Court notes that, as a corrections officer, Defendant Venettozzi had never served on the IGRC. (*Id.* at 42.)

After the disciplinary hearing officer makes his or her determination, an inmate has the right to appeal that determination. (*Id.* at 60.) Defendant Venettozzi's office is designated by Commissioner Annucci to review all of the appeals stemming from Tier III disciplinary hearing determinations. (*Id.*) Upon Defendant Venettozzi's office receiving an appeal, it has 60 business days to either affirm, modify, or reverse the appeal. (*Id.*) There is no standard procedure for assigning specific appeals to specific members of Defendant Venettozzi's team. (*Id.* at 63-64.) Once a member of Defendant Venettozzi's team reviews and comes to an initial decision on an inmate's appeal, either Defendant Venettozzi or the office's Assistant Director, Anthony Rodriguez ("Mr. Rodriguez"), must approve it. (*Id.* at 66-67.) For some appeals, Defendant Venettozzi approves the review decision without reviewing the hearing packet that accompanies the appeal. (*Id.* at 67.) Furthermore, Defendant Venettozzi has approved the review decision of appeals without reviewing the inmate's appeal letter. (*Id.* 67-68.) In other words, for efficiency purposes, Defendant Venettozzi and Mr. Rodriguez do not "do a complete and thorough stoppage and [conduct a] re-review of everyone's work." (*Id.* at 68.)

According to Defendant Venettozzi, if an inmate claimed as his or her defense to disciplinary charges that he or she was retaliated against by a DOCCS employee, and that inmate was able to establish sufficient evidence of the alleged retaliation, then the disciplinary hearing officer should dismiss the charges against that inmate. (*Id.* at 111.) In previous instances, but not all of them, when Defendant Venettozzi had approved a reversal of a hearing officer's determination, he has spoken with hearing officers to offer them guidance in how to not make mistakes when issuing their determinations. (*Id.* at 109-10.)

**\*18** On October 19, 2015, the Office of Special Housing and Inmate Discipline received Plaintiff Emerenciano's appeal of his Tier III disciplinary hearing determination. (Dkt. No. 73, Attach. 13.) As a result of his adjudication of guilty of the charges set forth within the misbehavior report, Plaintiff Emerenciano received 270 days in the SHU, as well as a loss of privileges. (*Id.* at 6.)

On April 19, 2016, after a review of Plaintiff Emerenciano's appeal, the Office of Special Housing and Inmate Discipline modified his punishment to 180 days in the SHU, effectively suspending 90 days of the initial punishment of SHU confinement and loss of privileges. (Dkt. No. 69, Attach. 29.)

On April 16, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had modified the determination of the disciplinary hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Dixon and had initially ordered him to serve 270 days in the SHU. (Dkt. No. 69, Attach. 29.) The memorandum stated that, "per conversation with the Attorney General's Office, no substantial evidence to support the charges [against Plaintiff Emerenciano]." (*Id.*)

In an email dated April 15, 2016, from Assistant Attorney General Christopher Fleury ("AAG Fleury") to Defendant Venettozzi and Nancy Heywood, and copying Corey Bedard and Tanya Selvaag, AAG Fleury informed Defendant Venettozzi of his "real concerns regarding the allegations" made by Plaintiff Emerenciano and his counsel. (Dkt. No. 73, Attach. 17.) Specifically, AAG Fleury stated that he did not believe, and a reviewing court would not believe, that the charges set forth in the misbehavior report had not been supported by substantial evidence. (*Id.*) AAG Fleury stated his conclusion was based on the testimony of five inmate witnesses who had corroborated the fact that Plaintiff Emerenciano made no such reference to a 1983 prison riot during an ILC meeting. (*Id.*)

A letter entitled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano to notify him that "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (Dkt. No. 69, Attach. 29, at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*) Also contained within the discovery exchanged in this case is a letter titled "Review of Superintendent's Hearing." (*Id.* at 3.) This letter was sent to Plaintiff Emerenciano to notify him that, "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.*) This

letter was electronically signed by Corey Bedard, who at the time was serving as the DOCCS Acting Director of Special Housing and Inmate Discipline. (*Id.*) According to Defendant Venettozzi, Plaintiff Emerenciano's Tier III disciplinary hearing determination was only modified, and not completely reversed, because his office "did not believe that the appeal overrode what the hearing officer (i.e., Defendant Bell) put in [his determination] for evidence." (Dkt. No. 69, Attach. 12, at 156 [Venettozzi Tr.].) Defendant Venettozzi was unaware of which DOCCS employee in his office had conducted the review of Plaintiff Emerenciano's appeal, and he was unable to recall details or any correspondence regarding the appeal. (*Id.* at 157, 166.)

**\*19** As discussed above in Part II.B. of this Decision and Order, "a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation" to establish his liability in a suit under § 1983. *Grullon*, 720 F.3d at 138. Among district courts in the Second Circuit, there has been a persistent split as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the underlying constitutional violation. *Samuels v. Fischer*, 168 F. Supp.3d 625, 643 (S.D.N.Y. 2016); *compare Hinton v. Prack*, 12-CV-1844, 2014 WL 4627120, at \*17 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement.") *with Murray v. Arquitt*, 10-CV-1440, 2014 WL 4576569, at \*12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement.") (Mordue, S.J.).

Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)—"which eliminated special standards for supervisory liability and required that alleged constitutional violations be 'established against supervisory officials directly,' 983 F.3d at 618" two district courts within this circuit have found that "a defendant's 'fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violations. *Chavez*, 2021 WL 4248917, at \*14 (citing *Washington v. Fitzpatrick*, 20-CV-0911, 2021 WL 966085, at \*10 [S.D.N.Y. Mar. 15, 2021]).

" 'In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional violation....' " *Caimite v. Rodriguez*, 17-CV-0919, 2020 WL 6530780, at *9 (N.D.N.Y. Apr. 9, 2020) (Hummel, M.J.) (quoting *Collins v. Ferguson*, 804 F. Supp.2d 134, 140 [W.D.N.Y. 2011]). However, a supervisory official will be found to have been personally involved if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Whitley v. Miller*, 57 F. Supp.3d 152, 161 (N.D.N.Y. 2014).

In this case, a letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano. (Dkt. No. 69, Attach. 29, at 3.) This letter notified Plaintiff Emerenciano that "[o]n behalf of the Commissioner and in response to ... [his] letter of appeal ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.* at 3.) The letter contained an itemized breakdown of the modified penalties imposed upon Plaintiff Emerenciano. (*Id.*) Corey Bedard's signature is affixed towards the bottom portion of this letter. (*Id.*)

On April 19, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had reversed the determination of the Superintendent's hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Kowalowski. (*Id.* at 1.) The memorandum stated that, "per conversation with the [New York State] Attorney General's Office, no substantial evidence to support the charges." (*Id.*) A second letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano notifying him that, "[o]n behalf of the Commissioner ..., [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (*Id.* at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*)

**\*20** To the extent that Plaintiff Emerenciano argues that Defendant Venettozzi's electronic signature affixed on the letter notifying him of the expunction of the charges constitutes personal involvement, the Court finds that *Whitley* is persuasive. There, a judge of this District held that a modification of the plaintiff's punishment and a "typewritten form response" which stated that "there was not sufficient grounds to reconsider the previous decision on that hearing," and "do[es] not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement." *Whitley*, 57 F. Supp.3d at 162. As a result, the Court finds that Defendant Venettozzi's electronic signature does not constitute his personal involvement in Plaintiff Emerenciano's alleged due process deprivation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's Fourteenth Amendment due process claim against Defendant Venettozzi.

### C. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Supervisory Liability Claims Against Defendant Venettozzi

#### 1. Plaintiff DeJesus' Supervisory Liability Claim Against Defendant Venettozzi

Defendant Venettozzi argues that the Court must grant summary judgment in his favor as to Plaintiff DeJesus' supervisory liability claim against him, because DeJesus has failed to establish any grounds on which he could be held liable as a supervisor with regard to DeJesus' surviving retaliation claim against Defendant Dixon. (Dkt. No. 69, Attach. 2, at 17-20 [Defs.' Mem. of Law].)

Plaintiffs respond that, given the totality of the circumstances, Defendant Venettozzi should not be rewarded with diminished liability because he ignored the unconstitutional violations occurring at Clinton after having received notice of them. (Dkt. No. 73, at 32-38 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiff DeJesus argues that Defendant Venettozzi violated his First Amendment rights because he failed to prevent the Defendant Dixon's retaliation and acted with deliberate indifference by not remedying the alleged constitutional violations in a timely manner. (*Id.*) Furthermore, Plaintiff DeJesus argues that Defendant Venettozzi was deliberately indifferent to the retaliation that he suffered, because "his actions ... directly enabled, condoned, and ratified the unlawful retaliation being carried out against ... Plaintiff DeJesus, such that it too can be said [that] Defendant Venettozzi ... engaged in unlawful

retaliation. (*Id.*) Therefore, argues Defendant DeJesus, a "jury can reasonably and readily conclude [that] Defendant Venettozzi was not only directly involved in the retaliation by virtue of his direct role in relation to their disciplinary appeals and by virtue of having not only created and/or tolerated a custom or policy through which retaliation against ILC members ..., but that he was aware that the charges against these individuals were discriminatory by being directly and expressly based upon protected conduct and protected speech." (*Id.* at 37.)

"It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora*, 08-CV-0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (Peebles, M.J.). To prove a claim of failure-to-intervene, the plaintiff must establish that the officer-defendant had "(1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp.2d 501, 512 [S.D.N.Y. 2008]).

**\*21** On March 8, 2016, counsel for Plaintiff DeJesus submitted a preliminary appeal from his Tier III disciplinary hearing determination to Defendant Venettozzi's office. (*Id.* at 117.) Defendant Venettozzi's office received Plaintiff DeJesus' appeal on March 17, 2016. (*Id.*) On June 3, 2016, Defendant Venettozzi's office reversed the Superintendent's determination as to Plaintiff DeJesus' Tier III disciplinary hearing because the issued misbehavior report did not support the charges against Plaintiff DeJesus. (*Id.* at 107-08, 121-23.) As a result of the decision to reverse the Superintendent's determination, the two charges that had been brought against Plaintiff DeJesus were dropped. (Dkt. No. 69, Attach. 23, at 1.) Defendant Venettozzi acknowledged that every appeal reviewed by his office is evaluated on a case-by-case basis, and reviews, more likely than not, go much further in depth than merely reading the misbehavior report that was issued to the inmate. (Dkt. No. 69, Attach. 12, at 119-21 [Venettozzi Tr.].)

Put simply, the evidence does not support Plaintiff DeJesus' argument regarding Defendant Venettozzi's failure to intervene in the alleged retaliation against DeJesus by Defendant Dixon. Instead, Plaintiff DeJesus' argument

assumes that, because of his title as the Director of the Office of Special Housing and Inmate Discipline, Defendant Venettozzi knew, or reasonably should have known, about Defendant Dixon's alleged retaliation against Plaintiff DeJesus. Additionally, Plaintiff DeJesus does not provide evidence showing *how* Defendant Venettozzi "intentionally built and maintained a system ... [that] tolerates a wrongful custom and policy" of deliberate indifference towards unconstitutional retaliatory conduct. (*Id.*)

With regard to Plaintiffs' apparent argument that the length of time it took for Defendant Venettozzi's office to review Plaintiff DeJesus' appeal was insufficient, Plaintiffs point to the fact that, before the reversal of the disciplinary hearing officer's determination, counsel for Plaintiff DeJesus and Plaintiff DeJesus himself contacted Defendant Venettozzi to alert him to the pending appeal, and yet, the appeal was decided more than sixty days after it was received by Defendant Venettozzi's office. (Dkt. No. 73, at 34 [Pls.' Opp'n Mem. of Law].) Of course, "[r]eceiving letters of complaint from an inmate and failing to respond is generally insufficient to establish personal involvement." *Johnson v. McKay*, 14-CV-0803, 2015 WL 1735102, at *9 (N.D.N.Y. Apr. 16, 2015) (report-recommendation by Dancks, M.J., adopted by Sannes, J.); *Smart v. Goord*, 441 F. Supp.2d 631, 643 (S.D.N.Y. 2006) (noting that the defendant "cannot be held liable on the sole basis that he did not act in response to letter of protest by [plaintiff]"); *accord, Chaney v. Vena*, 15-CV-0653, 2017 WL 6756645, at *7-8 (N.D.N.Y. Nov. 29, 2017) (Baxter, M.J.), *adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (McAvoy, J.). Plaintiffs do not specify the manner in which they "contacted" Defendant Venettozzi, nor the extent of any communication that they might have had. To the extent that Plaintiff DeJesus argues that Defendant Venettozzi did not follow DOCCS policies regarding the sixty-day deadline to decide an appeal, a failure to adhere to an internal policy or state law does not constitute a violation of § 1983. *H'Shaka v. Gorman*, 444 F. Supp.3d at 355, 384-85 (N.D.N.Y. 2020) (Suddaby, C.J.).

In any event, a violation of the 60-day deadline for a decision on such an appeal does not violate Plaintiff DeJesus' due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions. *See Austin v. Fischer*, 09-CV-4812, 2010 WL 3187642, at *2 (S.D.N.Y. Aug. 11, 2020) ("Plaintiff alleges that the Commissioner issued a decision sixty eight days after Plaintiff's submission of his administrative appeal, exceeding the sixty-day limit set forth in ... § 254.8 .... However, this

eight day delay does not violate Plaintiff's due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions.") (internal quotation marks omitted), *aff'd*, 453 F. App'x 80 (2d Cir. 2011).

**\*22** Finally, although there may be a genuine dispute of fact as to the degree of personal involvement that Defendant Venettozzi had in reviewing Plaintiff DeJesus' appeal, any such genuine dispute of fact is not a *material* one. This dispute of fact lacks materiality because, even if Defendant Dixon had committed a constitutional violation by issuing a misbehavior report to Plaintiff DeJesus, Defendant Venettozzi's office *reversed* the Tier III disciplinary decision; it did not affirm or partially modify the hearing officer's determination. In other words, Defendant Venettozzi's office did indeed intervene to correct the repercussions stemming from Defendant Dixon's alleged unlawful retaliation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi.

### 2. Plaintiff Emerenciano's Supervisory Liability Claim Against Defendant Venettozzi

Because Plaintiff Emerenciano has decided to abandon his due process claim against Defendant Bell, and pursue his due process claim against only Defendant Venettozzi, the Court need only focus on Venettozzi's actions while supervising Defendant Kowalowski in connection with Emerenciano's disciplinary hearing.

For his supervisory liability claim to survive the pending motion, Plaintiff Emerenciano must provide admissible evidence from which a rational jury could render the following three findings of fact: (1) that Defendant Venettozzi had a realistic opportunity to intervene and prevent Defendant Kowalowski from allegedly retaliating against Plaintiff Emerenciano; (2) that a reasonable person in Defendant Venettozzi's position would have known that Emerenciano's First Amendment rights were being violated; and (3) that Defendant Venettozzi did not take reasonable steps to intervene to prevent further alleged retaliation by Defendant Kowalowski. *Henry*, 2011 WL 5975027, at \*4.

It is undisputed that, on November 30, 2015, Defendant Venettozzi's office modified the punishment that had initially

been imposed upon Plaintiff Emerenciano after a finding of guilt at his Tier III disciplinary hearing. (Dkt. No. 69, Attach. 29, at 3-4.) It is also undisputed that, on April 16, 2016, Defendant Venettozzi's office ultimately reversed the finding of guilt. (*Id.* at 1-2.) As indicated above in Part III.C.1. of this Decision and Order, this reversal of a finding of guilt actually shows that Defendant Venettozzi did indeed intervene in Defendant Kowalowski's alleged unlawful retaliation. As a result, Plaintiff's theory of liability involves an argument that Defendant Venettozzi should have done so sooner: more specifically, that, when Venettozzi's office modified Plaintiff Emerenciano's punishment on November 30, 2015, Venettozzi should have reversed the finding of guilt.

The problem with this argument is that Defendant Venettozzi has no recollection of personally participating in that modification. (Dkt. No. 69, Attach. 12, at 138-67 [Venettozzi Tr.].) Furthermore, Plaintiff Emerenciano has no personal knowledge of such participation. Instead, he relies on Defendant Venettozzi's title as the head of the office that modified Plaintiff Emerenciano's punishment as the grounds for his supervisory liability, which is precisely the sort of *respondeat superior* theory of liability that has long been prohibited under the law. Finally, the record contains uncontroverted evidence that, the same day that Defendant Venettozzi learned of the concerns of an Assistant Attorney General regarding Plaintiff Emerenciano's disciplinary conviction, Venettozzi passed those concerns along to a subordinate; and the very next day Venettozzi's office reversed the finding of guilt. (*See, e.g.*, Dkt. No. 73, Attach. 17 [attaching email message dated April 15, 2016].) Simply stated, based on the current record, no reasonable jury could find Defendant Venettozzi liable for Defendant Kowalowski's alleged unlawful retaliation.

**\*23** For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED in part** and **DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants on the following claims, which are **DISMISSED**:

(a) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Bell;

**Keyes v. Venettozzi, Slip Copy (2022)**
2022 WL 991402

(b) Plaintiff Scott's retaliation claim under the First Amendment against Defendant Houck;

(c) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Bell;

(d) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Venettozzi;

(e) Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi; and

(f) Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi; and it is further

**ORDERED** that the following claims **SURVIVE** this motion for summary judgment:

(a) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Dixon;

(b) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Rock; and

(c) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Kowalowski; and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE** the following individuals as Defendants in this action: Earl Bell, Richard Houck, and Donald Venettozzi.

**All Citations**

Slip Copy, 2022 WL 991402

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4486086
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE No. 1; John Doe No
2; and M. Soto, Defendants.

Civil Action No. 9:11–CV–0250 (TJM/DEP).
|
July 26, 2012.

**Attorneys and Law Firms**

Benji D. Reed, Elmira, NY, pro se. [1]

[1]  The court's records list the plaintiff as being confined in the Southport Correctional Facility "Southport", based upon a change of address notice filed by Reed on February 22, 2012. *See* Dkt. No. 20. According to publically available information, however, Reed is now being held in the Elmira Correctional Facility. *See* http//nysdoccslookup.doccs.ny.gov. GCA00P00/ WINQ130 (screenshot attached. Plaintiff is reminded of his obligation under the court's rules to notify the court and defendants' counsel of any further address changes in order to facilitate communications with him. *See* N.Y.N.D.L.R. 10.1(c)(2).

Hon. Eric T. Schneiderman, Attorney General of the State of New York, James Seaman, Esq., Assistant Attorney General, Albany, NY, for Defendant Soto.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1**  Plaintiff Benji D. Reed, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 against various prison officials, alleging deprivation of his civil rights. While the scope of his complaint has been winnowed, and it now raises only claims of cruel and unusual punishment and unlawful retaliation against one named and

two unidentified "Doe" defendants, as originally filed that pleading asserted an array of claims stemming from incidents occurring at two separate correctional facilities.

In response to plaintiff's complaint the sole remaining named defendant has moved for dismissal of all claims against him for failure to state a plausible cause of action upon which relief may be granted. The plaintiff, in turn, has applied for leave to amend his complaint, and for appointment of counsel to represent him *pro bono*. For the reasons set forth below, I recommend that defendant's motion to dismiss be granted, and will deny plaintiff's application for leave to amend, on the basis of futility in light of my recommendation regarding the legal sufficiency of his existing claims, as well as his request for assignment of counsel.

I. *BACKGROUND* [2]

[2]  The following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). In light of the severance and transfer of plaintiff's claims arising out of his confinement at the Southport Correctional Facility to the Western District of New York, I have included only the facts relevant to his remaining claims, all of which involve events at the Eastern Correctional Facility ("Eastern").

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to the claims remaining in the action, he was designated to Eastern, located in Napanoch, New York. *Id.* at ¶ 3.

The events giving rise to plaintiff's claims were set in motion on September 14, 2010, when Reed developed an illness he attributed to food consumed in the mess hall at Eastern. Complaint (Dkt. No. 1) ¶¶ 32–37. Plaintiff maintains that the food causing his intestinal issues was known by defendant John Doe No. 1 to have been contaminated, and should have been inspected by defendant John Doe No. 2 prior to being served to the inmates. Complaint (Dkt. No. 1) ¶¶ 41–42.

2012 WL 4486086

Plaintiff was initially treated on the following day at the facility's medical clinic, along with several other affected inmates, and given "dymotabs" to address the condition. Complaint (Dkt. No. 1) ¶ 38. The medication was subsequently discontinued on that same day, however, and plaintiff was confined to his cell and placed on a water diet for one day. *Id.* at ¶¶ 39–40.

While at Eastern, plaintiff was designated to undergo alcohol and substance abuse treatment in a program ("ASAT") overseen by defendant M. Soto, a counselor at the facility. *See* Complaint (Dkt. No. 1) ¶¶ 6, 31. Based apparently upon his absence from ASAT treatment while confined to his cell due to illness, plaintiff received a misbehavior report authored by defendant M. Soto accusing him of lying regarding his location on September 15, 2010, after being asked why he did not appear for ASAT treatment, and for failing to follow facility rules regarding attendance in the program. Complaint (Dkt. No. 1) ¶¶ 46–47. At a subsequent disciplinary hearing conducted to address the accusations set forth in the misbehavior report, however, the charges were dismissed. *Id.* at ¶ 49.

**\*2** Following plaintiff's return to the ASAT program he was called into defendant Soto's office and, after a conversation during which Reed refused to discuss the conviction that led to his incarceration, he was forced by Soto to sign a refusal to participate in ASAT training. *Id.* at ¶¶ 50–56. Plaintiff was then removed from the ASAT program and escorted to his cell, where he remained in keeplock pending a hearing stemming from the issuance of a new misbehavior report alleging his refusal to participate in the ASAT program.[3] *Id.* at ¶¶ 57–61. At a subsequent hearing, conducted on October 12, 2010, Reed was exonerated of all charges and was permitted to return to the ASAT program. *Id. at* ¶¶ 64–65. As a result of issuance of the two misbehavior reports, while at Eastern plaintiff was keeplock-confined for a total of fourteen days.[4] *See* Plaintiff's Memorandum (Dkt. No. 18) p. 6 of 18.

3    Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving the inmate of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at \*2 n. 2 (N.D.N.Y. Mar. 31, 1997)

(Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)) (Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.). Inmate conditions while keeplocked are substantially the same as in the general population, the primary exception being that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

4    Plaintiff's opposition memorandum also intimates that he lost good time credits as a result of the relevant events. *See* Plaintiff's Memorandum (Dkt. No. 18) at p. 6 of 18. There is no factual support for this statement, however, in either plaintiff's complaint or the attached exhibits.

Plaintiff was subsequently transferred out of Eastern and into the Southport Correctional Facility, located in Pine City, New York, in December 2010. Complaint (Dkt. No. 1) ¶ 71.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on March 8, 2011. Complaint (Dkt. No. 1). Plaintiff's complaint named the two Doe defendants, M. Soto, and seven corrections employees assigned to Southport as defendants, and asserted claims under the Eighth Amendment to the United States Constitution, the Americans With Disabilities Act, 42 U.S.C. § 12,101 *et seq.,* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, additionally setting forth a pendent claim of negligence. By order issued on August 2, 2011, based upon an initial review of plaintiff's complaint and accompanying *in forma pauperis* application, Senior District Judge McAvoy ordered all claims arising from events occurring at Southport severed, and directed that those claims be transferred to the Western District of New York. Dkt. No. 4.

In lieu of answering plaintiff's complaint defendant Soto, the sole remaining named defendant in this action, moved on October 17, 2011 for dismissal of plaintiff's claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 11. In his motion defendant argues that plaintiff's complaint fails to allege a plausible claim upon which relief may be granted, and that in any event he is entitled to

qualified immunity from suit. *Id.* Plaintiff has since submitted a response in opposition to defendant's motion. Dkt. No. 18.

Following the filing of defendant's dismissal motion, plaintiff moved on December 7, 2011 for leave to file an amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Dkt. No. 14. In his motion Reed asserts that amendment is sought to permit elimination of the claims and references to the defendants affected by the transfer to the Western District of New York, and to clarify and expand upon facts set forth in his original complaint relating to events at Eastern. *See* Motion for Leave to Amend (Dkt. No. 14) ¶¶ 1–2. Plaintiff has also requested appointment of counsel to represent him in the action, *pro bono.* Dkt. No. 15. Defendant Soto has since responded in opposition to those motions, by letter dated January 6, 2011 from his counsel, Megan A. Brown, Esq., arguing that the motion for leave to amend should be denied as futile for the same reasons as set forth in his dismissal motion, and taking no position with regard to plaintiff's request for appointment of counsel. Dkt. No. 17.

**\*3** Defendant's dismissal motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b) (1)(B) and Northern District of New York Rule 72.3(c). *See* Fed.R.Civ.P. 72(b). The remaining two motions brought by the plaintiff fall within my non-consensual jurisdiction, and therefore will be addressed in the form of an order from this court.

## III. *DISCUSSION*

### A. *Standard of Review*

Defendant's motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a) (2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b) (6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims." *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations and quotations omitted)).

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

### B. *Plaintiff's Retaliation Claim*

Plaintiff alleges that defendant Soto, motivated by Reed's use of the medical facilities at Eastern, issued two false misbehavior reports to him in September 2010. In response,

2012 WL 4486086

Soto argues that plaintiff's vague and conclusory allegations offered in support of this retaliation claim are insufficient to survive a motion to dismiss.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the provisions of the Eighth Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.2008). Claims by inmates that adverse actions taken by prison workers are, of course, easily incanted, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis,* 320 F.3d at 352 (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff succeeds in carrying this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*5** Affording plaintiff the deference which he is due as a *pro se* litigant and broadly construing his complaint, it appears that plaintiff is claiming the September misbehavior reports were issued in retaliation for his having sought medical treatment due to a sudden illness.[5] As defendant correctly argues, the mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to level of constitutional significance. *Boddie v. Schnieder,* 105

F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)). The further assertion that the false misbehavior report was prompted by the accused inmate having engaged in protected activity, however, can suffice to support a cognizable claim of unlawful retaliation. *Franco,* 854 F.2d at 589.

5      In his motion defendant Soto has assumed, for the sake of argument, that plaintiff's resort to seeking medical treatment within the facility constituted protected activity sufficient to trigger the First Amendment's protection against retaliation, and I will do likewise.

Having assumed plaintiff's ability to establish that he engaged in protected activity, the court's focus turns next to the question of whether he has sufficiently alleged that he experienced adverse action at the hands of the defendant. In the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493; *see also Davis,* 320 F.3d at 353. The adverse action inquiry is a contextual one. *Davis,* 320 F.3d at 353. Courts should bear in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

The adverse action alleged by the plaintiff in support of his retaliation claim consists of the issuance of two false misbehavior reports. The filing of a false misbehavior report can qualify as an adverse action for purposes of a First Amendment retaliation. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). The false misbehavior reports at issue led to plaintiff's keeplock cell confinement for a period of fourteen days. At this early procedural juncture, I am unable to conclude that this allegation is insufficient to support a plausible finding of adverse action. *See Edwards v. Horn,* No.2012 WL 76012, at * 16 (S.D.N.Y. Mar. 8, 2012) (citing *Gill,* 389 F.3d at 384) (false misbehavior report and placement in keeplock constitutes adverse action)).

The third requirement for pleading a cognizable retaliation claim involves linking the protected activity and adverse action alleged. It is in connection with this element that plaintiff's retaliation claim fails. In cases involving claims of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558

(N.D.N.Y.2007). When evaluating whether a misbehavior report is the product of retaliatory animus, an analysis most typically undertaken on a motion for summary judgment, courts generally look to several factors as bearing upon any potential nexus between the protected conduct and the misbehavior report, including "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

 **\*6** In this instance, plaintiff's complaint is lacking in any factual allegations that would establish the requisite nexus between his visit to the prison infirmary and defendant Soto's issuance of misbehavior reports. Indeed, in his complaint Reed hypothesizes that Soto disbelieved his explanation concerning his whereabouts at the time of his absence from the ASAT program, prompting him to issue the misbehavior reports. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 54, 65. This allegation by the plaintiff suggests a non-retaliatory motivation for defendant's issuance of the misbehavior reports at issue.

In light of the plaintiff's failure to state facts sufficient to satisfy this critical element of a retaliation claim, I recommend that the defendant's motion be granted, and that plaintiff's retaliation cause of action under the First Amendment be dismissed.

### C. *Verbal Harassment/False Misbehavior Report Claims*
Liberally construed, plaintiff's complaint could be interpreted as also asserting a claim, independent of retaliation, under the Eighth Amendment for harassment and for issuance of false misbehavior reports.

As was previously observed, the mere issuance of a false misbehavior report, standing alone, is insufficient to support a cognizable claim under the Eighth Amendment or otherwise on behalf of a prison inmate; a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)). As such, plaintiff's claim related to the filing of a false misbehavior report, independent of his First Amendment retaliation cause of action, is subject to dismissal.

Defendant also interprets plaintiff's complaint as alleging that he was generally harassed by Soto, and that Soto stated to other inmates that Reed was a monster with whom they should not associate. These allegations appear to be calculated to state a violation of his Eighth Amendment's right to be free from cruel and unusual punishment. Reed's complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection. As a general matter, mere verbal harassment, including that accompanied by the use of profanity, without any corresponding physical injury does not support a cognizable claim under section 1983, however boorish and unprofessional the alleged conduct may be. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Nor do threats amount to a constitutional violation. *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). Because plaintiff's complaint lacks allegations that would plausibly support an Eighth Amendment violation claim, I recommend dismissal of that cause of action, to the extent that his complaint may properly be construed as raising such a claim.

### D. *Leave to Amend*
 **\*7** Following the filing of plaintiff's dismissal motion, plaintiff sought leave to amend his complaint to flesh out certain factual allegations in support of his claims. *See* Dkt. No. 14. At this juncture the court must determine whether to permit the amendment now sought, and additionally whether the plaintiff should be granted leave to amend in any event in an effort to cure the deficiencies perceived with regard to his existing claims against defendant Soto.

### 1. *Leave to Amend Generally*
Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted-under circumstances not applicable here-a party may amend its pleading "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be liberally granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Elma RT v. Landesmann Int'l Mktg. Corp.,* No. 98–CIV–662, 2000 WL 297197, at \*3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman* ).

Notwithstanding the familiar and well-accepted precept that leave to amend should be granted freely and is typically permitted, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then permitting amendment would be an act of futility that should not be sanctioned. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 124 (E.D.N.Y.1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a proposed claim sets forth facts and circumstances that may entitle the pleader to relief, then futility is not a proper basis on which to deny the right to amend. *Saxholm,* 938 F.Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1029 (S.D.N.Y.1995) and *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief)).

The court has reviewed plaintiff's proposed amended complaint, and finds that it suffers from the same deficiencies as are noted above with respect to his initial complaint. Accordingly, plaintiff's motion for leave to file the proposed amended complaint accompanying his motion will be denied on basis of futility. [6] *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted); *accord Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sep.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted).

[6]  In his proposed amended complaint plaintiff seeks to add a claim for denial of equal protection, alleging that because he was issued a misbehavior report for exercising his right to seek medical care while another inmate was permitted to attend the medical clinic, his right to equal protection was denied. *See* Proposed Amended Complaint (Dkt. No. 14–1) ¶ 60.

     The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)

(citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (internal quotation marks omitted)).

While plaintiff's complaint alleges that he was treated differently than another inmate, conspicuously absent from his proposed amended complaint is the allegation of any fact plausibly suggesting that the difference in treatment was the result of an intentional or purposeful discrimination directed at an identifiable or suspect class. For this reason, I find that the proposed amended complaint does not state a plausible equal protection claim.

### 2. Leave to Amend to Cure Perceived Deficiencies

**\*8** Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon,* 875 F.Supp. at 1003 (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). The court must next determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

I am unable to conclude that if given the opportunity plaintiff nonetheless would be unable to set forth allegations sufficient to avoid dismissal of his claims at this early stage in the litigation. If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25 (N.D.N.Y. May 22, 1995)

2012 WL 4486086

(Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

E. *Appointment of Counsel*
In addition to seeking leave to amend, plaintiff has applied to the court for appointment of counsel. As a threshold matter, prior to requesting appointment of *pro bono* counsel, a party must first demonstrate that he or she has been unable to obtain counsel through the private sector or public interest firms. *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 173–74 (2d Cir.1989) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). Given that plaintiff has not provided the court with information regarding any efforts by him to obtain counsel, his request is subject to denial on this basis alone.

Turning to the merits of his application, I find that Reed has not demonstrated entitlement to appointment of counsel under the applicable statute. 28 U.S.C. § 1915(e)(1) affords district courts broad—though not limitless—discretion in determining whether to appoint counsel to represent indigent civil litigants. *Hodge,* 802 F.2d at 60. In *Hodge,* the Second Circuit noted that when exercising that discretion the court

**\*9**  should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for crossexamination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and

any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Id.* at 61–62; *see also Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (citing Hodge). As can be seen, of the criteria enunciated by the Second Circuit to be considered when determining whether assignment of pro bono counsel is appropriate, the most important is the merits —that is, "whether the indigent's position [is] likely to be of substance." *Cooper,* 877 F.2d at 172 (citations and internal quotations omitted). Where a plaintiff does not provide a court with evidence, as opposed to mere allegations, relating to his or her claims, that party does not meet this threshold requirement. *See Herman v. Runyon,* No. 96 CIV. 6080, 1997 WL 118379, at *1 (S.D.N.Y. Mar. 17, 1997).

Each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, J.) (citing *Hodge,* 802 F.2d at 61). Although the Constitution guarantees indigent litigants "meaningful access" to the courts, it does not entitle all such parties to receive the benefit of *pro bono* representation. *Hodge,* 802 F.2d at 60. While, as was previously indicated, the appointment of counsel to represent indigent parties in civil suits is authorized by statute, when that authority is exercised the court is required to call upon attorneys to donate their time *pro bono* to the benefit of indigent litigants and the court. Accordingly, in deference to the limited resources available to the court to serve the interests of the many indigent litigants who pursue claims before it, and recognizing the "thankless burden" associated with such assignments, *Miller v. Pleasure,* 296 F.2d 283, 285 (2d Cir.1961), *cert. denied,* 370 U.S. 964, 82 S.Ct. 1592, 8 L.Ed.2d 830 (1962), courts should not grant such applications indiscriminately, but instead must exercise good judgment and restraint in doing so. *Cooper,* 877 F.2d at172.

In this instance, plaintiff has failed to make a sufficient showing to warrant appointment of counsel to represent him at this early stage in the litigation. Plaintiff's application for appointment of counsel will therefore be denied, without prejudice to renewal. [7]

[7]    In accordance with the customary practice of this court, once a case passes through the discovery and motion phases and becomes trial ready, *pro bono* counsel is usually appointed for an indigent *pro*

2012 WL 4486086

*se* inmate litigant to assist in preparation for and during the trial, either as attorney of record or as standby counsel.

## IV. *SUMMARY AND RECOMMENDATION*

The claims now remaining before this court, following severance and transfer of a portion of plaintiff's original complaint to the Western District of New York, include causes of action against two John Doe defendants arising from plaintiff's alleged investigation of contaminated food, as well as claims of retaliation, harassment, and cruel and unusual punishment against defendant M. Soto. Because the Doe defendants in this case have not yet been identified and thus have not yet appeared in the action, the court has not been called upon to gauge the sufficiency of plaintiff's claims against those defendants.[8] Turning to plaintiff's claims against defendant Soto, based upon a review of the allegations set forth in plaintiff's complaint, I recommend that all claims against defendant Soto be dismissed, with leave to replead, and find it unnecessary to address his alternative argument, to the effect that he is entitled to qualified immunity from suit.

[8] Because only "persons" may act under color of state law, a complaint seeking money damages pursuant to § 1983 must name one or more individuals as defendants. *See Walker v. State of Connecticut,* No. 3:06CV165, 2006 WL 1981783, *2 (D.Conn.2006); *Connor v. Hurley,* No. 00Civ.8354LTSAJP, 2004 WL 885828, at *3 (S.D.N.Y.2004). It is not uncommon for a *pro se* plaintiff to include a "John Doe" or other unknown defendants, together with named defendants in a complaint. Generally, in such cases the complaint is served upon the named defendants, and the plaintiff is directed to pursue discovery to identify the John Doe(s) and to thereafter seek leave to amend the complaint to name them as defendants. In the event the plaintiff chooses to abandon his claims against defendant Soto, leaving only the two "Doe" defendants in the case, I recommend the court allow plaintiff to name the superintendent of Eastern as a defendant—even though there is no suggestion of his or her personal involvement in the alleged constitutional violations—solely for the purpose of effecting service and so that issue may be joined. In that event, once issue is joined, plaintiff may seek through discovery the identity of the John Doe defendant(s). *See Peralta v. Doe,* No. 04–CV–6559P, 2005 WL 357358, at *2 (W.D.N.Y. Jan.24, 2005) (citing *Valentin v. Dinkins,* 121 F.3d 72, 76 (2d Cir.1997)) (district court should assist *pro se* incarcerated litigants with their inquiry into the identities of unknown defendants and "may pursue any course that it deems appropriate to a further inquiry into the identity" of the unknown defendant); *Harvey v. Corrections Officer,* 9:09–CV–0517 (N.D.N.Y.) (LEK/GHL) (order filed 6/1/09 permitting plaintiff to name superintendent as a defendant for purposes of service and discovery).

**\*10** Turning to plaintiff's pending motions, I conclude that his motion for leave to amend should be denied, based upon futility, but that he nonetheless should be afforded an opportunity to further amend his complaint in an effort to cure the deficiencies cited in this report and recommendation in connection with his allegations against defendant Soto. I further find, however, that he has failed to establish a basis for appointment of counsel to represent him, *pro bono,* at this early procedural juncture in this litigation.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that the motion of defendant M. Soto to dismiss plaintiff's claims against him in this action (Dkt. No. 11) be GRANTED, and that all claims against that defendant be DISMISSED, with leave to file an amended complaint as directed above within thirty days from the date of the filing a decision and order acting upon my recommendation of dismissal; and it is further

ORDERED, that plaintiff's motions for leave to amend (Dkt. No. 14) and for appointment of counsel (Dkt. No. 15) be DENIED in all respects, without prejudice to renewal.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

2012 WL 4486086

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4486086

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4486085

2012 WL 4486085
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE NO. 1; John Doe No
2; and M. Soto, Defendants.

No. 9:11–CV–0250 (TJM/DEP).
|
Sept. 27, 2012.

**Attorneys and Law Firms**

Benji D. Reed, Elmira, NY, pro se.

James Seaman, New York State Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his July 26, 2012 Report–Recommendation and Order, Magistrate Judge Peebles recommended that "the motion of defendant M. Soto to dismiss plaintiff's claims against him in this action (Dkt. No. 11) be GRANTED, and that all claims against that defendant be DISMISSED, with leave to file an amended complaint as directed [in the ReportRecommendation and Order] within thirty days from the date of the filing of a decision and order acting upon my recommendation of dismissal." Rep. Rec., p. 28 [dkt. # 22].

In the Report–Recommendation and Order, Magistrate Judge Peebles also addressed Plaintiff's motions (1) for leave to file an amended complaint [Dkt. No. 14], and (2) to appoint counsel [Dkt. No. 15]. Magistrate Judge Peebles denied Plaintiff's motion for leave to amend because the proposed amended complaint submitted with the motion did not contain allegations setting forth plausible claims. See July 26, 2012

Report–Recommendation and Order, pp. 18–20. Magistrate Judge Peebles denied Plaintiff's motion for appointment of counsel [Dkt. No. 15], without prejudice to renewal, because Plaintiff "failed to make a sufficient showing to warrant appointment of counsel to represent him at this early stage in the litigation." Id. p. 25; see also id. pp. 22–25.

Defendant Soto objects to the recommendation to the extent that it recommends that Plaintiff be granted leave to file an amended complaint, arguing that Plaintiff already had ample opportunity to do so but failed to state a claim upon which relief can be granted. Def. Obj. [dkt. # 24]. Plaintiff objects by asserting that the complaint does contain sufficient factual allegations to set forth a plausible claim of retaliation, or, in the alternative, he should be granted leave to file an amended complaint to assert a retaliation claim. Pl. Obj. [dkt. # 26]. He also argues that he should be appointed counsel "for the sole purpose of ascertaining the names of the two John Doe defendants." Id.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1)(C); see also United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." Machicote v. Ercole, 2011 WL 3809920, at \* 2 (S.D.N.Y., Aug.25, 2011) (citations and interior quotation marks omitted); DiPilato v. 7–Eleven, Inc., 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same). By the same reasoning, a party may not advance new theories that were not presented to the magistrate judge in an attempt to obtain this second bite at the apple. See Calderon v. Wheeler, 2009 WL 2252241, at \*1, n. 1 (N.D.N.Y. July 28, 2009); Green v. City of New York, 2010 WL 148128, at \* 4 (E.D.N.Y. Jan.14, 2010) ("[N]ew claims ... presented in the form of, or along with, 'objections ...' should be d ism issed.") (citations omitted).

**\*2** General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. Farid v. Bouey, 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); see Frankel v.

*N.Y.C.,* 2009 WL 465645 at *2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b) (1)(C).

## III. DISCUSSION

With this standard in mind, and after having reviewed Defendant's and Plaintiff's objections, the Court determines to adopt the recommendation for the reasons stated in Magistrate Judge Peebles's thorough report.

Plaintiff's attempts to reargue the positions he took before Magistrate Judge Peebles are insufficient. The Court finds no error in Magistrate Judge Peebles's analysis or determinations. Moreover, Plaintiff is granted leave to re-plead his claims, so he suffers no prejudice by dismissal. Should he elect to do so, Plaintiff should take care to re-plead his retaliation claim with more particularity as to (1) what he asserts was the retaliatory conduct, and (2) what he believes was the motivation for this conduct. *See* Rep. Rec. p. 21.[1]

[1]    As Magistrate Judge Peebles stated:
    If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25, 1995 WL 316935 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128

(2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint [must] also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Inasmuch as the re-pled claims must be accordance with the parameters set forth contained in the Report–Recommendation and Order, *see* fn. 1, *supra,* the Court rejects Defendant's objection to this portion of the recommendation. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ( "It is the usual practice upon granting a motion to dismiss to allow leave to replead.") (citations omitted), *cert den.,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Hughes v. Anderson,* 2011 WL 5829658, at *1 (2d Cir. Nov.21, 2011) ("As a general matter (excepting clearly frivolous cases), it is improper for a district court to dismiss a complaint with prejudice for failure to state a claim without giving the plaintiff notice and an opportunity to be heard and to offer an amended pleading.") (summary order) (citing *Perez v. Ortiz,* 849 F.2d 793, 797 (2d Cir.1988)).

To the extent that Plaintiff's objections challenge Magistrate Judge Peebles's determinations to deny (1) leave to file the previously proposed amended complaint, and (2) appointment of counsel, the objections are in the nature of an appeal. A district court judge reviewing a magistrate judge's non-dispositive pretrial order may not modify or set aside any part of that order unless it is clearly erroneous or contrary to law. *Labarge v. Chase Manhattan Bank, N.A.,* 1997 WL 583122, at *1 (N.D.N.Y. Sept.3, 1997) (Pooler, D.J.) (citing 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); N.D.N.Y. LOCAL RULE 72.1(b)); *Mathias v. Jacobs,* 167 F.Supp.2d 606, 621–23 (S.D.N.Y.2001). Findings are clearly erroneous when the reviewing court is firmly convinced the lower court decided an issue in error. *Lanzo v. City of New York,* 1999 WL 1007346, *2–3 (E.D.N.Y. Sept.21, 1999). This standard imposes a heavy burden on the objecting party, and only permits reversal where the district court determines that the magistrate judge "abused his broad discretion over resolution of discovery matters." *Labarge,* 1997 WL 583122, at *1; *see Mathias,* 167 F.Supp.2d at 621–23; *Lanzo,* 1999 WL 1007346, *3.

**\*3**  The Court finds no error or abuse of discretion by Magistrate Judge Peebles and, therefore, affirms Magistrate

2012 WL 4486085

Judge Peebles's decisions in these regards for the reason set forth in the Report–Recommendation and Order at pages 18–20 and 22–25.

## IV. CONCLUSION

For the reasons discussed above, the Court adopts Magistrate Judge Peebles's July 26, 2012 Report–Recommendation and Order in its entirety. Therefore, Defendant M. Soto's motion to dismiss Plaintiff's claims against him in this action (Dkt. No. 11) is GRANTED, and all claims against Defendant Soto are DISMISSED. Plaintiff is granted leave to file an amended complaint. An amended complaint, if one is filed, must be in accordance with the directions contained in the Report–Recommendation and Order, and must be filed within thirty

(30) days from the date of the filing of this Decision and Order.

To the extent that Plaintiff's objections can be construed as appeals from Magistrate Judge Peebles's determinations to deny Plaintiff's motions to amend the complaint [Dkt. No. 14], and to appoint counsel [Dkt. No. 15], Magistrate Judge Peebles's determinations are AFFIRMED.

## IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4486085

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1235593
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Elvin LEBRON, Plaintiff,

v.

Donald SELSKY; Glenn S. Goord; Anthony J. Annucci;
Lucien J. LeClaire, Jr.; John H. Nuttall; John J. Donelli;
Thomas J. Ricks; S. Stuart; Bruce J. Smith; John J.
LeClaire; R. Wells; Sgt. Sorenzon; Gregory L. Boyton;
Lt. A.C. Rocque; Lt. J. Colby; Capt. Faulkner; David
L. McNulty; B. Jarvis; William Burke; Kevin L.
McLaughlin; Thomas C. Sanders; Peggy Walcott;
Richard D. Roy; John Mehrmann; C.C. Pasquil; M.
Leferve; Captain Racette; Joseph E. McCoy; Robert
J. Murphy; Mr. Jeffrey Hale; C.O. McKernon; J.
Litweiler; Lt. Marshall; Paul Chappins, Jr.; Supt.
Michael McGinnis; D. Hillard; D. Sullivan; Lt. Donahue;
Sgt. Wetzel; and Captain M. Sheahan, Defendants.

No. 9:05-CV-0172 (GTS/DRH).
|
March 31, 2010.

**Attorneys and Law Firms**

Elvin Lebron, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Stephen M. Kerwin, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Elvin Lebron ("Plaintiff") against
the forty above-captioned employees of the New York
State Department of Correctional Services ("Defendants"),
are the following: (1) Defendants' motion for summary
judgment (Dkt. No. 179); (2) United States Magistrate Judge
David R. Homer's Report-Recommendation recommending

that Defendants' motion be granted in part and denied in
part (Dkt. No. 194); (3) Defendants' Objections to the
Report-Recommendation (Dkt. No. 197); and (4) Plaintiff's
Objections to the Report-Recommendation (Dkt. No. 202).
Also before the Court are Plaintiff's appeals from Magistrate
Judge Homer's Orders denying (1) Plaintiff's motion to
supplement the pleadings (Dkt.Nos.186, 194, 202), (2)
Plaintiff's two motions to strike certain documents from the
record (Dkt.Nos.187, 193, 194, 201, 202). For the reasons
set forth below, the Report-Recommendation is adopted in
part and modified in part; Defendants' motion for summary
judgment is granted in its entirety; Magistrate Judge Homer's
Order denying Plaintiff's motion to supplement the pleadings
is affirmed; Magistrate Judge Homer's Orders denying
Plaintiff's two motions to strike certain documents from the
record are affirmed; and Plaintiff's Amended Complaint is
dismissed in its entirety.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Amended Complaint

On February 9, 2005, Plaintiff filed his Complaint in
this action. (Dkt. No. 1.) On April 7, 2005, he filed an
Amended Complaint. (Dkt. No. 6.) Construed with the utmost
of liberality, Plaintiff's Amended Complaint alleges that,
between approximately November 29, 2001, and February,
2004, while he was incarcerated at Adirondack Correctional
Facility ("Adirondack C.F.") in Ray Brook, New York,
his civil rights were violated in essentially the following
six ways: (1) certain Defendants retaliated against him
for filing grievances, in violation of his First Amendment
rights; (2) certain Defendants unlawfully confiscated his
mail, in violation of his First Amendment rights; (3) certain
Defendants denied him access to the courts, in violation of his
First Amendment rights; (4) certain Defendants denied him
equal protection under the law, in violation of his Fourteenth
Amendment rights; (5) certain Defendants denied him due
process by refusing to answer and rectify his complaints,
in violation of his Fourteenth Amendment rights; and (6)
certain Defendants denied him due process at a disciplinary
hearing, in violation of his Fourteenth Amendment rights.
(*See generally id.*)

On November 2, 2007, the Court issued a Decision and Order
dismissing the following claims from Plaintiff's Amended
Complaint: (1) the majority of Plaintiff's Fourteenth
Amendment due process claims; (2) his First Amendment
claim for denial of access to the courts; and (3) his Fourteenth
Amendment equal protection claim. (Dkt. No. 132.) As a

Case 9:19-cv-01610-BKS-TWD Document 112 Filed 08/22/23 Page 178 of 279
**LeBron v. Selsky, Not Reported in F.Supp.2d (2010)**
2010 WL 1235593

result, currently before the Court are the following claims: (1) Plaintiff's Fourteenth Amendment due process claim against Defendants Faulkner, McLaughlin, Wells, and Mehrmann for refusing to answer and rectify his multiple complaints; (2) Plaintiff's Fourteenth Amendment due process claim against Defendants Selsky, Goord, Annucci, J. Leclaire, Donelli, Ricks, Sanders, Roy, Pasquil, Hillard, Leferve, Racette, McCoy, and Murphy based on actions and inactions that occurred during his disciplinary hearing; (3) Plaintiff's First Amendment confiscation of mail claim against Defendants Chappins, McGinis, Wetzel, Marshall, Sullivan, Donahue, Sheahan, Litweiler, Nuttal, LeClaire, Annucci, McKernon, and Hale; and (4) Plaintiff's First Amendment retaliation and false misbehavior report claim against Defendants Sorenzon, Stuart, Walcott, McLaughlin, J. LeClaire, Smith, Boyton, Roque, Burke, L. LeClaire, Selsky, Murphy, Jarvis, Wells, Colby, Faulkner, and McNulty. Familiarity with the factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### B. Defendants' Motion for Summary Judgement

**\*2** On December 29, 2008, Defendants filed a motion for summary judgment seeking dismissal of Plaintiff's remaining claims. (Dkt. No. 179.) Generally, in support of their motion for summary judgment, Defendants argue as follows: (1) various Defendants should be dismissed based upon the Court's Decision and Order of November 2, 2007; (2) Plaintiff has failed to establish his procedural due process claim against Defendant Faulkner; (3) because Plaintiff has not established an underlying due process violation, his due process claims against the remaining Defendants must be dismissed; (4) Plaintiff has failed to adduce evidence establishing his retaliation and false misbehavior report claim; (5) he has failed to establish a claim for illegal confiscation of mail; (6) his claims against most Defendants should be dismissed on the alternative grounds that Plaintiff has failed to exhaust his available administrative remedies; and (7) the Defendants against whom he has claims regarding which he did exhaust his administrative remedies are entitled to qualified immunity. (*Id.*)

On April 28, 2009, after an extension of time was granted by the Court, Plaintiff filed a response in opposition to Defendants' motion. (Dkt. No. 185.) Generally, in his response, Plaintiff argues as follows: (1) he has introduced evidence from which a rational factfinder could conclude that Defendants violated his Fourteenth Amendment procedural due process rights during the disciplinary hearing; (2) he

has introduced evidence from which a rational factfinder could conclude that Defendants did not have reasonable cause to inspect his outgoing mail, and therefore the subsequent confiscation violated his First Amendment rights; (3) he has introduced evidence from which a rational factfinder could conclude that Defendants retaliated against him for filing a grievance against Officer Woodruff, in violation of his First Amendment rights [1] ; (4) he has exhausted his administrative remedies with respect to all Defendants; and (5) Defendants are not entitled to qualified immunity. [2]

[1]    According to Defendants, Plaintiff sent a letter to Defendant Walcott (of DOCS' office in Albany), which contained correction fluid (also known informally as "white-out"), a contraband substance pursuant to Adirondack C.F. rules. (Dkt. No. 194, at 5.) This letter, which has never been produced, is referred to by Plaintiff as the "phantom letter." (*Id.*)

[2]    On May 19, 2009, Defendants filed a reply to Plaintiff's response, in which they reiterated their argument that Plaintiff's Amended Complaint should be dismissed in its entirety based on Plaintiff's failure to adduce evidence establishing any of his claims. (Dkt. No. 190, Attach.3.)

### C. Magistrate Judge Homer's Report-Recommendation and Orders

On September 11, 2009, Magistrate Judge Homer issued a Report-Recommendation recommending that Defendants' motion be granted in part and denied in part. More specifically, Magistrate Judge Homer recommends as follows: (1) that Plaintiff's First Amendment claim for retaliation involving the cell search and subsequent issuance of a false misbehavior report *not* be dismissed due to the existence of genuine issues of material fact; (2) that Plaintiff's First Amendment claim for illegal confiscation of mail be dismissed; (3) that Plaintiff's Fourteenth Amendment due process claims be dismissed; and (4) that Defendants Leferve, McLaughlin, Mehrmann, Pasquil and Sanders be dismissed without prejudice for failure to effect service, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b). (Dkt. No. 194.) Familiarity with the grounds of Magistrate Judge Homer's Report-Recommendation is assumed in this Decision and Order, which (again) is intended primarily for the review of the parties.

**\*3** In addition, on September 11, 2009, and November 18, 2009, Magistrate Judge Homer denied (1) Plaintiff's motion

to supplement the pleadings (Dkt. Nos.186, 194, 202), (2) Plaintiff's two motions to strike certain documents from the record (Dkt.Nos.187, 193, 194, 201, 202).

### D. Objections to Magistrate Judge Homer's Report-Recommendation

#### 1. Defendants' Objections

On November 2, 2009, Defendants submitted their Objections to the Report-Recommendation. (Dkt. No. 197.) Generally, in their Objections, Defendants argue as follows: (1) Magistrate Judge Homer erred in not dismissing Plaintiff's retaliation and false misbehavior report claims because Plaintiff failed to introduce admissible record evidence that Defendant Walcott knew of his grievance against Woodruff, such that her notifying Defendant McLaughlin about his use of correction fluid could be deemed retaliatory, and "[t]he dismissal of Walcott dooms the remainder of [P]laintiff's retaliation claim"; and (2) even if Plaintiff's retaliation claim against Defendant Walcott remains, Defendants Sorenzon, Stuart, McLaughlin, J. LeClaire, Smith, Boyton, Roque, Burke, L. LeClaire, Selsky, Murphy, Jarvis, Wells, Colby, Faulkner, and McNulty are entitled to qualified immunity as a matter of law because their actions were "objectively reasonable" based on the circumstances and the information they received. (*Id.*)

#### 2. Plaintiff's Objections

On December 3, 2009, after being granted an extension of time to do so by the Court, Plaintiff filed his Objections to Magistrate Judge Homer's Report-Recommendation, and his Orders denying Plaintiff's three non-dispositive motions. (Dkt. No. 202.) Generally, in his Objections, Plaintiff argues, *inter alia,* as follows: (1) Magistrate Judge Homer erred in dismissing his due process claims because, *inter alia,* (a) Adirondack C.F. did not list or otherwise include correction fluid as a banned substance in any of its written materials, (b) certain testimony of Defendants LaClaire and Faulkner is missing from the hearing transcript and has not been produced, (c) Defendant Falkner improperly permitted a portion of the hearing to be conducted in Plaintiff's absence, without personally ensuring that Plaintiff understood the consequences of not participating in the "final day" of his hearing, and (d) Defendant Faulkner failed to make a "reasonable attempt" to locate Plaintiff's requested witness for the disciplinary hearing through the N.Y.S. Parole Board; (2) Defendants violated his constitutional rights by tampering with his mail because "their penological interest in maintaining compliance with facility rules via a mail

watch was based on Directive 4421, ... not 4422[,] which was not followed"; (3) Defendants who were involved in the due process violations and mail tampering incidents are not entitled to qualified immunity because they violated his constitutional rights; and (4) his motion to supplement the pleadings and his motion to strike certain evidence should have been granted. (*Id.*) Although Plaintiff's appeals from two of the last three non-dispositive motions were not arguably timely in nature, the Court will consider them, out of special solicitude to Plaintiff.

### E. Defendants' Response to Plaintiff's Objections

**\*4** On December 8, 2009, Defendants filed a response to Plaintiff's Objections. (Dkt. No. 203.) Generally, in their response, Defendants argue, *inter alia,* that Plaintiff's Objections contain an admission that the "phantom letter" that he sent to the DOCS in Albany contained whiteout (a contraband substance). (Dkt. No 203, at 2.)

### F. Plaintiff's Supplemental Objection

On December 21, 2009, Plaintiff filed a Supplemental Objection to Defendants' Response, denying that he admitted sending a letter to an official in Albany that contained correction fluid, and clarifying Defendants' misreading of his statement for the Court. (Dkt. No. 204.) [3]

[3]     (*See also* Dkt. No. 202, at 1 [stating that "D.S.S. Mclaughlin never received a telephone call from Defendant Walcott on January 10th, 2002, *advising him* that Lebron possessed contraband because the letter Petitioner had sent to Albany contained white-out correction fluid (which was not banned from inmates.)"]; *see also* Dkt. No. 203, at 2 [stating that "the letter petitioner had sent to Albany contained white-out correction fluid (which was not banned from inmates)."].)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report-Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [4] When only general objections are made a magistrate

judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[5] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

[4]    On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1) (C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

[5]    *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

### B. Standard Governing a Motion for Summary Judgment

Magistrate Judge Homer correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 194, at 12-13.) As a result, this standard is incorporated by reference in this Decision and Order.

### III. ANALYSIS

#### A. Plaintiff's Retaliation Claim

As stated in Part I.C. of this Decision and Order, Magistrate Judge Homer recommends that Plaintiff's First Amendment claim for retaliation involving the cell search and subsequent issuance of a false misbehavior report *not* be dismissed due to the existence of genuine issues of material fact. In their Objections, Defendants argue, *inter alia,* that Magistrate Judge Homer erred in not dismissing Plaintiff's retaliation claim because Plaintiff failed to introduce admissible record evidence that Defendant Walcott knew of Plaintiff's grievance against Woodruff, such that her notifying Defendant McLaughlin about his use of correction fluid could be deemed retaliatory. Defendants further argue that the dismissal of Walcott dooms the remainder of Plaintiff's retaliation claim.

**\*5** To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

As an initial matter, although the record establishes that Plaintiff sent a letter to DOCS' office Albany, which was reviewed by Defendant Walcott,[6] there is no admissible record evidence from which a rational factfinder could conclude that Defendant Walcott knew of Plaintiff's grievance

against Officer Woodruff when she reviewed Plaintiff's letter. [7] Under the circumstances, Plaintiff's retaliation claim cannot survive Defendants' motion for summary judgment. *See Murray v. Pataki*, 03-CV-1263, 2009 WL 981217, at *10 (N.D.N.Y. Apr.9, 2009) (Suddaby, J. adopting Treece, M.J.) ("[T]here is no evidence on the record that Defendants ... knew about those Grievances; nor is there any indication as to why those Defendants would retaliate against Plaintiff for grievances filed against other officers. For their part, Forth and Jones swear they had no knowledge of Plaintiff's prior Grievances against Irwin and Travers. Plaintiff has failed to show any evidence of a causal connection between the Grievances he filed against Irwin and Travers and the alleged retaliatory actions of Forth, Jones, and Girdich. Therefore, it is recommended that Plaintiff's retaliation claims be dismissed against Defendants Forth, Jones, and Girdich.").

6    (Dkt. No. 179, Attach. 6, at 23-24; Dkt. No. 185, Attach. 4, at 66; *cf.* Dkt. No. 179, Attach. 2, at 68-69 [attaching pages 66-67 of Plaintiff's deposition transcript, in which he testified that he may have sent a letter containing correction fluid to someone in DOCS' office in Albany, which Defendant Walcott subsequently obtained].)

7    For example, Defendants have not been able to produce the letter in question, and the evidence in the record indicates that the subject matter of the letter is unknown. (Dkt. No. 185, Attach. 4, at 66.) Moreover, the evidence in the record indicates that Defendant Walcott, who works at DOCS' office in Albany, telephoned Adirondack C.F. on or about January 10, 2002, and told non-party Barbara Granish merely that she had reviewed a letter containing correction fluid from Plaintiff (i.e., not that she knew that Plaintiff had filed a grievance against Officer Woodruff and/ or that she wanted to retaliate against Plaintiff for filing a grievance). (Dkt. No. 179, Attach. 14, at 5; Dkt. No. 179, Attach. 6, at 23; Dkt. No. 185, Attach. 4, at 66.) Finally, the evidence in the record indicates that DOCS' Central Office Review Committee ("CORC") in Albany received Plaintiff's appeal of his grievance filed against Woodruff on January 14, 2002-four days *after* Defendant Walcott's telephone call to Ms. Granish. (Dkt. No. 179, Attach. 3, at 20.)

Moreover, even assuming that Defendant Walcott knew of Plaintiff's grievance against Officer Woodruff, "retaliatory searches are not actionable under § 1983." *Walker v. Keyser*, 98-CV-5217, 2001 WL 1160588, at *9 (S.D.N.Y. Oct.2, 2001) (citing, *inter alia, Higgins v. Artuz*, 94-CV-4810, 1997 WL 466505, at *4 [S.D.N.Y. Aug. 14, 1997] [finding that "[s]earches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature"] ). [8]

8    *See also Demaio v. Mann*, 877 F.Supp. 89, 95 (N.D.N.Y.1996) (Kaplan, J.); *Payne v. Axelrod*, 871 F.Supp. 1551, 1556 (N.D.N.Y.1995) (Kaplan, J.); *Freeman v. Goord*, 02-CV-9033, 2005 WL 3333465 at *5 (S.D.N.Y. Dec.7, 2005); *Rodriguez v. McClenning*, 399 F.Supp.2d 228, 239 (S.D.N.Y.2005); *Salahuddin v. Mead*, 95-CV-8581, 2002 WL 1968329 at *5 (S.D.N.Y. Aug.26, 2002); *Walker v. Goord*, 98-CV-5217, 2000 U.S. Dist. LEXIS 3501, at *26 (S.D.N.Y. Mar. 21, 2000); *Bey v. Eggleton*, 96-CV-3302, 1998 WL 118158, at *4 (S.D.N.Y. Mar.17, 1998).

Furthermore, even assuming that a retaliatory cell search can constitute adverse action (either alone or in conjunction with the issuance of a misbehavior report that results in a disciplinary conviction that is subsequently reversed on appeal), Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his grievance against Officer Woodruff "was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir.2003). To the contrary, the record rather clearly establishes that Defendant McLaughlin ordered Defendants Smith and J. LeClaire to conduct a search of Plaintiff's cell because McLaughlin had been informed that Plaintiff had sent a letter containing correction fluid to DOCS' office in Albany, which had been reviewed by Defendant Walcott. (Dkt. No. 179, Attach. 6, at 24.) The record further establishes that the misbehavior report was issued not with retaliatory intent, but simply because contraband-including three bottles correction fluid-was in fact recovered from Plaintiff's cell during that search. [9] Finally, the Court cannot help but note that the record establishes that the cell search on January 10, 2002, was somewhat attenuated from the filing of Plaintiff's grievance against Defendant Wolcott on December 18, 2002, having occurred more than three weeks after that filing. Based on this record evidence, Plaintiff's retaliation claim cannot, and does not, survive Defendants' motion for summary judgment. [10]

9    The Court notes that, while Plaintiff's disciplinary conviction of January 23, 2002 (which was based on the misbehavior report of January 10, 2002) was subsequently reversed on appeal, no admissible record evidence exists indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false; rather, the reversal was based merely on a finding that the disciplinary hearing was incomplete. (Dkt. No. 185, Attach. 4, at 78 [attaching memorandum from Donald Selsky stating, "THE ABOVE-NOTED SUPERINTENDENT'S HEARING HAS BEEN REVERSED ON OCTOBER 23, 2002, FOR THE FOLLOWING REASON(S): REVERSED AFTER DISCUSSION WITH ATTORNEY GENERAL'S OFFICE DUE TO INCOMPLETE HEARING RECORD."].) The Court notes further that, in his deposition, Plaintiff indicated that he possessed correction fluid at least at some point in time, testifying that (1) he did not believe correction fluid to be contraband, (2) that he believed he could possess as much correction fluid as he wanted, (3) it was available throughout the facility, and (4) it was a "possibility" that he used it in a letter to DOCS' office in Albany. (Dkt. No. 179, Attach. 2, at 68, 69 and 75 [attaching pages 66, 67 and 73 of Plaintiff's deposition transcript].)

10   See Jermosen v. Coughlin, 86-CV-0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (granting summary judgment to defendants on plaintiff's retaliation claim because there was evidence demonstrating that "plaintiff in fact committed the prohibited conduct charged in the misbehavior report," the filing of which was the retaliatory act); Battice v. Phillip, 04-CV-0669, 2006 WL 2190565, at *7 (E.D.N.Y. Aug.2, 2006) (finding that "defendants have submitted undisputed affidavits explaining that Plaintiff's cell was searched based on a tip that it contained contraband. Because defendants have carried their burden of demonstrating that the search would have been conducted in the absence of any retaliatory motive, and Battice has failed to put forth any evidence to dispute those assertions, summary judgment with respect to this claim is proper."); Jordan v. Garvin, 01-CV-4393, 2004 WL 302361, at *6 (S.D.N.Y. Feb.17, 2004) (holding that search

of cell to find written music recording contract after inmate had filed grievance challenging prison rule prohibiting inmate business transactions that precluded him from entering into contracts was not retaliatory because contract in question was contraband under relevant prison rules).

*6   For each of these alternative reasons, Plaintiff's retaliation claim is dismissed. [11]

11   The Court notes also that Defendants are entitled to qualified immunity on this claim because "it is not well-settled that cell searches can be the subject of a First Amendment retaliation (as opposed to an Eighth Amendment cruel-and-unusual punishment) claim." Jones v. Harris, 665 F.Supp.2d 384, 398 (S.D.N.Y.2009).

**B. Plaintiff's Remaining Claims and Motions**

The only Objections offered by Plaintiff to Magistrate Judge Homer's Report-Recommendation and Orders regarding the claims and/or motions not discussed above in Part III of this Decision and Order are simply reiterations of Plaintiff's previous arguments, and/or are merely general objections. (Dkt. Nos.202, 204.)

After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report-Recommendation and Orders, and Plaintiff's Objections thereto, the Court concludes that Magistrate Judge Homer's thorough Report-Recommendation and Orders regarding the claims and motions not discussed above in Part III of this Decision and Order are correct in all respects. Magistrate Judge Homer employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. [12] As a result, the Court accepts and adopts the remainder of Magistrate Judge Homer's Report-Recommendation, and affirms his Orders on Plaintiff's three non-dispositive motions, for the reasons stated therein.

12   The Court notes that those portions of the Report-Recommendation would survive even de novo review.

**ACCORDINGLY,** it is

**ORDERED** that United States Magistrate Judge David R. Homer's Report-Recommendation (Dkt. No. 194) is

2010 WL 1235593

*ACCEPTED* and *ADOPTED* as **modified** by this Decision and Order; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 179) is *GRANTED* in its entirety; and it is further

**ORDERED** that Plaintiff's claims against Defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders are *DISMISSED* from the action, without prejudice, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is further

**ORDERED** that all other Defendants are *DISMISSED* from this action with prejudice; and it is further

**ORDERED** that Magistrate Judge Homer's Order denying Plaintiff's motion to supplement the pleadings (Dkt. No. 186, 194) is *AFFIRMED,* and it is further

**ORDERED** that Magistrate Judge Homer's Orders denying Plaintiff's two motions to strike certain documents from the record (Dkt.Nos.187, 193, 194, 201) are *AFFIRMED;* and it is further

**ORDERED** that Plaintiff's Amended Complaint is *DISMISSED* in its entirety.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235593

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 8474802
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sheldon COOPER, Jr., Plaintiff,
v.
A. ANNUCCI, et al., Defendants.

No. 9:18-CV-762 (GTS/CFH)
|
Signed 11/09/2020

**Attorneys and Law Firms**

Sheldon Cooper, Jr., 2020-00914, Orange County Jail, 110 Wells Farm Road, Goshen, New York 10924, Plaintiff pro se.

Attorney General for the, State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants, OF COUNSEL: KONSTANDINOS D. LERIS, ESQ., Assistant Attorney General.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

*1    Plaintiff pro se Sheldon Cooper, Jr. ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Greene Correctional Facility ("Greene CF") Sergeant ("Sgt.") David DeGraff ("Sgt. DeGraff"); Cayuga Correctional Facility ("Cayuga CF") Lieutenant ("Lt.") Daniel Walawender ("Lt. Walawender"); Cayuga CF Sergeants Gregg Smith ("Sgt. Smith") and Christopher Seymour ("Sgt. Seymour"); Cayuga CF Correction Officers ("C.O.") Jaci Stanton ("C.O. Stanton"); C.O. Kevin Cashin ("C.O. Cashin"); C.O. Kristopher Corey ("C.O. Corey"); C.O. Scott Payne ("C.O. Payne"); and C.O. Joanne Withers ("C.O. Withers"); and Cayuga CF nurse Kim Randolph ("Nurse Randolph"), violated his constitutional rights under the First and Eighth Amendments. See Dkt. No. 12 ("Amend. Compl.").

Following initial review of plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. 1915A(b), Chief U.S. District Judge Glenn T. Suddaby held that the following claims survived: (1) plaintiff's Eighth Amendment excessive force and failure to intervene claims against Sgt. Smith and C.O. Cashin; and (2) plaintiff's First Amendment retaliation claims against Sgt. DeGraff, Sgt. Smith, Nurse Randolph, C.O. Payne, C.O. Withers, C.O. Corey, Sgt. Seymour, Lt. Walawender, [2] C.O. Stanton, and C.O. Cashin. See Dkt. No. 14 at 3. [3] The Court previously dismissed plaintiff's remaining claims and additional defendants without prejudice on initial review of plaintiff's original complaint, see Dkt. No. 7 at 48, and plaintiff's Amended Complaint set forth identical factual assertions as in the original complaint except that plaintiff provided the names for certain defendants previously named as John or Jane Does. See Dkt. No. 14 at 2.

[2]     Plaintiff initially named Cayuga CF Lt. Soto as a defendant in his Amended Complaint. See Dkt. No. 12 at 6 ¶ 28. Following the Court's Decision & Order on initial review of plaintiff's Amended Complaint, Lt. Walawender was substituted in place of Lt. Soto as a named defendant in this action, all references to Lt. Soto in the Amended Complaint were deemed to refer to Lt. Walawender, and Lt. Soto was dismissed as a defendant. See Dkt. Nos. 30, 32.

[3]     Plaintiff's First Amendment retaliation claim against C.O. Christopher Corp ("C.O. Corp.") also survived the Court's initial review of the Amended Complaint. See Dkt. No. 14 at 3. However, on November 13, 2019, the Court approved a stipulation and order of partial discontinuance pursuant to Federal Rule of Civil Procedure 41(a), dismissing all claims against C.O. Corp with prejudice from this action. See Dkt. No. 55.

Presently pending before the Court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. See Dkt. No. 84. Despite the Court granting plaintiff a 30-day extension to file a response to defendants' motion, see Dkt. No. 89, plaintiff did not timely file a response and the extended deadline has since expired. For the reasons that follow, it is recommended that defendants' motion for summary judgment be granted in part.

## I. Background

**\*2** The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection III.A., infra. At all relevant times, plaintiff was an inmate incarcerated first at Greene CF and then at Cayuga CF.

### A. Plaintiff's Factual Assertions and Claims[4]

[4]    To the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the Amended Complaint. See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks and citations omitted)).

### 1. Incidents Involving Sgt. DeGraff at Greene CF

Plaintiff states that, on December 8, 2017, Sgt. DeGraff conducted a cell search, during which he "drew a picture of a penis on ... plaintiff's shower wall with ... soap and ripped ... plaintiff's Bible apart and only left behind the cover." Amen. Compl. at 14. On December 13, 2017, plaintiff filed a Prison Rape Elimination Act ("PREA") complaint with the DOCCS Office of Special Investigations ("OSI") relating to the December 8, 2017 cell search in which he alleged, among other things, that Sgt. DeGraff sexually harassed him by drawing a penis on plaintiff's shower wall. See id.; Dkt. No. 12-2 at 30. Plaintiff states that he also filed an inmate grievance against Sgt. DeGraff based on the December 8, 2017 cell search. See Amen. Compl. at 14. Plaintiff further alleges that, on December 19, 2017, Sgt. DeGraff conducted another cell search during which he again drew a picture of a penis on plaintiff's shower wall, threw away the remainder of plaintiff's Bible, and "left behind a puddle of a watery substance under ... plaintiff's desk next to the shower ... which ... plaintiff and his [cellmate] determined to be urine, since the shower was off that day." Id. at 15. Plaintiff states that he requested to be removed from his cell and was placed in a holding cell, which Sgt. DeGraff "approached" and stated, "[y]ou sure you want to do this Cooper? I don't think you want to go down that road!" Id. Plaintiff states

that he and his cellmate were issued inmate misbehavior reports based on the December 19, 2017 cell search, for which plaintiff was found guilty at the ensuing disciplinary hearing. Id. at 15. However, plaintiff's guilty disposition was "reversed on appeal due to only a paper not being filled out correctly." Id. Liberally construed, the Amended Complaint alleges that Sgt. DeGraff violated plaintiff's First Amendment rights by issuing him a misbehavior report in retaliation for plaintiff filing a grievance against Sgt. DeGraff on December 8, 2017. See Amen. Compl. at 14-15.

### 2. Incidents at Cayuga CF

### a. Plaintiff's Placement on Suicide Watch on January 17, 2018: Sgt. Smith, C.O. Cashin, and Nurse Randolph

On January 2, 2018, plaintiff was transferred from Greene CF to Cayuga CF. See Amen. Compl. at 15. On January 11, 2018, plaintiff alleges that another inmate informed him that C.O. Stanton, a female correction officer, entered the bathroom plaintiff and another inmate were using and watched plaintiff urinate "for about five seconds." Id. at 16. Plaintiff filed a PREA complaint against C.O. Stanton on January 11, 2018. See id. On January 17, 2018, plaintiff was sent to the medical facilities at Cayuga CF, where he alleges that Sgt. Smith and Nurse Randolph were present. See id. Plaintiff states that Sgt. Smith "produced a copy of plaintiff['s] PREA complaint he filed on January 11th." Id. Plaintiff alleges that Sgt. Smith "began a tirade of threats to ... [him if [he] did not sign off on the [PREA] complaint." Id. Plaintiff states that Sgt. Smith and Nurse Randolph "conspired with each other to ... place ... plaintiff on suicide watch if he did not sign off on the [PREA] complaint." Id. at 17. Plaintiff contends that when he refused to drop his PREA complaint against C.O. Stanton, he was handcuffed and escorted to the Cayuga CF Special Housing Unit ("SHU"). See id.

**\*3** Plaintiff alleges that, upon his arrival at the Cayuga CF SHU, C.O. Cashin "forcefully grabbed the back of [his] neck and stated ... 'this is the piece of shit who likes to write shit up?' " Amen. Compl. at 17. C.O. Cashin then "shoved ... plaintiff to the door" and "pushed and shoved the plaintiff through the door and all the way to [the] cell" saying plaintiff "likes to write female C.O.'s up for sexual assault." Id. Once at plaintiff's SHU cell, C.O. Cashin "bang[ed] the plaintiff's head on the window frames [sic] metal mesh wiring three times, and [said] 'I'll fuck you up, you pussy ass nigger!

I wish you would, I'll kill you!" Id. at 18. Plaintiff states that "Sgt. Smith stood in the doorway" while C.O. Cashin assaulted him. Id. at 17. Plaintiff posits that, following the assault, "the C.O.[ ]s walked away jesting with each other out loud[,] saying 'he likes to write female C.O.[ ]s up, saying they sexually assaulted him!' " Id. at 18. Plaintiff remained in SHU on suicide watch until January 22, 2018. See id. at 19. [5]

[5]    On January 23, 2018, plaintiff filed an inmate grievance ("Grievance No. CAY-18303-18") in which he asserted his Eighth Amendment excessive force and failure to intervene claims against Sgt. Smith and C.O. Cashin and First Amendment retaliation claim against Sgt. Smith and Nurse Randolph based on the alleged January 17, 2018 incident. See Dkt. No. 84-13 at 22-27.

Liberally construed, plaintiff alleges that Sgt. Smith and Nurse Randolph violated his First Amendment rights by placing him in SHU on suicide watch in retaliation for his refusal to drop the PREA complaint against C.O. Stanton. See Amen. Compl. at 16-17. Further, plaintiff asserts Eighth Amendment claims for excessive force and failure to intervene against C.O. Cashin and Sgt. Smith, respectively. See id. at 17.

### b. C.O. Payne and C.O. Withers Refusal to Transfer Plaintiff to Single Bunk Cube

Plaintiff posits that, between February 22, and April 5, 2018, "C.O. Withers and C.O. Payne who worked ... inside dorm C-2[ ] conspired with each other by keeping ... plaintiff inside a double bunk cube and moving multiple inmates to single bunk cubes before ... plaintiff," despite the other inmates arriving in the dorm after plaintiff. Amen. Compl. at 23. Plaintiff states that placing inmates in single bunk cubes who arrived in dorm C-2 after him violated the Superintendent's rules. See id. Affording plaintiff's pro se pleadings the most liberal construction possible, he asserts that C.O. Withers and C.O. Payne violated his First Amendment rights for their alleged refusal to move him to a single bunk cube in retaliation for his filing a PREA complaint against C.O. Stanton. See id. at 19, 23.

### c. Plaintiff's April 5, 2018 Placement in SHU: Lt. Walawender, Sgt. Seymour, and C.O. Corey

On April 5, 2018, C.O. Stanton entered the C-2 dorm where plaintiff was housed. See Amen. Compl. at 24. Plaintiff retrieved a letter he had received, which stated that his PREA complaints were being investigated. See id. at 25. Plaintiff intended "to wait for the area [sergeant] to do a round," so that he could "produce this letter to the [sergeant] and inform the [sergeant] that [he] did not feel safe around [C.O.] Stanton." Id. Later that day, when Sgt. Seymour came into the C-2 dorm, "plaintiff went up to the C.O.'s desk," where Sgt. Seymour was sitting, "placed [his letter on] the desk," explained the contents of the letter, and stated that he did not feel safe being around C.O. Stanton. Id. Sgt. Seymour ordered plaintiff "to step away from the desk," and "[p]laintiff complied." Id. Sgt. Seymour then called Lt. Walawender on the phone regarding plaintiff's request, after which Sgt. Seymour informed plaintiff that he could not move plaintiff out of the C-2 dorm. See id. After Sgt. Seymour called Lt. Walawender a second time shortly thereafter, "Sgt. Seymour directed C.O. Corey to place ... plaintiff in handcuffs" and Sgt. Seymour and C.O. Corey escorted plaintiff to SHU. Id. at 26. Affording the Amended Complaint a liberal construction, plaintiff alleges that Lt. Walawender, Sgt. Seymour, and C.O. Corey violated his First Amendment rights by placing him in SHU in retaliation for filing a PREA complaint against C.O. Stanton. See Amen. Compl. at 24-26.

### d. C.O. Stanton's and C.O. Cashin's Inmate Misbehavior Reports

**\*4**  On April 6, 2018, plaintiff received an inmate misbehavior report dated April 5, 2018, issued by C.O. Stanton, which cited plaintiff for creating a disturbance and failing to comply with a direct order. See Amen. Compl. at 26; Dkt. No. 12-2 at 68. C.O. Stanton's misbehavior report stated that, on April 5, 2018, plaintiff "charged the officer's desk yelling" to Sgt. Seymour, "I don't want [C.O. Stanton] working this dorm, she can't work this dorm, I feel unsafe and don't know what I will do to her." Dkt. No. 12-2 at 68. The misbehavior report indicated that plaintiff "was given a direct order to step away from the desk at which time he didn't comply," and that plaintiff "forcefully threw down a piece of paper on the officers desk continuing to cause a disruption." Id. Plaintiff "was then removed from the dorm by Sgt. Seymour and C.O. Corey [and] was escorted to SHU." Id. Plaintiff states that he "wrote an inmate grievance on April 5[th] in connection to C.O. Stanton retaliating against [him]" for filing his PREA complaint against her. Amen. Compl. at 26; see Dkt. No. 12-2 at 72.

Plaintiff also received a misbehavior report from C.O. Cashin dated April 6, 2018, for failing to comply with a direct order, creating a disturbance, and harassment. See Amen. Compl. at 26; Dkt. No. 12-2 at 70. C.O. Cashin's misbehavior report stated that, on April 6, 2018, he "was on duty in SHU, when [he] heard yelling coming from a gallery." Dkt. No. 12-2 at 70. When C.O. Cashin made a round of the gallery, he "observed [plaintiff] yelling from his feed up hatch to" another SHU inmate's cell. Id. C.O. Cashin ordered plaintiff to stop yelling, to which plaintiff replied, "whatever fuck you bitch." Id. C.O. Cashin's misbehavior report cited plaintiff with failing to comply with a direct order, creating a disturbance, and harassment. See id. Plaintiff states that he filed an inmate grievance against C.O. Cashin for "retaliating against [him]." Amen. Compl. at 26. Plaintiff attached as an exhibit to his Amended Complaint a handwritten note stating that, "on 4/7/18," he "placed on [his] cell door ... a grievance to [the Inmate Grievance Office] complaining about [C.O.] Cashin," and inquiring whether the Inmate Grievance Office was in receipt of that complaint. Dkt. No. 12-2 at 73. Affording the Amended Complaint a liberal construction, plaintiff alleges that C.O. Stanton and C.O. Cashin violated his First Amendment rights by issuing him false misbehavior reports in retaliation for filing grievances and/or PREA complaints against them. See Amen. Compl. at 32-34.

**B. Defendants' Motion [6] for Summary Judgment: Arguments and Supporting Evidence**

[6]    Defendants initially contended that plaintiff failed to exhaust administrative remedies for his First Amendment retaliation and Eighth Amendment excessive force and failure to intervene claims relating to his January 17, 2018 transfer to suicide watch in SHU, as contained in Grievance No. CAY-18303-18. See Dkt. No. 84-15 at 20. Defendants pointed out that plaintiff had appealed the denial of Grievance No. CAY-18303-18 on April 29, 2018, by signing an appeal statement, but, as of June 20, 2018, the date plaintiff filed his complaint and commence this action, the Central Office Review Committee ("CORC") had not yet issued a response to that grievance, and plaintiff had not contacted Cayuga's Inmate Grievance Program Supervisor ("IGPS") or CORC regarding

the status of his grievance appeal. See id. However, on October 19, 2020, the Attorney General's Office submitted a letter brief to "formally abandon" that argument in light of the Second Circuit's decision in Hayes v. Dahlke, 976 F.3d 259 (2d Cir. 2020). See Dkt. No. 91 at 1. The Attorney General's Office observed that, because CORC had not issued a response within 30 days of plaintiff's appeal, Hayes precluded their argument that plaintiff failed to exhaust administrative remedies by commencing the action before receiving a response from CORC. See Dkt. No. 91 at 1. Accordingly, defendants' argument in this regard is deemed withdrawn and abandoned. See Hayes, 976 F.3d 259 (holding that, "because the DOCCS Inmate Grievance Procedure imposes a mandatory deadline for the CORC to respond, an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations."). As defendants make no arguments with respect to the merits of plaintiff's Eighth Amendment claims for excessive force and failure to intervene against Sgt. Smith and C.O. Cashin, and defendants qualified immunity argument does not address these claims, see Dkt. No. 84-15 at 34, the abandonment of their failure to exhaust argument concerning plaintiff's Eighth Amendment claims renders their motion, in effect, a partial motion for summary judgment, despite defendants' request that the Amended Complaint "be dismissed in its entirety." Id. at 36.

**1. Exhaustion of Administrative Remedies [7]**

[7]    Defendants raised failure to exhaust as an affirmative defense in their Answer to plaintiff's Amended Complaint. See Dkt. No. 34 at 3 ¶ 13 ("Plaintiff did not properly exhaust his administrative remedies prior to commencing this action and therefore this action is subject to dismissal under the [PLRA].").

**\*5** Defendants contend that plaintiff failed to exhaust administrative remedies by failing to file a grievance concerning his First Amendment retaliation claims against (1) C.O. Withers' and C.O. Payne's for allegedly refusal to transfer him to a single cube bunk between February 22, and April 5, 2018; (2) Lt. Walawender, Sgt. Seymour, and C.O. Corey for allegedly retaliatorily transferring him

to SHU on April 5, 2018; and (3) C.O. Stanton and C.O. Cashin for allegedly issuing him retaliatory inmate misbehavior reports on April 5 and 6, 2018. See Dkt. No. 84-15 at 20-21.[8] Defendants contend that these claims are not governed by 7 N.Y.C.R.R. § 701.3(i), which states that "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the Prison Litigation Reform Act (PLRA) exhaustion requirement ... before bringing a lawsuit regarding an alleged sexual abuse," if the inmate files a PREA complaint. See id. at 18. Rather, defendants aver, the foregoing retaliation claims are governed by the three-step grievance procedure set forth under 7 N.Y.C.R.R. § 701.1 et seq. See id. In particular, defendants argue that, although plaintiff premises the foregoing claims of retaliation on his filing a PREA complaint against C.O. Stanton on January 11, 2018, he "does not allege that ... defendants sexually assaulted or harassed him, nor are his claims [in this regard] necessarily intertwined with PREA." Id. In support of this contention, defendants proffer the sworn declarations of Morgan Swan ("Swan"), the Inmate IGPS at Cayuga CF, and Rachael Seguin ("Seguin"), the Assistant Director of the Inmate Grievance Program ("IGP") for DOCCS. See Dkt. No. 84-12 at 1 ¶ 1; Dkt. No. 84-13 at 1 ¶ 1. Swan declares that plaintiff's First Amendment claims against (1) C.O. Withers' and C.O. Payne's for allegedly refusing to transfer him to a single cube bunk between February 22, and April 5, 2018; (2) Lt. Walawender, Sgt. Seymour, and C.O. Corey for allegedly retaliatorily transferring him to SHU on April 5, 2018; and (3) C.O. Stanton and C.O. Cashin for allegedly issuing him retaliatory inmate misbehavior reports on April 5 and 6, 2018, based on "alleged retaliation for a previously filed PREA complaint ... are not covered under the exception for filing a grievance set forth in [section] 701.3(i) ... as there are no allegations that any staff member sexually harassed or sexually assaulted plaintiff" or that any of the defendants "failed to protect plaintiff from any alleged sexual harassment or sexual assault." Id. at 7 ¶ 20. Seguin explains, "[i]nstead," plaintiff's First Amendment retaliation claims "are issues properly addressed through the DOCCS IGP—i.e., through the established grievance procedures detailed in 7 N.Y.C.R.R. § 701.1 et seq." Id. Swan also declares that the foregoing First Amendment retaliation claims are governed by the three-step grievance procedure under 7 N.Y.C.R.R. § 701.1 et seq. See Dkt. No. 84-13 at 7 ¶¶ 20-21.

[8]    Defendants do not dispute that plaintiff's claim against Sgt. DeGraff is governed by 7 N.Y.C.R.R. § 701.3(i) and, therefore, concede that plaintiff

exhausted his administrative remedies as to that claim by filing a grievance relating to his claims against Sgt. DeGraff in this action. See Dkt. No. 84-15 at 18 n.9.

Defendants argue that, because plaintiff did not file grievances concerning the foregoing First Amendment retaliation claims, plaintiff failed to exhaust the three-step grievance procedure under 7 N.Y.C.R.R. § 701.1, and his claims must be dismissed for failure to exhaust administrative remedies. See Dkt. No. 84-15 at 18-19. In support their argument, defendants cite Swan's declaration, which states that, upon arrival at Cayuga CF, plaintiff attended and successfully completed the facility orientation, which includes a presentation on the facility's grievance policies and procedures. See Dkt. No. 84-13 at at 2 ¶ 5. Swan declares that, "[i]f plaintiff filed any grievances while he was housed at Cayuga [CF] there would be a record of it in the Cayuga [CF's] grievance office." Id. at ¶ 23. However, Swan declares that, "[a]s is evident from plaintiff's Inmate Grievance Report ..., plaintiff did not file any grievance while housed at Cayuga [CF] related to" to the aforementioned retaliation claims. Id. at 9 ¶ 33. Swan explains that "plaintiff filed one grievance with Cayuga [CF's] grievance office while he was housed [there]: Grievance No. CAY-18303-18." Id. at ¶ 25. Swan notes that "Grievance No. CAY-18303-18 was filed before the remaining claims [relating to the alleged incidents at Cayuga CF] occurred." Id. at ¶ 26. Included as an exhibit to Swan's declaration is plaintiff's grievance log at Cayuga CF from January 1, 2018, to May 3, 2018, which lists plaintiff's only grievance as Grievance No. 18303. See id. at 20.

Further, Swan acknowledges that plaintiff's allegation that he filed a grievance concerning his retaliation claims against Lt. Walawender, Sgt. Seymour, and C.O. Corey based on the alleged April 5, 2018 incident, and against C.O. Stanton and C.O. Cashin based on their misbehavior reports, and that plaintiff claims to have submitted a letter following up with regards to his grievance against C.O. Cashin. See id. at ¶¶ 35, 36. However, "[u]pon review of the records maintained at Cayuga [CF's] grievance office," Swan declares that "plaintiff did not: (1) file a grievance with respect to those claims, or (2) send any correspondence, including the April 21, 2018 letter attached to [plaintiff's] complaint, to Cayuga [CF's] grievance office." Id. at ¶ 37. Concerning plaintiff's letter dated April 21, 2018, Swan declares that, "[h]ad plaintiff [send such correspondence], he would have been advised that no grievance was ever received or filed by Cayuga [CF's] grievance office with respect to those claims." Id. Defendants also point to plaintiff's deposition testimony in which he

2020 WL 8474802

acknowledged that he did not file an inmate grievance against C.O. Withers and C.O. Payne based on their alleged refusal to transfer him to a single bunk cube. See Dkt. No. 84-1 at 364. Plaintiff states that he never filed an inmate grievance against C.O. Withers and C.O. Payne because his retaliation claim against those defendants was related to his PREA complaint against C.O. Stanton. See id.

**\*6** Moreover, defendants cite Seguin's declaration, which states that, in her role as the Assistant Director of the IGP for DOCCS, she "oversee[s] the records that DOCCS maintains of appeals received by [CORC], ... the final level of administrative review in the DOCCS [IGP] pursuant to 7. N.Y.C.R.R. § 701 *et seq.*" Dkt. No. 84-12 at 3. Seguin's search of "CORC records for appeals received from facility-level grievance determinations for plaintiff" revealed that, aside from Grievance No. CAY-18303-18, "plaintiff did not appeal any grievance ... to CORC related to his allegations ... which are the subject of this action." Id. at 7 ¶ 21, 8 ¶ 28. Attached to Seguin's declaration is a list of plaintiff's grievances filed with CORC, which shows that plaintiff filed only Grievance No. CAY-18303-18 while incarcerated at Cayuga CF. See id. at 12.

### 2. Merits of Plaintiff's First Amendment Retaliation Claims

#### a. Sgt. DeGraff

Defendants posit that plaintiff's First Amendment retaliation claim against Sgt. DeGraff fails because plaintiff cannot establish a causal connection between the alleged retaliatory conduct related to the December 19, 2017 cell search and/or misbehavior report and plaintiff's protected conduct of filing a grievance against Sgt. DeGraff on December 8, 2017. See Dkt. No. 84-15 at 24. Defendants submit Sgt. DeGraff's sworn declaration in which he states that he had no knowledge of plaintiff's December 8, 2017 grievance against him (Grievance No. GNE-9668-17) until he was interviewed about it on January 6, 2018. See Dkt. No. 84-2 at 5 ¶ 28. Sgt. DeGraff further declares that, "when [he] authorized the search of plaintiff's cell on December 19, 2017[, he] was unaware that plaintiff had filed Grievance No. GNE-9668-17 against [him]." Id. at 6 ¶ 31. Defendants also submit a memorandum drafted by Sgt. DeGraff on January 6, 2018, relating to Grievance No. GNE-9668-17 in which Sgt. DeGraff stated that he had "no knowledge of any complaints [plaintiff] ha[d] filed." Id. at 24. Sgt. DeGraff declares that,

had he been aware of Grievance No. GNE-9668-17, he would have responded because "it was [his] custom and practice to respond to a grievance on the date [he] was notified about it, or as soon thereafter as possible." Id. at 5 ¶ 28. In addition, defendants point to plaintiff's deposition testimony in which plaintiff stated that, "between December 8[ ] and December 15[, 2017]," Sgt. DeGraff did not say anything to [plaintiff]." Dkt. No. 84-1 at 81. Further, plaintiff responded "[n]o" when asked whether Sgt. DeGraff ever "ma[d]e any comments about the grievance [plaintiff] filed" or "ma[d]e any threats." Id. Plaintiff also testified that he did not "tell [Sgt. DeGraff he] file[d] the grievance." Id. However, plaintiff testified that he was "almost sure" Sgt. DeGraff knew about his December 8, 2017 grievance, because plaintiff "kn[e]w the grievance process and ... once they start the investigation, they interview the person you're grieving, so [he was] pretty sure [Sgt. DeGraff] was interviewed within that time frame." Id. at 82.

Further, defendants contend that plaintiff's First Amendment claim against Sgt. DeGraff fails because plaintiff has not established an adverse action based on the December 19, 2017 misbehavior report. See Dkt. No. 84-15 at 25. In particular, defendants aver that, although the charges in Sgt. DeGraff's December 19, 2017 misbehavior report were ultimately reversed on appeal based solely on a technicality because a form was not properly submitted, it is undisputed that plaintiff committed the violations charged in the misbehavior report. See id. at 26. In his sworn declaration, Sgt. DeGraff denies that either of the officers who he ordered to conduct the cell search of plaintiff's cell on December 19, 2017, drew a penis on the wall of plaintiff's shower or urinated in plaintiff's cell, and states that plaintiff's property was not damaged during the cell search. Dkt. No. 84-2 at 4 ¶ 20. He also denies issuing plaintiff a false misbehavior report. See id. at 2 ¶ 9. Sgt. DeGraff states that, while making his regular rounds on December 19, 2017, he "noticed that there were numerous contraband items in plain sight in plaintiff's cell." Dkt. No. 84-2 at 3 ¶ 13. Sgt. DeGraff states that he "called for officers by radio to perform a suspicion search of plaintiff and his cellmate's cell." Id. at ¶ 14. He states that he "supervised the officers as they entered plaintiff's cell to conduct the search," and that "[d]uring the search, contraband was found, ... includ[ing] stripped wires, pillows and sheets ripped to create drag lines" and "covering from the pillows [that] had been removed and thrown outside the rec area, and the filling [of which] was stuffed into the pillowcases." Id. at ¶ 17. Photographs of the contraband recovered from plaintiff's cell are included as an exhibit to Sgt. DeGraff's declaration.

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 190 of 279

See id. at 4 ¶ 18; id. at 9-10. Thus, defendants argue, even assuming Sgt. DeGraff conducted the cell search with retaliatory animus, he ordered the cell search and issued the misbehavior report based on proper reasons, which precludes a finding of adverse action. See Dkt. No. 84-15 at 26. In addition, defendants posit that, since the hearing disposition relating to the December 19, 2017 misbehavior report was reversed prior to plaintiff serving any portion of the 30-day keeplock sentence, plaintiff cannot establish adverse action. See id. at 27. Finally, defendants contend that Sgt. DeGraff's alleged threats made after the December 19, 2017 cell search were not sufficiently specific or serious to amount to adverse action. See id. at 26.

**b. Sgt. Smith and Nurse Randolph**

 *7  Defendants argue that plaintiff's First Amendment retaliation claim against Sgt. Smith and Nurse Randolph fails for lack of adverse action because legitimate reasons existed for placing plaintiff in SHU on suicide watch on January 17, 2018. See Dkt. No. 84-15 at 27. In support of this argument, defendants cite the sworn declaration of Nurse Randolph, who stated that, based on a review of her records from January 17, 2018, plaintiff told her that "he had been sexually harassed by a female correction officer on January 11, 2018; that he was in fear for his life and that he might hurt someone else; and that he had a history of depression." Dkt. No. 84-4 at 2 ¶ 7. "Using [her] medical judgment," and in compliance with DOCCS Directive No. 4101, Nurse Randolph states that she "determined that [plaintiff's] comments suggested that he could potentially harm himself or others," so she "requested that [plaintiff] be placed on a one-on-one suicide watch." Id. at ¶ 8, § 12; see id. at ¶ 9.

Defendants also contend that plaintiff fails to establish a causal connection between Nurse Randolph's recommendation that he be placed on suicide watch and his filing the January 11, 2018 PREA complaint against C.O. Stanton. Dkt. No. 84-15 at 28. Defendants again note Nurse Randolph's sworn declaration in which she states that she "was not informed of [p]laintiff's PREA complaint against C.O. Stanton prior to [her] medical evaluation" of plaintiff and "did not act in retaliation for plaintiff's submission of the PREA complaint and had no reason to do so." Dkt. No. 84-4 at 3 ¶¶ 14, 15. Defendants also note that plaintiff has not alleged that Nurse Randolph ever threatened him. See Dkt. No. 84-15 at 28. Therefore, defendants argue, any assertion by plaintiff that Nurse Randolph was aware of his

PREA complaint against C.O. Stanton is speculative and fails to establish sufficient causal connection to support a First Amendment retaliation claim against her. See id. 28.

**c. C.O. Withers and C.O. Payne**

Defendants contend that plaintiff has established neither adverse action nor causal connection with respect to his First Amendment retaliation claim against C.O. Withers and C.O. Payne. See Dkt. No. 84-15 at 29. First, defendants argue that a non-retaliatory reason existed for not moving plaintiff from a double bunk cube to a single bunk cube between February 22, and April 5, 2018—because it was not yet plaintiff's turn to move. See id. In support of their argument, defendants submit the sworn declarations of C.O. Withers and C.O. Payne. See Dkt. Nos. 84-6, 84-7. C.O. Withers declares that, although she does not specifically recall plaintiff, "[t]here was a procedure in place to move inmates from a double bunk to a single bunk, which [she] always followed." Dkt. No. 84-6 at 2 ¶ 5. C.O. Withers elaborates that, "[g]enerally, when an inmate entered the [C-2] dorm, he would be placed on the top bunk of a double cube." Id. at ¶ 9. "After an inmate had been in a double bunk cube for a while, he could move from a top to a bottom bunk if it became available," and then "from a double cube to a single cube," depending on availability. Id. at ¶ 10. "[T]e procedure to move an inmate from a double cube to a single cube was based solely on the inmate's seniority in the dorm." Id. at ¶ 11. To keep track of the inmates' seniority, C.O. Withers declares that "[a] list was maintained of inmates eligible for a single cube based on the date they entered the dorm." Id. at ¶ 12. When a single cube became available, "the next inmate on the eligible list would be asked if he wanted to move." Id. at ¶ 13. Further, C.O. Withers explains that the approval of a supervisor and the inmate's consent were required before an inmate could be moved to a single cube, but that she "had no authority to move an inmate at his own request" and that she "only moved inmates based on seniority and with a supervisor's approval." Id. at ¶ 17; see id. at ¶¶ 15, 16. C.O. Payne's declaration reiterates the foregoing procedure for moving inmates from double to single bunk cubes. See Dkt. No. 84-7 at 3-4 ¶¶ 19-27. C.O. Payne adds that "[n]o inmate came in after plaintiff [who] was moved before him." Id. at ¶ 28. Both C.O. Withers and C.O. Payne deny intentionally preventing plaintiff's transfer to a single cube and state that, to the extent plaintiff was not moved to a single cube between February 22, and April 5, 2018, "it was not his turn to move." Id. at ¶ 29; Dkt. No. 84-6 at 3 ¶ 19. Thus,

defendants posit, plaintiff cannot establish adverse action. See Dkt. No. 84-15 at 29.

**\*8** Next, defendants contend that neither C.O. Withers nor C.O. Payne had knowledge of plaintiff's PREA complaint against C.O. Stanton and, therefore, plaintiff cannot establish retaliation. See Dkt. No. 84-15 at 30. Defendants point to C.O. Withers' and C.O. Payne's sworn declarations in which both defendants state that they did not work the same shift as each other, but worked on days when the other was off from work, and rarely had any contact with each other. See Dkt. No. 84-6 at 3 ¶ 20; Dkt. No. 84-7 at 3 ¶¶ 13, 15-17. C.O. Withers declares that she did not know C.O. Stanton until becoming involved in the present lawsuit, see See Dkt. No. 84-6 at 3 ¶ 22, and C.O. Payne states that he only rarely had any contact with C.O. Stanton, as she worked a different shift than him. See Dkt. No. 84-7 at 3 ¶ 13. Both C.O. Withers and C.O. Payne declare that they were unaware of plaintiff's PREA complaint against C.O. Stanton, and never had any conversations about either plaintiff or C.O. Stanton. See Dkt. No. 84-6 at 3 ¶ 22; Dkt. No. 84-7 at 5 ¶¶ 30-31. Defendants further posit that, even if C.O. Withers told plaintiff she was going to send him back to SHU, "she never mentioned the PREA complaint to him," and that, "even if C.O. Payne mentioned to another officer that plaintiff filed a PREA complaint against a 'female officer' on January 22, 2018, he did not mention which officer the complaint was filed against, [ ]or make any comments about potentially retaliating against plaintiff." Dkt. No. 84-15 at 31. Defendants also point to plaintiff's deposition testimony in which he acknowledged that he did not "objectively" know whether C.O. Withers knew about his PREA complaint against C.O. Stanton, but only assumed that she did "because [the C.O.s] all talk amongst themselves." Dkt. No. 84-1 at 336. Thus, defendants argue, plaintiff has failed to establish retaliatory animus and causation to support a First Amendment retaliation claim against C.O. Withers and C.O. Payne. See Dkt. No. 84-15 at 30, 31.

### d. Lt. Walawender, Sgt. Seymour, and C.O. Corey

Defendants argue that plaintiff's First Amendment retaliation claim against Lt. Walawender, Sgt. Seymour, and C.O. Corey based on his placement in SHU on April 5, 2018, must be dismissed because plaintiff has failed to establish adverse action. See Dkt. No. 84-15 at 31. In particular, defendants posit that the record evidence establishes that Sgt. Seymour directed that plaintiff be placed in SHU for a non-retaliatory

reason—plaintiff failed to comply with a direct order in violation of DOCCS rules. See id. In addition, defendants argue that plaintiff has failed to establish a causal nexus between his PREA complaint against C.O. Stanton and his placement in SHU on April 5, 2018. See id. Defendants point to plaintiff's deposition testimony in which he stated that he "kn[e]w for a fact that [Sgt. Seymour] didn't know" about plaintiff's PREA complaint before plaintiff showed him the letter from Effman. Dkt. No. 84-1 at 403. Moreover, defendants note that plaintiff testified at his deposition that Lt. Walawender, Sgt. Seymour, and C.O. Corey had no basis to retaliate against plaintiff and that plaintiff had not even seen any of these defendants prior to April 5, 2018. See id. at 402, 404-05.

### e. C.O. Stanton and C.O. Cashin

Defendants also contend that plaintiff's First Amendment retaliation claims against C.O. Stanton and C.O. Cashin based on the allegedly false misbehavior reports they issued plaintiff on April 5, and April 6, 2018, fail because they do not constitute adverse action. See Dkt. No. 84-15 at 32. Defendants point out that plaintiff was found guilty of all charges filed against him in both misbehavior reports. See id. Thus, defendants posit, they are entitled to summary judgment dismissing plaintiff's First Amendment claim based on C.O. Stanton's and C.O. Cashin's April 2018 misbehavior reports. See id.

### 3. Qualified Immunity

Defendants argue that, "[t]o the extent that plaintiff has provided sufficient evidence to assert First Amendment retaliation claims against Sgt. Smith, Nurse Randolph, C.O. Withers, C.O. Payne[,] and C.O. Corey, they are nevertheless entitled to qualified immunity." Dkt. No. 84-15 at 34. Concerning plaintiff's retaliation claim against Nurse Randolph, defendants posit that, given plaintiff's statements to Nurse Randolph on January 17, 2018, that he was in a fragile mental state and concerned that he may hurt someone if he went back to his dorm, it was reasonable for Nurse Randolph to recommend his placement on SHU suicide watch. See id. With respect to plaintiff's retaliation claim against Sgt. Smith stemming from his placement in SHU suicide watch, defendants argue that Sgt. Smith had no individual authority to place plaintiff on suicide watch. See id. Further, defendants posit that, as neither C.O. Withers nor

C.O. Payne had authority to move plaintiff to a single bunk cube without a supervisor's approval, it was not objectively unreasonable for those defendants to keep plaintiff in a double bunk cube. See id. Finally, defendants aver that no reasonable official would conclude that C.O. Corey violated plaintiff's rights by escorting him to SHU on April 5, 2018, as he was merely following orders given by Lt. Walawender and Sgt. Seymour. See id. Defendants cite plaintiff's deposition testimony in which plaintiff acknowledged that C.O. Corey's involvement was limited to placing handcuffs on him and escorting him to a SHU cell, and that C.O. Corey "had no choice" but to follow the direction of Sgt. Seymour. See id.; Dkt. No. 84-1 at 394.

### III. Discussion [9]

[9]     All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standard

 *9 Summary judgment may be granted only if the submissions of the parties taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists." Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson, 477 U.S. at 248. A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (internal quotation marks omitted). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. See Salahuddin, 467 F.3d at 273. The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (internal quotation marks and citation omitted); see also Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) ("[A]ffidavits must be based upon concrete particulars, not conclusory allegations." (internal quotation marks and citation omitted)). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance

with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

## B. Abandonment of Claims

**\*10** Despite defendants express warning of the consequences of failing to properly respond to their motion for summary judgment, see Dkt. No. 84 at 2-3, plaintiff did not file a response in opposition to defendants' motion for summary judgment. Accordingly, plaintiff's First Amendment retaliation claims against Sgt. DeGraff, C.O. Withers, C.O. Payne, Lt. Walawender, Sgt. Seymour, C.O. Corey, Sgt. Smith, Nurse Randolph, C.O. Stanton, and C.O. Cashin should be dismissed as abandoned. See Maher v. All. Mortg. Banking Corp., 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (internal quotation marks and citation omitted)); see also Wiggan v. New York City Dep't. of Correction, No. 12-CV-1405 (GBD/HBP), 2014 WL 4631456, at \*3 (W.D.N.Y. Sept. 16, 2014) (granting summary judgment and dismissing claims, as abandoned, that a pro se inmate failed to address in response to the defendants' motion for summary judgment); Martien v. City of Schenectady, No. 1:04-CV-679 (FJS/RFT), 2006 WL 1555565, at \*2 (N.D.N.Y. June 2, 2006) (deeming abandoned and granting summary judgment in favor of the defendant as to a claim that the pro se plaintiff did not address in response to the defendant's motion for summary judgment). Even if plaintiff had responded to defendants' motion, defendants would be entitled to partial summary judgment for the reasons that follow.

## C. Exhaustion of Administrative Remedies

As an initial matter, defendants correctly argue that plaintiff's First Amendment retaliation claims against (1) C.O. Withers and C.O. Payne for allegedly refusing to transfer him to a single cube bunk between February 22, and April 5, 2018; (2)

Lt. Walawender, Sgt. Seymour, and C.O. Corey for allegedly retaliatorily transferring him to SHU on April 5, 2018; and (3) C.O. Stanton and C.O. Cashin for allegedly issuing him retaliatory inmate misbehavior reports on April 5 and 6, 2018, are governed by 7 N.Y.C.R.R. § 701.1 *et seq.*, not section 701.3(i). See Dkt. No. 84-15 at 18-19. As Swan and Seguin correctly explained in their sworn declarations, although the foregoing retaliation claims are premised on alleged acts in retaliation for plaintiff's filing his January 11, 2018 PREA complaint against C.O. Stanton, none of plaintiff's retaliation claims involve allegations of sexual abuse or harassment or failure to prevent sexual abuse or harassment. See Dkt. No. 84-12 at 7 ¶ 20; Dkt. No. 84-13 at 6 ¶¶ 19, 21. Rather, the foregoing retaliation claims were the proper subject for the grievance procedure set forth in 7 N.Y.C.R.R. § 701.1 *et seq.* See Dkt. No. 84-12 at 7 ¶ 20; Dkt. No. 84-13 at 6 ¶¶ 19, 21; see also Waters v. Melendez, No. 15-CV-0805 (TJM/CFH), 2018 WL 3079764, at \*3 (N.D.N.Y. May 18, 2018) (analyzing the issue of exhaustion of administrative remedies for the plaintiff's First Amendment retaliation claims, which were premised on his filing of a PREA complaint, under the grievance procedure in 7 N.Y.C.R.R. § 701.1 *et seq.* and applicable caselaw where his retaliation claims did not allege sexual abuse or harassment or the failure to prevent sexual abuse or harassment), report and recommendation adopted, No. 9:15-CV-0805 (TJM/CFH), 2018 WL 3069209 (N.D.N.Y. June 21, 2018), aff'd, 783 F. App'x 56 (2d Cir. 2019) (summary order); Johnson v. Conley, No. 3:17-CV-00070 (JAM), 2018 WL 4224076, at \*2 (D. Conn. Sept. 5, 2018) (same), appeal dismissed (Nov. 26, 2018). Thus, the undersigned will assess the issue of exhaustion of the foregoing claims based on the grievance procedure set forth under 7 N.Y.C.R.R. § 701.1 *et seq.*

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Cucchiara v. Dumont, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at \*4 (N.D.N.Y. Apr. 26, 2019) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)). Further, the exhaustion requirement applies even where the prisoner seeks relief not

2020 WL 8474802

available in the administrative grievance process, such as money damages. See Porter, 534 U.S. at 524. "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated." Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218 (2007).

 **\*11** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (internal quotation marks and citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, in Ross v. Blake, the Supreme Court held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ____ U.S. ____ 136 S. Ct. 1850, 1862 (2016). Thus, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. See Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

However, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, ____ U.S. ____, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

There is no genuine dispute that, at all relevant times, DOCCS had in place a well-established three-step administrative procedure for inmate grievances known as the IGP. See Dkt. No. 65-6 at 7-24; Dkt. No. 65-7 at 2-3 ¶¶ 7-9; see also N.Y. COMP. CODES R. & REGS. (7 N.Y.C.R.R.) § 701.5. First, the inmate must file a complaint with an IGP clerk within 21 calendar days of the alleged incident. See 7 N.Y.C.R.R. § 701.5(a)(1). An IGP representative has 16 calendar days to informally resolve the issue. See id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within 16 calendar days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. See id. at § 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. See id. at § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to CORC within seven calendar days after receipt of the superintendent's determination. See id. at § 701.5(d)(1)(i). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty 30 calendar days from the time the appeal was received." Id. at § 701.5(d)(3)(ii).

"Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court." Murray v. Goord, 668 F. Supp. 2d 344, 355-56 (N.D.N.Y. 2009). On a motion for summary judgment, "[t]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action." McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017), report and recommendation adopted, No. 9:16-CV-277 (MAD/DJS), 2018 WL 879270 (N.D.N.Y. Feb. 14, 2018).

### 1. Plaintiff Failed to Exhaust his Administrative Remedies

 **\*12** Defendants have met their burden of establishing that no genuine issue of material fact exists concerning plaintiff's failure to exhaust his administrative remedies with respect

to his First Amendment retaliation claims premised on his filing of the January 11, 2018 PREA complaint against (1) C.O. Withers' and C.O. Payne's for allegedly refusing to transfer him to a single cube bunk between February 22, and April 5, 2018; (2) Lt. Walawender, Sgt. Seymour, and C.O. Corey for allegedly retaliatorily transferring him to SHU on April 5, 2018; and (3) C.O. Stanton and C.O. Cashin for allegedly issuing him retaliatory inmate misbehavior reports on April 5 and 6, 2018. The sworn declarations of Swan and Seguin and accompanying exhibits make clear that neither Cayuga CF IGP nor CORC have any record of plaintiff filing grievances or administrative appeals relating to those claims. See Dkt. No. 84-12 at 8 ¶ 28, 11-12; Dkt. Nos. 84-13 at 9 ¶¶ 33, 37. As Swan explained, review of the records maintained at Cayuga's grievance office demonstrates that "plaintiff did not: (1) file a grievance with respect to those claims, or (2) send any correspondence, including the April 21, 2018 letter attached to [plaintiff's] complaint, to Cayuga's grievance office." Dkt. No. 84-13 at 10 ¶ 37. Further, as Swan declared with respect to plaintiff's purported letter dated April 21, 2018, "[h]ad plaintiff [sent such correspondence], he would have been advised that no grievance was ever received or filed by Cayuga's grievance office with respect to those claims." Id. Therefore, as plaintiff failed to file a grievance concerning these claims, he has failed to exhaust his administrative remedies. See Barnes v. Annucci, No. 9:15-CV-0777 (GLS/DEP), 2019 WL 1387460, at *8 (N.D.N.Y. Mar. 12, 2019) (explaining that, "if a plaintiff fails to follow each of the required three steps of the ... IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA."), report and recommendation adopted, No. 9:15-CV-777 (GLS/DEP), 2019 WL 1385297 (N.D.N.Y. Mar. 27, 2019). In addition, as Seguin's declaration and supporting documentation establishes, aside from Grievance No. CAY-18303-18, plaintiff did not appeal any grievance decision to CORC. See Dkt. No. 84-12 at 7 ¶ 21, 8 ¶ 28, 12; see also Omaro v. Annucci, 68 F. Supp. 3d 359, 364 (W.D.N.Y. 2014) ("It is well-established that an inmate who does not appeal to CORC has failed to exhaust his administrative remedies.").

Furthermore, no exception to the mandatory exhaustion requirement applies here. As the record evidence demonstrates, the inmate grievance process, as set forth in 7 N.Y.C.R.R. § 701 et seq. and DOCCS Directive No. 4040, was available to plaintiff and plaintiff was well-versed in that process as evidenced by his filing 10 grievances between April 2018, and January 1, 2019, while incarcerated at various

DOCCS facilities, including Cayuga CF. See Dkt. No. 84-12 at 11-12. Further, plaintiff's contention that he did not file a grievance against C.O. Withers or C.O. Payne for their alleged retaliatory refusal to place him in a single bunk cube between February 22, and April 5, 2018, because he believed his retaliation claim against those defendants was related to his PREA complaint against C.O. Stanton fails to raise a genuine issue of material fact. See Dkt. No. 84-1 at 364; Cuello v. Lindsay, No. 09-CV-4525 (KAM/MDG), 2011 WL 1134711, at *9 (E.D.N.Y. Mar. 25, 2011) (explaining that ignorance of the law in general is insufficient to excuse exhaustion). Indeed, plaintiff does not claim that his ignorance was due to ambiguous language in the regulations, making the grievance procedure "unavailable." See Hurst v. Mollnow, No. 9:16-CV-1062 (DNH/TWD), 2018 WL 4178226, at *8 (N.D.N.Y. July 20, 2018), report and recommendation adopted, No. 9:16-CV-1062 (DNH/TWD), 2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018); Cf. Williams v. Priatno, 829 F.3d 118, 124 (2d Cir. 2016) (observing that administrative remedies are unavailable if the regulatory scheme providing for appeal is so opaque and confusing that the inmate could not use it (internal quotation marks and citation omitted)). In addition, given the exhibits in this case, plaintiff does not, and cannot claim that any officer prevented him from filing a grievance with respect to the First Amendment claims against C.O. Withers, C.O. Payne, Lt. Walawender, Sgt. Seymour, C.O. Corey, C.O. Stanton, and C.O. Cashin.

Where a prisoner has failed to exhaust available administrative remedies and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile. See Berry v. Kerik, 366 F.3d 85, 88 (2d Cir. 2004); see also Richard v. LeClaire, No. 9:15-CV-00006 (BKS/TWD), 2019 WL 5197041, at *9 (N.D.N.Y. May 6, 2019) ("Because [the p]laintiff's failure to exhaust is at this point incurable, the Court recommends that summary judgment for failure to exhaust administrative remedies be with prejudice."). Here, more than two years have passed since the alleged First Amendment retaliations that took place between February and April 2018, for which plaintiff failed to file any grievances and/or administrative appeals. Consequently, dismissal with prejudice is appropriate as to plaintiff's First Amendment retaliation claims against C.O. Withers, C.O. Payne, Lt. Walawender, Sgt. Seymour, C.O. Corey, C.O. Stanton, and C.O. Cashin. See Berry, 366 F.3d at 88; Richard, 2019 WL 5197041, at *9. Thus, in the alternative to dismissal of plaintiff's First Amendment retaliation claims against C.O. Withers, C.O. Payne, Lt. Walawender, Sgt.

Seymour, C.O. Corey, C.O. Stanton, and C.O. Cashin, as abandoned, it is recommended that these claims be dismissed with prejudice for plaintiff's failure to exhaust available administrative remedies. Moreover, even if the Court declines to dismiss these claims as abandoned or for failure to exhaust available administrative remedies, it is recommended that defendants be granted summary judgment as to these claims, and plaintiff's retaliation claims against Sgt. DeGraff, Sgt. Smith, and Nurse Randolph for the reasons presented below.

### D. Merits of Plaintiff's First Amendment Retaliation Claims

**\*13** In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... *objectively*[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Id. With respect to the third element of the test, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129). "Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks v. Rock, 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at \*18 (N.D.N.Y. Mar. 28, 2014) (citation omitted); see Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at \*3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See Green, 2006 WL 846272, at \*3; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial." (internal quotation marks and citation omitted)). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at \*3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

### 1. Sgt. DeGraff

Plaintiff's First Amendment retaliation claim against Sgt. DeGraff fails. It is undisputed that plaintiff's December 8, 2017 grievance against Sgt. DeGraff constitutes protected activity. See Dkt. No. 84-15 at 24; Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity"). To plausibly allege causation, a plaintiff "must allege facts suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against him." Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotations, brackets, and citations omitted). It is well settled that "[a]llegations of adverse actions alone ... are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct." Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Factors indicating retaliatory

motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. See id. (citing Colon, 58 F.3d at 872-73). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

**\*14** However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted).

Here, although Sgt. DeGraff's December 17, 2017 cell search occurred within a close temporal proximity to plaintiff filing his December 8, 2017 grievance, it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." Flynn v. Ward, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at \*11 (N.D.N.Y. June 7, 2018) (internal quotation marks and citation omitted). Defendants' admissible evidence, including Sgt. DeGraff's sworn declaration and attached exhibits, demonstrate that plaintiff has not established causation between plaintiff's protected activity of filing the December 8, 2017 grievance against Sgt. DeGraff's and Sgt. DeGraff's alleged retaliatory actions of conducting a destructive cell search and issuing plaintiff a misbehavior report. Sgt. DeGraff's sworn declaration states that he had no knowledge

of plaintiff's December 8, 2017 grievance against him until he was interviewed about Grievance No. GNE-9668-17 on January 6, 2018—well after the allegedly destructive cell search was conducted or false misbehavior report was issued. See Dkt. No. 84-2 at 5 ¶ 28; Dkt. No. 84-2 at 24. Plaintiff has not produced any evidence, admissible or otherwise, to refute Sgt. DeGraff's sworn statements. See Henson v. Gagnon, No. 9:13-CV-0590 (GTS/TWD), 2015 WL 9809874, at \*12-13 (N.D.N.Y. Dec. 10, 2015) (granting summary judgment and dismissing a pro se inmate's First Amendment retaliation claim against a correction officer for failure to establish causation where the correction officer submitted a sworn statement that he had no knowledge of the plaintiff's grievance against him at the time he conducted a cell search and issued the plaintiff a misbehavior report, and the plaintiff offered no evidence to refute the correction officer's sworn statement), report and recommendation adopted, No. 9:13-CV-0590 (GTS/TWD), 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016). Further, plaintiff's conclusory assertion that he was "almost sure" that Sgt. DeGraff had knowledge of the December 8, 2017 grievance is insufficient to raise a genuine issue of material fact with respect to Sgt. DeGraff's knowledge. Dkt. No. 84-1 at 82. See Henson, 2015 WL 9809874, at \*12 ("[C]onclusory statements are not sufficient to support causation on retaliation claims; the claims must be supported by specific facts."). Moreover, plaintiff acknowledged during his deposition that Sgt. DeGraff never made any comments or threats to plaintiff for filing the December 8, 2017 grievance, and that between December 8 and 15, 2017, Sgt. DeGraff "did not say anything to" plaintiff. Dkt. No. 84 at 81. Therefore, plaintiff's retaliation claim against Sgt. DeGraff is unsupported by any statements of retaliatory animus by DeGraff. See Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872-73). In addition, "[t]he record ... establishes that the misbehavior report was issued not with retaliatory intent, but simply because contraband ... was in fact recovered from [p]laintiff's cell during that search." LeBron v. Selsky, No. 905-CV-0172 (GTS/DRH), 2010 WL 1235593, at \*5 (N.D.N.Y. Mar. 31, 2010). Indeed, it is undisputed that plaintiff was found guilty of the charges in Sgt. DeGraff's misbehavior report, and that plaintiff's guilty determination was only reversed on administrative appeal because a paper was not correctly filed. See Amen. Compl. at 15; Dkt. No. 84-15 at 25; see also LeBron, 2010 WL 1235593, at \*5 n.9 (rejecting the plaintiff's First Amendment retaliation claim premised on an allegedly false misbehavior report and observing that, although the disciplinary conviction upon which the allegedly false misbehavior report was based was ultimately reversed on appeal, "no admissible record evidence

exist[ed] indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false; rather, the reversal was based merely on a finding that the disciplinary hearing was incomplete.").

**\*15** Finally, defendants have also demonstrated, through admissible evidence, that Sgt. DeGraff ordered the cell search because he personally observed large amounts of contraband in plaintiff's cell, the photographs of which are included as an exhibit to Sgt. DeGraff's sworn declaration— not based on any retaliatory motive. See Dkt. No. 84-2 at ¶ 17, 4 ¶ 18, 9-10. Thus, defendants have established that Sgt. DeGraff would have taken the action complained of regardless of any retaliatory animus he may have held against plaintiff. See Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003); Brooks, 2014 WL 1292232, at \*18 (citation omitted)). In addition, in his uncontroverted sworn declaration, Sgt. DeGraff denies that he or the officers who conducted the December 17, 2017 cell search, which he supervised, destroyed any of plaintiff's property, drew a picture of a penis on plaintiff's shower, or urinated in plaintiff's cell. See Dkt. No. 84-2 at 4 ¶ 20. Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Sgt. DeGraff be dismissed.

### 2. Sgt. Smith and Nurse Randolph

Plaintiff's First Amendment retaliation claim against Sgt. Smith and Nurse Randolph is meritless. Plaintiff's allegations are belied by Nurse Randolph's sworn affidavit, in which she denied having knowledge of plaintiff's January 11, 2018 PREA complaint against C.O. Stanton, or that she and Sgt. Smith retaliated against plaintiff by placing him on suicide watch. See Dkt. No. 84-4 at 3 ¶¶ 14, 15. Indeed, contrary to plaintiff's self-serving allegations that Sgt. Smith threatened him to retract his PREA complaint in front of Nurse Randolph, her uncontroverted sworn declaration establishes that she "was not informed of [p]laintiff's PREA complaint against C.O. Stanton prior to [her] medical evaluation." Id. at 3 ¶ 14. In addition, Nurse Randolph's sworn declaration establishes that she recommended placing plaintiff on suicide watch based on her medical judgment and because she "determined that [plaintiff's] comments suggested that he could potentially harm himself or others," not for any retaliatory motive. Id. at ¶ 8. Plaintiff's retaliation claim is further undercut by Sgt. Smith's uncontroverted sworn declaration in which he states that, "[c]ontrary to

[p]laintiff's claim," he interviewed plaintiff on January 17, 2018, regarding plaintiff's PREA complaints against Sgt. DeGraff and C.O. Stanton "in the Disciplinary Lieutenant's office at Cayuga [CF]," and that "[he] was the only person in the room with [plaintiff] during the interview." Dkt. No. 84-3 at ¶¶ 5, 6. Sgt. Smith also denies threatening plaintiff to drop his PREA complaints and states that, "[a]t some point during the interview, plaintiff told [him] that he was in fear for his life and he was going to hurt someone if he went back to his down." Id. at ¶ 12. Based on plaintiff's comments, Sgt. Smith escorted him to the infirmary, where Nurse Randolph recommended placing plaintiff on suicide watch after he reiterated his concerns for his life and his potential to harm others. See id. at ¶¶ 15, 16. Thus, defendants have established that plaintiff's placement on suicide watch did not constitute adverse action under the circumstances, and that this action would have been taken regardless of any retaliatory animus they may have held against him. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at \*18; see also Mateo v. Fischer, 682 F. Supp. 2d 423, 434-35 (S.D.N.Y. 2010) (dismissing the plaintiff's First Amendment retaliation claim based on his transfer to the Office of Mental Health ("OMH") where the Court concluded that the plaintiff's statements "could lead a reasonable person to believe that a referral to OMH was justified."). Accordingly, it is recommended that plaintiff's retaliation claims against Sgt. Smith and Nurse Randolph be dismissed.

### 3. C.O. Withers and C.O. Payne

Plaintiff's claim that C.O. Withers and C.O. Payne retaliated against him in violation of his First Amendment rights for filing his PREA complaint against C.O. Stanton by refusing to transfer him to a single bunk cube lacks merit and is belied by defendants' admissible evidence. To the extent that plaintiff contends that C.O. Withers and C.O. Payne violated internal Cayuga CF policy or regulations by transferring inmates with less seniority to single bunk cubes before him in the C-2 dorm, plaintiff's claim fails because it is well settled that "[a] section 1983 claim is not the appropriate forum in which to seek review of a violation of a prison regulation." McAllister v. Call, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at \*11 (N.D.N.Y. Oct. 29, 2014) (internal quotation marks and citation omitted); see Ahlers v. Nowicki, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at \*4 (N.D.N.Y. Mar.18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983;

only rights secured by the Constitution and federal law are actionable under § 1983.").

 **\*16** Next, the record is bereft of facts to support a causal nexus between plaintiff's PREA complaint against C.O. Stanton and C.O. Withers' and C.O. Payne's alleged refusal to place him in a single bunk cube. The Amended Complaint fails to allege specific facts that these defendants had knowledge of his PREA complaint against C.O. Stanton. See Amen. Compl. at 23. Rather, C.O. Withers' and C.O. Payne's uncontroverted sown declarations state that they did not have knowledge of plaintiff's PREA complaint against C.O. Stanton and never had any conversations about either her or plaintiff. See Dkt. No. 84-6 at 3 ¶ 22; Dkt. No. 84-7 at 5 ¶¶ 30-31. In fact, C.O. Withers and C.O. Payne did not even work the same shift and had only rare interactions with one another. See Dkt. No. 84-6 at 3 ¶ 20; Dkt. No. 84-7 at 3 ¶¶ 13, 15-17. In addition, C.O. Withers did not know of C.O. Stanton before becoming involved in this lawsuit, see Dkt. No. 84-6 at 3 ¶ 22, and C.O. Payne had only rare interactions with C.O. Stanton as they did not work the same shift. See Dkt. No. 84-7 at 3 ¶ 13. Thus, plaintiff's conclusory assertion that he assumed that these defendants knew of his PREA complaint "because [the C.O.] all talk among themselves," Dkt. No. 84-1 at 336, is insufficient establish causation between his protected conduct and the alleged adverse action. See Baskerville, 224 F. Supp. 2d at 732; See Henson, 2015 WL 9809874, at \*12-13.

In any event, C.O. Wither's and C.O. Payne's uncontested sworn declarations establish prima facie that no adverse action was taken against plaintiff insofar as he was not transferred to a single bunk cube between February 22, and April 5, 2018. C.O. Withers and C.O. Payne both declare that they did not intentionally prevent plaintiff's transfer and explain that, to the extent that plaintiff was not moved to a single bunk cube between February 22, and April 5, 2018, it was because it was not yet his turn to move under Cayuga CF's procedure for such transfers. See Dkt. No. 84-6 at 3 ¶ 19; Dkt. No. 84-7 at ¶ 29. Thus, even if C.O. Withers and/or C.O. Payne held retaliatory animus against plaintiff, which plaintiff has not demonstrated, defendants have established that plaintiff still would not have been transferred to a single bed cube during that period. Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at \*18. Consequently, it is recommended that plaintiff's First Amendment retaliation claims against C.O. Withers and C.O. Payne be dismissed.

### 4. Lt. Walawender, Sgt. Seymour, and C.O. Corey

Plaintiff's First Amendment retaliation claim against Lt. Walawender, Sgt. Seymour, and C.O. Corey also lacks merit and is belied by defendants' uncontroverted admissible evidence. Rather than placing plaintiff in SHU on April 5, 2018 in retaliation for plaintiff's PREA complaint against C.O. Stanton—plaintiff's own evidence, namely C.O. Stanton's April 5, 2018 misbehavior report—establishes that plaintiff was placed in SHU for creating a disturbance and failing to comply with a direct order in violation of DOCCS rules. See Dkt. No. 12-2 at 68. Indeed, Lt. Walawender's and Sgt. Seymour's uncontested sworn declarations corroborate C.O. Stanton's misbehavior report. See Dkt. No. 84-8 at 2 ¶¶ 6-13, 3 ¶¶ 16-19; Dkt. No. 84-9 at 2 ¶¶ 9-11. Moreover, defendants' evidence establishes that no causal nexus exists between his placement in SHU on April 5, 2018, and his PREA complaint against C.O. Stanton. As Lt. Walawender and Sgt. Seymour declare, neither defendant knew of plaintiff's PREA complaint prior to April 5, 2018. See Dkt. No. 84-8 at 4 ¶ 20; Dkt. No. 84-9 at 2 ¶ 11; Henson, 2015 WL 9809874, at \*12-13. In addition, plaintiff testified at his deposition that he "kn[e]w for a fact that [Sgt. Seymour] didn't know" about plaintiff's PREA complaint against C.O. Stanton before plaintiff showed him the letter from Effman on April 5, 2018, see Dkt. No. 84-1 at 403; that Lt. Walawender, Sgt. Seymour, and C.O. Corey, had no basis to retaliate against him; and that plaintiff had not even seen any of these defendants prior to April 5, 2018. See id. at 402, 404-05. Thus, it is recommended that plaintiff's First Amendment retaliation claims against Lt. Walawender, Sgt. Seymour, and C.O. Corey be dismissed.

### 5. C.O. Stanton and C.O. Cashin

 **\*17** As discussed above in subsection III.D.4, supra, plaintiff's First Amendment retaliation claim against C.O. Stanton for purportedly filing a false misbehavior report is belied by the record evidence, including the sworn declarations of Lt. Walawender and Sgt. Seymour, which corroborate all of the charges contained in her April 5, 2018 misbehavior report. Indeed, regardless of any retaliatory animus C.O. Stanton may have held against plaintiff because of his PREA complaint against her, admissible evidence establishes that she issued plaintiff the April 5, 2018 misbehavior report for the non-retaliatory and legitimate reasons of plaintiff's failure to comply with a direct order

and creating a disturbance in violation of DOCCS rules. See Dkt. No. 84-8 at 2 ¶¶ 6-13, 3 ¶¶ 16-19; Dkt. No. 84-9 at 2 ¶¶ 9-11. Moreover, C.O. Stanton has attached a copy of the disciplinary hearing disposition finding plaintiff guilty of both charges, see Dkt. No. 84-11 at 11, which the Cayuga CF Superintendent later affirmed on administrative appeal. See id. at 17. Thus, plaintiff was found to have "committed ... all[ ] of the prohibited conducted charged in the misbehavior report." Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998). Accordingly, defendants have met their burden of establishing that C.O. Stanton's misbehavior report would have been issued regardless of any retaliatory animus she held against plaintiff, which is sufficient to avoid liability on plaintiff's retaliation claim. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18. Plaintiff's conclusory assertions to the contrary are insufficient to create a genuine issue of fact to defeat defendants' prima facie entitlement to summary judgment on his First Amendment claim against C.O. Stanton. See Kerzer, 156 F.3d at 400. Similarly, defendants have established that C.O. Cashin issued his April 6, 2018 misbehavior report against plaintiff for legitimate reasons regardless of any retaliatory animus he may have held against plaintiff through the admissible evidence of the disciplinary hearing disposition finding plaintiff guilty of all three charges contained therein. See Dkt. No. 84-5 at 9; Hynes, 143 F.3d at 657; see Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18. Based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claims against C.O. Stanton and C.O. Cashin be dismissed.

In sum, it is recommended that plaintiff's First Amendment retaliation claims be dismissed as abandoned for plaintiff's failure respond to defendants' motion. Alternatively, it is recommended that plaintiff's First Amendment retaliation claims be dismissed for failure to exhaust administrative remedies. In the event that the Court disagrees with the foregoing recommendations, it is recommended that plaintiff's defendants' motion for summary judgment in this regard be granted and plaintiff's First Amendment retaliation claims be dismissed on the merits. In light of the foregoing, the undersigned declines to reach defendants' additional alternative arguments.

**IV. Conclusion**

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 84) be **GRANTED** to the extent that it seeks dismissal of plaintiff's First Amendment retaliation claims against defendants Lt. Walawender, Sgt. DeGraff, Sgt. Smith, Sgt. Seymour, C.O. Stanton, C.O. Cashin, C.O. Corey, C.O. Payne, C.O. Withers, and Nurse Randolph, and that those claims be **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED**, that that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72. [10]

[10]     If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2020 WL 8474802

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 235946
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sheldon COOPER, Jr., Plaintiff,

v.

D. DEGRAFF, Sgt. Greene Corr. Fac.; J. Stanton, C.O., Cayuga Corr. Fac.; K. Cashin, C.O., Cayuga Corr. Fac.; K. Corey, C.O., Cayuga Corr. Fac.; Sgt. Smith, Sgt., Cayuga Corr. Fac., f/k/a as John Doe #2; Sgt. Seymour, Sgt., Cayuga Corr. Fac., f/k/a as John Doe #4; C.O. Payne, C.O., Cayuga Corr. Fac., f/k/a as John Doe #5; C.O. Withers, C.O. Cayuga Corr. Fac., f/k/ a as John Doe #1; Kim Randolph, Nurse, Cayuga Corr. Fac., f/k/a as John Doe #2; and Daniel P. Walawender, Watch Commander, Cayuga Corr. Fac., Defendants.

9:18-CV-0762 (GTS/CFH)
|
Signed 01/25/2021

**Attorneys and Law Firms**

SHELDON COOPER, JR., 16-A-5117, Plaintiff, Pro Se, Downstate Correctional Facility, Box F, Fishkill, NY 12524.

HON. LETITIA JAMES, Attorney General for the State of New York, OF COUNSEL: KONSTANDINOS D. LERIS, ESQ., Assistant Attorney General, Counsel for Defendants, The Capitol, Albany, New York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Sheldon Cooper, Jr. ("Plaintiff") against the above ten employees of the New York State Department of Corrections and Community Supervision ("Defendants") pursuant to 42 U.S.C. § 1983 and the First and Eighth Amendments of the United States Constitution, are (1) Defendants' motion for summary judgment and (2) United States Magistrate Judge Christian F. Hummel's Report-Recommendation recommending that Defendants' motion be granted with respect to Plaintiff's First Amendment retaliation claims asserted against Defendants Walawender, DeGraff, Smith, Seymour, Stanton, Cashin, Corey, Payne, Withers, and Randolph. (Dkt. Nos. 84, 93.) Specifically,

Magistrate Judge Hummel recommended that Plaintiff's First Amendment retaliation claims asserted against those Defendants be dismissed with prejudice on three alternative grounds: (a) abandonment of the claims due to Plaintiff's failure to respond to Defendants' motion; (b) Plaintiff's failure to exhaust his administrative remedies related to all First Amendment retaliation claims except the one against Defendant DeGraff; and (c) the absence of a genuine issue of material fact as to the merits of Plaintiff's First Amendment retaliation claims. (Dkt. No. 93.) Neither party has filed an objection to the Report-Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.)

After carefully reviewing the relevant papers herein, including Magistrate Judge Hummel's thorough Report-Recommendation, the Court can find no clear-error in the Report-Recommendation. [1] Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein, Defendants' motion for summary judgment is granted with respect to Plaintiff's First Amendment retaliation claims asserted against Defendants Walawender, DeGraff, Smith, Seymour, Stanton, Cashin, Corey, Payne, Withers, and Randolph, and Plaintiff's First Amendment retaliation claims asserted against Defendants Walawender, DeGraff, Smith, Seymour, Stanton, Cashin, Corey, Payne, Withers, and Randolph are dismissed with prejudice.

[1]    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

**\*2** **ACCORDINGLY**, it is

2021 WL 235946

**ORDERED** that Magistrate Judge Hummel's Report-Recommendation (Dkt. No. 93) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 84) is **GRANTED** with respect to Plaintiff's First Amendment retaliation claims asserted against Defendants Walawender, DeGraff, Smith, Seymour, Stanton, Cashin, Corey, Payne, Withers, and Randolph; and it is further

**ORDERED** that Plaintiff's First Amendment retaliation claims asserted against Defendants Walawender, DeGraff, Smith, Seymour, Stanton, Cashin, Corey, Payne, Withers, and Randolph are **DISMISSED with prejudice** and it is further

**ORDERED** that Plaintiff's Eighth Amendment claims for use of excessive force and failure to intervene against Defendants Smith and Cashin **SURVIVE** Defendants' motion. [2]

[2]     Although Defendants initially argued in their motion that these Eighth Amendment claims should be dismissed for failure to exhaust all available administrative remedies because Plaintiff

had not received a decision from the Central Office Review Committee ("CORC"), Defendants subsequently explicitly abandoned this argument based on the Second Circuit's intervening decision in *Hayes v. Dahlke*, 976 F.3d 259 (2020), in which Second Circuit held that, "because DOCCS Inmate Grievance Procedure imposes a mandatory deadline for the CORC to respond, an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations." *Hayes*, 976 F.3d at 270. Thus, as Magistrate Judge Hummel found, Defendants' failure to make any argument about the merits of the Eighth Amendment claims against Defendants Smith and Cashin means that Defendants' motion does not provide any basis for this Court to review the merits of those claims at this time. (Dkt. No. 93, at 9 n.6 [Report-Recommendation filed Nov. 9, 2020].)

**All Citations**

Slip Copy, 2021 WL 235946

---

2021 WL 4312392
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

No. 9:18-CV-0390 (MAD/CFH)
|
Signed 05/27/2021

**Attorneys and Law Firms**

TOWAUN COLEMAN, Plaintiff pro se, 07-A-2215, Southport Correctional Facility, P.O. Box 2000, Pine City, New York 14871.

OF COUNSEL: ERIK BOULE PINSONNAULT, ESQ., Assistant Attorney General, HON. LETITIA JAMES, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

**\*1**  Plaintiff pro se Towaun Coleman ("Coleman" or "Plaintiff"), who was, at all relevant times, in the custody of Clinton Correctional Facility ("Clinton C.F."), brings this action pursuant to 42 U.S.C. § 1983 against Defendants, former Superintendent of Clinton C.F. Steven Racette ("Racette"), Lieutenant Durkin ("Durkin"), Sergeant Hutti ("Hutti"), Sergeant King ("King"), Correctional Officer John Reyell ("Reyell"), Correctional Officer Wyatt ("Wyatt"), Correctional Officer S. Dubrey ("Dubrey"), Correctional Officer Spinner ("Spinner"), Correctional Officer J. Tyler ("Tyler"), Correctional Officer Coryea ("Coryea"), and Correctional Officer Demers ("Demers"), for violations of his constitutional rights under the First and Eighth Amendments. See Dkt. No. 85 ("Sec. Am. Compl.").

Presently before the Court is Defendants' motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 91. Coleman opposed Defendants' motion. [2] See Dkt. No. 98. For the following reasons, it is recommended that Defendants' motion for partial summary judgment be granted in part and denied in part.

[2]    Defendants did not submit a reply.

**I. BACKGROUND**

In support of the motion, Defendants filed a Statement of Material Facts. [3] See Dkt. No. 91-6. The facts recited are for the relevant time period as referenced in the Second Amended Complaint and are related herein in the light most favorable to Coleman as the nonmoving party. See subsection II(A) infra.

[3]    At the filing date of Defendants' motion, Local Rule 7.1(a)(3) provided:

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.

The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching

numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. <u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u> The non-movant's response may also set forth a short and concise statement of any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs, followed by a specific citation to the record where the fact is established.

Effective January 1, 2021, the rule number was changed to Local Rule 56.1.

Defendants filed a Statement of Material Facts. Dkt. No. 91-6. Coleman provided a Statement of Material Facts, but did not respond to Defendants' Statement of Material Facts. See Dkt. No. 98. The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." [Prestopnik v. Whelan, 253 F.Supp. 2d 369, 371 (N.D.N.Y. 2003)](). Although the Local Rules provide that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," <u>pro se</u> plaintiffs are afforded special solicitude in this District and within the Second Circuit. N.D.N.Y. L.R. 7.1(a)(3); <u>see</u> subsection II.A. <u>Supra</u>.

### A. Facts [4]

[4]   The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/ documents in the context of the within motion. See [Daniel v. Unum Provident Corp., 261 Fed. App'x 316, 319 (2d Cir. 2008)]() ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party"). In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities

resolved in favor of the non-moving party. See [Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)]().

**\*2**  On June 6, 2015, staff at Clinton C.F. discovered that two inmates, Richard Matt and David Sweat, had escaped from the facility. Dkt. No. 91-4 at ¶ 5. As a result, the entire facility was placed on lockdown immediately. Dkt. No. 91-3 at ¶ 4. At that time, Racette was the Superintendent at Clinton C.F. Dkt. No. 91-4 at ¶ 1.

On June 8, 2015, staff at Clinton C.F. conducted cell frisks throughout the facility, including Coleman's housing location, Upper H Block, 12 Company. [5] Dkt. No. 91-5 at 35-36. [6] At the relevant time, Coleman was housed in Cell 15. Dkt. No. 91-2 at ¶ 6. Between 8:00 A.M. and 9:00 A.M., Clinton C.F. staff began entering Upper H Block. Sec. Am. Compl. at ¶ 26. Durkin supervised the searches that were conducted in the Upper H Block on June 8, 2015. Dkt. No. 91-3 at ¶¶ 7, 10.

[5]   A cell frisk is a search of the inmate's cell. Dkt. No. 91-2 at ¶ 5.

[6]   Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

On June 25, 2015, Coleman filed a grievance (CL-67063-15) related to an assault that allegedly occurred on June 8, 2015, in the Upper H Block, 12 Company. Dkt. No. 91-3 at ¶ 8. In his grievance, Coleman identified Defendants Durkin, Hutti, King, Reyell, Dubrey, Spinner, Tyler, and Wyatt as "individuals that assaulted [him] or [ ] witnessed the assault." Dkt. No. 91-3 at 9. In March 2016, Coleman was transferred out of Clinton C.F., but returned in October 2018. [7] Dkt. No. 25; Dkt. No. 98-2 at 25.

[7]   In March 2016, Coleman was transferred from Clinton C.F. to Green Haven C.F. See <u>Coleman v. Racette</u>, No. 9:15-CV-0040, Dkt. No. 44 (N.D.N.Y. filed Mar. 31, 2016).

The remaining record contains few undisputed facts. Coleman and Defendants disagree on many of the events that transpired on June 8, 2015 and provide conflicting accounts of the circumstances surrounding the incidents.

### 1. Plaintiff's Version of Events

Coleman claims that Coryea and Demers came to his cell and directed him to step out for a pat frisk. Dkt. No. 91-5 at 14-18; Sec. Am. Compl. at ¶¶ 27-28. After the pat frisk, Coryea and Demers directed Coleman to "turn around" so that he could observe the search of his cell. Id. Coleman witnessed Coryea reading his phone book while Demers read through Coleman's legal materials; including his "current Federal claim." [8] Dkt. No. 91-5 at 18-20. Coleman overheard Coryea and Demers whispering, and Demers asked Coleman if he was a "rat" or "snitch," meaning a confidential informant. Id. at 20.

[8]    The claim involved a different correctional officer at Clinton C.F. Sec. Am. Compl. at ¶ 30.

Coryea and Demers began "throwing" Coleman's property onto the floor and out of his cell. Dkt. No. 91-5 at 22-23. At that time, Coleman saw Hutti and Durkin walking toward his cell. Id. at 24. Coleman "addressed" Hutti and "inquired" about the items that were being discarded from his cell. Id. at 24-25. While Coleman was speaking with Hutti about his personal property, Durkin asked Coryea and Demers "what's taking [you] so long." Id. at 26. One of the officers responded, "he has too much shit." Dkt. No. 91-5 at 27. Durkin then "yelled" at Coleman, "if you don't throw this shit away, I'm going to throw it away for you." Id.; Sec. Am. Compl. at ¶¶ 35-36. Coleman responded that he "had the amount of property I'm entitled to have by the State of New York. I have no more or no less." Dkt. No. 91-5 at 27. Durkin continued, "I don't care how much property you're entitled to have. If you don't get rid of this shit, we will." Id.

*3    At that time, Coryea stepped out of Coleman's cell and told Durkin, "he's been running his mouth all day" and approached Coleman. Sec. Am. Compl. at ¶ 37; Dkt. No. 91-5 at 27-28. Coleman alleges that Coryea "struck him" in the face, causing him to lose consciousness. Dkt. No. 91-5 at 28-31. When Coleman awoke, he was handcuffed and carried to the front of the housing block by "a number of Correctional Officers." Sec. Am. Compl. at ¶ 38. Coleman was "savagely beaten for what appeared to be a half an hour" by a number of individuals Id. at ¶ 39; Dkt. No. 91-5 at 30-36. Coleman heard someone say, "pick him up," and, as he was brought to his feet, Coryea "grabbed a handfull [sic] of Plaintiff's hair, lifted Plaintiff's head from off the floor," "spit in Plaintiff's face" and punched him "one last time with a gloved fist" while yelling racial slurs. Sec. Am. Compl. at ¶ 40.

### 2. Defendants' Version of Events

In support of the motion, Defendants proffer declarations from Racette, Durkin, and Demers. Racette and Durkin claim that Racette was not present during the frisk of Coleman's cell on June 8, 2015. Dkt. No. 91-4 at ¶ 13; Dkt. No. 91-3 at ¶ 5. Racette also asserts that he was not responsible for ordering cell frisks and/or searches throughout the facility. Dkt. No. 91-4 at ¶ 13.

Durkin, who supervised the search of Upper H Block, did not observe any officer using excessive force on Plaintiff. Dkt. No. 91-3 at ¶¶ 7, 10-11. Demers claims that he was assigned to frisk cell UH 12/35 ("Cell 35"), which was "20 cells away from Plaintiff's cell." Dkt. No. 91-2 at ¶¶ 7-8. Demers asserts that he did not frisk Coleman's cell, he did not read Plaintiff's legal papers or phone book, and did not use force on Plaintiff. Id. at ¶¶ 7, 10-11. Demers also states that he did not observe any other staff member use force on Plaintiff on June 8, 2015. Id. at ¶ 12.

### B. Procedural History

In April 2018, Coleman commenced the within action. Dkt. No. 1. In December 2018, Coleman filed an Amended Complaint. Dkt. No. 31. Upon review of the Amended Complaint, the Court found that the following claims survived review and required a response: (1) First Amendment retaliation claims against Defendants Durkin, John Doe #1 and Wood; (2) Eighth Amendment excessive force and failure-to-intervene claims against Defendants John Doe #1-4, Durkin, Hutti, King, Reyell, Wyatt, Dubrey, Tyler, Spinner, and Racette; and state law claims against Defendants John Doe #1-4, Durkin, Hutti, King, Reyell, Wyatt, Dubrey, Tyler, Spinner, and Racette. See Dkt. No. 33. Defendants filed Answers to the Amended Complaint (Dkt. Nos. 36, 68) and, in April 2019, Defendants filed a partial motion to dismiss. Dkt. No. 44. In a Memorandum-Decision and Order filed in February 2020, the Court dismissed several claims, including all claims against Wood. Dkt. No. 54.

On June 24, 2020, Coleman field a motion to amend the Amended Complaint. Dkt. No. 77. On August 11, 2020, Coleman appeared at a deposition. Dkt. No. 91-5 at 4. On August 28, 2020, the Court granted Coleman's motion, accepted the Second Amended Complaint (Dkt. No. 85) and ordered Defendants to respond to the

2021 WL 4312392

following: (1) First Amendment retaliation claims against newly-added defendants Coryea and Demers; (2) Eighth Amendment excessive force and failure to intervene claims against defendants Coryea, Demers, Durkin, Hutti, King, Reyell, Wyatt, Tyler, Dubrey, and Spinner; and (3) Eighth Amendment claims based on supervisory liability against Racette. Dkt. No. 84. On October 13, 2020, Defendants filed an Answer to the Second Amended Complaint. Dkt. No. 88

On October 27, 2020, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking partial summary judgment: dismissal of all claims against Racette and Demers for lack of personal involvement and dismissal of First Amendment claims against Demers and Coryea. See generally Dkt. No. 91. Coleman opposed the motion. [9] Dkt. No. 98.

[9]     In response to the motion for summary judgment, Coleman submitted a Memorandum of Law. Dkt. No. 98-1. In the submission, Coleman introduces arguments related to the denial of medical attention. See id. at 16. The Second Amended Complaint does not include a claim related to deliberate medical indifference. See generally Dkt. No. 85. Thus, this issue is not properly before this Court and will not be considered.

## II. DISCUSSION

### A. Legal Standard

**\*4** A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56 (c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 317, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Eighth Amendment Claims

"The Eighth Amendment requires prison officials to take 'reasonable measures to guarantee the safety of inmates' in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 8 (1992) (internal quotation marks and citation omitted); Blyden, 186 F.3d at 262.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (internal quotation marks and citations

2021 WL 4312392

omitted) Thus, the key inquiry for an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[ ] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (observing that the Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.") (internal quotation marks and citation omitted). In assessing whether defendants acted maliciously or wantonly, the Second Circuit has set forth five factors to consider:

> **\*5** the extent of the injury and the mental state of the defendant[;] … the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Similarly, "a state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." Morales v. New York State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988). To state a claim for failure to protect under the Eighth Amendment, a plaintiff must demonstrate that (1) he or she was "incarcerated under conditions posing a substantial risk of serious harm," the objective prong; and (2) prison officials acted with deliberate indifference to that risk and the inmate's safety, the subjective prong. Farmer, 511 U.S. at 834.

As to the objective prong, the deprivation must be "sufficiently serious," Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation marks omitted)), and "contemplate[ ] 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Id. (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990)). "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation

or a request by plaintiff to be separated from the attacker." Gilmore v. Rivera, No. 13-CV-6955, 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014); see Rivers v. Spinnella, No. 9:09-CV-309 (FJS/RFT), 2010 WL 6428486, at *5 (N.D.N.Y. Nov. 4, 2010) (granting the defendants' motion for summary judgment where "there [were] no specific facts, nor even allegations, that indicate the [the d]efendant was aware that [the p]laintiff faced a substantial risk of serious harm until the altercation had already started."). [10]

[10]    Copies of the unpublished decisions cited within this Report-Recommendation & Order have been provided to plaintiff pro se.

As to the subjective prong, the plaintiff must demonstrate that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. See Farmer, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The plaintiff must "show that the defendants actually inferred from that disclosure that a substantial risk of serious harm existed." Murray v. Goord, 668 F. Supp.2d 344, 359 (N.D.N.Y. 2009). A prison official's negligence does not amount to a constitutional violation. See Hathaway, 37 F.3d at 66.

### 1. Claims Against Racette

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); Wright, 21 F.3d at 501. Thus, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Before deciding Ashcroft v. Iqbal, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or

appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

 **\*6** In Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability. Consistent with other circuits, the Court concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " Id. at 618. Therefore, to avoid summary judgment, the plaintiff had to establish that the defendant violated the Eighth Amendment by her "own conduct, not by reason of [her] supervision of others who committed the violation" and could not "rely on a separate test of liability specific to supervisors." Id. at 619.

It is undisputed that Racette was not present during the search of Coleman's cell in the Upper H Block on June 8, 2015. Dkt. No. 91-3 at ¶ 5; Dkt. No. 91-4 at ¶ 13. Racette asserts, and Coleman does not dispute, that he did not see any staff use excessive force on any inmates between June 6, 2015, and June 28, 2015. Dkt. No. 91-4 at ¶ 12. As Coleman does not provide evidence that Racette was present at the time of the alleged assault, the Eighth Amendment excessive force claim against Racette must be dismissed. See Tangreti, 983 F.3d at 619; see also Celestin v. Angeletta, No. 19 CV 1887, 2021 WL 1062344, at *4 (S.D.N.Y. Mar. 19, 2021) (dismissing the plaintiff's excessive force claim against the captain because the plaintiff "does not connect Captain [ ] to the purported assault"); Forbes v. Doe, No. 6:18-CV-06700, 2021 WL 810020, at *3 (W.D.N.Y. Mar. 3, 2021) (dismissing claims against employee of Monroe County Sheriff's Department because the plaintiff failed to allege that employee was involved in searches or the use of excessive force against the plaintiff).

With respect to the failure-to-protect claim, Coleman alleges that Racette was personally involved in the constitutional violations because he was aware of Coleman's "many complaints of threats and harassment from the staff at Clinton." See Dkt. No. 98-1 at 9, 2, 12, 17. As support,

Coleman relies upon a DOCCS' computer-generated list of grievances entitled "Closed Cases." Dkt. No. 98-2 at 3. The list includes four grievances: one he filed at Auburn Correctional Facility in December 2010 and three he filed at Clinton C.F. in April 2015, July 2015, and March 2016. Dkt. No. 98-2. The July 2015 grievance relates to the events that transpired on June 8, 2015, and the March 2016 grievance was relates to medical treatment. Id. The April 2015 grievance involves verbal harassment by an unidentified "C.O. at Clinton C.F. Id. The grievance was "reviewed by" Chris M. Vanbergen and "authorized" by Jeffrey A. Hale. Id. The named defendants, including Racette, are not referenced anywhere in the document. Id.

Coleman also contends that Racette was aware of his prior complaints related to harassment and threats at Clinton C.F. because Racette was a defendant in his "prior 1983 claim." Dkt. No. 98-1 at 12-13. Specifically, Coleman refers to a civil rights complaint he filed in this District in January 2015. See Coleman v. Racette, et al., No. 9:15-CV-0040 (TJM/ATB), Dkt. No. 1 (N.D.N.Y. filed on Jan. 14, 2015) ("Coleman I"). In Coleman I, Plaintiff asserted First and Eighth Amendment claims against Racette and Clinton Correctional Officer L. Nolan related to an alleged excessive force incident that he alleged occurred in December 2014. Id., Dkt. Nos. 19, 21. In lieu of an answer, the defendants filed a motion to dismiss. Id., Dkt. No. 28. On January 4, 2016, the Court dismissed all claims against Racette for failure to plead personal involvement. [11] Coleman I, Dkt. No. 38.

[11]    On November 27, 2018, Coleman I was resolved with a Stipulation and Order of Discontinuance. See Coleman I, Dkt. No. 114.

 **\*7** Upon review of the record in the instant action, including the list of grievances, and, taking judicial notice of Coleman I, the Court addresses the objective and subjective standards of an Eighth Amendment failure-to-protect claim. As to the first prong – whether plaintiff established that he was incarcerated under conditions posing a substantial risk of serious harm – Coleman provides proof of general allegations of prior verbal harassment and accusations of excessive force against a Clinton C.F. officer not involved with the June 2015 incident. Coleman did not file any grievances or complaints against the officers purportedly involved in the June 2015 incident. Moreover, Coleman does not allege that he had prior altercations or any kind of history with the named defendants. In fact, Coleman testified that he never saw Coryea or Demers before June 8, 2015. Dkt. No. 91-5 at

14. As such, the evidence presented does not support the conclusion that Coleman faced a substantial risk of serious harm from the named defendants.

As to the second prong – whether plaintiff established that Racette acted with the necessary state of mind – the Court notes that Eighth Amendment failure to protect claims cannot be based on a defendant's knowledge of a "general risk" of harm to an inmate. See, e.g., Hogan v. Fischer, No. 09-CV-6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (internal citation omitted) (holding that the failure to protect the plaintiff from a general threat of harm is insufficient to raise a failure-to-protect claim under the Eighth Amendment) vacated in part on other grounds 738 F.3d 509 (2d. Cir. 2013). Here, nothing in the record suggests that Racette acted with deliberate indifference. Even assuming that Racette was aware of Coleman's April 2015 grievance and Coleman I, prior to June 8, 2015, [12] the complaints set forth therein did not involve the named defendants, physical assault, or threats of physical violence. Thus, Coleman has failed to show that Racette knew that Coleman was under the threat of harm and had the opportunity to prevent such harm. See Farmer, 511 U.S. at 829.

[12]     Racette was not served with the summons and amended complaint in Coleman I until July 28, 2015, after the alleged use of force on June 8, 2015. Coleman I, Dkt. Nos. 23, 26

As Coleman has failed to show that he faced a "substantial risk of harm" from the named defendants, and that Racette failed to protect Coleman from future harm by the defendants, it is recommended that Defendants' partial motion for summary judgment and dismissal of the failure-to-protect claims against Racette be granted. See, e.g., Boyd v. Petralis, No. 6:16-CV-06286, 2021 WL 1100395, at *6 (W.D.N.Y. Mar. 23, 2021) (dismissing failure-to-protect claims based upon Tangreti and lack of evidence that the defendants were aware of the plaintiff's fear of an attack or any prior complaints against the deputies until after the incident); see also Brown v. Annucci, No. 19 CV 9048, 2021 WL 860189, at *5 (S.D.N.Y. Mar. 8, 2021) ("Aside from a general reference to records of misusing force, plaintiff pleads no facts suggesting [defendants] consciously or recklessly disregarded a serious risk of harm certain correction officers allegedly posed to plaintiff.") (internal quotation marks and citations omitted).

Accordingly, it is recommended that the Eighth Amendment claims against Racette be dismissed and that Defendants' motion for summary judgment be granted.

### 2. Claim Against Demers

Defendants argue that the Eighth Amendment claim against Demers must be dismissed for lack of personal involvement because Coleman cannot recollect who was involved in the alleged excessive force incident and did not identify Demers as one of the attackers. Dkt. No 91-1 at 17-18.

"A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." Munoz v. Martinez, No. 03 CIV. 0828, 2005 WL 1355094, at *4 (S.D.N.Y. June 8, 2005) (citation omitted); see Alexander v. Racette, 9:17-CV-309 (BKS/CFH), 2020 WL 5802273, at *11 (holding that, the fact that the plaintiff could not identify with certainty who was involved in the assault was not fatal where the plaintiff presented evidence that his assaulter was wearing a CIU jacket without a name tag but that he had a bag over his head for much of the assault, combined with evidence that a defendant may have worn his CIU jacket on the day in question "raise[d] a triable issue of fact as to whether [the defendant] was personally involved" was the individual involved in questioning the plaintiff and in the assault). "This is especially true where the acts complained of by the plaintiff, if true, (e.g., mace to the eyes, standing on back, 'mushing' face into the ground) are likely to have prevented plaintiff from identifying which of three defendant officers specifically engaged in the bad acts." Shankle v. Andreone, No. 06-CV-487, 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009).

*8  Here, Coleman testified that, at the time of the cell search, he was not able to identify the officers because they were not wearing name tags. See Dkt. No. 91-5 at 14, 20. With assistance, Coleman was later able to identify the officers as Coryea and Demers. Id. at 20-22; Dkt. No. 98-1 at 19-20. Coleman further testified that, although he saw Coryea hit him, he could not identify all of the officers involved in the assault because he was "stomped on" while he was "face down" on his stomach and "in and out of consciousness." Dkt. No. 91-5 at 33-35. Although Coleman cannot affirmatively state which officers participated in the physical assault, he testified that Demers was "present for the incident on June 8[th] when 2015, when [he] was punched and kicked and stomped [on.]" Id. at 33, 38, 40-42.

Conversely, Demers avers that he was assigned to search Cell 35, twenty cells away from Coleman's cell and that he did not "strike Plaintiff or otherwise use force" on Coleman. Dkt. No. 91-2 at ¶¶ 8, 11. Demers provided a Cell Frisk Sheet which, he contends, supports his position that he searched Cell 35 and Coryea searched Cell 15. [13] Dkt. No. 91-2 at ¶ 4, pp. 5-6. Demers claims that if he had searched Coleman's cell on June 8, 2015, he would have put his name on the cell frisk sheet and signed the form. Id. at ¶ 9.

[13]     Demers stated that the Cell Frisk Sheet is dated June 18, 2015. Dkt. No. 91-2 at ¶ 4. Based upon a review of the document, which is dated June 8, 2015, it is clear that Demers' declaration contains a typographical error in relation to the date.

The competing evidence rests on the credibility of Coleman on one hand and Demers on the other. [14] In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party requires the Court to credit Coleman's version of the events for purposes of this motion. See In re Dana Corp., 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

[14]     Although the record contains a declaration from Durkin, who admits he was present in Upper H Block on June 8, 2015, Durkin does not confirm, refute, or address Demers' claim that he was not personally involved in the alleged use of force.

Thus, although Coleman acknowledges that he is unable to identify which of the defendants exerted what force upon him, he has proffered sufficient evidence to raise an issue of material fact as to Demers' personal involvement to require resolution by a trier of fact. Accordingly, it is recommended that Defendants' motion on this ground be denied.

### C. Retaliation Claims

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and

(3) ... there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon, 58 F.3d at 872.

Here, Defendants do not dispute that Coleman allegedly suffered an adverse action to satisfy the second prong of the retaliation claim. Rather, Defendants argue that Coleman's retaliation claims against Demers and Coryea are subject to dismissal because Coleman "failed to explain the nature of his protected speech supporting his First Amendment claim" against Demers and Coryea. Dkt. No. 91-1 at 19. Moreover, Defendants contend that the record lacks evidence demonstrating a causal connection between the protected conduct and the alleged adverse action, the alleged excessive force incident. Dkt. No. 91-1 at 19-20.

**\*9** It is well settled that the filing of administrative grievances and lawsuits constitutes protected speech. See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir 2003) ("[T]he filing of prison grievances is a constitutionally protected activity"); Williams v. Ingraham, No. 04-CV-257 (GLS/DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights.") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)).

As to the third element, the plaintiff bears the burden of establishing that causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991)). A plaintiff may establish a causal connection "with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)).

In determining whether a causal connection exists between the plaintiff's protected activity and a

2021 WL 4312392

prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

**1. Retaliation Claims Based upon "Many Grievances"**

Coleman claims that Demers and Coryea were motivated to retaliate against him because they were aware of his "many grievances[.]" Dkt. No. 98-1 at 26. However, this conclusory claim, submitted for the first time in opposition to the motion for summary judgment, is not supported by competent, admissible evidence. As discussed supra, the record lacks facts establishing that Coleman filed grievances or complaints against Demers or Coryea prior to the June 2015 incident. Indeed, Coleman has not proffered any evidence establishing that Demers or Coryea were aware that Coleman filed any grievances prior to the June 2015 incident. Accordingly, Coleman has not established a viable retaliation claim based upon his generalized contention that Defendants were aware of his filing "many grievances." Id.

**2. Retaliation Claims Based upon Coleman I**

Defendants concede that the filing of lawsuit is constitutionally protected activity. [15] Dkt. No. 91-1 at 19. Although Defendants' Memorandum of Law lacks any argument in support of dismissal of Coleman's retaliation claims based upon Coleman I, Coleman bears the burden of demonstrating that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. In this regard, Coleman relies upon the "close proximity in time" between his protected conduct and the adverse action. See Dkt. No. 98-1 at 26.

[15]  In the December 2019 Report-Recommendation and Order, this Court concluded that Coleman

engaged in protected conduct when he filed Coleman I. Dkt. No. 61 at 24.

It is well-settled that "temporal proximity without more is insufficient to survive summary judgment." Flynn v. Ward, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *11 (N.D.N.Y. June 7, 2018) (internal quotation marks and citation omitted). Instead, a plaintiff must come forward with additional "circumstantial evidence" establishing that the protected activity was "a substantial or motivating factor" in the defendant's conduct. See id. at *10. Retaliation is not "reasonably inferred" where a plaintiff's protected speech does not involve the defendant alleged to have retaliated against him. See Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009). "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." Jones v. Fischer, No. 9:10-CV-1331 (GLS/ATB), 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (citing Hare v. Hayden, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.")).

 *10  Coleman testified that Demers and Coryea "grabbed" his legal work and began reading through his "claim against another correctional officer within that facility." Dkt. No. 91-5 at 18-19. Coleman overheard Defendants "whispering amongst themselves[,]" and although he admits that he "could not make out nor hear what they were whispering about," the assault occurred "shortly thereafter." Id. at 22; Dkt. No. 98-1 at 28.

As discussed, Coryea and Demers were not named defendants in Coleman I. Even assuming the truth of Coleman's claim that Demers read Coleman's legal materials, the record lacks evidence demonstrating that Demers or Coryea were motivated to retaliate against Coleman based on Coleman's filing of that lawsuit. Coleman has not proffered any explanation as to why Coryea or Demers would be motivated to retaliate against him in response to a lawsuit against Nolan. Coleman does not allege, and the record does not support, a conclusion that Demers or Coryea made any reference to the lawsuit, Nolan, or the December 2014 incident referenced in Coleman I prior to the alleged assault. Coleman's conclusory and speculative allegations are insufficient to support "an inference of a causal connection between" the protected conduct; i.e. filing Coleman I, and the alleged excessive force incident. See Baskerville, 224 F.Supp.2d at 732.

2021 WL 4312392

As there is an absence of factual support to demonstrate a causal connection, Coleman's retaliation claims against Demers and Coryea, based upon Coleman I, lack merit. Celotex Corp., 477 U.S. at 323.

**3. Retaliation Claims Based Upon Oral Complaints**

Construing Coleman's arguments in a light most favorable to him, Coleman asserts that Defendants were motivated to retaliate against him after overhearing his conversations with Hutti and Durkin. Dkt. No. 98-1 at 25. Defendants argue that the verbal exchanges between Coleman, Hutti, and Durkin were "brief and isolated" and cannot be construed as constitutionally-protected speech. Dkt. No. 91-1 at 20.

A prisoner does not have a First Amendment right to engage officers in a verbal dispute. See Torres v. Mulligan, No. 3:17-CV-677, 2017 WL 2623165, at *3 (D. Conn. June 16, 2017) (dismissing retaliation claim against officer who allegedly assaulted the plaintiff immediately after the plaintiff told the defendant to "stop making inappropriate comments"). However, district courts in the Second Circuit have concluded that an inmate's oral complaints to a correctional officer, under some circumstances, may constitute speech or conduct protected under the First Amendment. See, e.g., Mazyck v. Keller, 6:20_CV-06055, 2021 WL 1201224, at *8 (W.D.N.Y. Mar. 31, 2021) (finding that the plaintiff "plausibly alleged that he engaged in protected activity for purposes of his First Amendment claim" where the plaintiff alleged to have verbally reported an assault by a correctional officer to a supervisor, and as a result, faced retaliation); Smith v. Woods, No. 03-CV-480 (DNH), 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) (noting that "the First Amendment protects, not only the filing of written grievances and complaints, but under some circumstances, the making of oral complaints to correction officers."), aff'd, 219 F. App'x 110 (2d Cir. 2007) (summary order) (citation omitted); Sprau v. Coughlin, 997 F.Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint against a prison guard sufficient to establish protected activity); but see Booker v. Griffin, No. 16-CV-00072, 2018 WL 1614346, at *17 (S.D.N.Y. Mar. 31, 2018) (dismissing First Amendment claims against correctional officers on the basis of qualified immunity "because the law is not well-settled regarding whether an inmate's verbal complaint constitutes protected speech, it would not necessarily be 'clear to a reasonable officer' that taking an adverse action in response to such a complaint

would rise to the level of a constitutional violation.") (internal citation omitted).

**\*11** Although the Second Circuit has yet to articulate a bright line rule regarding constitutionally-protected oral speech by an inmate, several district courts in this Circuit have held that a verbal confrontation with a correction officer based on an inmate's dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity. See Williams v. Smith, No. 11-CV-0601 (LEK/TWD), 2015 WL 1179339, at *10 (N.D.N.Y. Mar. 13, 2015) (verbal complaint "about problems with [inmate's] braces" was not protected conduct); Carl v. Griffin, No. 08-CV-4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) ("[The p]laintiff's brief and isolated verbal [encounter with the defendant] does not constitute protected First Amendment speech [because] [t]o construe it as such would elevate every verbal exchange between a prison employee and a prisoner to the level of protected speech under the First Amendment.") (internal quotation marks and citation omitted); see also Lugo v. Van Orden, No. 07-CV-879 (TJM/GJD), 2008 WL 2884925, at *3 n.4 (N.D.N.Y. July 23, 2008) ("A simple discussion with a corrections officer would not be protected speech unless that discussion was in the form of a complaint or concern about the officer or some policy involved.").

In his grievance, Coleman described his verbal exchange with Hutti as a "conversation" about his property. Dkt. No. 91-5 at 25. During his deposition, Coleman testified that while Demers and Coryea were "throwing stuff out of [his] cell," he "started addressing" Hutti and "started inquiring about the items that these two officers had discarded from [his] cell as rubbish." Dkt. No. 91-5 at 25-26. Coleman summarized his exchange with Hutti:

A. Basically, there was a particular item that was discarded from my cell which was a property bag is, you know, a bag they sell on commissary that allows inmates to -- to store items in this property bag to create space in your cell.

So Sergeant Coryea was the one who discarded this bag from out of my cell, so I asked -- asked -- asked Sergeant Hutti -- I didn't ask him. I stated to Sergeant Hutti that this officer was discarding property that I'm entitled to have. And I would like to know if I could retrieve it, because I'm entitled to have this.

Dkt. No. 91-5 at 26-27.

Coleman does not allege that he voiced any complaints to Hutti and does not describe the exchange with Hutti as argumentative. In his grievance, Coleman claimed that Durkin "yelled" at him, but Coleman described his tone to Durkin as "respectful." Dkt. No. 1-1 at 43. During his deposition, Coleman testified that while he was speaking with Hutti, Durkin interrupted and "started yelling in [his] face[.]" Dkt. No. 91-5 at 27. Durkin told Coleman, "if you don't throw this shit away, I'm going to throw it away for you." Id. Coleman testified that he responded:

> A. At that time, I interjected, and I stated to Lieutenant Derkin [sic] that I had a lot of amount [sic] of property that I'm entitled to have by the State of New York. I have no more or no less. At that time, he started yelling back in my face again, saying I don't care how much property you're entitled to have. If you don't get rid of this shit we will."

Dkt. No. 91-5 at 27.

Based upon Coleman's sworn testimony and the record before the Court, Coleman did not intend for his statements regarding the manner in which his property was handled to "reach anyone" other than Hutti and Durkin. See Carl, 2011 WL 723553, at *5. The record suggests that the verbal exchanges were, at best, "isolated" disagreements related to the cell search that day. There is no evidence that the parties engaged in any further conversations or arguments regarding these issues. Accordingly, the Court concludes that the oral exchanges between Coleman and Hutti and Coleman and Durkin were not verbal grievances or protected conduct. See Cosby v. McDonald, No. 3:20-CV-432, 2020 WL 5026550, at *6 (D. Conn. Aug. 25, 2020) (finding that there is a distinction between "verbal grievances and verbal confrontations or arguments between a prisoner and a correctional officer and [district courts] have concluded that the latter do not constitute protected speech") (collecting cases); see also Ford v. Martuscello, No. 9:14-CV-1566 (DNH/DEP), 2016 WL 5322166, at *4 (N.D.N.Y. June 23, 2016) (confronting a corrections officer based on a dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity), report

and recommendation adopted, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016) (citations omitted).

**\*12** Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of Coleman's First Amendment retaliation claims against Coryea and Demers be granted.

### III. CONCLUSION

**WHEREFORE**, for the reasons set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for partial summary judgment (Dkt. No. 91) be **GRANTED** as to Plaintiff's claims against Racette and Plaintiff's First Amendment retaliation claims against Demers and Coryea; and **DENIED** in all other respects; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [16]

16    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

2021 WL 4312392

**All Citations**

Slip Copy, 2021 WL 4312392

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Jones v. Fischer, Not Reported in F.Supp.2d (2013)

2013 WL 5441353

KeyCite Yellow Flag - Negative Treatment

Distinguished by Johnson v. Naqvi,  D.Conn.,  April 29, 2021

2013 WL 5441353
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael JONES, Plaintiff,

v.

Brian FISCHER et al., Defendants.

No. 9:10–cv–1331 (GLS/ATB).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

Michael Jones, Ossining, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Krista A. Rock, Assistant Attorney General, of
Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

#### I. *Introduction*

**\*1** Plaintiff *pro se* Michael Jones commenced this action
against defendants Brian Fischer, Tersea David, David Rock,
K. Rabideau, L. Whalen, Lt. Chase, J. Eggleston,[1] S.
Meskunas, A. Prack, C. Leon, and C.O. Lincon, pursuant to
the First, Eighth, and Fourteenth Amendments of the U.S.
Constitution, 42 U.S.C. § 1983, and the Americans with
Disabilities Act (ADA). (*See generally* Am. Compl ., Dkt. No.
5.) Jones alleged that defendants violated his rights to proper
medical care, due process, and his right to be free from cruel
and unusual punishment. (*Id.*)

1     The court notes that Eggleston's name is misspelled
      on the docket, and the court directs the Clerk to
      amend the docket to reflect the proper spelling of
      Eggleston's name. (Dkt. No. 54, Attach.3.)

The remaining defendants, L. Whalen, Lt. Chase, J.
Eggleston, S. Meskunas, A. Prack, and C. Leon, filed a motion

for summary judgment, requesting that the remainder of the
claims and defendants be dismissed.[2] (Dkt. No. 54.) Jones'
remaining claims include: (1) an Eighth Amendment claim
against Leon regarding Jones' medically prescribed diet; and
(2) Due Process and First Amendment retaliation claims
against defendants Eggleston, Meskunas, Prack, Whalen, and
Chase with respect to allegedly false misbehavior reports
and two disciplinary hearings. (Dkt. Nos. 44, 60 at 2.) In a
Report–Recommendation and Order (R & R) dated July 22,
2013, Magistrate Judge Andrew T. Baxter recommended that
defendants' motion be granted and Jones' amended complaint
be dismissed in its entirety as to all defendants.[3] (Dkt. No.
60.) For the reasons that follow, the R & R is adopted in its
entirety.

2     The court notes that J. Carver was named as a
      defendant in Jones' initial complaint, (Dkt. No.
      1), but was omitted in Jones' amended complaint,
      (Dkt. No. 5), and subsequently dismissed as
      a defendant in a Decision and Order by U.S.
      District Judge Thomas J. McAvoy, (Dkt. No.
      6 at 5, 9). In that same Decision and Order,
      C.O. Lincon also was dismissed as a defendant,
      and Jones' conspiracy claims and claims that he
      was denied adequate warmth or food portions at
      Upstate Correctional Facility were dismissed. (*Id.*
      at 5–9.) Thereafter, defendants filed a motion to
      dismiss for failure to state a claim. (Dkt. No. 37.)
      Magistrate Judge Andrew T. Baxter recommended
      granting that motion, in part, and dismissing the
      complaint in its entirety against Fischer, David,
      Rock, and Rabideau (and, therefore, dismissing
      Jones' ADA claims). (Dkt. No. 44 at 39–40.) That
      recommendation was adopted by this court. (Dkt.
      No. 45.)

3     The Clerk is directed to append the R & R to this
      decision, and familiarity therewith is presumed.

#### II. *Standard of Review*

Before entering final judgment, this court routinely reviews
all report and recommendation orders in cases it has
referred to a magistrate judge. If a party has objected to
specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations *de novo. See Almonte v. N.Y. State Div.
of Parole,* No. 04–CV–484, 2006 WL 149049, at \*3, \*5

(N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are filed, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. [4] *See id.* at *4–5.

[4]  "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 WL 149049, at *6.

### III. *Discussion*

Jones purports to object to the R & R on various grounds, all of which boil down to arguments he previously raised in his response to defendants' motion for summary judgment, (*compare* Dkt. No. 56, *with* Dkt. No. 61), and all of which Judge Baxter considered and rejected.

First, with respect to his Eighth Amendment claim, Jones objects on the theory that genuine issues of material fact exist with respect to: (1) what Leon's intentions were when he removed Jones from his medical diet because (a) it is unclear whether Leon removed Jones from his medical diet after having a conversation with another officer, and (b) if Leon had, in fact, seen Jones exchange food, Leon would have told Jones, (Dkt. No. 61 at 2–3); (2) whether defendant Leon had the authority to remove Jones from his diet, (*id.* at 3); (3) whether the date of the alleged incident took place on July 14, 2010, as Jones contends, or on July 15, 2010, as defendants contend, (*id.* at 3–4); and (4) whether removal from the medical diet caused Jones' blood pressure to rise to the point that he had to be placed on high blood pressure medication, (*id.* at 4). As noted above, however, Jones raised these arguments in his response to defendants' motion for summary judgment, and Judge Baxter considered and rejected them. (Dkt. No. 56 at 4–5; Dkt. No. 60 at 4–19.)

 **\*2**  Second, with respect to his due process claim, Jones objects on the theory that genuine issues of material fact exist on three grounds: (1) whether the denial of documentary evidence was a due process violation because he was denied the opportunity to review copies of all of the handwriting samples that were used to compare with the handwriting in the threatening letter, (Dkt. No. 61 at 7–8, 10); (2) whether there was sufficient evidence to support Eggleston's conclusions in the Tier III disciplinary hearing because she did not make an

independent determination, (*id.* at 10); and (3) whether the special housing unit conditions created an atypical hardship that constituted an Eighth Amendment violation, (*id.*). Again, Jones raised these arguments in his response to defendants' motion for summary judgment, and Judge Baxter considered and rejected each of them. (Dkt. No. 56 at 6–9; Dkt. No. 60 at 20–40.)

Finally, with respect to his retaliation claim, Jones objects on the ground that there is a genuine issue of material fact that exists as to whether the actions of defendants were taken in retaliation of Jones' grievances. (Dkt. No. 61 at 11–12.) This argument, too, was raised in Jones' response to defendants' motion for summary judgment, and considered and rejected by Judge Baxter. (Dkt. No. 56 at 9–10; Dkt. No. 60 at 40–45.)

All of Jones' objections, therefore, are general and do not warrant *de novo* review. *See Almonte,* 2006 WL 149049, at *4. After carefully reviewing the record, the court finds no clear error in the R & R and adopts it in its entirety.

### IV. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's July 22, 2013 Report–Recommendation and Order (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 54) is GRANTED; and it is further

**ORDERED** that the amended complaint, (Dkt. No. 5), is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 217 of 279
Jones v. Fischer, Not Reported in F.Supp.2d (2013)
2013 WL 5441353

This matter was referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

## I. *Background*

In his amended civil rights complaint, plaintiff alleged that defendants violated his rights to proper medical care, due process, and his right to be free from cruel and unusual punishment. (Dkt. No. 5). Defendants initially made a motion to dismiss, based upon their allegation that plaintiff had "three strikes" pursuant to 28 U.S.C. § 1915(g) and therefore, should not be entitled to proceed in forma pauperis. (Dkt. No. 32). The defendants' motion was rendered moot when plaintiff paid the filing fee on December 1, 2011.

**\*3** On December 19, 2011, defendants filed a second motion to dismiss for failure to state a claim, addressed to the merits of the amended complaint. (Dkt. No. 37). On May 1, 2012, I recommended granting the motion in part, and on May 23, 2012, Chief Judge Sharpe adopted my recommendation, dismissing some, but not all of plaintiff's claims. (Dkt.Nos.44, 45). On December 28, 2012, the remaining defendants filed a motion for summary judgment, pursuant to Fed.R.Civ.P. 56, addressed to the remainder of the amended complaint. (Dkt. No. 54). Plaintiff has responded in opposition to the motion, and defendants filed a reply. (Dkt.Nos.56, 59).

The remaining claims are as follows:

(1) An Eighth Amendment claim regarding plaintiff's medically prescribed diet against defendant Leon only.

(2) Due process and First Amendment retaliation claims with respect to allegedly false misbehavior reports and two disciplinary hearings against defendants Eggleston, Meskunas, Prack, Whalen, and Chase.

For the following reasons, this court agrees with defendants and will recommend dismissal of the entire complaint against all remaining defendants.

## DISCUSSION

## II. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

Although the court briefly discussed the facts in its prior ReportRecommendation (Dkt. No. 44), additional evidence has been added to the record, in support of the summary judgment motion,[1] in the form of affidavits, documents relating to the claims, and plaintiff's deposition of September 28, 2012. (Dkt. No. 54–1–54–12). Thus, the court will discuss the additional facts as relevant to the issues raised in the pending motion.

1    Defendants' original motion was to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Such a motion is directed to the face of the complaint. The court may also consider documents or exhibits that are attached to the complaint or incorporated by reference. *See Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion

to dismiss, without converting the proceeding
to one for summary judgment). With a motion
for summary judgment, the court may consider
additional evidence beyond the complaint to
determine whether there are no disputed questions
of material fact and whether summary judgment for
either party is appropriate, as stated in the standard
set forth above. *See* Fed.R.Civ.P. 56(c)(1)-(4).

## III. *Medical Diet*

### A. Facts

**\*4** In the amended complaint, Plaintiff claims that on June
14, 2010, while he was incarcerated at Clinton, defendant
Leon told plaintiff that he was removing plaintiff's name from
the "special diet meal list." (Amended Complaint (AC) at 6, ¶
(h)). [2] Plaintiff alleges that when he asked why he was being
removed from this list, defendant Leon stated that plaintiff
knew why, and it was because " 'I was [sic] you eating
toast.' " [3] (*Id.*) Plaintiff claims that his "special diet" was
low sodium, based upon plaintiff's high blood pressure. As
a result of his removal from the diet, plaintiff states that he
experienced headaches and dizziness. (*Id.* at 6, ¶ (i)) When
he went to the facility clinic, he was allegedly told that due to
his elevated blood pressure, he would have to be monitored to
determine whether he should be placed on medication. (*Id.*)
Plaintiff filed a grievance against defendant Leon. (*Id.* at 6(j)).

[2]    Plaintiff has numbered the pages of his amended
complaint at the bottom. He has also identified
paragraphs on each page by letter. However,
plaintiff begins each cause of action with a new set
of letters, beginning with ¶ (a). Thus, to properly
cite to the amended complaint, the court will first
cite the bottom page of the document and then cite
to the lettered paragraph in which the cited facts are
stated.

[3]    Other documents in the record have clarified that
there is a typographical error in the amended
complaint. It is apparent that plaintiff meant that
defendant Leon "saw" plaintiff eating toast.

During his deposition, plaintiff testified that he was first
placed on a special low sodium diet due to his "above normal"
blood pressure when he was incarcerated at Shawangunk
Correctional Facility. (Pl.'s Dep. at 15) [4] (Dkt. No. 54–9;
Rock Decl. Ex. B). Plaintiff stated that his blood pressure
was not "too high," and that the special diet helped

"somewhat." (*Id.* at 17). Plaintiff was on the special diet
while he was incarcerated at Eastern, Clinton, Upstate, and
Coxsackie Correctional Facilities. (*Id.* at 18).

[4]    The deposition transcript has its own numbered
pages which are different than the page numbers
assigned by the court's CM/ECF system. The court
will use the pages that are on the deposition
transcript itself.

The incident with defendant Leon took place while plaintiff
was confined at Clinton Correctional Facility. Plaintiff
testified that defendant Leon was one of the "head cooks"
at the Clinton Annex. On June 14, 2010, plaintiff states that
he came into the mess hall for breakfast, and as he was "on
the line getting close to receiving [his] tray, he saw an officer
speaking to defendant Leon, and pointing at plaintiff. (*Id.*
at 20, 22). After plaintiff sat down with his tray, defendant
Leon walked over to plaintiff and asked whether his name was
"Jones." (*Id.* at 20). Plaintiff acknowledged that he was Jones,
and defendant Leon walked away. (*Id.*)

Plaintiff testified that when he came back for the lunch meal,
he went to the diet line to pick up his tray, but was told that he
was no longer on the list for the special diet. Plaintiff stated
that when he asked defendant Leon why, he said " 'You know
what you did.' " (*Id.*) Plaintiff testified that he "never could
figure out why he took my name off the diet list." (*Id.* at 22).
During the deposition, plaintiff stated that he did not recall
defendant Leon saying anything else. (*Id.* at 23). According
to plaintiff, the only difference between the special diet and
the regular meal was the sodium content. (*Id.*)

Plaintiff acknowledged that in order to participate in a special
diet program, he had to sign a "contract," agreeing to certain
things. (*Id.* at 24). When asked whether he could "trade food
with other inmates," plaintiff stated that it depended on the
kind of food, and that although he was allowed to eat bread, he
could not eat bread with butter. (*Id.*) Plaintiff testified that
he never cheated on the diet, and he never traded food with
any inmates. (*Id.* at 26).

**\*5** Plaintiff testified that later on in the day, he became dizzy,
so he sought medical attention by putting himself on the list
for sick call. (*Id.* at 27). Plaintiff stated that when he told the
nurse about his symptoms, she took his blood pressure and
noticed that it was elevated. (*Id.* at 28). Plaintiff told the nurse
that he had been removed from the special diet, and the nurse
made plaintiff an appointment to see a doctor. (*Id.* at 29).
Plaintiff testified that when he saw the doctor, he told plaintiff

that he was going to put him back on the special diet. (*Id.*) Plaintiff states that he was off of the diet for about a month. (*Id.* at 30). When asked whether he knew the procedure to put an inmate back on a special diet list, plaintiff stated that it depended on the "circumstances [of] the removal." (*Id.*)

Plaintiff testified that he filed a "basic inmate" grievance about his removal from the diet, but that he also wrote to the medical health director in Albany and the Commissioner of the Department of Corrections and Community Services ("DOCCS"). (*Id* .) When asked what he thought defendant Leon did "wrong," plaintiff stated that defendant Leon

> had no authority to remove me from the diet, he wasn't a doctor and he's a cook, so that was outside of his jurisdiction. The only thing he should have done was reported me to the doctor, let them [sic] make a decision [sic] what they was [sic] going to do if something occurred that wasn't supposed to happen.

(*Id.* at 31). Defense counsel asked plaintiff: "Is that why you're suing Leon?" Plaintiff answered: "Yes, it is." (*Id.*) When plaintiff was asked if defendant Leon did anything else to violate plaintiff's constitutional rights, plaintiff stated that he could not answer the question because he had not completed discovery. (*Id.*)

Defendant Leon has filed an affidavit, together with exhibits, in support of the summary judgment motion. (Dkt. No. 54–4; Leon Aff.) Defendant Leon states that he is the Head Cook at Clinton and has held that position since 2007, overseeing the preparation and distribution of food for 2,800 inmates, including those inmates who are medically-ordered therapeutic diets. (Leon Aff. ¶ 2). He is responsible for ensuring that the appropriate quantities of food are available to the inmates and for the prevention of waste. (*Id.*) Therapeutic diets "generally involve a modification of servings of food items from the general facility menu." (*Id.* ¶ 4).

Inmates who receive a therapeutic diet get their food trays by going through a separate diet line, and each food tray is individually prepared for the inmate by a food server in order to meet the requirements of the particular diet. (*Id.*

¶ 5). Inmates are required to comply with their therapeutic diets, and the diets are treated the same as if they were a prescription for medication. There is also a presumption that the inmate is eating the appropriate food because the diets are monitored. If an inmate eats only intermittently, or does not eat, the tests used to monitor the inmate's condition will not provide the physician with a correct appraisal of the effect of the diet on the inmate's condition. (*Id.* ¶ 6). The failure of an inmate to follow his diet also creates problems for the food service personnel, who must serve 2,800 inmates per day, while maintaining quality and preventing waste. Therapeutic meals are prepared for individual inmates, pursuant to a prescription, and if the meals are not eaten, they must be thrown away. (*Id.* ¶ 7).

**\*6** On June 1, 2010, a "Controlled A" diet was ordered for plaintiff by his doctor. (Leon Aff. ¶ 8 & Ex. A). A "Controlled A" diet consists of enhanced fiber, low fat, low cholesterol, and low sodium foods. [5] (*Id.*) In order to participate in the diet, plaintiff signed the "Therapeutic Diet Request Form and Attendance Agreement," which states that attendance is mandatory, his eating would be monitored, and if he did not comply with the diet, he could be subject to disciplinary action or removal from the program, "or both." (*Id.* ¶ 9 & Ex. A). The agreement is signed by plaintiff and witnessed by a nurse. (*Id.* Ex. A).

[5]     Plaintiff's testimony that the only difference between the standard inmate diet and his therapeutic diet was the sodium content was not accurate. (*See* Pl.'s Dep. at 23).

The Therapeutic Diet Meal Attendance policy is attached to defendant Leon's affidavit. (Leon Aff. Ex. B at 17). The policy states that non-compliance with the meal plan or failure to participate in three diet meals per week is a violation of the attendance policy. Violation of the attendance policy can result in counseling, removal from the diet meal program or disciplinary action. (*Id* ). Inmates are expected to accept their trays and "avoid food swapping." (*Id.*) The policy also states that

> Health Services will be notified in writing by the food service supervisor when diet meal service has been discontinued due to attendance policy violation. Discontinuance of the therapeutic meals due to

> noncompliance should be documented
> in the medical record.

(*Id.*) One of defendant Leon's responsibilities as Head Cook is to monitor the inmates' compliance with their special diets. (Leon Aff. ¶ 12). Defendant Leon states that he is required to report any incidents of non-compliance to his supervisor, Food Administrator ("FA") David Timmons. (*Id.*) FA Timmons then relays that information to the Director of Health Services, who ultimately makes the determination of whether the inmate should be "removed from the diet." (*Id.* ¶ 13).

Defendant Leon states that on June *15,*[6] 2010, he saw plaintiff exchanging and taking other inmates' "regular" food, which "constituted non-compliance" with his "therapeutic diet regimen." (Leon Aff. ¶ 14). As a result, on the same day, defendant Leon wrote a note to his supervisor, FA Timmons, informing him of the plaintiff's violation. (*Id.* ¶ 15 & Ex. C). FA Timmons would then be responsible for sending the information to the Director of Health Services. (*Id.*) Defendant Leon states that the *"actual cancellation"* of a therapeutic diet can only be approved and effectuated by the Director of Health Services." (*Id.* ¶ 16) (emphasis added). Sometimes the inmate is "removed" from his special diet, sometimes he is not. (*Id.*) Defendant Leon states that in reporting plaintiff's non-compliance, he was not acting with any malicious intent or deliberate indifference. (*Id.* ¶ 18).

[6]    Plaintiff now disputes the date of the incident. In his response to the motion for summary judgment, he states that the incident occurred on July 14, 2010 at breakfast, not on July 15, 2010 at lunch time. (Dkt. No. 56 at 4). First, plaintiff must mean "June" not "July," and second, plaintiff's own exhibit indicates that the date was June 15, 2010. (Dkt. No. 56–1, Ex. A). The Inmate Grievance Complaint is dated *June 15, 2010,* and the first sentence states that *"on the above date,* I went to the *noon* meal and was told be Cook Colos [sic] that he has removed my name off the diet list." (*Id.*) (emphasis added). Because plaintiff's own exhibits contradict his statement regarding the date and time of the incident, there is no question of fact, even if such a dispute would have made a difference.

FA Timmons[7] has also submitted an affidavit, which includes the documents generated by plaintiff's grievance

related to this incident. (Timmons Aff. Ex. B; Dkt. No. 54– 10). FA Timmons confirms in his affidavit, that defendant Leon properly reported plaintiff's non-compliance with the therapeutic meal plan on the same day that the violation occurred. (Timmons Aff. ¶ 26 & Ex. C). Plaintiff filed his grievance on June 17, 2010, two days after the incident. (*Id.* Ex. C at 2).

[7]    FA Timmons has not named as a defendant in plaintiff's action.

 **\*7** On June 17, 2010, during the grievance investigation, defendant Leon stated in a memorandum to Nancy Rattlif, Inmate Grievance Supervisor, that "I saw inmate Jones ... exchanging and taking other inmates [sic] regular food on 6–15–2010, this puts him on [sic] violation of his diet contract." (*Id.* Ex. C at 7). The Inmate Grievance Resolution Committee ("IGRC") responded that the "cook" stated that plaintiff was observed exchanging and taking other inmates' regular food "and removed him from diet." (*Id.* Ex. C at 9). The "dissenting" opinion stated that "removing from medical diet should only be done by medical personnel." (*Id.*) Plaintiff appealed, indicating that he wished to be put back on the diet, and the Superintendent "granted" plaintiff's request on July 15, 2010, stating that "[o]nly the medical provider may remove an inmate from a therapeutic diet."[8] (*Id.* Ex. C at 5).

[8]    One of plaintiff's exhibits shows that he was placed back on the therapeutic diet on July 17, 2010. (Pl.'s Resp. Ex. B; CM/ECF p .7).

Although it is unclear why a favorable result would be appealed, plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC").[9] The CORC's decision is dated October 6, 2010, "accepts" the action requested "in part," and indicates that it considered the facts and circumstances of the case, including the "recommendation of the Division of Health Services." (*Id.* at 1). The CORC confirmed that plaintiff was observed trading food while on the diet "and was appropriately removed in accordance with the signed contract." (*Id.*) Plaintiff was cautioned to "comply" with the contract in the future to avoid "similar difficulties." The CORC found insufficient evidence to substantiate malfeasance by the staff and noted that plaintiff had been transferred. (*Id.*)

[9]    The "Appeal Statement" says only "see body of grievance." (Timmons Aff. Ex. C at 5). The body of the grievance states that plaintiff wishes

2013 WL 5441353

to be placed back on the special diet list and "no retaliation" be commenced as a result of the grievance. (*Id.* at 6). It is possible that plaintiff appealed because the Superintendent's decision did not address the issue of retaliation. The CORC did address that issue, stating that it is against DOCCS regulations to retaliate against inmates for good faith use of the grievance procedure, and if an inmate feels that he has been the subject of retaliation he "may pursue a complaint that reprisal occurred through the grievance mechanism." (*Id.*)

In response to defendants' motion for summary judgment, plaintiff has submitted a variety of medical records, many of which contain blood pressure measurements, in an attempt to argue that the removal from his therapeutic diet caused his blood pressure to be permanently elevated such that he was no longer able to control it with diet alone. (Pl.'s Exs. I, J, K, J–2).

### B. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or

interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

**\*8** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

The denial of a medically prescribed diet may, under certain circumstances, rise to the level of an Eighth Amendment violation. *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles v. Coughlin,* 725 F.2d 12, 15–16 (2d Cir.1983); *Mandala v. Coughlin,* 920 F.Supp. 342, 353 (E.D.N.Y.1996); *Johnson v. Harris,* 479 F.Supp. 333, 336–37 (S.D.N.Y.1979)). The objective component requires the plaintiff to show evidence of some adverse health impact cause by the discontinuance or failure to provide the special diet. *Hall v. County of Saratoga,* No. 1:10–CV–1120, 2013 WL 838284, at \*7 (N.D.N.Y. Mar. 6, 2013) (citing *Davidson v. Desai,* 817 F.Supp.2d 166, 190 (W.D.N.Y.2011)). The subjective, deliberate indifference component must be demonstrated by proof that corrections personnel intentionally denied access to, or interfered with the prescribed treatment. *Abdush–Shahid v. Coughlin, supra.* The plaintiff also has a duty to inform staff that he is not

receiving his medically prescribed diet, and if he fails to do so, deliberate indifference does not exist. *Evans v. Albany County Correctional Facility,* No. 9:05–CV–1400, 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (citing *LaBounty v. Gomez,* No. 94 Civ. 3360, 1998 WL 214774, at *2 (S.D.N.Y. May 1, 1998)).

### C. Application

The plaintiff was prescribed the "Controlled A" diet, consisting of enhanced fiber, low cholesterol, and low sodium. It is clear that plaintiff did not receive his therapeutic diet for approximately one month between June 15 and July 15 of 2010.

Plaintiff signed an agreement that he would not deviate from the diet and would not miss meals. He was well aware that the failure to do so could result in counseling, removal from the diet, and/or disciplinary action. [10] The evidence submitted shows that on June 15, 2010, defendant Leon reported to his supervisor, FA Timmons, in writing, that plaintiff was in violation of his special meal agreement. The handwritten note at the bottom of the "Interdepartmental Communication" form states that "[the] inmate was eating [a] regular meal." (Leon Aff. Ex. C). Plaintiff testified that he did not know why defendant Leon took his name off the list, but at one point, states that defendant Leon told plaintiff that he was seen eating toast.

[10]    Plaintiff has signed several of these "contracts." The earliest one submitted by plaintiff is dated June 26, 2009. (Pl.'s Ex. L at CM/ECF p. 44). Plaintiff has also submitted requests dated September 8, 2009; December 17, 2009; June 1, 2010; August 25, 2010; and November 5, 2010. (*Id.* at CM/ECF pp. 39–43).

**\*9** Plaintiff argues that because he was off of his diet for "so long," his blood pressure went so high that he could no longer monitor it with diet, and he had to be prescribed medication. However, plaintiff sought medical attention from a nurse "the next day" after his name was taken off the list because he was allegedly feeling dizzy. Plaintiff stated that when he went to sick call, "they" could see his blood pressure had gone up. (Pl.'s Dep. at 27–28). Plaintiff stated that the nurse told him that she would make an appointment for plaintiff to see his doctor, and the doctor said that he would put plaintiff back on the diet. (*Id.* at 29). Moreover, plaintiff filed a grievance two days after the incident, which was immediately investigated. On July 15, 2010, he was placed back on the special diet.

The court notes that July 15, 2010 was the same day that the Superintendent granted plaintiff's grievance.

Defendant Leon states that he saw plaintiff eating food that was not on the diet menu and reported the violation to his supervisor. If plaintiff were already eating foods that were not authorized on the diet, the fact that defendant Leon discontinued the diet meals did not affect plaintiff's health; his own violation of the diet rules was the cause of any problems. [11] Refusal to comply with proper treatment, including violations of the diet and the failure to attend meals according to the contract has been held to be sufficient to grant summary judgment in the defendant's favor. *See e.g. Abdush–Shahid,* 933 F.Supp. at 180 (plaintiff's removal from the special diet was not deliberate indifference where plaintiff refused to eat the special meals); *Hucks v. Artuz,* No. 99 Civ. 10420, 2003 WL 22019744, at *6 (S.D.N.Y. Aug.22, 2003) (evidence that an inmate refuses to comply with medical treatment was sufficient for summary judgment); *Rivera v. Goord,* 253 F.Supp.2d 735, 756 (S.D.N.Y.2003) (citations omitted) (same).

[11]    The court notes in passing that plaintiff has submitted copies of his medical records. On July 14, 2010, the day before he was placed back on the special diet, and when he had been off of the therapeutic diet for approximately one month, plaintiff's blood pressure was 129/83. (Pl.'s Ex. I at 1). One week after he started the diet again, his blood pressure was back up to 147/90 in one arm and 146/96 in the other arm. (*Id.* at 2). The provider ordered a "BP med eval." In August of 2010, plaintiff's blood pressure was 139/92, and on October 21, 2010, his blood pressure was 118/64. (Pl.'s Ex. J–2 at CM/ECF pp. 114, 117). On August 21, 2010, plaintiff's blood pressure was 139/92, and there was an order for a low sodium diet signed at Upstate Correctional Facility on August 25, 2010. (*Id.* at CM/ECF pp. 114, 115). While plaintiff had a few extremely high readings in August of 2011 (more than one year after this incident), after he was prescribed Catapress and another blood pressure medication, in September of 2011, his blood pressure readings were 120/86 and 138/85. (Pl.'s Ex. J at CM/ECF p. 29). On September 6, 2011, plaintiff complained that he had headaches associated with his blood pressure, but his blood pressure reading was 120/86 that day, and ten days later, on September 16, 2011, it was still relatively

low. (*Id.* at CM/ECF p. 29). There is no question that plaintiff has high blood pressure, which was poorly controlled from time to time. However, there is no evidence that defendant Leon's conduct in reporting plaintiff's violation of the therapeutic meal rules was the cause of any serious problems plaintiff experienced with his blood pressure.

There appears to have been no actual cancellation of plaintiff's special diet, [12] only a temporary discontinuance, apparently initiated by defendant Leon. [13] FA Timmons states that the "actual cancellation" of a therapeutic diet can only be approved and effectuated by the Director of Health Services." (Timmons Aff. ¶ 27). Defendant Leon's only recourse was to report the violation to FA Timmons, which was done in this case.

[12]    A diet "cancellation" would be registered on the same form as the diet request and attendance contract. There is a space on the form for a "DIET REQUEST" and a "DIET CANCELLATION." (Timmons Aff. Ex. A). The policy provides that if the diet order is cancelled, and the inmate's name is removed from the list, "documentation of the supporting reasons for cancellation or removal MUST be placed in the inmate's medical record." (Timmons Aff. Ex. B at 10). There is no such documentation in this record.

[13]    Defendant Leon does not concede that he initially discontinued giving plaintiff his special diet, but there appears to be no question that plaintiff did not receive the therapeutic diet for one month. The grievance documents show that the IGRC stated that the "Cook stated Jones was observed exchanging [sic] taking other inates [sic] regular food on 6–15–10 which put him in violation of contract and *removed him from diet.* Must request reinstatement to diet meal with medical." (Leon Aff., Ex. B at 9) (emphasis added). The "dissenting opinion" stated that "removing from medical diet should only be done by medical personnel." (*Id.*) The investigative report on appeal, written by M. Ratliff, after interviewing defendant Leon, states that plaintiff "was observed exchanging and taking other inmates [sic] regular food on 6–15–10 which put him in violation of the diet contract and *he was removed from diet.*" (*Id.* at 14) (emphasis added). A meeting was scheduled with a doctor

to "address this procedure," and on the next day, Deputy Superintendent of Programs ("DSP") Keysor wrote that "only medical will remove from diet. 3 missed meal—warning given—2nd offense, medical *notified." (Id.*)

There is no question that defendant Leon had no authority to *cancel* a diet request, and it is unclear whether he had the authority to discontinue the meals while cancellation was being contemplated by the Director of Health Services. [14] The policy itself implies that a diet may be "discontinued," pending possible cancellation by Health Services. (Leon Aff. Ex. B at 17). The policy states that Health Services will be *notified* in writing by the food service supervisor "when diet meal service has been *discontinued* due to attendance policy violation." (*Id.*) (emphasis added). This sentence implies that "discontinuance" is different from "cancellation." The diet is "discontinued" because of the violation, but then the medical department is notified and must then decide whether to "cancel" the therapeutic diet order.

[14]    The court notes that plaintiff's grievance was granted to the extent that he was ordered back on the diet because, according to the Superintendent's response, only the medical department could remove someone from the therapeutic diet.

 **\*10** Even assuming that defendant Leon had no authority to "discontinue" giving plaintiff the special meals, and even if plaintiff's medical condition had been seriously impacted by the one-month interruption of his special diet, there is absolutely no indication that defendant Leon took the action he did with deliberate indifference to plaintiff's serious medical needs. The therapeutic meal policy specifically provides that an inmate may be put back on the program through the facility sick call procedures. (Timmons Aff. Ex. B at 17). Defendant Leon knew of the policy, and he sent his memorandum to defendant Timmons on the same day that the violation occurred. Thus, defendant Leon acted knowing that the medical staff would evaluate whether plaintiff needed to be placed back on the special diet for medical reasons. By requesting sick call and filing a grievance, plaintiff essentially asked to be placed back on the special diet within days of being advised by defendant Leon that plaintiff was no longer on the list. The length of time that plaintiff ultimately spent "off" of the diet was not under defendant Leon's control. [15] The court notes that the grievance investigation report implies that the procedure followed was discussed with "Dr. Johnson" and ultimately, it appears that plaintiff's grievance was

2013 WL 5441353

granted because only medical personnel should be allowed to even "discontinue" giving inmates the therapeutic diet. [16]

15  Defendants argue that the "removal" from plaintiff's medical diet was caused by "someone else, namely the medical personnel who possessed the sole authority to effectuate that removal." (Def.'s Br. at 11) (Dkt. No. 54–12). However, FA Timmons states that he "would have" discussed the report with medical personnel who then "would have" made a determination of whether to cancel the diet. (Timmons Aff. ¶ 26). It is not clear from the affidavit that this is exactly what happened. FA Timmons states that sometimes an inmate is removed from the special diet and sometimes he is not. (*Id.* ¶ 28). FA Timmons also states that the Form 3273 is not used when addressing an issue of non-compliance with the Attendance Agreement: "that is an administrative matter handled between the Director of Food Services and the Director of Health Services." (*Id.* ¶ 29). Although it is unclear, this may mean that unless the diet is actually canceled by the Director of Food Services, no form is used, and there is no record of the action taken.

16  The notation states "7/15/10 pe [sic] DSA Keysor-only medical *will remove* from diet." (Leon Aff. Ex. B at 14). It appears that the DSP was indicating that in the future, the procedure to follow was that after 3 missed meals, an inmate would be warned, and after the "2nd offense," the medical department would be notified. (*Id.*)

In *Collazo v. Pagano,* 656 F.3d 131, 135 (2d Cir.2011), the court granted summary judgment in favor of a defendant who removed an inmate from the special meal program, finding that there was nothing in the record to indicate that the defendant had the requisite intent in either of two instances in which he asked for the plaintiff's special dietary status to be revoked. Each time that the defendant asked for a revocation of the inmate's dietary status, the defendant had determined that plaintiff had violated the rules of the mess hall or of the special diet itself. *Id.* In *Collazo,* once it was determined that the plaintiff's violations were the result of a misunderstanding, the special diet was restored.

Defendant Leon has presented evidence that he reported plaintiff's violation of the special diet, not to jeopardize his health, but in an effort to make sure that plaintiff

properly participated in the therapeutic diet program. Plaintiff admits that he was seen in the medical department the day after his special diet was discontinued. Plaintiff's special diet was restored after plaintiff filed a grievance about the discontinuance. Plaintiff has not submitted any evidence or facts to rebut the defendant's showing. Therefore, summary judgment may be granted in favor of defendant Leon on the Eighth Amendment claim, given the complete lack of evidence suggesting that he acted with deliberate indifference to plaintiff's serious medical needs.

**IV.** *Disciplinary Hearings/Retaliation*

**A. Facts**

***11** Defendants have included additional facts about plaintiff's due process and retaliation claims regarding his two disciplinary hearings.

**1. Threatening Letter**

Plaintiff claims that on July 26, 2010, defendant Chase improperly confined plaintiff in the Special Housing Unit ("SHU") and issued a misbehavior report, charging him with threats, rioting, false statements, and impersonation. (AC ¶ 6–s). Defendant Chase has filed an affidavit stating that, as part of his duties as a Corrections Lieutenant, he investigates charges of serious misconduct by inmates. (Chase Aff. ¶ 5; Dkt. No. 54–2). Lt. Chase states that on July 23, 2010, he was Acting Captain at Clinton Annex, and one of his responsibilities was to open all mail addressed to Captain Holdridge. (Chase Aff. ¶ 8). On that date, defendant Chase opened a letter that was purportedly from an inmate named A. Alexander. The letter contained allegations against two corrections officers, and ended with a threat that the writer and "other inmates" in his housing unit would " 'do all we have to do to get these officers off the unit.' " (*Id.* ¶ 9). A copy of the letter is attached to defendant Chase's affidavit as Exhibit A.

Defendant Chase brought the letter to the attention of Housing Sergeant Giambruno, and they began an investigation with the help of Corrections Counselor, defendant Laura Whalen. (*Id.* ¶ 10). Following an interview with inmate Alexander, they determined that he did not write the letter. Defendants then began comparing the handwriting in the letter to the handwriting of other inmates in the unit, including plaintiff. Similarities between plaintiff's handwriting and the handwriting in the letter caused defendants Chase and Whalen to conclude that plaintiff was the true author of the letter. Defendant Chase then wrote the misbehavior report and had

plaintiff confined to SHU on July 26, 2010, pending the Tier III disciplinary hearing. (Chase Aff. ¶¶ 14–15 & Ex. C).

Defendant Chase denies that he took this action in retaliation for any grievance written by plaintiff. (*Id.* ¶ 16). Defendant Chase alleges that the letter raised the possibility of a serious threat to the safety and security of the facility, and he believed that the investigation conducted by the officers "conclusively established" that plaintiff was the author of the letter. (*Id.* ¶ 17). Defendant Chase states that, at the time he wrote the misbehavior report, he was not aware that plaintiff filed grievances against defendant Leon, Officer Lincoln, or any other individual. (*Id.* ¶ 19). Defendant Chase states he had a good faith basis for writing the report, and plaintiff was ultimately found guilty of the violation. (*Id.* ¶ 20). Defendant Chase states that he is not, and has never been, involved with Clinton's food service program or with plaintiff's special diet in any way. (*Id.* ¶ 22).

In his affidavit, defendant Chase also explains the method by which they determined that plaintiff was the author of the letter, even though defendant Chase has never taken a course in handwriting analysis. Defendants Chase and Whalen compared the handwriting in the letter to the handwriting of eight porters in plaintiff's housing unit. (Chase Aff. ¶ 26). The penmanship of each sample differed sufficiently so that the samples could not be confused, and there was no need to distinguish among similar samples. (*Id.* ¶ 30). Defendant Whalen was plaintiff's counselor, was familiar with his handwriting, and concurred with defendant Chase's analysis. (*Id.*)

**\*12** Defendant Whalen has also filed an affidavit in support of the summary judgment motion. (Whalen Aff.) (Dkt. No. 54–11). Defendant Whalen states that anonymous or forged notes are common in the prison environment, and it is often necessary to identify the authors. (Whalen Aff. ¶ 7). She saves all correspondence and any other documents that she receives from inmates, and she has been asked at times to participate in investigations involving the identification of an inmate's handwriting. (*Id.* ¶¶ 7–8).

On July 23, 2010, she was asked to assist defendant Chase and Lieutenant Giambruno in investigating the letter described above. Once the defendants determined that Alexander had not written the letter, they put together a list of porters housed in the same building for a comparison of their handwriting to the letter in question. After looking at a sample of plaintiff's handwriting, defendant Whalen determined that some of

the characteristics in his writing were very similar to the threatening letter, but that the samples of the handwriting of other inmates in the unit did not match the letter. (Whalen Aff. ¶¶ 9–14).

The defendants then examined additional samples of plaintiff's handwriting and concluded that plaintiff was the true author of the letter. Defendant Whalen states that the comparison they conducted would not have required an expert in handwriting analysis, and it was "immediately obvious" that plaintiff's sample was the only one that bore any resemblance to the handwriting in the threatening letter. (*Id.* ¶¶ 15–19). Defendant Whalen has participated in many such investigation and states that she is confident that defendants drew the correct conclusion about the author. (*Id.* ¶ 23).

The disciplinary hearing was held before defendant Eggleston, who at the time in question, was an Education Supervisor for DOCCS. [17] She was often asked to conduct Tier III disciplinary hearings. (Eggleston Aff. ¶ 2). She held the Tier III disciplinary hearing against plaintiff from July 29, 2010 through August 5, 2010. A copy of the transcript of the hearing is attached as Exhibit B to defendant Eggleston's affidavit. At the conclusion of the hearing, defendant Eggleston found plaintiff guilty of the charges and imposed a penalty of 45 days in SHU, plus 45 days from a previously suspended sanction, and included 90 days loss of privileges, together with a two month loss of good time. (Eggleston Aff. ¶ 11 & Ex. A at 1).

[17]    Defendant Eggleston is currently retired. (Eggleston Aff. ¶ 2).

Defendant Eggleston states that she did not violate any of plaintiff's due process rights, she did not conduct an "off-the-record" conversation about the charges with defendant Chase, she agreed to show plaintiff the letter that he was accused of writing and to check on the availability of the letters used for comparison, but denied as unreasonable, plaintiff's request that she obtain writing samples from all inmates housed in plaintiff's unit. (*Id.* ¶¶ 20–23).

**2. Phone Program Violation**

**\*13** Defendant Whalen filed a misbehavior report against plaintiff, dated July 27, 2010. (Whalen Aff. ¶ 25; Meskunas Aff. ¶ 4 & Ex. A). [18] The misbehavior report states that on July 23, 2010, plaintiff was moved from Building 14 to Building 11–A2, pending an investigation. A review of the

2013 WL 5441353

telephone records showed that plaintiff had exchanged his personal identification number ("PIN") with another inmate in Building 14 so that plaintiff could circumvent his keeplock status. Defendant Whalen states that this was established by records, showing that four telephone calls were made, using plaintiff's PIN, to a telephone number listed on his personal telephone list, belonging to "Anthony Mosley." These calls were made after plaintiff was placed on keeplock status and could not have made the telephone calls. (Whalen Aff. ¶ 25; Meskunas Aff. ¶ 5 & Ex. A at 4). The misbehavior report states that plaintiff gave his PIN to another inmate, who used the number to call Mr. Mosley—on plaintiff's telephone list—on plaintiff's behalf. *Id.* Plaintiff was charged with a telephone program violation, exchanging PINs, and refusing a direct order. (Meskunas Aff. ¶ 4).

18    Although defendant Whalen states that her misbehavior report is attached to her affidavit as Exhibit C, there is no such exhibit in the record. However, the misbehavior report has been attached to defendant Meskunas's affidavit in Exhibit A. The court will cite to the copy in the Meskunas affidavit.

On July 28, 2010, plaintiff met with his employee assistant. (Meskunas Aff. ¶ 7 & Ex. A at 7). Defendant Meskunas held a disciplinary hearing between August 2, 2010 and August 10, 2010, and a copy of the transcript of the hearing is attached to his affidavit as Exhibit B. Defendant Meskunas refused to call Mr. Mosley as a witness for plaintiff. (Meskunas Aff. Ex. A at 5). The denial was in writing and indicated that the requested witness could not give relevant evidence because the inmate who placed the call already testified. (*Id.* ¶¶ 16–18). At the conclusion of the hearing, plaintiff was found guilty of two of the three charges. [19] (Meskunas Aff. Ex. A at 1). Defendant Meskunas imposed a penalty of two months loss of telephone and commissary privileges. (*Id.* ¶ 19 & Ex. A at 1–2). The determination was affirmed by defendant Prack. (Meskunas Aff. ¶ 20 & Ex. C).

19    Plaintiff was found not guilty of the refusal to obey an order. (Meskunas Aff. Ex. A at 1).

### B. Legal Standard

#### 1. Due Process

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural

safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. See *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards,* 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

*14 If a liberty interest is found to exist, due process requires advance notice of the charges against the inmate and a written statement of reasons for the disposition. *Wolff v. McDonnell,* 418 U.S. 539, 563–64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or

2013 WL 5441353

"a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation). [20]

[20]    "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* 01CIV.8235, 2002 WL 31040370, at *13 n. 21 (S.D.N.Y. Sept.12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

### 2. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show first, that he engaged in constitutionally protected speech or conduct, and second, that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

There is no question that filing grievances qualifies as a "constitutionally protected" activity. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory

allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

### C. Application

### 1. Due Process

#### a. Threatening Letter

**\*15**  Defendants first argue that plaintiff has failed to establish a liberty interest and that, in any event, he was afforded the requisite due process with respect to the disciplinary hearing. [21] As a sanction for writing the letter in question, plaintiff received a 45–day term of confinement in SHU, the reinstatement of a prior suspended 45–day term, and a two month recommended loss of good time. The period of SHU confinement was 90 days. Defendant Eggleston also declined to give plaintiff credit for the time he spent in pre-hearing confinement from July 26, 2010 until the conclusion of the hearing. She ruled that his SHU time would begin to run on the date that the hearing concluded. The extra time could be considered additional confinement relating to the charges. Although defendant Eggleston also recommended a loss of good time, plaintiff is serving a life sentence and is not entitled to earn good time. (Prack Aff. ¶ 18 & Ex. B). Thus, the "deprivation" of good time credits did not affect plaintiff's term of imprisonment, and does not count toward creating a liberty interest in this case. The only sanction that the court may consider is the time that plaintiff spent in confinement as a result of these charges. [22] In his response to the motion for summary judgment, plaintiff alleges that he spent 106 days in SHU. (Pl.'s Resp. at 2) (Dkt. No. 56).

[21]    Defendant Prack, the Acting Director of Special Housing and Inmate Programs and Inmate Disciplinary Program also argues that plaintiff has not shown sufficient personal involvement by defendant Prack. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Because I find no constitutional

violation in this case, I need not reach the issue of personal involvement.

22    Although in its Report, recommending denial of the defendants' motion to dismiss, this court found that plaintiff had a liberty interest in the first hearing, the court was not aware that plaintiff was unable to earn good time credits. (Dkt. No. 44 at 39).

As stated above, typically, sanctions of SHU confinement of less than 101 days do not implicate a liberty interest protected by due process unless the conditions were more severe that "normal" SHU conditions. *Palmer, supra.* There is no indication in plaintiff's amended complaint that the conditions in SHU were any more severe than those experienced in SHU generally. In fact, plaintiff testified at his deposition that he received one hour per day recreation, got his meals, was able to have books, was able to have writing materials, and the same was true for the time he spent in SHU at Upstate in connection with this charge. (Pl.'s Dep. at 52–53). Thus, plaintiff did not have a liberty interest that was protected by due process in his first disciplinary hearing, even if plaintiff spent a few extra days in SHU, more than the 101 days cited in the case law. The plaintiff's due process claims could be dismissed on this basis, however, the court will also consider the merits.

Even assuming that plaintiff did have a liberty interest, he received all the process to which he was entitled. He argues that defendant Eggleston spoke to defendant Chase ex-parte for seven minutes prior to his testimony at the disciplinary hearing. In the amended complaint, plaintiff argued that defendant Eggleston denied him the right to review the eight samples that were used for comparison and did not make an independent appraisal of the evidence. Plaintiff claims that defendants Chase and Whalen are not handwriting experts and have no basis for finding that plaintiff's handwriting matched that of the letter. Plaintiff argued that defendant Eggleston improperly directed that plaintiff's SHU sentence should run from the conclusion of the hearing, rather than giving him credit for the time that he served in pre-hearing confinement. In his response to defendants' motion for summary judgment, he now argues that defendant Eggleston violated plaintiff's right to present evidence because she refused to obtain writing samples from *all* of the inmates in the housing unit before finding that the handwriting on the suspect letter matched plaintiff's handwriting.[23] (Pl.'s Resp. at 7).

23    This basis for his due process claim was not raised in the amended complaint. (*See* AC at 9, ¶¶ u, w). Generally, a party may not raise new claims in his or her response to a motion for summary judgment. *See Brown v. Raimondo,* 9:06–CV–0773, 2009 WL 799970, at *2, n. 2 (N.D.N.Y. March 25, 2009) (Report–Recommendation of Treece, M.J., *adopted by* Suddaby, J.) ("The Court notes that opposition papers [on summary judgment motions] are not the proper vehicle to instill new causes of action or add new defendants."), *aff'd,* 373 F. App'x 93 (2d Cir.2010); *Smith v. Greene,* 9:06–CV0505, 2011 WL 1097863, at *3, n. 5 (N.D.N.Y.Feb.1, 2011) (Baxter, M.J.) ("[P]laintiff should not be allowed to assert any new claims at this stage of the case, particularly through his response to a summary judgment motion."), *adopted by,* 2011 WL 1097862 (N.D.N.Y. March 22, 2011) (Suddaby, J.); *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008) (McAvoy, J., *adopting* Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment); *Shaheen v. McIntyre,* 9:05–CV–0173, 2007 WL 3274835, at *1, 9 (N.D.N.Y. Nov.5, 2007) (McAvoy, J., *adopting* Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment). Because, plaintiff did not raise this issue in the amended complaint, defendant Eggleston did not address it in her affidavit. Notwithstanding the above, and because this is an alternative finding, the court will consider the merits of this claim in addition to the other bases for plaintiff's due process claim against defendant Eggleston.

### i. Seven Minute Conversation

*16 Defendant Eggleston denies plaintiff's allegations and states that the transcript of the hearing belies plaintiff's claim that any off-the-record, ex parte conversations occurred. (Eggleston Aff. ¶¶ 16–19). A review of the transcript shows that there is no basis for plaintiff's allegations. During the hearing, the telephone rang, defendant Eggleston answered, and she had a conversation with the individual on the other end. (Eggleston Aff. Ex. B at 25). From the conversation,

2013 WL 5441353

it is apparent that the person on the other end of the telephone was defendant Chase, and at the end of the conversation, defendant Eggleston stated that "Lieutenant Chase is coming." (*Id.*)

While they were waiting for defendant Chase, defendant Eggleston and plaintiff discussed obtaining documents. (*Id.* at 25–26). Plaintiff complained that he should have obtained documents at least 24 hours before the hearing, and complained that he needed the time to prepare a defense. Defendant Eggleston then asked if plaintiff needed more time, and he said yes, but that he still would like defendant Chase to come and testify because plaintiff had some questions. (*Id.* at 26). Defendant Eggleston stated "Okay. What we're going to do then at this time, I am going to adjourn this hearing, or stop the tape." Plaintiff said "Right." (*Id.*) The tape was stopped at 9:45 a.m. "so that [defendant Eggleston could] evaluate Lieutenant Chase's materials." Plaintiff agreed, and defendant Eggleston also stated that she would evaluate what they could give plaintiff to look at. (*Id.*) Thus, plaintiff agreed to stopping the tape recording, and the tape was off until 10:05 a.m. Defendant Chase then testified about his investigation. (*Id.* at 27–41).

There is no indication that plaintiff was asked to step out of the room at any time as he alleges in the amended complaint. (AC at 9 ¶ u). In any event, if plaintiff was not present during the alleged conversation, it is unclear how he would have known that defendant Chase discussed the subject matter of the investigation with defendant Eggleston.[24] In her affidavit, defendant Eggleston specifically states that "it was [her] invariable practice as Hearing Officer never to have a witness in the hearing room without the inmate being present." (Eggleston Aff. ¶ 19). She correctly states that the transcript shows that, from the time of defendant Chase's arrival until the conclusion of his testimony, plaintiff was present. (*Id.*) (citing Ex. B at 26–41).

[24]    The court also notes that the transcript contradicts plaintiff's assertion in the amended complaint that defendant Eggleston told plaintiff to step out. The transcript reads as follows:

Jones: ... I'm objecting to the seven minute conversation you had with Chase off the record before he testified.

Eggleston: I didn't have a seven minute conversation with him.

Jones: Yes it was. Yes. When he came in you all was discussing ... what was the nature of

the investigative material. You told him to step out.

Eggleston: That didn't have nothing [sic], that had nothing to do with this investigation.

Jones: Okay. All right All right. [sic] That's cool.....

(Eggleston Aff. Ex. B at 82).

Plaintiff was afforded the opportunity to question defendant Chase about his investigation during the testimony. Defendant Whalen and Sergeant Giambruno also testified at the hearing. (*Id.* at 44–47). Inmate Alexander testified at the hearing as a witness for plaintiff. (*Id.* at 50–58). Inmate Alexander testified that he did not believe that plaintiff wrote the letter because he always typed his letters. (*Id.* at 57).

At the end of the hearing, when plaintiff was noting all of his objections, he objected to the "seven minute conversation" that defendant Eggleston had with defendant Chase "off the record" before he testified. (*Id.* at 82). Defendant Eggleston stated on the record, that she did not have a seven minute conversation with defendant Chase, and that whatever discussion she had with him "had nothing to do with this investigation." (*Id.*) As reflected in the portion of the transcript referred to in footnote 24 above, the plaintiff accepted the defendant Whalen's response to his objection during the hearing. No reasonable fact finder could credit plaintiff's conclusory allegation regarding an ex parte communication, given the clearly contradictory evidence in the record.

### ii. Documentary Evidence

**\*17** Plaintiff claims that his due process rights were violated because defendant Eggleston refused to produce the handwriting samples taken from the other porters on the unit. The court also notes that at the hearing, plaintiff asked for handwriting samples from *all* inmates in his housing unit and samples from other members of the Inmate Liaison Committee ("ILC").[25] Plaintiff was given the threatening letter and the samples of his own handwriting that were used as a comparison. (Eggleston Aff. Ex. B at 22–23). Defendant Eggleston stated that plaintiff's samples and the threatening letter were the only "pertinent" samples, and that she was not going to produce the samples from the other eight porters, obtain samples from other ILC members or obtain samples from 50 other inmates on the unit.[26] (*Id.* at 6, 17–18, 42–43).

Case 9:19-cv-01610-BKS-TWD    Document 112    Filed 08/22/23    Page 230 of 279
Jones v. Fischer, Not Reported in F.Supp.2d (2013)
2013 WL 5441353

<sup>25</sup> Inmate Alexander was the Vice Chairperson of the ILC, and plaintiff's theory was that someone on the ILC wrote the letter, pretending to be Alexander in order to get Alexander into trouble. (Eggleston Aff. Ex. B. at 14).

<sup>26</sup> Initially, defendant Eggleston stated that although she was not going to obtain 50 samples, she would "do probably a reasonable number like three." (Eggleston Aff. Ex. B at 5). She then asked plaintiff "which inmates would you like," but plaintiff did not give her any names and continued to request all the inmates.

Plaintiff claims that defendant Eggleston did not give appropriate reasons for her refusal. A hearing officer does not violate due process by excluding irrelevant or unnecessary evidence or testimony. *Kawalinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999) (citing *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991)); *Chavis v. vonHagn,* No. 02–CV–119, 2009 WL 236060, at *62 (W.D.N.Y. Jan. 30, 2009) (citing *Kawalinski, supra* ).

It is clear from defendant Eggleston's comment that she believed she had the "pertinent" information, and that she believed the samples of the other inmates' handwriting that were determined not to match the threatening letter were not relevant to the hearing. She specifically stated that asking for handwriting samples from all the ILC members was not a reasonable request, as was plaintiff's request for samples from all the inmates on the unit. (Eggleston Aff. Ex. B at 9). Defendant Eggleston noted that there were no other members of the ILC in plaintiff's dorm, other than Alexander, and the threatening letter referred to officers who worked in plaintiffss and Alexander's housing unit. (*Id.* at 17–18). Defendant Eggleston credited defendant Whalen's and defendant Chase's testimony that none of the other samples matched the letter, thus producing the samples taken from the eight porters was also not necessary. Plaintiff had the opportunity to argue that *his* samples did not match the threatening letter. Thus, defendant Eggleston was justified in refusing to produce or obtain the requested evidence.

### iii. Sufficiency of the Evidence

Defendant Chase and Whalen compared the threatening letter with samples of plaintiff's handwriting and samples of the handwriting of eight porters who lived on the same unit. They both testified at plaintiff's hearing, and stated that plaintiff's was the only sample that came close to the handwriting in the threatening letter. Plaintiff had the opportunity to question them. Defendant Whalen also testified that she was plaintiff's counselor and was familiar with his handwriting, but that when she was approached to help with the investigation "at no time was a specific inmate directed to [her]." (Eggleston Aff. Ex. B at 45–47). Plaintiff was allowed to present his witnesses, including the inmate who was impersonated in the letter.

**\*18** Sergeant Giambruno also testified that he was involved in the investigation, and he remembered comparing the threatening letter to three or four different inmates' samples, given to him by officers. (*Id.* at 48). He stated that he compared a couple of samples from plaintiff's unit and some from another building who had previously been housed in plaintiff's unit. However, Sergeant Giambruno did not find enough similarities in any of the letters. (*Id.* at 49). When he was not successful in finding a match, he turned a copy of the letter over to defendant Whalen, and ended his involvement in the case. (*Id.*) He was not involved in determining that plaintiff's handwriting was a match for the threatening letter. (*Id.*)

The proof relied upon by defendant Eggleston constituted at least "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e.g., Monier v. Holt,* 4:CV–05–2062, 2005 WL 3531369, at *2 (M.D.Pa. Dec.21, 2005), *aff'd,* 259 F. App'x 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114–03, 2007 WL 1033359, at *3 (W.D.N.C. Apr.2, 2007), *aff'd,* 242 F. App'x 19 (4th Cir.2007) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at *2 (E.D.Ark. Mar.9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards).

Defendant Eggleston read a lengthy decision into the record that is supported by at least "some" evidence. (*Id.* at 87). She stated that she discussed the witnesses that she found

were credible and the witnesses that were less relevant. She explained why she made her determination, discussed the sentence, and reminded plaintiff of his right to appeal. (*Id.* at 87–88).

The court notes that this determination was later administratively reversed after plaintiff filed an Article 78 proceeding challenging the determination. (Prack Aff. ¶ 21 & Ex. D). Defendant Prack states that this was "[d]ue to an overabundance of caution." (*Id.*) Notwithstanding that reversal, the hearing officer's failure to make an independent examination of the handwriting would not have violated plaintiff's federal due process rights. *See, e.g., Monier v. Holt,* 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[27]

[27]    In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico,* 356 F.3d 481, 489–90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill,* a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico,* 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of

evidence). Neither of these cases applies here. Both defendants Chase and Whalen testified regarding their investigation, there were no confidential informants, and plaintiff was allowed to question both of the defendants. His theory that they should have reviewed more handwriting samples and that defendant Chase was unreliable because he was not a handwriting expert does not implicate federal due process rights. This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to cross-examination.

**\*19** In his response to the motion for summary judgment, plaintiff cites various New York State cases. *See e.g. Hill v. LeFevre,* 124 A.D.2d 383, 507 N.Y.S.2d 330 (4th Dep't 1986). This case discussed confidential testimony by an individual who did not testify in the inmate's presence. Plaintiff cites the "substantial evidence" standard, however, as stated above, the sufficiency standard for federal due process is "some" or a "modicum" of evidence. Plaintiff also cites state law cases in which it was determined that the hearing officer erred in failing to make her own determination of whether the plaintiff's handwriting was similar to the subject letter. *See Odom v. Goord,* 271 A.D.2d 723, 705 N.Y.S.2d 433 (3d Dep't 2000). In *Odom,* the court stated that although the corrections officer was not legally qualified to render an opinion that two documents contained the same handwriting, the hearing officer was so qualified. *Id.* 271 A.D.2d at 724.

As stated above, the standard for review of disciplinary hearings in state court is stricter than for federal due process purposes. In any event, in this case, defendant Eggleston had the samples of plaintiff's own writing to compare to the unknown author's threatening letter, and she did compare them. Plaintiff is complaining that defendant Eggleston did not look at the *other* inmates' letters to make an independent determination of whether defendants chose the correct inmate as the author. (Pl.'s Resp. at 8). The cases cited by plaintiff do not apply, and even if the evidence had been insufficient for state law purposes, that did not rise to the level of a constitutional violation.

### iv. Credit for Time Served in Pre–Hearing Confinement

Finally, plaintiff alleges that it was error for defendant Eggleston to make plaintiff's sanction run from the time of

2013 WL 5441353

the hearing, rather than giving him credit for time served in keeplock prior to the hearing. Defendant Eggleston states in her affidavit that giving credit for time served is a common practice, but the decision to grant such credit is within the discretion of the hearing officer and is not a procedural requirement. (Eggleston Aff. ¶ 33). Defendant Eggleston "rarely" granted credit for time served, and she believed it would have been "particularly inappropriate" in this case because of plaintiff's lengthy disciplinary history and because the suspension of a prior disciplinary sanction did not deter plaintiff from repeated offenses. (*Id.* ¶ 34).

The court notes that, other than a section stating that any disciplinary penalty imposed in a Tier III hearing is to run consecutively to "any other like penalty previously imposed" unless *"the hearing officer"* determines that the penalties shall run concurrently and advises the inmate, there are *no regulations* governing credit for pre-hearing confinement. N.Y. Comp.Code R. & Regs., tit.7, § 254.7(a)(2) (emphasis added). This section clearly leaves the determination of whether to run penalties consecutively or concurrently up to the hearing officer, without any procedural requirement other than notice to the inmate. The federal due process requirements do not contain any reference to the sanctions imposed or when the sanction must begin to run after an inmate is found guilty of the violation. Thus, there is no due process implication to this claim.

### b. Telephone Violation

**\*20** The sanction imposed after plaintiff's second disciplinary hearing consisted only of a short period of deprivation of privileges. The length of plaintiff's confinement was not affected. Based on *Sandin,* this court finds that plaintiff had no liberty interest protected by due process with respect to the disciplinary hearing held by defendant Meskunas. Thus, any due process claim relating to that hearing may be dismissed.

### 2. *Retaliation*

Plaintiff alleges that the two misbehavior reports discussed above were filed against him in retaliation for his grievance against defendant Leon. In their affidavits, both defendants Chase and Whalen state that they did not know about plaintiff's grievance against defendant Leon, and they did not issue any false or retaliatory misbehavior reports. (Chase Aff. ¶¶ 19–23; Whalen Aff. ¶¶ 24–33).

During plaintiff's deposition, he was asked which grievance he believed resulted in retaliation. (Pl.'s Dep. at 32). Plaintiff stated that "it was a number of grievances and complaints," but then he stated that only one was a grievance, and "the rest of them I think were complaints. I don't recall there being actual grievances." (*Id.*) Plaintiff specified the grievance against defendant Leon as the formal grievance that caused the alleged retaliation. (*Id.*) Plaintiff testified that when he was going to the grievance hearing, he was sitting in the hallway, and an officer asked plaintiff to tell him the subject matter of the grievance. (*Id.* at 33). When plaintiff explained the facts of the grievance, the officer told plaintiff that "it's not a good thing to write grievances against people in Clinton, especially somebody that's well liked like Leon." (*Id.*) Plaintiff could not name the officer who allegedly gave plaintiff this information. He described the officer as "[h]eavy-set, about 5′7″ or 8″, brown hair, about 260 pounds ...." (*Id.*)

Plaintiff claims that the unknown officer gave plaintiff a hard time about a permit for his wedding band approximately one week after the above conversation. Plaintiff attributes this verbal harassment to the fact that he told the officer about the Leon grievance. (*Id.* at 35). Plaintiff testified that he wrote a "complaint" against this unknown officer. (*Id.*) It does not appear that this "complaint" was a formal grievance because plaintiff states he wrote to the Superintendent and was interviewed by a Sergeant about this issue. (*Id.* at 35–38). Plaintiff also explained that in retaliation for the grievance against Leon, and in retaliation for his wife's complaints, plaintiff's wife was harassed at various times when she was visiting. (*Id.* at 38–41). Plaintiff stated that Officer Lincoln was involved in this harassment, and unnamed officers were "whispering and pointing" at plaintiff and his wife.[28] (*Id.* at 39–30).

[28]  Any claims relating to these alleged incidents were dismissed after the defendants' first motion. (Dkt. Nos. 44, 45–1 at 32–33).

Plaintiff also alleges that the July 23, 2010 incident and misbehavior report were in retaliation for the Leon grievance and plaintiff's wife's complaints about poor treatment during her visits. (*Id.* at 41). Plaintiff claims that on July 23, 2010, his housing unit was searched, and he was taken to SHU. He testified that he knew these actions were in retaliation for the Leon grievance and other complaints because, after he was taken to SHU, defendant Chase interviewed plaintiff and asked him about "the complaints." (*Id.* at 42). Plaintiff told Chase "what was going on and why." (*Id.*) Plaintiff claimed

2013 WL 5441353

that defendant Chase told plaintiff that writing complaints was not viewed favorably at Clinton, [29] and that Chase could "do anything he want[ed] because he was in charge." (*Id.*)

[29]   Whatever plaintiff told defendant Chase during this interview could not have been the reason for retaliation. The investigation of the threatening letter was already underway.

**\*21** Although plaintiff discussed defendant Chase at great length during the deposition, there was really no indication of how he or defendant Whalen would have known about a grievance against defendant Leon or any other complaint, formal or otherwise, made by plaintiff. Defendant Whalen only became involved in the misbehavior report regarding the threatening letter because defendant Whalen was a corrections counselor, who kept all correspondence sent to her by inmates, and who was asked to assist in the investigation of the threatening letter by examining samples of plaintiff's handwriting. (Whalen Aff. ¶¶ 4, 7, 9, 11). They looked at a number of samples of inmates' writing by putting together a list of the porters housed in the same building as plaintiff for a handwriting comparison. (*Id.* ¶¶ 11–12).

Plaintiff speculates that this misbehavior report and the telephone violation charge were retaliatory based upon an alleged statement by an unknown officer and a claim that defendant Chase told plaintiff that writing grievances was not a good idea. However, plaintiff claims that this alleged retaliation was committed by officers against whom he had not written any grievances, and it is unclear how either defendant Chase or defendant Whalen would have become aware of plaintiff's grievance against defendant Leon.

In his response to the motion for summary judgment, plaintiff also speculates that his letters of complaint regarding visitation, addressed to other officers, found their way to defendant Chase. A few of the complaint letters were forwarded to Captain Holdridge, and defendant Chase testified at plaintiff's disciplinary hearing that he was Acting Captain and was reading Captain Holdridge's mail. (Pl.'s Resp. at 10–11). One of the letters attached as an exhibit states that plaintiff's "July 5, 2010 letter regarding staff complaint" was referred to Captain Holdridge. (Pl.'s Ex. N). No July 5, 2010 letter was attached. [30]   The next two letters are dated July 9, 2010 and July 13, 2010 and are addressed to Superintendent LaValley. (Pl.'s Ex. O). Both letters complain about visitation and Officer Lincoln. The response from Superintendent LaValley states that at the time of the incident,

defendant Chase "intervened and remedied the situation *in [her] favor.*" [31]   (Pl.'s Ex. P) (emphasis added).

[30]   This might be a typographical error by Superintendent LaValley because two letters of complaint were referred to Captain Holdridge, (Pl.'s Ex. N, Q), but the letters in Exhibit O are dated July 9, and July 13.

[31]   Neither plaintiff nor his wife, ever mentions defendant Chase by name, but plaintiff's letter states that his wife spoke to "a Lieutenant," who stated he would take care of the situation. (Pl.'s Ex. O; Dkt. No. 56–1, CM/ECF p. 51). Plaintiff's letter then states: "After that I was call [sic] down to the visiting room approximately five minutes later." (*Id.*) Plaintiff's wife also mentions that she spoke to "a lieutenant" who remedied the situation. (Pl.'s Ex. O; Dkt. No. 56–1, CM/ECF p. 52). Plaintiff's wife stated that the time elapsed was 15 minutes, but in any event it was clear that the "lieutenant," who we now know from Superintendent LaValley's letter was defendant Chase, helped plaintiff and his wife during the incident.

Thus, plaintiff has not established a nexus between his protected activity and the alleged retaliation. Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr.14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at \*8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved

2013 WL 5441353

in the disciplinary action). In this case, plaintiff's current speculation that defendant Chase retaliated against plaintiff based on two letters forwarded to Captain Holdridge that defendant Chase may have seen, is unfounded. This is particularly true because in Superintendent LaValley's letter, he states that defendant Chase resolved the visitation issue in plaintiff's wife's favor.

**\*22** Finally, defendants also argue that even if plaintiff had made the appropriate showing, they would have taken the same action, notwithstanding any retaliatory motive. Defendants point out that plaintiff was found guilty of the conduct charged in the misbehavior reports. The charges in question were supported by documentary evidence, and notwithstanding the reversal of the first hearing, a review of the letters and plaintiff's handwriting shows that defendants had a reasonable basis for the charges. The PIN violation was also supported by evidence documenting the telephone calls made using plaintiff's PIN when he would have been unable to make the telephone calls. Thus, plaintiff's claims of retaliation may be dismissed. *See Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (where the record clearly demonstrates that the inmate in fact committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report, the

defendants meet their burden of demonstrating proper, non-retaliatory reasons for filing the misbehavior report, and are entitled to summary judgement on a retaliation claim).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 54) be **GRANTED,** and the amended complaint **DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5441353

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by  Lewis v. Hanson,   N.D.N.Y.,   April 9, 2020

2011 WL 1453789

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Susan Lee HARE, Plaintiff,

v.

James HAYDEN et al., Defendants.

No. 09 Civ. 3135(RWS).

|

April 14, 2011.

OPINION

SWEET, District Judge.

**\*1** Defendants Reverend Maria Lopez ("Lopez"), Deputy Superintendant James Hayden ("Hayden"), and Grievance Supervisor Kim Watson ("Watson") (collectively, "Defendants") have filed motions for summary judgment. For the reasons stated below, these motions are granted.

### Prior Proceedings

Plaintiff Susan Lee Hare ("Hare" or "Plaintiff") filed her complaint on April 1, 2009, alleging misconduct by Superintendant Ada Perez, Superintendant Elizabeth Williams, Hayden, Lopez, and Watson. Defendants Perez, Williams, Hayden, and Watson answered on September 16, 2009. Defendant Lopez answered on August 31, 2010. On November 22, 2010, the Court signed off on the stipulated dismissal of Defendants Perez and Williams.

Defendant Lopez and Defendants Hayden and Watson filed separate motions for summary judgment on December 13, 2010 and December 14, 2010, respectively. These motions were heard on submission on January 19, 2011.

### Statement of Facta

In August 2008, Plaintiff was programmed as a Catholic clerk assisting Father O'Shea, the Catholic Chaplain at Bedford Hills Correctional Facility ("BHCF"). She was programmed for both the morning and afternoon shifts. *See*

Deposition of Susan Hare, attached to Declaration of John Knudsen ("Knudsen Dec") as Exhibit A ("Hare Dep."), at 15. On August 14, 2008, a meeting occurred between Plaintiff, Father O'Shea, and Hayden. At that meeting, Father O'Shea recommended that Plaintiff remain the Catholic clerk after his retirement on August 15, and Hayden agreed that Plaintiff remain in the position. Affirmation of James Hayden ("Hayden Aff."), ¶ 3, attached to Knudsen Dec. as Exhibit C.

Plaintiff then sent a letter dated August 16, 2008 to Hayden in which she made several allegations against Reverend Lopez, including that Lopez met with Hare on August 15, that Lopez ordered the moving of a cabinet with Catholic items, and that Lopez ordered her clerks to pack up the Catholic items in the Sacristy into bags and put them out for the trash. *See* Hare Letter dated Aug. 18, 2008, attached to Knudsen Dec. at Exhibit B at Hare 27–31. The underlying theme of Plaintiff's letter appears to have been that Reverend Lopez was using her position to defile the Catholic religion. *See Id.* at 30 ("the Catholic (sic) have been defiled by this woman and her community.") In response to Plaintiff's letter and to address the allegations, Hayden set up a meeting on August 18, 2008 with Plaintiff, Lopez and two other inmates, Tuttle and Ramsey. Hayden Aff., ¶ 5.

The August 18 meeting between Plaintiff and Reverend Lopez was very contentious. Hayden Aff. ¶ 6. During the meeting, Hayden attempted to verify the allegations made in Plaintiff's August 16 letter. *See* Hare 110–11. He could not substantiate any of Plaintiff's allegations and determined that they were largely hearsay. *Id.;* Hayden Aff, ¶ 6. According to Hayden, Lopez did not attempt to attack Plaintiff during that meeting. Hayden Aff. ¶ 7; Affirmation of John Ruiz, ¶ 2, attached to Knudsen Dec as Exhibit D.

**\*2** Plaintiff contends that on August 18, Lopez verbally abused and physically threatened her in the chapel. Pl. Opp. Aff., at 4–7. Plaintiff claims that this interaction led to an investigation which prevented her from working as Catholic clerk. *Id.* at 4. It is unclear whether this interaction was separate from the August 18, 2008 meeting.

Plaintiff filed a grievance alleging that Reverend Lopez verbally harassed her during the August 18 meeting. *See* Hare 104–105. Hayden notified the Superintendent's Office of his personal observations during that meeting, which were incorporated into the Superintendent's response. *See* Hare 103; Hayden Aff., ¶ 8. Following the August 18 meeting, Plaintiff did not appear for her program assignment as

Catholic clerk for two weeks, after which time Reverend Lopez forwarded a memorandum to counselor Greenfield on September 2, 2008, requesting that Plaintiff be removed from her position as Catholic clerk and noting that no new Catholic clerk should be named until a Catholic Priest had been hired. *See* Hare 42. Plaintiff contends that this report was false and that she showed up for work but was sent away. Pl. Opp. Aff. at 9. Counselor Greenfield contacted Hayden to discuss Lopez's request for Plaintiff's removal. Hayden Aff., ¶ 9. According to Hayden, Plaintiff was removed from her Catholic clerk position by him on September 8, 2008, at the latest. Hayden Aff., ¶ 11. Plaintiff contends that she was not removed until September 15, 2008. Pl. Opp. Aff. at 9.

Hayden claims to have removed Plaintiff from her position for multiple reasons. Initially, it was reported that plaintiff failed to report for two weeks for programming after Father O'Shea retired. Hayden Aff., ¶ 10; Hare 42. Also, Hayden determined that Plaintiff was being disruptive to the provision of Catholic services at Bedford Hills. Hayden Aff. ¶ 10. Hayden had investigated plaintiffs numerous allegations about Reverend Lopez and her alleged interference with the Catholic programs and could not substantiate any of them. *Id.* For example, Hayden states that Plaintiff was telling inmates and outside civilians in the Catholic community that Lopez had the cabinet with Catholic items in it moved, and had articles removed from the Sacristy. *Id.* Hayden had received a call from Deacon Lou Santore, a civilian volunteer, who had been told these claims by Plaintiff and was upset. Hayden investigated these claims and determined them to be inaccurate. *Id.* Instead, he determined that the cabinet was moved by a volunteer from the long-term inmate committee, and that Plaintiff appeared to be the only person with the combination to the Sacristy. *Id.;* Affirmation of Kowsillia Magoo, ¶ 4, attached to Knudsen Dec. as Exhibit E. As part of his responsibilities as Deputy Superintendent of Programs, Hayden states that he could not allow inmates to use their programming position to disrupt the inmate and civilian volunteer populations. *Id.*

 **\*3** Additionally, Hayden discussed this issue with all the other chaplains at the facility, who agreed that Plaintiff should no longer remain as the Catholic clerk. Hayden Aff., ¶ 11. This included Sister MaryAnn Collins, who was a part-time employee at the facility and apparently effectively acted as head of the Catholic community there. *Id.* Finally, Hayden determined that Plaintiff and Reverend Lopez were not able to work together. *Id.* Plaintiff drafted a handwritten grievance complaint on September 4, 2008, in which she complained

that Reverend Lopez was retaliating against her because of her prior grievance, and asked that she "stop being harassed and retaliated against by Rev. Lopez." Hare 40–41. Defendant Watson responded to that grievance, noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could no longer be harassing her. Hare 39. Watson states that this was an attempt by her to informally resolve Plaintiff's grievance. Affirmation of Kim Watson ("Watson Aff."), at ¶ 3, attached as Exhibit F to Knudsen Dec. Plaintiff did not request to have the grievance formally processed, but if she had, Watson claims she would have done so. *Id.* Plaintiff contends that she took Watson's response to mean that she could not file a grievance.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Affidavits submitted in opposition to summary judgment must be based on personal knowledge from a competent source, and "set forth such facts as would be admissible in evidence." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(c)). Hearsay or other evidence that would be inadmissible at trial cannot be credited to defeat a summary judgment motion. *See Id.* at 219 ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

### Plaintiff's Retaliation Claims are Dismissed

In order to state a valid retaliation claim, a plaintiff must allege that her actions were protected by the Constitution, and that such "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal citations omitted). There must be a "causal connection between the protected [conduct] and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal citation and quotations omitted). "A plaintiff cannot state a retaliation

claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " *Anderson v. Lapolt,* No. 07 Civ. 1184, 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000)); *see also Sawyer v. Jowers,* No. 08 Civ. 186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) ("To state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred") (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (if plaintiff's claim of retaliation had been based on circumstantial evidence alone, and not also supported by direct evidence of defendant's admission, Court would be inclined to grant summary judgment); *Bussey v. Phillips,* 419 F.Supp.2d 569, 585 (S.D.N.Y.2006) ("In order to survive summary judgment on a retaliation claim, a plaintiff bears the burden of showing two genuine issues of material fact: first, that the plaintiff engaged in constitutionally protected conduct, and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials.").

**\*4** Even where a plaintiff meets her burden of establishing a prima facie retaliation claim, it is still subject to dismissal if sufficient other non-retaliatory reasons to take the adverse action were present. *See Bussey,* 419 F.Supp.2d at 585; *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). Furthermore, inmates have no right, constitutional or otherwise, to any particular job or assignment within a prison. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citing *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983). Inmates can be removed from prison assignments for virtually any reason, provided that such decisions are not based on the inmate's race or religion. *Bussey,* 419 F.Supp.2d at 589 (S.D.N.Y.2006).

It should be noted that "courts must approach prisoner claims of retaliation with skepticism and particular care," as such claims are "easily fabricated" and run the risk of "unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). *See also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (noting that prisoner retaliation claims are " 'prone to abuse' because prisoners can claim retaliation for every decision they dislike.") (quoting

*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *Colon,* 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."); *Gill,* 824 F.2d at 194 (because of the potential for abuse, the Court of Appeals requires a "higher level of detail in pleading [retaliation claims]").

Plaintiff contends that she was removed from her position as Catholic clerk by Hayden in retaliation for her complaints against Lopez.[1] There is no dispute that Plaintiff's complaints against Lopez are protected speech and that her removal from her position as Catholic clerk was an adverse action; however, Plaintiff fails to establish the causal link between her complaints and her dismissal, particularly in light of legitimate non-discriminatory reasons for her dismissal given by Hayden.

[1]    To the extent that Plaintiff's allegations of retaliation are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. *Kearney v. County of Rockland,* 373 F.Supp.2d 434,440–41 (S.D.N.Y.2005) ("plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.")

As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer). Here, even giving Plaintiff every reasonable inference, Plaintiff fails to establish that Hayden had a motive to retaliate arising from her complaints against Lopez, and that Hayden's retaliatory motive formed the basis for her dismissal.

**\*5** To the extent Plaintiff contends that Hayden was incompetent or covering up Lopez's misconduct, the evidence before the Court indicates otherwise. Hayden investigated

Plaintiff's claims against Reverend Lopez. The August 18, 2008 meeting between Plaintiff, Hayden and Lopez was called in order for Hayden to investigate Plaintiffs allegations in her August 16 letter, *see* Hayden Aff., ¶ 5, and at that meeting, Hayden questioned both Plaintiff and Lopez to determine the veracity of Plaintiff's allegations. *See* Hare 110–111; Hare Dep., at 73–74. Plaintiff's subsequent grievance on August 21 alleged that Lopez mistreated her during the August 18 meeting, a claim for which there was no need for Hayden to investigate since he was present for the meeting and knew what had and had not occurred. *See* Hayden Aff., ¶ 8. Finally, there is no evidence to indicate that Hayden was "covering up" for Lopez, and the record indicates that Hayden reasonably found Plaintiff's complaints against Lopez to be meritless. Plaintiff's allegations of a cover up are conclusory and are insufficient to meet Plaintiff's burden for a retaliation claim at the summary judgment stage. *See Graham,* 89 F.3d at 79.

Even if the Court were persuaded that there was a causal connection between Plaintiff's complaints against Lopez and her dismissal for her position as Catholic clerk, Hayden had valid, non-discriminatory reasons for dismissing her. "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where ... prison officials have broad administrative and discretionary authority.' " *Graham,* 89 F.3d at 79 (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Here, Hayden identified four legitimate reasons for Plaintiff's removal: (1) she failed to show up for work for 2 weeks [2]; (2) her behavior disrupted the overall provision of Catholic services at Bedford Hills; (3) her removal was recommended by all the other chaplains, including the part-time chaplain, Sister MaryAnn Collins; and (4) the inability of Plaintiff and Lopez to work together. Hayden Aff., ¶¶ 10–11.

[2]    Plaintiff contends that she did show up for work but was sent away by Lopez. This claim against Lopez is addressed, *infra.* Hayden's reliance on Lopez's absence report was reasonable and was a legitimate basis for Hayden's decision to dismiss Plaintiff.

Plaintiff's allegations that Lopez independently retaliated against her, by preventing her from returning to her program assignment, falsely reporting her absence from her job, and otherwise acting inappropriately toward her, are belied by Plaintiff's acknowledgement that Lopez never made any statement revealing that she engaged in any conduct with the intent to retaliate against Plaintiff for writing complaint

letters or for any other act by Plaintiff. (Hare Dep. at 135). Plaintiff can only point to her conclusory assumptions of Lopez's motive and has failed to adequately substantiate her claims to survive this motion for summary judgment.

Furthermore, even if Plaintiff did establish that Lopez filed a false report in retaliation for her complaints, Plaintiff cannot establish that the adverse action of her dismissal from her position as Catholic clerk by Hayden arose from that allegedly false report. As discussed above, Hayden chose to dismiss Plaintiff for three other legitimate reasons and would have done so regardless of the report. Hayden Aff., ¶¶ 10–11. *See Graham,* 89 F.3d at 79 (quoting *Lowrance,* 20 F.3d at 535).

### Plaintiff's Claim that Lopez Filed a False Misbehavior Report is Dismissed

**\*6**  To the extent that Plaintiff claims Lopez falsely reported her absence from work for two weeks, this allegation does not support a claim. "The Second Circuit has held that the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process...." [3] *Faison v. Janicki,* No. 03 Civ. 6475, 2007 WL 529310, at \*4 (W.D.N.Y. Feb. 14, 2007) (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). *See also Moore v. Casselberry,* 584 F.Supp.2d 580, 582 (W.D.N.Y.2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report"); *Flemings v. Kinney,* No. 02 Civ. 9989, 2004 WL 1672448, at \*3 (S.D.N.Y. Jul. 27, 2004) ("[i]t is well settled that 'a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report' ") (quoting *Boddie,* 105 F.3d at 862). Furthermore, the record does not support Plaintiff's assertion that Lopez's report was false. Officers Ruiz and Magoo both affirm that they were never instructed by Lopez not to allow Plaintiff to enter the chapel. Ruiz Aff., ¶ 3; Magoo Aff., ¶ 3. Lopez denies having falsified the report.

[3]    A plaintiff does have a claim "where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights." *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). However, as discussed above, Plaintiff, to the extent she makes such a claim, fails to establish that Lopez was motivated by Plaintiff's complaints when she filed the allegedly false report.

2011 WL 1453789

*Plaintiff's Claim that She was Unable to File a Grievance is Dismissed*

Plaintiff alleges that she was denied the right to file a grievance when Watson responded to Plaintiff's September 4, 2008 grievance, which requested that Lopez stop retaliating against her, by noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could not retaliate against her. *See* Hare 39–41. Watson claims to have sent this memorandum to Plaintiff in an attempt to informally resolve the grievance, which is part of Watson's responsibilities, Watson Aff. ¶ 3, but Plaintiff alleges she understood the memorandum to indicate that she was not allowed to file a grievance. Watson claims she would have formally filed the grievance if Plaintiff had contacted her and requested that it be formally filed. *Id.*

While there is a dispute of fact as to whether Plaintiff was allowed to file a grievance, Plaintiff has no constitutionally protected right to file a grievance, and thus does not have a cognizable § 1983 claim. *See Shell v. Brzeziniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim") (citing *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001)); *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 437 (E.D.N.Y.2009) ("[T]he grievance procedure or lack thereof cannot itself form the basis of a Section 1983 claim because there is no constitutional right to a grievance mechanism") (citing *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008)). Notably, Defendants do not argue that Plaintiff has failed to exhaust her claim of retaliation because this grievance was not processed through the entire grievance system.

*Plaintiff's Claims of Verbal Abuse are Dismissed*

**\*7** Plaintiff accuses Lopez of approaching her on August 18, 2008 "in a menacing way, raising her hands toward plaintiff from behind in a motion as if to strangle plaintiff" (Pl. Opp. Aff. at 7) and asserts that Lopez "screamed" at her and called her a "liar" (Hare Dep. at 57) or otherwise spoke to her in an abusive manner. While Lopez denies Hare's allegations regarding her conduct, even when the evidence concerning them is viewed most favorably to Plaintiff, these allegations do not support an action pursuant to § 1983. The Eighth Amendment proscribes the " 'unnecessary and wanton infliction of pain' " on prisoners by prison officials. *Boddie,* 105 F.3d at 861 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). Hare does not claim that any actual physical harm

was caused to her by Lopez, and she acknowledged in her deposition testimony that, on the occasion when she alleges Lopez approached her in a physically threatening manner, "[m]y back was to her" (Hare Dep. at 61), and "I didn't see her ...." (Hare Dep. at 58). According to Plaintiff, Officer Ruiz "stopped the whole incident" before any assault could take place. (Hare Dep. at 57).

It is undisputed that there was no actual assault, and Plaintiff's evidence, viewed most favorably to her, establishes nothing more than verbal abuse. As the Court held in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y, 1998):

> [V]erbal harassment or profanity alone, "unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem," does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983. *Del Carpio v. Walker,* No. 95 Civ. 1502(RSP) (GJD), 1997 WL 642543, at * 6 (N.D.N.Y. Oct. 15, 1997) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997)); *see Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at *6 (S.D.N.Y. Apr. 22, 1994), *aff'd,* 89 F.3d 826, 1995 WL 722263 (2d Cir.1995); *Hurdle v. Ackerhalt,* No. 92–CV–1673, 1993 WL 71370, at *1–2 (N.D.N.Y. Mar. 8, 1993) (allegations of threats and harassment do not rise to the level of a Constitutional violation).

Plaintiff's claim fails because she does not allege that she suffered any physical injury. *See Bouknight v. Shaw,* No. 08 Civ. 5187, 2009 WL 969932, at *3 (S.D.N.Y. Apr. 6, 2009) ("Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983.") (citing *Purcell,* 790 F.2d at 265). *See also Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("We agree with the majority of our sister circuits that [42 U.S.C. § ] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.") Rather, Plaintiff contends that she suffered only "mental anguish" as a consequence of the Defendants' actions.

**\*8** "Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not *de minimus.*" *Shabazz,* 994 F.Supp. at 475. Plaintiff stated in her deposition that she was affected by Lopez's conduct particularly because she was a domestic violence victim and because Lopez came from a position of trust. (Hare Dep. at 139). However, Plaintiff admitted during her deposition that, notwithstanding the availability of mental health services, she never sought such services, but attained sufficient relief from her distress by speaking about it with a chaplain. (Hare Dep. at 139–40). Based on Plaintiff's allegations and record, Plaintiff's mental pain was *de minimus. See Shabazz,* 994 F.Supp. at 475 (mental anguish caused by repeated use of racial slurs was *de minimus* ); *Jermosen v. Coughlin,* No. 87 Civ. 6267, 1993 WL 267357, at \*6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994) (*de minimus* psychological harm when correctional officers "approached plaintiff with their nightsticks raised in a threatening position" before conducting a strip frisk).

### *Plaintiff's Claims for Infringement of Her Religious Rights are Dismissed*

#### a. The Alleged Removal of Religious Objects from the Sacristy

Hare's complaint discusses at length the alleged removal of religious articles from the Catholic sacristy at BHCF, but she has acknowledges that she did not observe anyone removing those articles, and that she has no personal knowledge regarding who is responsible for any such conduct. (Hare Dep. at 137; Pl. Opp. Aff. at 7). Lopez, for her part, denies any involvement in or knowledge of this occurrence. (Lopez Aff., ¶¶ 14–15). It appears that Plaintiff's only basis for claiming that Lopez had any involvement in the alleged removal of the articles in question is her assertion that she was told by Officer Magoo and through a grapevine of other inmates that Lopez had authorized other inmates to take this action. (Hare Dep. at 37; Pl. Opp. Aff. at 9). This hearsay claim is not corroborated by Officer Magoo; in fact, he has affirmed that he did not make a statement to Hare. (Magoo Aff., ¶ 4). Likewise, Inmate Rose Ramsey, who allegedly told Lucy Tuttle, who allegedly told Plaintiff, about Lopez's role in the removal of articles for the Catholic service has not provided an affidavit corroborating Plaintiff's contention. Thus, Hare does not present admissible evidence to support her allegation that Lopez caused the removal of items from the Catholic sacristy. *See Finnegan v. Board of Educ. of Enlarged City School Dist. of Troy,* 30 F.3d 273, 274 (2d Cir.1994) (hearsay

that would not be admissible at trial cannot be relied upon in opposition to a motion for summary judgment). Without establishing Lopez's involvement in the alleged removal of Catholic items, Plaintiff has not established a claim. As the Court of Appeals has recognized, "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

**\*9** Even if Plaintiff had established that Lopez bears responsibility for the removal of those articles from the sacristy, the conduct she alleges would not establish any violation of Hare's personal rights. She does not claim that any of the articles in question belonged to her, and, in the absence of specific criteria that Hare does not allege here, a plaintiff does not have standing to assert the constitutional rights of others. *Camacho v. Brandon,* 317 F.3d 153, 159 (2d Cir.2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.' ") (quoting *Campbell v. Louisiana,* 523 U.S. 392, 397 (1998)). *Cf. Hudson v. Palmer,* 468 U.S. 517, 547 n. 13 (1984) (Stevens J., conc. in part and diss. in part) ("A prisoner's possession of ... personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause of the First Amendment"). Thus, Hare's allegations regarding the alleged removal and desecration of objects from the Catholic sacristy does not give rise to any genuine dispute regarding facts that would be material to her § 1983 action against Lopez.

#### b. The Alleged Denial of Plaintiff's Right to Practice Her Religion

Plaintiff alleges that Lopez impermissibly infringed upon her right to practice religion. She does not allege any involvement in this deprivation by Hayden or Watson, so this claim is dismissed as to them.

In her complaint, Plaintiff asserts denial of "the right to practice Freedom of Religion," but she does not specify how this alleged violation of her civil rights occurred. In her affirmation opposing the summary judgment

motions [4], Plaintiff contends that Lopez prevented Plaintiff from continuing her Catholic video group and curtailed "all Catholic programs, which precluded plaintiff from participating in them, as they no longer were running." Pl. Opp. Aff. at 8. Also, referring to Lopez's alleged verbal abuse of Plaintiff on August 8, 2011, Plaintiff claims that "Lopez's actions effectively precluded any operations of religious programs for Catholic inmates." Pl. Opp. Aff. at 6. These assertions are insufficient to place into issue facts that, if resolved in Plaintiff's favor, would entitle her to relief pursuant to Section § 1983.

[4]      As with her retaliation claims, to the extent that Plaintiff's allegations of infringement on her rights to practice her religions are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. Kearney, 373 F.Supp.2d at 440–41.

To establish a free exercise claim under the First Amendment, a plaintiff must demonstrate that state action substantially burdened her observation of a "central religious belief" without a "compelling government interest" justifying the burden. Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir.2006) (quoting Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 384–85 (1990)). An inmate's right to the free exercise of religion is "subject to limitations that arise both as a consequence of being incarcerated and from 'valid penological objectives.' " Harris v. Lord, 957 F.Supp. 471, 474 (S.D.N.Y.1997) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987)).

*10  With regard to the alleged curtailment of programs such as the "Praise Dance" or the video activities that she sought to organize, Plaintiff does not claim that these programs were "central or important" to the practice of her religion, an essential component of a claim that her religious beliefs were "substantially burdened." Ford v. McGinness, 352 F.3d 582, 593–94 (2d Cir.2003).

Hare's claims regarding the "suspension" of Catholic programs appear to be linked with her role in leading such programs. Plaintiff's papers and testimony recognize, however, the Catholic Chaplain, Father O'Shea, retired in August of 2008. The subsequent temporary suspension of programs that he had supervised cannot be deemed an unreasonable infringement on Plaintiff's practice of her religion, but simply a consequence of the institution's

temporary lack of a Catholic Chaplain. Plaintiff's claim appears to be premised on her assumption that, even in Father O'Shea's absence, she should have been permitted to continue running these programs. (See Hare Dep. at 105 ("Even if I was not a clerk, I should have been allowed to run the program")). However, as discussed above, inmates have no right to any particular position or assignment at a correctional institution. See Gill, 824 F.2d at 194.

Plaintiff's claim that Lopez prevented her from attending Catholic Mass and other religious programming, to the extent that she asserts it, is not supported by the record and does not survive summary judgment even when all reasonable inferences are made in her favor. At her deposition she testified as follows:

Q. In general, do you recall at any time when you were trying to go to Catholic mass where you were not allowed to go?

A. If [Lopez] knew I was in there, then I was harassed. If she told the officer this Sunday she found out, she would tell that officer. If that officer was there, then I would be harrassed.

Q. How were you harassed?

A. Because I was told to leave, I'm not allowed to be there.

Q. How many times, to the best of your recollection, were you told that you had to leave the Catholic mass?

A. I would say a couple of times. Like I said, I got tired of being harassed, and I just stopped going.

...

Q. What about programming, were you allowed to go to Catholic programming?

A. No. Those were during the day. That's when she really got me. Then on Tuesday night she was there late. She was there until 8 o'clock at night. That was her late night. She made sure that the officer knew I was not supposed to be there.

(Hare Dep. at 106–07).

Plaintiff does not identify the officers involved or specify the dates on which she was allegedly told to leave the chapel. Plaintiff also provides no basis for her claim that, when they allegedly told her to leave, the officers were acting at the

direction of Lopez, and does not claim to have observed Lopez giving any officer such instructions. Officers Ruiz and Magoo, who were stationed outside the 112 Chapel during the period in question, have affirmed that they never received any such instruction from Lopez. Ruiz Aff. ¶ 3; Magoo Aff. ¶ 3. Thus, Plaintiff has not presented any admissible evidence that would support her claim that Lopez prevented her from attending Mass or other religious services, and the record suggests that she was not denied entry to Mass.

 **\*11**  Moreover, it is unclear whether being told to leave the chapel "a couple of times" (Hare Dep. at 107)—even when the evidence is viewed most favorably to Plaintiff—rises to the level of a "substantial burden" on Hare's religious freedom. It is undisputed that Hare's right to free exercise of religion includes the right to attend religious services. *O'Lone,* 482 U.S. 342, 348 (1987). However, that right is not unlimited or absolute, but is subject to limitations that arise both as a consequence of being incarcerated and from "valid penological objectives." *Id.* Because Plaintiff provides no particulars as to the dates and times when she was allegedly prevented from attending Mass, and does not identify the officers who allegedly prevented her from doing so, her claims are too vague to permit the Court to determine both that the alleged removal actually occurred and, if it did, whether it was justified by a compelling government interest. *See Skoros,* 437 F.3d at 39.

In view of all of these circumstances, the Court concludes that Hare's claim that her freedom of religion was infringed is not based on facts that would entitle her to relief pursuant to § 1983. *See Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986) (summary judgment stage is appropriate juncture for *pro se* plaintiffs to make clear the facts that they believe support their claims, and for a court to grant summary judgment where the underlying facts are insufficient).

### *Plaintiff's Reference to Additional Witnesses Does Not Merit a Denial of Summary Judgment*

Plaintiff claims that Defendants' motions for summary judgment should be denied on the grounds that two witnesses have yet to file affidavits. Four months have passed since Defendants filed their motions for summary judgment, and Plaintiff has not attempted to submit these additional affidavits. Furthermore, Plaintiffs' description of what their witnesses will say demonstrates that they would not rescue her claims.

Plaintiff contends that Inmate Lucy Tuttle observed Lopez verbally abuse and physically threaten her in the chapel on August 18, 2008 and in the subsequent meeting on that same day (to the extent that these are separate instances). As was discussed above, Lopez's alleged verbal abuse does not support a § 1983 claim for cruel and unusual punishment, as Plaintiff alleges.

Plaintiff also contends that Lieutenant Collins was Sergeant Collins at BHCF at the time Lopez prevented Plaintiff from entering her work assignment as Catholic Chaplain's Clerk, again without specifying when this occurred. Lopez's alleged refusal to allow Plaintiff to work as Catholic clerk is insufficient to support a § 1983 claim, as Lopez holds no right to her prison assignment. To the extent that Collins's affidavit would support Plaintiff's allegation that Lopez falsely reported her absent from work in retaliation for the Plaintiff's complaints, Plaintiff has not established that her complaints motivated the allegedly false reporting. Furthermore, Plaintiff cannot establish that the adverse action of her removal from her position as Catholic clerk was caused by the allegedly false reports, as Hayden cited other valid reasons for his decision to remove her.

### *Conclusion*

 **\*12**  For the reasons stated above, Defendants' motions for summary judgment are granted.

It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1453789

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4589678

2022 WL 4589678
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Kerry KOTLER, Plaintiff-Appellant,

v.

C. BOLEY, J. Carreras, Sergeant, S. Reams, Inmate
Grievance Program Supervisor, Defendants-Appellees,
K. Chauvin, Senior Counselor, Defendant.

No. 21-1630
|
September 30, 2022

Appeal from a judgment of the United States District Court
for the Southern District of New York (Karas, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **VACATED** and the case is
**REMANDED**.

**Attorneys and Law Firms**

FOR APPELLANT: Kerry Kotler, pro se, Marcy, NY.

FOR APPELLEE: Barbara D. Underwood, Solicitor General,
Judith N. Vale, Deputy Solicitor General, Blair J. Greenwald,
Assistant Solicitor General, Of Counsel, for Letitia James,
Attorney General, New York State Office of the Attorney
General, New York, NY.

PRESENT: Susan L. Carney, Joseph F. Bianco, Alison J.
Nathan, Circuit Judges.

**SUMMARY ORDER**

**\*1** In 2017, Kerry Kotler, pro se and incarcerated, sued
corrections officers C. Boley and J. Carreras pursuant to 42
U.S.C. § 1983, asserting First Amendment retaliation and
due process claims. Kotler alleged that in retaliation for his
participation in the prison inmate grievance program, the
defendants searched his cell, wrote a false misbehavior report,
confined him to special disciplinary units for three months,
and testified falsely at his disciplinary hearing. The district
court granted the defendants' motion to dismiss, reasoning
that Kotler failed to state a retaliation or due process claim. [1]

We assume the parties' familiarity with the underlying facts,
the procedural history of the case, and the issues on appeal.

[1]    Kotler also brought this action against Supervising
Offender Rehabilitating Coordinator Chauvin and
Inmate Grievance Program Supervisor Reams,
and the district court dismissed the claim against
Chauvin for failure to serve. On appeal, Kotler
references his claims against Chauvin but, because
in his briefing on appeal he does not address the
district court's dismissal of these claims, he has
abandoned any challenge. See LoSacco v. City of
Middletown, 71 F.3d 88, 92–93 (2d Cir. 1995).
Kotler has expressly abandoned his claims against
Reams. Appellant's Br. at 2.
Further, the district court did not enter final
judgment as a separate document. Judgment is
deemed to have been entered under Federal Rule of
Appellate Procedure 4(a)(7), and Kotler's notice of
appeal was timely under Rule 4(a)(2).

We review de novo the dismissal of a complaint pursuant
to Rule 12(b)(6), "accepting all factual allegations as true
and drawing all reasonable inferences in the plaintiff's favor."
Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015). The
complaint must plead "enough facts to state a claim to relief
that is plausible on its face." Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007). Because Kotler filed his complaint
pro se, "it must be construed liberally to raise the strongest
arguments it suggests." Walker v. Schult, 717 F.3d 119, 124
(2d Cir. 2013) (alterations adopted).

**I. First Amendment Retaliation Claim**
To establish a First Amendment retaliation claim, a prisoner
must show "(1) that the speech or conduct at issue was
protected, (2) that the defendant took adverse action against
the plaintiff, and (3) that there was a causal connection
between the protected speech and the adverse action." Espinal
v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (citation and
internal quotation marks omitted). To establish an "adverse
action" in the prisoner context, the "retaliatory conduct" must
be such that it "would deter a similarly situated individual
of ordinary firmness from exercising his or her constitutional
rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)
(citation omitted); see also Espinal, 558 F.3d at 128 n.7.

**\*2** We approach prisoner retaliation claims with "skepticism
and particular care, because virtually any adverse action taken
against a prisoner by a prison official—even those otherwise

2022 WL 4589678

not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and internal quotation marks omitted). Such claims must be "supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Id.* (citation and internal quotation marks omitted).

There is no dispute that Kotler easily meets the first element of his retaliation claim, as it is "well established" that filing inmate grievances is constitutionally protected conduct. *See id.* at 294.

Concerning the second element, the district court concluded that Kotler failed to allege an adverse action because a cell search would not deter a prisoner of "ordinary firmness," "whose cell can be searched at any time," from submitting grievances. *Kotler v. Boley*, 2018 WL 4682026, at *4 (S.D.N.Y. Sept. 28, 2018). Kotler asserts on appeal that "the question is not whether the search itself" was an adverse action, but "whether the overall and collective actions" of the defendants constituted adverse action. Appellant's Br. at 11.

We assess adverse action by "look[ing] to the specific circumstances in which retaliation claims arise." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020). Here, the "specific circumstances" alleged by Kotler included not only the cell search but also a false report—based on contraband that allegedly would not have ordinarily resulted in discipline—and false testimony at the hearing. Further, Kotler alleged that these actions resulted in several months of disciplinary confinement. We have previously concluded that conduct similar to some of Kotler's allegations (e.g., false reports and associated sanctions) constituted adverse action. *See, e.g., id.* at 273 (concluding that "sending a prisoner to keeplock for some indeterminate amount of time" constituted adverse action); *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (concluding that "the filing of false misbehavior reports" and "three weeks in keeplock" constituted adverse action).

It is thus plausible that a cell search, the issuance of a disciplinary report based on an item that would usually just be thrown away, a false disciplinary report, placement in disciplinary housing, and false testimony at a disciplinary hearing could deter prisoners "of ordinary firmness" from exercising their constitutional right to file grievances.

Kotler also must satisfy causation, the third element of a retaliation claim, which requires that his allegations

be "sufficient to support the inference that [his filing of grievances] played a substantial part in the adverse action." *Davis*, 320 F.3d at 354 (citation and internal quotation marks omitted). The district court determined that because Kotler never alleged the *content* of the grievances, including whether the grievances were filed against Boley and Carreras specifically, he did not plausibly allege a causal connection between the grievances and the defendants' subsequent actions. *Kotler v. Boley*, 2020 WL 905752, at *2 n.2 (S.D.N.Y. Feb. 25, 2020).

It is true that the subject matter of the grievances "could have aided in establishing a plausible motivation" for the defendants' alleged retaliation against Kotler, *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), but causation may be established even if a prisoner's protected conduct was not directed at the defendant, *see Davis*, 320 F.3d at 354 (explaining that prisoner stated a retaliation claim against prison officials who allegedly took adverse action against him, even though his protected conduct was a lawsuit against officials at a different prison); *see also Espinal*, 558 F.3d at 129–30 (reversing grant of summary judgment to correction officer on retaliation claim, reasoning that a factfinder could infer that the officer was aware of the protected conduct, a lawsuit against *other* officers, and retaliated against the prisoner).

 *3 Here, although Kotler did not allege the content of the grievances, he alleged a motivation for the defendants' actions: Kotler was advocating on behalf of other inmates. Kotler's allegation that he helped another inmate write a grievance—combined with Boley's alleged statement tying the search to Kotler's advocacy—creates a reasonable inference that the defendants had a retaliatory motivation for the search and subsequent actions. This inference is further supported by his other allegations, including that the item Boley recovered would ordinarily have been thrown away instead of resulting in a disciplinary report and confinement, that the defendants submitted a false grievance report, and that the defendants gave false and contradictory testimony at the hearing about the reason for the search.

In addition, "[o]ne way a plaintiff can establish a causal connection is by showing that protected activity was close in time to the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (citation and internal quotation marks omitted). The single day that Kotler alleged passed between the protected conduct and the defendants' retaliatory actions

Case 9:19-cv-01610-BKS-TWD   Document 112   Filed 08/22/23   Page 245 of 279

Kotler v. Boley, Not Reported in Fed. Rptr. (2022)
2022 WL 4589678

falls well within this Court's precedent on temporal proximity. *See, e.g.*, *Hayes*, 976 F.3d at 273 (explaining that one month between a grievance and false misbehavior report constituted circumstantial evidence of retaliation).

The defendants assert that causation cannot be inferred because there were non-retaliatory reasons for their actions: cells may be searched at random and Kotler conceded that contraband was found in his cell. But Kotler alleged that the defendants "normally would have ... simply discarded" the contraband found in his cell and that Boley lied about how dangerous the item was by stating it had been sharpened. Taking Kotler's allegations as true, the non-retaliatory justifications for the defendants' actions are insufficient to dismiss his claim. At this "early state" of the proceedings, he should have "the opportunity to develop facts" to demonstrate his claim. *See Davis*, 320 F.3d at 354 (citation omitted). Therefore, his complaint plausibly alleged a First Amendment retaliation claim.

## II. Due Process Claim

A prisoner can establish a due process violation by showing that "a false misbehavior report[ ] ... was issued in retaliation for exercising a constitutionally protected right." *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) (citation omitted). The district court dismissed Kotler's due process claim against Boley and Carreras because it concluded that Kotler had not alleged that the false report was retaliatory, and he had alleged that they had testified falsely at the hearing to justify the cell search, not in retaliation for his protected conduct. *Kotler*, 2018 WL 4682026, at *5; *Kotler*, 2020 WL 905752, at *3. Because we conclude that Kotler plausibly alleged that the defendants' retaliation for the grievances *included* writing the false report and testifying falsely at the hearing, the district court should reconsider Kotler's due process claim on remand.

Finally, the defendants argue they are entitled to qualified immunity. The district court did not reach this issue, and we decline to do so in the first instance.

Accordingly, we **VACATE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this order.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 4589678

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3813172
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emile MOREAU, Plaintiff,

v.

Sherry ELLSWORTH, et. al., Defendants.

9:20-CV-124 (DNH/ATB)
|
Signed 07/15/2021

**Attorneys and Law Firms**

EMILE MOREAU, Plaintiff pro se.

DAVID C. WHITE, Asst. Attorney General for Defendants.

## REPORT-RECOMMENDATION

Andrew T. Baxter, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff's remaining [1] claims allege that defendants violated his First Amendment rights by interfering with his mail and his access to courts, and retaliating against him for the exercise of his constitutional rights. (Complaint ("Compl.") Dkt. No. 1). Plaintiff also claims that two of the defendants were deliberately indifferent to his medical condition in violation of the Eighth Amendment. (*Id.*) Plaintiff seeks substantial monetary relief. (Compl. ¶¶ 69-70).

[1]      Plaintiff's complaint also contained claims relating to the alleged failure to process his grievances and verbal harassment. Such claims were dismissed without prejudice in the court's initial review of this action. (Dkt. No. 8 at 23). Plaintiff did not amend his complaint with respect to the dismissed claims. Plaintiff's request for injunctive relief was also denied in the court's initial order. (*Id.*)

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 43). Plaintiff originally asked that the court deny the defendants' motion as untimely, or in the alternative, give plaintiff

additional time to respond. (Dkt. No. 45). Defendants filed a "reply," arguing that their motion was timely, but did not oppose giving plaintiff an extension of time to respond. (Dkt. No. 47. The court denied plaintiff's request to deny defendants' motion as untimely and afforded plaintiff the additional time he requested. (Dkt. No. 48). Plaintiff filed his papers in opposition to the defendants' motion on the merits, and the defendants filed a reply. (Dkt. Nos. 50, 53).

## DISCUSSION

### I. Facts and Procedural History

On December 27, 2013, while confined at Green Haven Correctional Facility, plaintiff filed a section 1983 civil rights action in the United States District Court for the Southern District of New York ("Southern District"). (Compl. ¶ 2). *See Moreau v. Peterson*, No. 7:14-CV-201, Dkt. No. 2 (S.D.N.Y. Jan. 8, 2014) ("*Moreau* I"). In July 2015, the Southern District court dismissed the action and entered judgment for defendants. *See Moreau I*, No. 7:14-CV-201 (NSR), 2015 WL 4272024 (S.D.N.Y. July 13, 2015). On July 10, 2015, plaintiff was transferred to Eastern Correctional Facility ("Eastern"). (Compl. ¶ 3). In August 2015, plaintiff appealed the decision in *Moreau I* to the United States Court of Appeals, Second Circuit ("Second Circuit"). *Id.*; *see Moreau v. Peterson*, No. 15-2534, Dkt. No. 1 (2d Cir. Aug. 11, 2015) ("*Moreau II*").

On June 8, 2016, plaintiff was elected as the inmate representative to the Inmate Grievance Resolution Committee ("IGRC"). (Compl. ¶ 46). Plaintiff explains that he complained to IGP Supervisor, Francois about the way that another inmate's grievance was handled. (Compl. ¶ 47). Plaintiff claims that, since then, he was the subject of retaliation. (Compl. ¶ 48). Defendant Correction Officer Justin von der Heyde [2] ("von der Heyde") and IGP Supervisor Francois would no longer allow plaintiff in the grievance office or would write him a note to tell him not to report for work. *Id.* On August 4, 2016, plaintiff sent a letter to K. Francois, the IGP Supervisor and Sergeant B. Liefeld explaining that he was resigning from his position because a knee condition prevented him from traversing the stairs to the IGRC office. *Id.* (Dkt. No. 1-2 at 25). Plaintiff states that after he left his position, he tried to avoid "unnecessary contact" with defendant von der Heyde. (Compl. ¶ 50).

[2]      In the complaint, plaintiff referred to this defendant as J. Vonderheyde. However, it is clear from the

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.      1

2021 WL 3813172

defendants' papers that the correct spelling of this defendant's last name is "von der Heyde," and the court will use the proper spelling herein.

**\*2** The Second Circuit affirmed the judgment in *Moreau I* on January 12, 2017.[3] Compl. ¶¶ 4-6; *Moreau II*, 672 F. App'x 119 (2d Cir. 2017). On January 27, 2017, the Second Circuit mailed the decision to plaintiff. Plaintiff claims that the mail room supervisor at Eastern, defendant Sherry Ellsworth ("Ellsworth"), did not deliver the envelope to plaintiff until February 21, 2017. (Compl. ¶ 26; Dkt. No. 1-1 at 8).

[3]    Although plaintiff alleges that the appeal was denied on October 27, 2016 and then affirmed after a rehearing, plaintiff is incorrect. Plaintiff filed his appeal, but then incorrectly made a "motion" to reverse *Moreau I*. (*Moreau II*, Dkt. Nos. 95). The Second Circuit denied the "motion" on October 27, 2016 because it was procedurally improper. (*Moreau II*, Dkt. No. 99). Plaintiff then made a motion for "rehearing" of Dkt. No. 99, which was denied on November 28, 2016. (*Moreau II*, Dkt. Nos. 105, 108). The appeal itself was not denied after a rehearing. The district court's decision was simply affirmed on January 12, 2017. (*Moreau II*, Dkt. No. 112) (published at 672 F. App'x 119 (2d Cir. 2017).

Plaintiff alleges that on February 10, 2017, he received an envelope with a motion that he previously attempted to serve on the New York State Attorney General on January 10, 2017. (Compl. ¶ 21). Plaintiff claims that Ellsworth did not mail the motion, held it until February 10, 2017, and then returned it to Plaintiff "opened" in an envelope with an outdated 1994 U.S. Postal label from Springfield, Massachusetts. *Id.* The outside of the envelope included a notation that read, "found loose in mail." (Compl. ¶ 23). Plaintiff claims that the "goal" of defendant Ellsworth and her staff was to delay plaintiff's papers so that he missed his court deadlines, resulting in his continued incarceration. (Compl. ¶ 24).

On February 16, 2016, plaintiff states that he received a letter from the Second Circuit which was postmarked February 8, 2016 and which was opened outside of his presence. (Compl. ¶ 28). Plaintiff claims that he made a Freedom of Information Law ("FOIL") request to see the "log book" page for the date he received the mail and claims he discovered that the page was "falsified." (Compl. ¶ 28).

Plaintiff states that on February 16, 2017, he sent a "complaint" to the United States Court of Federal Claims. (Compl. ¶ 7). Defendant Ellsworth allegedly held the "complaint" for five days before she sent it to the court.[4] (*Id.*) On March 6, 2017, plaintiff received a letter from the Court of Federal Claims, dated February 28, 2017, returning plaintiff's papers because it was unclear whether plaintiff meant to file a "complaint" with the Court of Federal Claims or whether he meant to file his papers in the U.S. Supreme Court. (Compl. ¶ 9). Plaintiff states that his "correspondence" with the Court of Federal Claims took one month, when it should only have taken two weeks. (Compl. ¶ 10).

[4]    Plaintiff states that the Court of Federal Claims received his papers on February 27, 2017. (Compl. ¶ 8).

Plaintiff claims that on March 9, 2017, he sent the "complaint" to the U.S. Supreme Court. (Compl. ¶ 11). Plaintiff claims that Superintendent Lee[5] and defendant Ellsworth held the mail for four days before sending it. (*Id.*) Plaintiff alleges that on March 27, 2017, his "complaint" was returned to him by the Supreme Court, with a letter from the Clerk of the Supreme Court which "did not mention anything about plaintiff's claim," instead, it discussed a "petition for writ of certiorari," the time to file it, and informed plaintiff that any claims must first be decided by a Court of Appeals or by the highest State Court available for review. (Compl. ¶ 12). Plaintiff states that he did "exhaust" his remedies, and that the Court of Appeals did consider his claim. (Compl. ¶ 13). Plaintiff alleges that the letter from the Supreme Court indicated that the "Rules of Court" and a sample petition for writ of certiorari were inclosed, but those items were not attached when plaintiff received the papers. (Compl. ¶ 13).

[5]    Superintendent Lee is not a named defendant in this action.

**\*3** Plaintiff believes that "here's what happened:" when he sent his "complaint" to the Supreme Court on March 9, 2017,[6] Superintendent Lee and defendant Ellsworth held the complaint until March 13, 2017, opened the envelope, removed plaintiff's complaint, replaced it with their own "different" papers, and sent the papers to the court. (Compl. ¶ 14). Plaintiff then alleges that on March 22, 2017, the Clerk of the Supreme Court sent plaintiff the "priority mail," which Superintendent Lee and defendant Ellsworth received on Friday March 24, 2017, opened the envelope, removed their "fake" documents that they sent to the court and the

documents the court sent to plaintiff, replaced them with plaintiff's original complaint, and delivered the package to plaintiff on Monday March 27, 2017. (Compl. ¶ 15).

[6]  The court notes that later in the complaint, plaintiff seems to repeat the same claim with slightly different dates and facts. Plaintiff claims that on February 16, 2017, he sent his "appeal" in *Moreau II* to the U.S. Supreme Court. Plaintiff claims he was overcharged for postage and was "held" by defendant Ellsworth until February 23, 2017. (Compl. ¶ 30). However, plaintiff also claims that on March 19, 2017 (not March 9th as he claimed in ¶ 32), he sent his "appeal" to the Supreme Court, which he claims was held, opened, and replaced with "fake" papers before being sent to the Supreme Court. (Compl. ¶ 33). He repeats the allegation regarding the March 22, 2017 priority package which was sent to plaintiff by the Supreme Court, which plaintiff claims was again opened, and defendant Ellsworth replaced its contents with plaintiff's original papers, after falsifying the log book. (*Id.*) Plaintiff also repeats that he did not receive the package until March 27, 2017. (*Id.*)

Plaintiff states that, on April 12, 2017, he received mail dated "10, 2017" from the U.S. Supreme Court, signed by Redmond K. Barnes. (Compl. ¶ 35). Apparently, the notice signed by Mr. Barnes stated that an in forma pauperis ("IFP") application, along with other IFP-related documents were enclosed in the mailing. (*Id.*) Plaintiff alleges that no such documents were included in the package that he received, and he claims that defendant Ellsworth removed them. (*Id.*)

Plaintiff claims that even after he was transferred out of Eastern,[7] he discovered more instances in which defendant Ellsworth interfered with his mail. (Compl. ¶¶ 36-37). On February 26, 2018, plaintiff sent a letter to the Appellate Division, Second Department inquiring about an action entitled *Moreau v. State of New York*. (Dkt. No. 1-2 at 4). Plaintiff claims that on March 3, 2018, the Appellate Division, Second Department informed plaintiff that his criminal appeal was denied in September of 2016 for failure to timely perfect the appeal. (Compl. ¶ 38). Plaintiff states that he never received any notice about the dismissal in 2016, while he was at Eastern. (Compl. ¶ 39). Plaintiff states that he requested a copy of the log book from Eastern for September 30, 2016,[8] which indicated that plaintiff received two letters, but he never received either of them. Instead, plaintiff claims that

defendant Ellsworth falsified plaintiff's signature and never gave the letters to plaintiff.[9]

[7]  Plaintiff states that he was transferred to Mohawk Correctional Facility ("Mohawk") on February 22, 2018. (Compl. ¶ 37).

[8]  In another part of the complaint, plaintiff claims that on September 30, 2016, the Second Circuit Court of Appeals sent plaintiff "mail" that he never received. (Compl. ¶ 40).

[9]  Neither letter was from the Appellate Division, Second Department. (Compl. ¶¶ 39).

Plaintiff alleges that on March 3, 2017, defendant von der Heyde threatened to "break plaintiff's neck if he saw [him] close [to] the Grievance Office." (Compl. ¶ 18, 51). On March 8, 2017, plaintiff states that he got a "call-out" for an identification photograph, but that in order to go to that location, plaintiff would be required to have contact with defendant von der Heyde. (Compl. ¶ 52). Plaintiff claims that he explained to the "ID" Officer that defendant von der Heyde was retaliating against him, and in order to avoid contact with the defendant, plaintiff would "wait in the Guardroom Floor" to avoid seeing the defendant. Although plaintiff claims that the ID officer said "okay," plaintiff was keep-locked and issued a misbehavior report two hours later by defendant von der Heyde for failure to obey an order. (Compl. ¶ 52-53).

**\*4**  On May 8, 2017, plaintiff was scheduled to report to the Inmate Grievance Resolution Committee ("IGRC") office at 9:00 a.m. for a "callout."[10] (Pl.'s Ex. K) (Dkt. No. 1-2 at 49). At 8:20 a.m., plaintiff informed Correction Officer Leone ("Leone")[11] that he could not walk up the stairs to the IGRC office due to his knee condition.[12] (*Id.*) Defendant von der Heyde verbally harassed Plaintiff with racial slurs and reported the issue to defendant A. Black ("Black"), the Inmate Grievance Program Supervisor. (*Id.*); (Compl. ¶ 59).

[10]  These additional facts appear in Plaintiff's Exhibit K which is plaintiff's May 18, 2017 grievance. (Dkt. No. 1-2 at CM/ECF p.49).

[11]  Officer Leone is not a defendant herein.

[12]  Plaintiff claims that he had a "flat pass medical order" and annexed two such passes as exhibits to his complaint. (Compl. ¶ 59; Dkt. No. 1-2 at 40,

2021 WL 3813172

41) The passes are dated May 11, 2017 and June 22, 2017. (*Id.*)

At 8:30 a.m., Black arrived and continued to abuse and intimidate Plaintiff. (Pl.'s Exs. I, K) (Dkt. No. 1-2 at 36-37 (5/22/17 Letter to Sup't Lee), 50 (5/18/17 Grievance)). Black stated that he "didn't give a damn about [plaintiff's] medical problems" and directed plaintiff to go upstairs or "kill [him]self" because he wrote too many grievances. (Compl. ¶¶ 20, 59-61; Dkt. No. 1-2 at 50). Defendants von der Heyde and Black gave Plaintiff a "direct order" to walk up the stairs. (Dkt. No. 1-2 at 50). Plaintiff claims that as he walked up the stairs, his left knee gave out, and he fell down the stairs, injuring his head, neck, shoulders, and legs ("the staircase incident"). (Compl. ¶ 62). Plaintiff was taken to the infirmary for treatment, and as a result of the incident, he was in physical therapy for over two months. (*Id.*)

The following issues remain after the court's initial review of the complaint:

(1) First Amendment mail interference claims against defendant Ellsworth.

(2) First Amendment access to courts claims against defendant Ellsworth.

(3) Eighth Amendment deliberate indifference claims against defendants von der Heyde and Black in connection with forcing plaintiff to go up the stairs.

(4) Retaliation claims against defendants Ellsworth, von der Heyde, and Black.

## II. **Summary Judgment**

### A. Legal Standards

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56*; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

### B. Evidence Submitted

**\*5** Plaintiff attached a substantial number of exhibits to his complaint. (Dkt. No. 1-1 (Exs. A-E) and 1-2 (Exs. F-L)). Defendants have attached exhibits to their summary judgment motion, including plaintiff's January 5, 2021 deposition (Dkt. No. 43-1 (Ex. A; the Declarations of Rachel Seguin and of defendants Ellsworth, Black, and von der Heyde (Dkt. Nos. 43-4 - 43-7)). Although plaintiff has attached exhibits to his opposition papers, most of them are duplicates of the defendants' exhibits and include a copy of the complaint. (Dkt. No. 50-2 - 50-10). I will discuss the facts contained in the exhibits as they are relevant to the court's analysis of defendants' motion.

## III. **Mail Interference**

### A. Legal Standards

It is well established that " 'the First Amendment protects an inmate's right to send and receive both legal and nonlegal mail, although prison officials may regulate that right if the restrictions they employ are 'reasonably related to legitimate penological interests.' " *Abreu v. Travers*, No. 9:15-CV-540 (MAD/ATB), 2016 WL 6127510, at \*10 (N.D.N.Y. Oct. 20, 2016) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989)). Legal mail is entitled to greater protection from interference than nonlegal mail. *Id.* (citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted)). In *Abreu*, the court noted that "[a] single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge." *Id.* (citing *Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975). *See also Ahlers v. Rabinowitz*, 684 F.3d

53, 64 (2d Cir. 2012) ("With regard to legal mail, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation.") (citation omitted). An inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Davis*, 320 F.3d at 351 (quoting *Cancel v. Goord*, No. 00 Civ. 2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001) (citing *Washington v. James*, 782 F.2d 1134,1139 (2d Cir. 1986))). "However, 'as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received.' " *Geneo v. City of New York*, No. 20-CV-2441, 2021 WL 2111817, at *5 (S.D.N.Y. May 25, 2021) (quoting *Davis*, 320 F.3d at 351 (citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

Inmates' suits, alleging unconstitutional opening of their legal mail without any showing of damages have been dismissed. *Abreu*, 2016 WL 6127510, at *10 (citing *Pacheco v. Comisse*, 897 F. Supp. 671, 681 (N.D.N.Y. 1995) (dismissing inmate's claim based on a single instance in which defendants allegedly opened his legal mail outside of his presence because "he has shown no prejudice as a result of the allegedly unauthorized opening"); *Walton v. Waldron*, 886 F. Supp. 981, 986 (N.D.N.Y. 1995) ("Existing precedent on an inmate's claim that his 'legal' mail has been improperly handled by prison officials requires a showing of harm."); *Gittens v. Sullivan*, 670 F. Supp. 119, 124 (S.D.N.Y. 1987), *aff'd*, 848 F.2d 389 (2d Cir. 1988) (holding that inmate's allegation that his legal mail was "interfered with on one occasion is insufficient to state a cause of action given that the interference complained of did not affect plaintiff's access to the courts")).

**B. Analysis**

**\*6** In this case, plaintiff alleges both improper opening and actual interference with his legal mail. Unfortunately, plaintiff's misuse of legal terminology and incomplete statement of facts makes some of the issues more confusing. The court has attempted to clarify the issues by researching the dockets of plaintiff's other federal actions in addition to reviewing the evidence presented by both plaintiff and defendants. *See Allah v. Murphy*, No. 9:14-CV-0438 (GTS/TWD), 2016 WL 4401069, at *6 n.11 (N.D.N.Y. May 16, 2016) (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (citations omitted) (docket sheets are public records, "of which the court could take judicial

notice.")), *report-recommendation adopted by*, 2016 WL 4386013 (N.D.N.Y. Aug. 17, 2016), *aff'd*, 699 F. App'x 41 (2d Cir. 2017).

Most of plaintiff's "interference" claims allege delay in either sending or receiving legal mail, based on plaintiff's opinion of how quickly the mail should have been processed. [13] Some of plaintiff's claims allege actual tampering with the mail, including removing plaintiff's documents and replacing them with "fake" documents as well as falsifying log book entries.

[13]     At his deposition, plaintiff conceded that he had never worked in a facility mail room. (Pl.'s Dep. at 69, 73).

The first part of the complaint alleges that, after the Second Circuit affirmed *Moreau v. Peterson*, 672 F. App'x 119 (2d Cir. 2017), plaintiff made several attempts to petition for certiorari which were tampered with by defendant Ellsworth. Plaintiff's allegations are not supported by the complaint, his own deposition testimony, or by the records of the action that he claims he was attempting to appeal.

Plaintiff alternately refers to the document that he sent to the Court of Federal Claims/Supreme Court as a "complaint" or "appeal." He claims that after *Moreau II* was decided, he sent a "complaint" to the Court of Federal Claims on February 16, 2017, but that on March 6, 2017, his papers were returned with a letter from the Clerk of the Court of Federal Claims. In conclusory fashion, he states that the correspondence took a month "when it should have taken about two weeks." (Compl. ¶¶ 7, 9, 10).

However, it is clear from the letter that plaintiff received from the Court of Federal Claims, [14] dated February 28, 2017, that plaintiff sent what he believed to be his appeal in *Moreau II*. The Court of Federal Claims sent the document back to plaintiff because it appeared that he meant to file the papers in the United States Supreme Court, and they were being sent back for him to do so. (Dkt. No. 1-1 at CM/ECF p.30). There is no indication that any delay was caused by defendant Ellsworth, and plaintiff only assumes this to be the case.

[14]     This letter is attached to plaintiff's complaint.

Plaintiff then claims that he sent the "complaint" to the United States Supreme Court on March 9, 2017, and that defendant Ellsworth "held" it for four days before she sent it out. (Compl. ¶ 11). Plaintiff states that on March 27, 2017, he

received an "open priority envelope" from the Supreme Court which contained a letter from the Court Clerk. Plaintiff claims that the Clerk's letter did not address plaintiff's claims, rather, the Clerk referred to a petition for certiorari and explained how plaintiff should proceed if he intended to file such a petition.

Because the Clerk did not address the "claims" in plaintiff's "complaint," he assumed that defendant Ellsworth had opened his outgoing mail to the Supreme Court, replaced his documents with some unknown "fake" documents, sent those documents to the Supreme Court, and then when the court sent correspondence to plaintiff, intercepted that correspondence, opened the envelope, took out the "fake" documents and put plaintiff's documents back in the envelope before delivering the mail to plaintiff.

**\*7** Plaintiff has attached the Supreme Court Clerk's letter to his complaint. (Dkt. No. 1-1 at CM/ECF p.42). The Clerk stated as follows:

> You may seek review of a decision only by filing a timely petition for writ of certiorari. The papers you submitted are not construed to be a petition for writ of certiorari. Should you choose to file a petition for writ of certiorari, you must submit the petition within the 90 day time limit allowed under Rule 13 of the Rules of this Court. A copy of the Rules of this Court and a sample petition for a writ of certiorari are enclosed.

> Your case must be reviewed by a United States court of appeals or by the highest state court in which a decision could be had. 28 U.S.C. 1254 and 1257.

(Dkt. No. 1-1 at CM/ECF p.42). Plaintiff claims that the Rules and the sample petition were not enclosed and accuses defendant Ellsworth of removing them. The complaint does not explain how plaintiff determined that defendant Ellsworth accomplished this. At his deposition, plaintiff did not sufficiently elaborate on how he concluded that defendant Ellsworth either delayed or tampered with plaintiff's documents to the point of removing documents and replacing them with "fake" ones. (Pl.'s Dep. at 51-64).

During his deposition, plaintiff alleged that the correspondence from the Supreme Court was actually delivered to the facility on March 24, 2017, but was not given to plaintiff until March 27, 2017, which would have given the defendant time to tamper with the contents. (Pl.'s Dep. at 68-72). Plaintiff claims that his family was "tracking" the

package, so he knew that it arrived at the facility on March 24, 2017. (Pl.'s Dep. at 69). However, even assuming that the package was delivered to the facility on March 24, 2017, defense counsel noted at the deposition that March 24, 2017 was a Friday. Plaintiff acknowledged that mail would not have been delivered to him on weekends. (Pl.'s Dep. at 72). Plaintiff's allegations about this particular correspondence are fanciful at best. It is inconceivable that defendant Ellsworth just happened to have "fake" papers to put in plaintiff's outgoing mail, keeping and replacing plaintiff's "real" papers when the package was sent back from the Supreme Court before it was delivered to the plaintiff.

Plaintiff apparently tried again to file, what he then referred to as a petition for certiorari in the United States Supreme Court. However, the document was sent back to him on April 10, 2017, noting various deficiencies, including the lack of a proper motion to proceed in forma pauperis ("IFP"). (Dkt. No. 1-1 at CM/ECF p. 43). In his letter, the Clerk of the Court indicated that plaintiff should "correct and resubmit as soon as possible," [15] and plaintiff was given 60 days from the date of the letter to do so. (*Id.*) Plaintiff's handwritten note at the top of the document states that the Superintendent and defendant Ellsworth opened the Clerk's mail and took the documents; thus, plaintiff could not "do the petition." (*Id.*)

[15]    The letter indicated that a proper form IFP application was enclosed. (Dkt. No. 1-1 at CM/ECF p.43).

During his deposition, plaintiff claimed that defendant Ellsworth and the mail room staff behaved this way to prevent him from complying with deadlines and keep him in prison. [16] (Pl.'s Dep. at 100). Plaintiff testified that no one told him that, it was "just the way they behave." (Pl.'s Dep. at 101). Defendant Ellsworth denies tampering with any of plaintiff's mail, and has submitted evidence showing that she was not working on April 12, 2017, the day that she is alleged to have tampered with the most recent correspondence from the Supreme Court. [17] (Ellsworth Decl. ¶ 16).

[16]    The court would point out that *Moreau I* was a civil rights action that had nothing to do with plaintiff's conviction, and the result of which would have no effect on the length of his incarceration. *See Moreau I, supra,* 2015 WL 4272024. As discussed further herein, at the same time, plaintiff was proceeding with an application for a second or

successive application for habeas corpus under 28 U.S.C. § 2254.

[17]    Defendant Ellsworth also states that the log books show that plaintiff signed for legal mail on April 12, 2017. (Ellsworth Decl. ¶ 16).

**\*8** Plaintiff also claims that on February 10, 2017, he "received back a motion under Newly Discovered Evidence" that plaintiff had served on the New York State Attorney General on January 10, 2017. (Compl. ¶ 21). Plaintiff implies that the motion was never sent to the Attorney General, that defendant Ellsworth held the motion for a month, and then placed it in a different envelope with the notation "found loose in the mail." (*Id.*) At his deposition, plaintiff claims that this motion was also to be sent to the United States Supreme Court, and the newly discovered evidence would have proven his innocence. (Pl.'s Dep. at 94-100). Plaintiff discussed his "newly discovered evidence," but failed to answer defense counsel's question, asking how plaintiff knew that defendant Ellsworth "held" his motion. (*Id.*)

The court notes that plaintiff's conclusory allegations are unsupported by any evidence. Defendant Ellsworth states in her affidavit that she was on extended leave until January 17, 2017, so she could not have "intercepted" or held anything that plaintiff mailed on January 10, 2017. (Ellsworth Decl. ¶¶ 12-13 & Ex. D) (Dkt. No. 43-5). In addition, a review of the docket sheet in the Second Circuit relative to *Moreau v. Ercole*, No. 17-126 shows that on January 12, 2017, plaintiff filed a motion for permission to file a second or successive habeas corpus petition. (Dkt. Nos. 1, 4 in 17-126). Plaintiff's submission was 201 pages long, and it was signed on January 9, 2017. (Dkt. No. 1-2, 4 in 17-126). Clearly, plaintiff's motion was not "held" or "intercepted" by anyone in the mail room and was sent promptly to the Second Circuit, where it was received only three days after plaintiff signed the document. [18] The motion was based on what plaintiff described as "Newly Discovered Evidence." (*Id.*) The Attorney General's Office appeared on February 7, 2017. [19] (Dkt. Nos. 23, 24 in 17-126). The Second Circuit denied plaintiff's motion ***on the merits*** on February 8, 2017. (Dkt. No. 26 in 17-126).

[18]    Plaintiff attempts to argue that defendant Ellsworth returned from her extended leave on January 17, 2017 and somehow located his papers in order to hold them. Clearly, since the papers were filed in the Second Circuit on January 12, 2017, plaintiff's

argument has no merit. It is unclear what plaintiff received "back" on February 10, 2017, but it is clear that his motion had already been decided, and defendant did not intercept or hold plaintiff's papers.

[19]    The court notes that the complaint indicates that the documents that were "returned" to plaintiff were intended for the Attorney General's Office, and perhaps were the copies of the motion that he attempted to serve. However, it is unlikely that defendant Ellsworth, even assuming she had been working on the date in question, would have intercepted and tampered with one set of documents, while promptly sending the other set to the court. In any event, plaintiff has not shown that he was injured in any way by the defendant's alleged conduct.

Defendant Ellsworth does concede that on February 16, 2017, a piece of plaintiff's legal mail was opened outside his presence in error. (Ellsworth Decl. ¶ 15). The matter was addressed with the mail room staff, and efforts were made to determine that such mistakes were not repeated. (*Id.*) There is no indication that plaintiff suffered any harm as a result of this single incident.

Plaintiff's complaint was vague, and neither his deposition, nor his response to defendants' motion have clarified or substantiated any of the conclusory accusations that he makes against defendant Ellsworth. To the extent that plaintiff claims that the defendant delayed his mail, there is no indication that plaintiff suffered any injury based on delays or that the delays were attributable to the defendant. The court will next examine the claim of denial of access to courts based on the same allegations.

## IV. <u>Access to Courts</u>

### A. Legal Standards

**\*9** The United States Constitution guarantees prisoners a "meaningful right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 830 (1977). As the Supreme Court explained in *Bounds*, this right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828. However, "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance," nor did it "guarantee inmates the wherewithal to transform

themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Instead, "the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.' " *Collins v. Goord*, 438 Supp. 2d 399, 415–16 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 355). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

The courts have recognized two variants of claims for denial of access to courts: first, "forward-looking claims," where "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and second, "backward-looking access claims," which cover "specific cases that cannot now be tried (or tried with all material evidence)" due to the actions of state officials. *Jean-Laurent v. Lawrence*, No. 12-CV-1502, 2015 WL 1208318, at *3 (S.D.N.Y. Mar. 17, 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 413-14 & n. 11 (2002)). "The Second Circuit has emphasized, however, that the viability of [backward-looking] claims is far from clear, pointing out that the [Supreme Court's] *Harbury* decision was careful not to endorse their validity." *Id.* (quoting *McNaughton v. de Blasio*, No. 14 Civ. 221, 2015 WL 468890, at *12 (S.D.N.Y. Feb. 4, 2015) (other citations omitted). Although the availability of a backward-looking access claim remains uncertain in this Circuit, [20] the existing case law suggests four elements:

> First, the plaintiff must identify a nonfrivolous, arguable underlying claim. Second, the plaintiff must establish that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim. Third, the plaintiff must show that the defendant's alleged conduct was deliberate and malicious. [21] Fourth, the plaintiff must demonstrate that the defendant's actions resulted in an actual injury to the plaintiff.

*Jean-Laurent v. Lawrence*, 2015 WL 1208318, at *4 (internal citations and quotations omitted). What does remain clear is that such denial-of-access claims are "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury*, 536 U.S. at 415; *see also Sousa*, 702 F.3d at 128 (citation omitted).

[20]  See *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) ("The viability of backward-looking right-of-access claims is far from clear in this Circuit ...")

[21]  But see *Desmarat v. Artus*, No. 08-CV-977 (DNH/RFT), 2011 WL 1564605, at *7 (N.D.N.Y. Mar. 25, 2011) (questioning whether 'maliciousness' is a proper element of a backward-looking access to court claim, based on Second Circuit jurisprudence).

**B. Analysis**

Notwithstanding plaintiff's attempts to show that his litigation was interrupted or his documents tampered with by defendant Ellsworth, there is absolutely no evidence showing that any of plaintiff's cases were adversely affected by the defendant's actions. Such lack of actual injury is fatal any claim of denial of access to courts. In fact, the evidence shows that plaintiff was able to litigate more than one case during the period in question. He was able to file a substantial motion for permission to file a second or successive habeas corpus petition. The denial of plaintiff's motion was due to its lack of merit and not due to any actions or omissions by defendant Ellsworth.

**\*10**  Plaintiff's attempt at filing a petition for writ of certiorari in *Moreau II* was not impeded by defendant Ellsworth, despite plaintiff's conclusory allegations. It is clear from the letters sent to plaintiff from both the Court of Federal Claims and later from the Supreme Court, that any delays in filing were due to plaintiff's errors and not due to interference from this defendant. Thus, any claim of denial of access to courts may be dismissed.

**V. Retaliation**

**A. Legal Standards**

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took

adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord,* 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher,* 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord,* 119 F. Supp 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 (2002)).

In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso,* No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon,* 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation.[22] *Cruz,* 2014 WL 2176256, at *6 (citing *Colon,* 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise." *Thomas v. Waugh,* No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001).

[22]    This court recognizes the existence of other factors, as discussed in *Colon,* applicable only when the alleged adverse action is the issuance of a misbehavior report.

**B. Analysis**

**1. Ellsworth**

Based on the findings above, this court has determined that plaintiff has failed to show that defendant Ellsworth intentionally delayed or interfered with plaintiff's mail. Thus, plaintiff cannot establish the second prong of the test for a First Amendment retaliation claim. He cannot show that the defendant took adverse action against him, and his claims of retaliation have been made in "wholly conclusory terms." This finding is supported by plaintiff's testimony at his deposition, during which he could not elaborate on the facts establishing the defendant's alleged interference with his mail. Thus, plaintiff's claims of retaliation may be dismissed as against defendant Ellsworth.

**2. von der Heyde**

**\*11** In his complaint, plaintiff states that defendant von der Heyde retaliated against plaintiff to "support" defendant Ellsworth's constitutional violations against him. (Compl. ¶ 17). This paragraph is followed by a variety of claims that defendant von der Heyde verbally harassed and threatened plaintiff with physical harm if he saw plaintiff near the grievance office. (Compl. ¶¶ 18-20, 51, 54). " '[V]erbal harassment and derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise to a level of constitutional significance, and therefore cannot constitute adverse action sufficient to support a retaliation cause of action.' " *Sanchez v. Shanley,* No. 9:20-CV-0648 (GTS/ML), 2021 WL 365912, at *3 (N.D.N.Y. Feb. 3, 2021) (quoting *Reed v. Doe No. 1,* No. 9:11-CV-0250 (TJM), 2013 WL 5441503, at *6 (N.D.N.Y. Sept. 27, 2013)).

Plaintiff does allege that on March 8, 2017, defendant von der Heyde issued a misbehavior report against plaintiff for failing to follow a direct order. (Compl. ¶ 51). Plaintiff vaguely asserts that he reported for an ID photograph and told another officer that defendant von der Heyde had been "retaliating" against him, so plaintiff was going to wait in "in the Guardroom Floor" to avoid any contact with the defendant. (*Id.*) Although plaintiff claims that the other officer told him that it was "okay," plaintiff was later issued a misbehavior report by defendant von der Heyde for failing to follow an order. (*Id.*) In the complaint, plaintiff states that he exhausted his administrative remedies, but does not clarify what he alleged in his grievance.

A review of plaintiff's exhibits shows that plaintiff filed a grievance on March 17, 2017, claiming that defendant von der Heyde was verbally harassing him, and ultimately filed the March 8, 2017 misbehavior report against plaintiff because "on February 27, March 1, and 6, 2017, I wrote [sic] grievance for tampering with my legal mails, and medical call-out harassment." (Pl.'s Ex. H) (Dkt. No. 1-1 at CM/ECF p.30). However, the grievances filed on the above dates were not against defendant von der Heyde, and the first grievance filed against defendant von der Heyde appears to have been written on March 17, 2017, more than a week after the defendant issued the misbehavior report in question.

While a plaintiff who "alleges retaliatory adverse action by one officer for a grievance filed against another officer ... faces a heightened burden of establishing a causal connection," this does not necessarily bar a retaliation claim where there are indications of "a retaliatory purpose - i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances." *Vincent v. Sitnewski*, 117 F. Supp. 3d 329, 338-39 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted). *See also Henderson v. Vanderwerff*, No. 9:13-CV-1537 (MAD/CFH), 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016). In this case, plaintiff does allege that on March 3, 2017, defendant von der Heyde threatened to break plaintiff's neck if he saw plaintiff near the grievance office. Thus, the court will not recommend dismissal based upon the fact that, until March 17, 2017, it appears that plaintiff's grievances were against other officers.

However, it is well-settled that, even where plaintiff can make a showing of retaliatory motive, the defendant may be entitled to summary judgment if he can show that the alleged retaliatory action would have occurred even without the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir.), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The defendant bears the burden of making the showing that she would have taken exactly the same action in the absence of an improper motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288). In this case, although plaintiff alleges that the March 8, 2017 misbehavior report was in retaliation for past grievances, he essentially acknowledged at least one of the charged violations–that he was not in an authorized location.[23] He was found guilty of that movement regulation violation charge after a hearing, and that finding was affirmed

on appeal. (Pl.'s Ex. I) (Dkt. No. 1-2 at CM/ECF pp. 33-35). Thus, the allegedly retaliatory action would have been taken regardless of the retaliatory motive and may not be the basis for a First Amendment retaliation claim. Since all the other "retaliatory" actions allegedly taken by defendant von der Heyde were verbal harassment, plaintiff has failed to raise a genuine issue of fact regarding his First Amendment retaliation claim against defendant von der Hyde.

[23]    While plaintiff believes that he had an explanation for his conduct, he nevertheless admits that he was waiting in a place where he was not authorized to be. (Compl. ¶ 52). Plaintiff claims that the officer on duty told plaintiff it was "okay" to wait "in the Guardroom floor." (*Id.*) Plaintiff was found "not guilty" of violating a direct order, but was found guilty of the movement violation. (Pl.'s Ex. I).

### 3. Black

**\*12**  Plaintiff alleges that defendant Black, who is the Inmate Grievance Supervisor at Eastern, retaliated against plaintiff by issuing a misbehavior report against him charging him with, inter alia, falsifying documents, in retaliation for the grievance that he attempted to file against defendant Black in relation to the May 8, 2017 staircase incident.[24] (Compl. ¶ 68). Defendant Black has filed a declaration, stating that the misbehavior report that he filed on June 14, 2017 was filed solely because the plaintiff violated facility rules and was in no way retaliatory. (Black Decl. ¶ 9) (Dkt. No. 43-6).

[24]    Plaintiff also claims that defendant Black prevented plaintiff from exhausting his administrative remedies in relation to the May 8th staircase incident as will be discussed below.

Plaintiff claims that on May 18, 2017, he filed a grievance against defendant Black in relation to the staircase incident of May 8, 2017. Plaintiff has filed affidavits signed by three other inmates who state that they saw plaintiff place the grievance in the proper receptacle. (Compl. ¶ 66 & Pl.'s Ex. K, CM/ECF pp. 55-57). Plaintiff claims that when he did not receive a response from the Inmate Grievance Resolution Committee, he attempted to "appeal" the grievance to the Superintendent. (Compl. ¶ 64).

Defendant Black explains that, instead of an appeal, he received plaintiff's initial grievance on June 8, 2017, and

determined that the grievance was untimely because it had been filed more than 21 days after the alleged incident. (Black Decl. ¶ 10 & Ex. B). A copy of the plaintiff's grievance, dated May 18, 2017, but stamped "received" by the IGRC on June 8, 2017 is attached to the complaint as Exhibit K. (Dkt. No. 1-2 at CM/ECF p. 49-52). The last page of the document contains a form for the IGRC "response." (*Id.* CM/ECF p. 52). The "Response of the IGRC" section is blank, and next to "date returned to inmate," plaintiff wrote "no date." Next to Chairperson, plaintiff wrote "no Chairperson," and next to "IGRC Member decision," plaintiff wrote "no IGRC Member decision." (*Id.*)

In the space for the written basis for appeal, plaintiff explained that, on May 18, 2017 he "sent" his grievance against "A. Black who directed me to harm myself on May 8, 2017." (*Id.*) The plaintiff wrote that since he had not received the IGRC decision, he was "appealing" to the Superintendent. (*Id.*) The document is notarized on June 7, 2018. (*Id.*) Then, plaintiff claims that, after defendant Black denied the grievance as untimely, plaintiff tried to appeal to the CORC, using a Department of Corrections and Community Supervision ("DOCCS") form upon which the Superintendent's decision is usually written. (*Id.* at CM/ECF p. 53).

The top of the form is where the Superintendent writes the appeal determination, and the bottom of the form is the "Appeal Statement," which is the space where the inmate indicates that he wishes to appeal. (*Id.*) Plaintiff completed both parts of the form himself, using the top part of the form as a space for additional explanation of the incident. (*Id.*) At his deposition, plaintiff admitted filling out the form and argued that he should have been allowed access to the form in order to appeal the Superintendent's failure to decide. (Pl.'s Dep. at 90-91).

On June 14, 2017, defendant Black issued a misbehavior report based on plaintiff's improper use of the form, charging plaintiff with "false information," possession of an "unauthorized item," "counterfeiting," possession of "contraband," "possession of a facility document," and "impersonation." (Black Decl. Ex. A). The misbehavior report explains as follows:

> **\*13** On 6/14/17, I received in the IGRC Box an envelope from inmate Moreau containing a fabricated and falsified Superintendent's Response

form (2133). The form used by inmate Moreau is an official NYS DOCCS document that he is attempting to portray as original, but it has clearly been altered by him. The information contained in the fabricated/counterfeited document is false. He does not have the permission of the Superintendent or myself to use this form in any such manner.

*Id.* Plaintiff claims that he had no other way to appeal the failure of the IGRC and the Superintendent to respond to his grievance and claims that this misbehavior report was issued in "retaliation." (Compl. ¶ 68, Pl.'s Dep. at 93).

Defendant Black has filed a copy of the memorandum that he sent to the plaintiff, dated June 8, 2017. (Black Decl. Ex. B). In this memorandum, defendant Black acknowledges that on June 8, 2017, he received plaintiff's grievance, which was dated May 18, 2017 but was untimely because it complained about an incident on May 8, 2018. The memorandum stated that plaintiff included a "fabricated IGRC response form." (*Id.*) The memorandum further reminded plaintiff that he could have asked for an extension of time to file his grievance, but no request for such extension was received with the untimely documents.[25] (*Id.*) The court notes that, even though defendant Black mentioned the falsified IGRC response in his memorandum of June 8, 2017, he did not issue a misbehavior report until plaintiff filed the next altered document in an effort to "appeal" to the CORC on June 14, 2017.

[25]    As stated above, for a short time, plaintiff was an IGRC member, and was thus presumably familiar with the rules and regulations of the grievance program. At his deposition, plaintiff testified that, in all, he had filed over one hundred grievances total, and had filed approximately 25-30 grievances at Eastern alone. (Pl.'s Dep. at 87). In addition a review of the Seguin declaration and of plaintiff's deposition shows that he filed a substantial number of grievances and was well aware of the procedures involved. (Seguin Decl.) (Dkt. No. 43-4).

Plaintiff uses the term "retaliation" very loosely in his complaint, and it is unclear what alleged conduct that he

attributes to defendant Black is "retaliation" and which constitutionally protected activity is the alleged basis for the retaliation. Plaintiff's strongest argument [26] for retaliation against defendant Black, based on the facts in his complaint, is that the June 14, 2017 misbehavior report was in retaliation for the grievance that plaintiff tried to file against defendant Black, dated May 18, 2017. [27]

[26]    It is well-settled that the court must interpret a pro se plaintiff's complaint to raise the strongest arguments it suggests. *Gause v. Claude*, No. 20-CV-4148 (JMA/SIL), 2021 WL 25356, at *2 (E.D.N.Y. January 4, 2021) (citing inter alia *United States v. Akinrosotu*, 637 F.3d 165, 167 (2d Cir. 2011) (per curiam)).

[27]    If the court assumes that plaintiff is also alleging that defendant Black attempted to prevent plaintiff from exhausting his administrative remedies, it is unclear if plaintiff claims that this conduct was in retaliation for past grievances against other officers. The May 18, 2017 grievance appears to be the first grievance plaintiff filed against defendant Black, and defendants argue that it is more difficult for a plaintiff to show that an officer retaliated against an inmate for a grievance that was directed at other officers. It appears from plaintiff's deposition that he is only using the allegedly "blocked" grievance as an excuse for failure to exhaust his remedies with respect to the staircase incident and the June 14, 2017 misbehavior report as the basis for his retaliation claim.

**\*14** However, defendant Black has shown that he would have filed the June 14, 2017 misbehavior report against plaintiff in the absence of any retaliatory motive. It is clear from defendant Black's June 8, 2017 memorandum, that he believed that plaintiff had filed a late grievance without asking for an extension of time to do so and had already tampered with the IGRC form. He did not issue a misbehavior report until plaintiff disregarded the memorandum and filed a new "appeal," using a different form which he again altered. The misbehavior report was issued because plaintiff insisted on violating the rules of which he was well-aware. Such misbehavior report may not be the basis of a retaliation claim, and that part of the complaint against defendant Black may be dismissed.

## VI. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

2021 WL 3813172

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**\*15** However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, —— U.S. ——, 136 S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, —— U.S. at ——, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, —— U.S. at ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that it is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, —— U.S. at ——, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id.* The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage

of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

**B. Analysis**

Defendants argue that plaintiff has failed to exhaust his deliberate indifference claim with respect to the staircase incident. As defendants note, using May 8, 2017 as the date of the incident, plaintiff had until May 29, 2017 to file a grievance and until June 22, 2017 within which to file a request, supported by a showing of mitigating circumstances, for an extension of time to file a grievance if the original deadline had passed. 7 NYCRR §§ 701.5(a), 701.6(g)(1)(i)(a). Defendants argue that, even though the grievance is dated May 18, 2017, plaintiff did not "file" the grievance until June 8, 2017, and he did not request an extension of time to do so. He opted instead to falsify documents in an effort to "appeal" the alleged failure to respond to his original grievance.

Plaintiff claims that defendant Black "blocked" his grievance by refusing to file it because it was late. Plaintiff also testified during his deposition that defendant Black prevented him from filing the grievance. (Pl.'s Dep. at 88). Although a little unclear in his testimony, plaintiff stated that

> [The Superintendent] said he never received it, as I just stated before, that ... wasn't the way that I do to exhaust my administrative remedy. Then, if you go to the court, the court will deny you if you did not exhaust your administrative remedy, but I always get an argument for that.
>
> If you banned me from exhausting my administrative remedies, you're not going to get to say it, you're going to use it, but it's not going to work. You give the Judge and say what - - which one you pardon for your administrative remedies.

(*Id.*) It is clear that plaintiff is well-aware that if a defendant "blocked" plaintiff's ability to exhaust his administrative remedies, plaintiff could avoid the exhaustion requirement.[28] Plaintiff's opposition to the defendants' motion for summary judgment clarifies his argument and specifically states that defendant Black "barred" inmates from exhausting their remedies.[29] (Dkt. No. 50-1, ¶ 62). However, plaintiff still admits, even in his response to the motion for summary judgment, that he "had a hold [sic] Form 2133, *he make a copy of it, without any superintendent's signature*, and on June 14, 2[0]17, he appeal to CORC. [sic] the non-decision

Moreau v. Ellsworth, Slip Copy (2021)
2021 WL 3813172

of the superintendent." [30] (Dkt. No. 50-1, ¶ 64) (emphasis added).

28    The court notes that at the deposition, it appeared that plaintiff had some language issues. However, other parts of his testimony indicate that he was well-aware of case law, and his difficulty with English did not appear to impair his understanding of the issues in the case.

29    Plaintiff may have slightly overstated his argument because he seems to allege that defendant Black barred all inmates from appealing their grievances. (Dkt. No. 50-1, ¶ 62-63).

30    Plaintiff referred to himself in the third person in his memorandum of law.

*16 Plaintiff seems to argue that he is entitled to have "Form 2133" so that he could appeal the "non-decision," and he did not falsify the document. However, it is clear that Form 2133 is only available if the Superintendent makes a decision, and plaintiff appeals therefrom. Defendant Black's June 8th memorandum to plaintiff clearly explains that plaintiff could have submitted a request for an extension of time to file his grievance. He had plenty of time to do so. Instead, plaintiff created his own problems by obtaining an old form, copying it, and attempting to submit his "appeal" when he was not appealing any determination and utilized the DOCCS form improperly.

After the Supreme Court decided *Ross*, the Second Circuit tackled the issue of "availability" of administrative procedures if a grievance is never filed, is never assigned a grievance number, and plaintiff has no notice of what happened to the grievance. *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams* the court found that the administrative remedy would be "unavailable," notwithstanding the regulations providing that an inmate may appeal "to the next step" if they do not receive a response within the required time limit, because the regulatory scheme was "so opaque" that "no reasonable prisoner" could use it. 829 F.3d at 124.

Appealing "to the next step" was only reasonably applicable if the initial grievance had actually been filed, and plaintiff did not receive a response. Then, the IGRC or the Superintendent's failure to respond was appealable "to the next step." *Id.* Because no reasonable inmate would have been able to determine how to use the procedure if the

grievance had not been filed, the Second Circuit found that the administrative remedy was "unavailable," and the exhaustion requirement was excused.

In *Williams*'s case, as in this case, the plaintiff contended that his grievance was not initially filed. [31] However, this case is distinguishable from *Williams* because receipt of the grievance was acknowledged by defendant Black in his June 8, 2017 memorandum to the plaintiff. In this memorandum, defendant Black specifically informed plaintiff that he needed to submit the late grievance together with a request for an extension of time to file. If plaintiff had done so, an extension could have been granted, and plaintiff could have exhausted his administrative remedies. Instead, adamant in his assertion that he had already filed the complaint and was appealing a "failure to decide," plaintiff took it upon himself to unsuccessfully and inappropriately devise a way to appeal. Plaintiff was no stranger to the grievance process and simply chose to ignore the defendant's direction. Thus, unlike the plaintiff in *Williams*, the administrative procedure was not unavailable, plaintiff simply chose to ignore it. Thus, he cannot argue that defendant Black "blocked" his attempt at exhausting his administrative remedies, and plaintiff's deliberate indifference claim may be dismissed for failure to exhaust.

31    The court assumes for purposes of argument that plaintiff in this case did mail the grievance on May 18, 2017.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' summary judgment motion (Dkt. No. 43) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

### All Citations

Slip Copy, 2021 WL 3813172

**Moreau v. Ellsworth, Slip Copy (2021)**

2021 WL 3813172

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 3793772
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emile MOREAU, Plaintiff,

v.

Sherry ELLSWORTH et al., Defendants.

9:20-CV-124
|
Signed 08/26/2021

**Attorneys and Law Firms**

EMILE MOREAU, Plaintiff, Pro Se, 04-A-1588, Marcy Correctional Facility, P.O. Box 3600, Marcy, NY 13403.

HON. LETITIA JAMES, New York State Attorney General, Attorneys for Defendants, The Capitol, Albany, NY 12224, OF COUNSEL: DAVID C. WHITE, ESQ., Ass't Attorney General.

**ORDER ON REPORT & RECOMMENDATION**

David N. Hurd, U.S. District Judge

**\*1** On February 5, 2020, *pro se* plaintiff Emile Moreau ("plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Eastern Correctional Facility, filed this 42 U.S.C. § 1983 action alleging, *inter alia*, that defendants violated his First Amendment rights by interfering with his mail and his access to the courts, and by retaliating against him for the exercise of those rights. Dkt. No. 1. Following

some preliminary motion practice and a period of discovery, defendants moved under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on all of plaintiff's remaining claims. Dkt. No. 43.

On July 15, 2021, U.S. Magistrate Judge Andrew T. Baxter advised by Report & Recommendation ("R&R") that defendants' motion be granted and that plaintiff's complaint be dismissed. Dkt. No. 56. Plaintiff has filed objections to the R&R. Dkt. No. 57.

Upon *de novo* review of the portions to which plaintiff has objected, the Report & Recommendation will be accepted and adopted in all respects. *See* 28 U.S.C. § 636(b)(1)(C).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ADOPTED;

2. Defendants' motion for summary judgment is GRANTED; and

3. Plaintiff's complaint is DISMISSED.

The Clerk of the Court is directed to enter a judgment accordingly and to close the file.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 3793772

---

**End of Document**                 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5332168
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emile MOREAU, Plaintiff,

v.

Sherry ELLSWORTH et al., Defendants.

9:20-CV-0124 (DNH/ATB)
|
Signed 11/16/2021

**Attorneys and Law Firms**

EMILE MOREAU, Plaintiff, Pro Se, 04-A-1588, Marcy
Correctional Facility, P.O. Box 3600, Marcy, NY 13403.

DAVID C. WHITE, ESQ., Ass't Attorney General, HON.
LETITIA JAMES, New York State Attorney General,
Attorneys for Defendants, The Capitol, Albany, NY 12224.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

 *1  On February 5, 2020, *pro se* plaintiff Emile Moreau
("plaintiff"), an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS") at Eastern Correctional Facility, filed this 42
U.S.C. § 1983 action alleging that defendants violated
his First Amendment rights by interfering with his mail
and his access to the courts, and by retaliating against
him for the exercise of those rights. Dkt. No. 1. Plaintiff
also claims defendants were deliberately indifferent to his
medical condition in violation of the Eighth Amendment. *Id.*
Defendants filed a motion for summary judgment on March
4, 2021 Dkt. No. 43.

By Report and Recommendation filed on July 15, 2021,
Magistrate Judge Andrew T. Baxter recommended that
defendants' motion for summary judgment be granted and the
complaint be dismissed in its entirety. Dkt. No. 56.

By Order of this Court filed on August 26, 2021 ("August
Order"), the Report and Recommendation was adopted. Dkt.
No. 58. Judgment was entered in accordance with the August
Order. Dkt. No. 59.

On September 13, 2021, plaintiff filed a motion for relief
that the Court has construed as a motion to reconsider and/
or vacate the August Order. Dkt. Nos. 60, 64 (reply), and 65
(supplemental reply).

**II. MOTION TO RECONSIDER/VACATE**

The decision to grant or to deny a Rule 59(e) motion for
reconsideration rests with the sound discretion of the District
Court." *U.S. v. Eubanks*, No. S7 92 CR 392, 1999 WL
1261256, at *5 (S.D.N.Y. Dec. 27, 1999) (citation omitted).
"A court may justifiably reconsider its previous ruling if: (1)
there is an intervening change in the controlling law; (2) new
evidence not previously available comes to light; or (3) it
becomes necessary to remedy a clear error of law or to prevent
manifest injustice." *Delaney v. Selsky*, 899 F.Supp. 923, 925
(N.D.N.Y. 1995) (citing *Doe v. New York City Dep't of Soc.
Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)).

"The standard for granting a motion for reconsideration is
strict[.]" *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255,
257 (2d Cir. 1995). A motion for reconsideration "should not
be granted where the moving party seeks solely to relitigate
an issue already decided." *Id.* Furthermore, a motion for
reconsideration is not to be used for "presenting the case
under new theories, securing a rehearing on the merits, or
otherwise taking a 'second bite at the apple.' " *Sequa Corp.
v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).

Rule 60(b) provides:

> **Grounds for Relief from a Final Judgment, Order
> or Proceeding.** On a motion and just terms, the court
> may relieve a party ... from a final judgment, order, or
> proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence, that with reasonable
> diligence, could not have been discovered in time to
> move for a new trial under Rule 59(b);
>
> (3) fraud, misrepresentation, or misconduct;
>
> (4) the judgment is void;
>
>  *2  (5) the judgment has been satisfied, released, or
> discharged; or
>
> (6) any other reason that justifies relief.

**Moreau v. Ellsworth, Slip Copy (2021)**

2021 WL 5332168

Fed. R. Civ. P. 60(b).

Construing his submission liberally, plaintiff requests relief under rule 60(b)(6) arguing "extraordinary circumstances." Rule 60(b)(6) is a "catch-all" provision that applies to "extraordinary circumstances" or "extreme hardship." *U.S. v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977). The decision whether to afford relief rests with the "sound discretion of the district court." *Garcia v. Myears*, No. 13-CV-0965, 2015 WL 1015425, at *2 (W.D.N.Y. March 9, 2015). "Generally, courts require that the evidence in support of the motion to vacate a final judgment be 'highly convincing,' that a party show good cause for the failure to act sooner, and that no undue hardship be imposed on other parties." *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987) (citation and internal citations omitted).

Upon review, plaintiff's request must be denied. Plaintiff has not cited to any caselaw which would mandate that the Court's prior decision be vacated and has not demonstrated an intervening change in controlling law, nor has he articulated any clear legal error. While plaintiff disagrees with the August Order, he has not made any showing that reconsideration of the August Order is warranted. *See, e.g., Banco de Seguros Del Estado v. Mut. Marine Offices, Inc.*, 230 F.Supp.2d 427, 431 (S.D.N.Y. 2002) (denying motion for reconsideration where movant "reargue[d] the points it made during the initial briefing and ... explain[ed] to the Court how its analysis is 'erroneous' "); *U.S. v. Delvi*, 2004 WL 235211 (S.D.N.Y. Feb. 6, 2004) (denying motion for reconsideration where movant "point[ed] to no facts or law that the Court overlooked in reaching its conclusion, and instead simply reiterate[d] the facts and arguments that the Court already considered and rejected"). The Court also finds that plaintiff has failed to sustain the burden of demonstrating extraordinary circumstances to warrant relief from the Judgment. Accordingly, Plaintiff's motion (Dkt. No. 60) is denied.

### III. CONCLUSION

Therefore, it is

ORDERED that

1. Plaintiff's motion to reconsider/vacate (Dkt. No. 60) is **DENIED**; and

2. The Clerk of the Court serve a copy of this Order on Plaintiff.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 5332168

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3322599
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Carlton WALKER, Plaintiff,
v.
SENECAL, Defendant.

9:20-CV-0082 (AMN/CFH)
|
Signed January 27, 2023

**Attorneys and Law Firms**

Carlton Walker, 85-A-155920-82, Franklin Correctional Facility, P.O. Box 10, Malone, New York 12953, Plaintiff pro se.

MARK G. MITCHELL, ESQ., Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224-0341, Attorney for defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff pro se Carlton Walker ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Bare Hill Correctional Facility ("Bare Hill C.F."), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendant Correction Officer Richard Senecal ("defendant") violated his constitutional rights under the First Amendment. Dkt. No. 1 ("Compl.").

Presently pending before the Court is defendant's motion for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 58. Plaintiff opposed defendant's motion, Dkt. No. 62, and defendant submitted a reply, Dkt. No. 63. For the reasons that follow, it is recommended that defendant's motion for summary judgment be granted.

**I. Background**

**A. Facts**

The record herein contains few undisputed facts. In support of his motion, defendant filed a Statement of Material Facts. See Dkt. No. 58-8. [2] As discussed infra, plaintiff failed to properly respond to defendant's Statement of Material Facts. See Dkt. No. 62-2. The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See Subsection II(A)(1), infra.

[2]    At the time of the filing of defendant's motion, N.D.N.Y. Local Rule 56.1 provided:

Any motion for summary judgment shall contain a separate Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.

The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a separate Response to the Statement of Material Facts. The opposing party response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. In addition, the opposing party's Response

may set forth any assertions that the opposing party contends are in dispute in a short and concise Statement of Additional Material Facts in Dispute, containing separately numbered paragraphs, followed by a specific citation to the record where the fact is established.

**\*2** On an unspecified date in September 2017, plaintiff sought to carry a "big stack" of legal materials in a net bag into the messhall. Dkt. No. 58-2 at 59-60. Defendant, standing at the entrance to the messhall, read through plaintiff's legal materials to see if plaintiff had other inmates' legal materials in his possession. See Compl. ¶ 435, 437. While reading the legal materials, defendant "came across the plaintiff's civil rights complaint, which was pending in the United States District Court, Northern District of New York, before Hon. Thomas J. McAvoy, Senior United States District Judge." Id. ¶ 439. In that case, plaintiff was "challenging the prison condition and also ... [his] claim of innocence was in it too." Dkt. No. 58-2 at 65, 71. "Officer Senecal ripped out the first 18 pages of plaintiff's 88 page[ ] Civil Rights Complaint, in which Acting Commissioner Annucci, and Superintendent Yelich are named as defendants, challenging the prison's condition as unconstitutional, including the Messhall, a post which Officer Senecal works." Compl. ¶ 440. Plaintiff testified that the document defendant allegedly partially destroyed was an amended complaint that plaintiff intended to file in the civil rights case before Judge McAvoy. See Dkt. No. 58-2 at 71-72, 74. Further, plaintiff testified that "some of [the complaint] was talking about the way the food [was] served" at his correctional facility, but "it's not just the mess hall, but a lot of it was dealing with the mess hall." Dkt. No. 58-2 at 81.

After the alleged destruction of plaintiff's legal papers, plaintiff told defendant that "he would be filing a grievance against [defendant], and about the fact that [defendant] ripped out Page 1 through 18 of [plaintiff's] 88 Page[ ] Civil Rights Complaint." Compl. ¶ 449. "[Defendant] told the plaintiff that if [plaintiff] [ ]ever put [defendant's] name on any grievance concerning [defendant] ripping out the pages, [defendant] would make sure that the plaintiff end[ed] up dead or in the Box." Id.

Defendant asserts that he "did not confiscate, destroy, or remove any of Walker's legal materials" nor did he ever "threaten or harass [plaintiff], verbally or otherwise," including never using "abusive language toward [plaintiff] or engage in retaliation against him." Dkt. No. 58-6 ¶ 6-7.

## B. Procedural History

In January 2023, plaintiff commenced this action. See Compl. Following an initial review of the complaint, the Court determined that the only claims surviving review and requiring a response were the First Amendment retaliation claims against defendants Senecal and Benware. See Dkt. No. 6. Defendants Senecal and Benware thereafter filed a motion to dismiss. See Dkt. No. 32. In August 2021, the Court dismissed several claims, including all claims against defendant Benware. See Dkt. No. 42. On May 27, 2022, defendant Senecal filed this motion pursuant to Fed. R. Civ. P. 56 seeking summary judgment and dismissal of all claims. See generally Dkt. No. 58.

## II. Discussion [3]

[3]     Copies of all unpublished decisions cited by the Court in this Report-Recommendation & Order, unless otherwise noted, have been provided to plaintiff.

Plaintiff asserts First Amendment retaliation claims against Senecal. See generally Compl. Defendant argues that plaintiff cannot demonstrate retaliation insofar as he cannot raise a triable issue of fact regarding (1) a causal connection between the alleged protected activity and the alleged retaliatory act, and (2) the existence of an adverse action. See Dkt. No. 58-7. Defendant claims, in the alternative, that he is entitled to qualified immunity. Id.

## A. Legal Standards

### 1. Motion for Summary Judgment

A motion for summary judgment may be granted if there is no genuine issue of material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See

[Anderson v. Liberty Lobby, Inc.](), 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. See [Skubel v. Fuoroli](), 113 F.3d 330, 334 (2d Cir. 1997).

**\*3** The party opposing the motion must set forth facts showing a genuine issue for trial. See [Matsushita Elec. Indus. Co. v. Zenith Radio Corp.](), 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See [Gallo v. Prudential Residential Servs., Ltd. P'ship](), 22 F.3d 1219, 1223-24 (2d Cir. 1994); [Graham v. Lewinski](), 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See [Triestman v. Fed. Bureau of Prisons](), 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations, or arguments that the submissions themselves do not suggest; that we should not excuse frivolous or vexatious filings by pro se litigants; and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also [Sealed Plaintiff v. Sealed Defendant](), 537 F.3d 185, 191 (2d Cir. 2008) ("on occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds pro se, [...] a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted); see also [Young v. N.Y.C. Dep't of Educ.](), No. 09-CV-6621, 2010 WL 2776835, at \*5 (S.D.N.Y. July 13, 2010)

(noting that the same principles apply to briefs and opposition papers filed by pro se litigants). "However, a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." [Lee v. Coughlin](), 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting [Carey v. Crescenzi](), 923 F.2d 18, 21 (2d Cir. 1991)).

### 2. N.D.N.Y. Local Rule 56.1

In support of his motion, defendant filed a Statement of Material Facts. See Dkt. No. 58-8. Local [Rule 56(b)]() requires that a party opposing summary judgment must file a response to the movant's Statement of Material Facts, "admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs." N.D.N.Y. L.R. 56(b). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Id. (emphasis omitted).

Here, in response to defendant's motion for summary judgment, plaintiff filed a document entitled "Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment." See generally Dkt. No. 62-3. This document is not properly responsive to defendant's statement of material facts because it does not admit or deny defendant's "assertions in a short and concise statement, in matching numbered paragraphs." N.D.N.Y. L.R. 56(b); See generally Dkt. No. 62-3. Instead, this document contains arguments of law, a reiteration of the facts plaintiff set forth in the complaint, new claims not previously raised in the complaint, and rearguments of claims that were previously dismissed. See generally Dkt. No. 62-3. The reiterated facts are not cited to locations in the record. Id.

**\*4** Defendant argues that because plaintiff failed to support his denials of defendant's statement of material facts with specific citations to the record, defendant's motion for summary judgment should be granted in its entirety. See Dkt. No. 63 at 1-3. The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." [Prestopnik v. Whelan](), 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (citing [Amnesty Am. v. Town of W. Hartford](), 288 F.3d 467, 470-71 (2d Cir. 2002)). Although the Local Rules provide that the Court shall deem admitted any facts that the nonmoving party fails to "specifically controvert," and pro se plaintiffs are expected to abide by the Local Rules, pro se plaintiffs

are also afforded special solicitude in this District and Circuit. See N.D.N.Y. L.R. 56.1(b); see also subsection II(A)(1) supra. Accordingly, in deference to the plaintiff's pro se status, the Court will independently review the record when evaluating defendant's motion for summary judgment, and "treat [plaintiff's] opposition as a response to" defendant's Statement of Material Facts. Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to [the p]laintiff as a pro se civil rights litigant, however, the Court will treat his opposition as a response to [the d]efendant's Rule 7.1 Statement...." (footnote omitted)); see Perry v. Ogdensburg Corr. Fac., No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016) ("[A]lthough [p]laintiff failed to respond to the statement of material facts filed by [d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective Motions for summary judgment.").

### B. Retaliation Claims

Plaintiff claims that in September 2017, defendant retaliated against him for filing an amended complaint in plaintiff's federal civil rights case by destroying a portion of plaintiff's legal materials from that case and threatening him. See generally Compl. More specifically, plaintiff argues that defendant threatened plaintiff that he if were to grieve defendant's destruction of his legal materials, plaintiff would end up dead or in "the box." Id. at ¶ 449.

To establish a First Amendment retaliation claim under Section 1983, a plaintiff must show: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a casual connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Id. In assessing adverse action, a court is to "look to the specific circumstances in which retaliation claims arise, 'bearing in

mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse.' " Hayes v. Dahlke, 976 F.3d 259, 272 (2d Cir. 2020) (quoting Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)). A plaintiff "must first show that the "protected conduct was 'a substantial or motivating factor in the prison officials' disciplinary decision[.]" Hayes, 976 F.3d at 272 (quoting Holland v. Goord, 758 F.3d 215, 225 (2d Cir. 2014)).

With respect to the third element of the test, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129). A plaintiff may establish a causal connection "with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 139 (2d Cir. 2003)).

> **\*5** In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (quoting Colon, 58 F.3d 865, 872-73 (2d Cir. 1995)).

Where the plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (citation omitted); see Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that

2023 WL 3322599

even without the improper motivation the alleged retaliatory action would have occurred.") (italics omitted).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennet v. Goord, 343 F.3d at 137 (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon, 58 F.3d at 872 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999) (additional citation omitted)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See id. at *3; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial.") (internal quotation marks and citation omitted). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks, citations, and footnote omitted).

As for the first prong, it is well settled that the filing of administrative grievances and lawsuits constitutes protected speech. See Williams v. Ingraham, No. 04-CV-257 (GLS/ DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights.") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002), abrogated on other grounds by Fabricio v. Annucci, 790 F. App'x 308 (2d Cir. 2019)). By demonstrating that he had commenced a lawsuit that was "pending in the United States District Court, Northern District of New York, before Hon. Thomas J. McAvoy, Senior United States District Judge," plaintiff has carried his burden of identifying evidence from which a jury

could conclude that he engaged in protected activity. Compl. ¶ 439.

**\*6** As both allegations -- defendant's destruction of plaintiff's legal materials and threats made to plaintiff – arise out of plaintiff's filing of a lawsuit "pending in the United States District Court, before Hon. Thomas J. McAvoy," the undersigned determines that plaintiff has sufficiently demonstrated protected activity. Id.

### 1. Destruction of Legal Materials

Plaintiff claims that defendant retaliated against him for his protected activity by destroying his legal papers. See generally Compl. Plaintiff claims that these legal papers were connected to "[p]laintiff's Civil Rights Complaint, which was pending in the United States District Court, Northern District of New York, before Hon. Thomas J. McAvoy, Senior United States District Judge." Compl. ¶ 439. Plaintiff claims that defendant was motivated to retaliate against him because in this lawsuit, plaintiff "challeng[ed] prison officials and prison conditions in the court." Dkt. No. 34 at 5.

Plaintiff bears the burden of demonstrating that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).

#### a. Adverse Action

Plaintiff's protected conduct notwithstanding, he has failed to raise a triable issue of material fact as to the remaining elements of his retaliation claim. In the context of a summary judgment motion, "a pro se party's bald assertion, unsupported by evidence, is not sufficient"; the plaintiff must present some evidence suggesting that the defendant took adverse action against him. Cole v. Artuz, No. 93-CV-5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)) (internal quotations and additional citations omitted). Plaintiff has failed to produce sufficient evidence identifying any discernable, adverse action that defendant took against him.

Plaintiff alleges that "defendant invalidated [plaintiff's] complaint, which was also [plaintiff's] personal property" by ripping out the first eighteen pages of the document's

eighty-eight pages.[4] Dkt. No. 34 at 5; see also Compl. at ¶ 440. This allegation is insufficient to create a triable issue of fact. See Colon, 58 F.3d at 873 (mere allegation that the inmate plaintiff sent letter to superintendent of prison complaining that contraband had been planted in his cell prior to prisoner's hearing, and that superintendent did not investigate, was not sufficient to create a triable issue of fact). First, it is unclear what plaintiff means by "invalidated." Dkt. No. 34 at 5. Applying special solicitude, the undersigned infers that plaintiff is arguing that his lawsuit that was then "pending in the United States District Court" was somehow negatively impacted from the partial destruction of his legal papers. Compl. ¶ 439. However, plaintiff's allegations are too vague and conclusory to defeat summary judgment. The only information that plaintiff has provided regarding this document is that it is a complaint arising out a "civil rights [action], which was pending in the United States District Court, Northern District of New York, before Hon. Thomas J. McAvoy, Senior United States District Judge" in which "Acting Commissioner Annucci, and Superintendent Yelich are named as defendants, challenging the prison's condition as unconstitutional, including the Messhall, a post where Office Senecal works." Compl. ¶¶ 439. 440.

[4]     In plaintiff's opposition to defendant's motion for summary judgment, plaintiff, for the first time, provides slightly more detail to his claim of adverse action, stating that he "re-wrote the complaint in which he included the allegations which were missing, but before he was able to mail it off to the court to replace the one which was filed on September 11, 2017, Defendant Senecal read it and ripped out the first 18 pages." Dkt. No. 62-3 at 17. Thus, it appears plaintiff is contending that he was in the process of drafting an amended complaint and that defendant ripped out the first eighteen pages of the amended complaint before he submitted it to the Court.

*7 Although the Court, in the July 19, 2021, Report-Recommendation & Order, Dkt. No. 31 at 11, hypothesized that the complaint to which plaintiff refers may arise from the case, Walker v. Cuomo, No. 9:17-CV-650 (TJM/DJS) (N.D.N.Y. June 16, 2017), plaintiff has not confirmed nor confirmed this suggestion. See Dkt. No. 58-7 at 10. However, even if this is the case, plaintiff fails to explain how the destruction of the first eighteen pages of an amended complaint negatively impacted him such that the Court can assess whether it amounts to adverse action. He does not

contend: that he was unable to proceed on specified claims or against certain defendants specifically because Senecal allegedly destroyed the first eighteen pages of an amended complaint (or proposed amended complaint); that, due to defendant's destruction of a portion of his legal papers, he requested from the Court additional time to re-write and submit the amended complaint but was denied additional time to file an amended complaint, which prevented him from proceeding on certain claims or against certain defendants; nor does he even explain why he was to be unable to re-write the first eighteen pages and submit those to the Court or commence a new action involving any claims or defendants contained within those pages.[5] Although not determinative given the lack of information plaintiff has provided to confirm that Walker v. Cuomo is the case in question, as defendant points out, even if the case is Walker v. Cuomo, a review of that case's docket reveals that on September 11, 2017, plaintiff did file an amended complaint naming the Superintendent and Commissioner. See Dkt. No. 58-7 at 11 n.7.

[5]     The undersigned is not concluding that if plaintiff made such arguments, his claim would be successful in defeating summary judgment.

Plaintiff's bare allegation of "invalidat[ion]" to his civil rights complaint is vague and conclusory and insufficient to amount to a demonstration of adverse action. As plaintiff's conclusory, unsupported allegations of adverse action fail to create a material question of fact, it is recommended that summary judgment be granted with respect to plaintiff's claim that defendant destroyed his legal materials in violation of the First Amendment. See Hare v. Hayden, No. 9-CV-3135 (RWS), 2011 WL 1453789, at *3 (S.D.N.Y. Apr. 14, 2011) ("Conclusory allegations of retaliation are not sufficient....") (citation omitted).

### b. Causal Connection

Even if, arguendo, plaintiff had established a material question of fact as to adverse action, summary judgment must be granted because no reasonable trier of fact could conclude that plaintiff has demonstrated an adequate causal connection between his protected activity and the alleged destruction of his legal papers.

To demonstrate causation, a plaintiff's allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." Diesel v. Town

*of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000) (quotation marks and citation omitted). "[I]n considering whether there is a causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." Blount v. Williams, No. 5:22-CV-582 (GTS/TWD), 2022 WL 3109585, at *4 (N.D.N.Y. June 29, 2022), report and recommendation adopted, 2022 WL 3100556 (N.D.N.Y. Aug. 4, 2022) (citation and quotation marks omitted).

"Retaliation is not 'reasonably inferred' where a plaintiff's protected speech does not involve the defendant alleged to have retaliated against him." Coleman v. Racette, No. 9:18-CV-390 (MAD/CFH), 2021 WL 4312392, at *9 (N.D.N.Y. May 27, 2021) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009)). "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." Jones v. Fischer, No. 9:10-CV-1331 (GLS/ATB), 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (first citing Hare, 2011 WL 1453789, at *4) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (then citing Wright, 554 F.3d at 274) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about a prior incident involving a different, nonparty corrections officer). However, in some cases, "causation may be established even if a prisoner's protected conduct was not directed at the defendant." Kotler v. Boley, No. 21-CV-1630, 2022 WL 4589678, at *2 (2d Cir. Sept. 30, 2022) (citing Davis, 320 F.3d at 354).

**\*8** While a plaintiff who "alleges retaliatory adverse action by one officer for a grievance filed against another officer ... faces a heightened burden of establishing a causal connection," this does not necessarily bar a retaliation claim where there are indications of "a retaliatory purpose - i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances." Vincent v. Sitnewski, 117 F. Supp. 3d 329, 338-39 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted). See also Henderson v. Vanderwerff, No. 9:13-CV-1537 (MAD/CFH), 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016).

Moreau v. Ellsworth, No. 9:20-CV-124 (DNH/ATB), 2021 WL 3813172, at *11 (N.D.N.Y. July 15, 2021), report and recommendation adopted, No. 9:20-CV-124, 2021 WL 3793772 (N.D.N.Y. Aug. 26, 2021), reconsideration denied, No. 9:20CV-0124 (DNH/ATB), 2021 WL 5332168 (N.D.N.Y. Nov. 16, 2021)

Here, even giving plaintiff every reasonable inference, plaintiff fails to clearly establish that defendant had a motive to retaliate against plaintiff due to his claims in the civil rights lawsuit before Judge McAvoy. Plaintiff has not proffered any evidence showing that defendant was ever named as a defendant in the complaint/case in question. Although, as discussed above, the fact that the complaint was related to a lawsuit against others is not a bar to plaintiff's retaliation claim, plaintiff still must show "indications of a retaliatory purpose." Moreau, 2021 WL 3813172, at *11 (citation omitted).

First, to the extent plaintiff argues that defendant retaliated against plaintiff for filing a lawsuit challenging the conditions of the correctional facility and/or the mess hall, plaintiff fails to create a material question of fact that defendant knew the contents of the complaint. Plaintiff alleges only that defendant saw the names of the superintendent and the commissioner on the complaint. Plaintiff alleges that defendant initially looked through his legal materials "to see if the plaintiff ha[d] other inmates' legal materials with his[,]" which defendant concedes. Compl. ¶ 437; see also Dkt. No. 58-6 ¶ 6 ("I briefly checked Walker's bag to determine whether the legal materials were his."). However, plaintiff's claim that defendant was aware of the content of the claims regarding the Bare Hill Correctional Facility mess hall is unsupported by his testimony. See Dkt. No. 58-2 at 65. Plaintiff testified that defendant ("came across my case where I was challenging the prison condition and also – not just the prison condition, but also my claim of innocence was in it too. And then he *saw* the Superintendent name in it and the Commissioner name was in it also.") (emphasis added). However, even accepting as true plaintiff's claim that defendant fully read plaintiff's legal materials and was aware of both the named defendants and the legal claims stated therein, the record lacks evidence demonstrating that defendant would be motivated to retaliate against plaintiff based on plaintiff's filing of that lawsuit or any of the allegations within the amended complaint, even though defendant "worked" with/for the Superintendent or Commissioner or worked in/near the mess hall. See generally Comp. As defendant makes clear, he did not work in the mess hall and was not responsible for the conditions of the mess hall. He was stationed at the door outside of the mess hall, where his duties involved "supervising the inmates entering and leaving the mess hall." Dkt. No. 58-6 at 2.

**\*9** Second, to the extent plaintiff may be suggesting defendant retaliated against plaintiff for bringing a lawsuit naming the commissioner or superintendent as defendants, as laid out, supra, allegations that a defendant retaliated against a plaintiff for claims made against others is not a bar to a retaliation claim, there must be "indications of 'a retaliatory purpose - i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances." Moreau, 2021 WL 3813172, at \*11. Although plaintiff contends that defendant told him that if he grieved the destruction of legal materials, he'd end up "dead or in the box", plaintiff does not claim that defendant made any statement that he was destroying the amended complaint because plaintiff was suing the commissioner or superintendent. Plaintiff's bare allegation that defendant destroyed the legal materials because plaintiff named the commissioner and superintended as defendants is too conclusory to defeat summary judgment and does not rise to the level of. ...

Third, plaintiff's testimony contradicts his complaint as to defendant's alleged motive in destroying the legal materials. In plaintiff's deposition, when asked whether defendant, at the time of the alleged incident, said anything about why he confiscated the pages, plaintiff responded, "[defendant] took them because I was challenging the prison condition and [it had] the Commissioner['s] name on it and the Superintendent['s] name" and "[defendant] said that you're not supposed to be coming here using the law library to ... file a lawsuit against the ... Superintendent and the Commissioner and challenging anything about ... the prison condition." [6] Dkt. No. 58-2 at 84-85. However, plaintiff further testified that "*[defendant's] main thing [was]* that I shouldn't be using the law library to challenge anybody ... challenge the prison condition, to put the Superintendent name in anything or the Commissioner because when I worked in the law library I [was] supposed to be assisting other inmate[s,] not working on my case." Id. at 78 (emphasis added). In his testimony, plaintiff suggests that defendant's motivation to destroy his legal materials was not merely seeing the Superintendent and Commissioner's name on the complaint; rather, that plaintiff was not supposed to have his personal legal materials on him because, as a law library employee, plaintiff was "supposed to be assisting other inmate[s]." Dkt. No. 58-2 at 78. Plaintiff does not attempt to allege or support an argument stating that defendant's destruction of plaintiff's legal materials as retaliation for plaintiff's working on his own legal case

instead of assisting *other* inmates, would amount to a First Amendment violation.

[6]      In plaintiff's opposition to defendant's motion for summary judgment, plaintiff also alleged that defendant was motivated to retaliate because "plaintiff was verbally protesting about his reading the plaintiff's legal materials and ripping out the first 18 pages of plaintiff's complaint." Dkt. No. 62-3 at 18. However, "[a]n opposition to a summary judgment motion is not the place for a plaintiff to raise new claims." Lyman v. CSX Transp., Inc., 364 F. App'x 699, 701 (2d Cir. 2010) (internal quotation marks omitted). Further, this allegation makes no legal sense. Under this version of events, plaintiff suggests that defendant was motivated to retaliate against plaintiff after plaintiff verbally complained about defendant ripping out the eighteen pages of the complaint. Since plaintiff is stating that his complaining occurred after the ripping out of pages, this fully defeats any argument that the complaining was motivation for defendant's conduct, which already occurred. Accordingly, even if the undersigned considers this new argument, it is without force.

In sum, plaintiff has not demonstrated that defendant had a motive to retaliate against plaintiff for his claims against other defendants. His conclusory and speculative allegations are insufficient to support "an inference of a causal connection between" the protected conduct and the alleged destruction of plaintiff's legal materials. See Baskerville, 224 F. Supp. 2d at 732; Hare, 2011 WL 1453789, at \*4 (citing Wright, 554 F.3d at 274). As plaintiff fails to show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline[,]" Graham, 89 F.3d at 81, plaintiff's retaliation claim against defendant, based on the destruction of legal materials, lacks merit, and dismissal is recommended. Celotex Corp., 477 U.S. at 323.

## 2. Verbal Threat

**\*10** Plaintiff also claims that defendant threatened him in retaliation for his protected speech by stating "that if he [ ] ever put his name on any grievance concerning him ripping out the pages, he would make sure that the plaintiff end[ed] up dead or in the Box." Compl. at ¶ 449. Defendant denies threatening plaintiff or using any abusive language. See Dkt. No. 58-6 ¶.

#### a. Adverse Action

In assessing adverse action, a Court is to "look[ ] to the specific circumstances in which retaliation claims arise." Boley, 2022 WL 4589678, at *2 (quoting Hayes v. Dahlke, 976 F.3d 259, 272 (2d Cir. 2020)). Moreover, "[h]ostile statements of prison guards, though made in connection with an inmate's exercise of free speech, do not presumptively violate the First Amendment." Tirado v. Shutt, No. 13-CV-2848 (LTS/AJP), 2015 WL 4476027, at *5 (S.D.N.Y. July 22, 2015) (citing Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)). "Though certain verbal threats may rise to the level of adverse actions, such threats are generally either quite specific or made on a repeated basis." Id. (citing Hepworth v. Suffolk County, No. 2:02-CV-6473, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) (holding that "a reasonable jury could find that [correction officers] unconstitutionally retaliated against [inmate] for exercising his First Amendment" rights where there were "continued verbal threats" that the inmate would be subjected to "another beating or be killed")); see, e.g., Bartley v. Collins, No. 95-CV-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"). "[T]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." Mateo, 682 F. Supp. 2d at 434 (citing Lunney v. Brureton, No. 04 Civ. 2438 (LAK/GWG), 2007 WL 1544629, at *19, *23 (holding that a threat stating, "if you don't stop writing grievances I'm going to break your fuckin' neck," was direct and specific enough to be adverse action)). Thus, "[w]ithout evidence that an unnecessary statement by a prison guard contributed to some concrete threat to the prisoner's safety and welfare, the making of the statement does not rise to the level of First Amendment retaliation." Davidson v. Bartholome, 460 F. Supp. 2d 436, 445 (S.D.N.Y. 2006) (citing Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001)). "Alternatively, 'a series of actions motivated by retaliation that are, collectively, sufficient to deter a person of ordinary firmness from exercising his First Amendment rights' can also rise to the level of adverse action." Zielinski v. Annucci, 547 F. Supp. 3d 227, 233 n.2 (N.D.N.Y. 2021) (citing Tirado, 2015 WL 4476027, at *7).

Here, defendant's threat that plaintiff would "end up dead or in the Box" is vague and de minimis in nature, which reduces the deterrent effect considerably. Compl. ¶ 449; see Mateo, 682 F. Supp. 2d at 434 (citing Kemp v. LeClaire, No. 03-CV-8445, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (holding nonspecific verbal threats like "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" did not rise to the level of adverse action and insufficient to establish a First Amendment retaliation claim)). Plaintiff does not content that the threat resulted in any physical injury, and, thus, is "exactly the type of threat[ ] that ha[s] been found to be insufficient to sustain a First Amendment claim." Id. Although plaintiff was not deterred from grieving the alleged destruction of his legal materials, it is feasible of keeplock would "deter a similarly situated individual of ordinary firmness from submitting grievances or complaints." Blount, 2022 WL 3109585, at *5 (citation omitted); Dkt. No. 58-2 at 94-96. However, "as a general matter, a single isolated threat to place an inmate in restrictive confinement for filing a grievance, without more, is not sufficient adverse action for purposes of a First Amendment retaliation claim[,]" Sanchez v. Shanley, No. 9:20-CV-0648 (GTS/ML), 2021 WL 365912, at *3 (N.D.N.Y. Feb. 3, 2021) (citing cases).

**\*11** Plaintiff does not contend that he was placed in keeplock confinement as a result of his interaction with defendant. This isolated threat to place plaintiff in disciplinary confinement, unaccompanied with subsequent action – which also did not deter plaintiff from filing grievances, would be unlikely to deter a similarly-situated individual of ordinary firmness from exercising his constitutional rights, and, therefore does not suffice to amount to an adverse action. See Hayes, 976 F.3d at 274; Gill, 389 F.3d at 381.

Accordingly, because plaintiff does not allege or support a claim that (1) he was reasonably deterred by defendant's nonspecific threats or that a similarly-situated person would be, or (2) that any injury or keeplock confinement resulted, defendant's alleged threat is insufficient to sustain a First Amendment retaliation claim, and it is recommended that the claim be dismissed.

#### b. Causal Connection

Even if the undersigned had determined that plaintiff demonstrated that defendant's threat amounted to an adverse action, plaintiff has not demonstrated there was an adequate causal connection between plaintiff's protected activity and defendant's alleged verbal threats.

Plaintiff has not proffered any evidence supporting a retaliatory motive on the part of defendant for the alleged verbal threats beyond stating that the alleged threat was "in retaliation for the plaintiff's protect[ed] activit[y]" of filing or attempting to file the amended complaint in his civil rights action. Dkt. No. 34 at 8. Not only does plaintiff fail to allege any adverse action stemming from defendant's alleged verbal threat, but plaintiff fails to allege any injury close in time to such alleged verbal threat. Accordingly, plaintiff fails to demonstrate a causal connection. In sum, as plaintiff has not demonstrated that the verbal threat amounted to an adverse action or demonstrate the existence of a causal connection between his protected speech and the alleged threat, it is recommended that defendant's motion seeking to dismiss plaintiff's claim of retaliation on the basis of threats be granted.

### C. Qualified Immunity

Defendant contends, in the alternative, that he is entitled to qualified immunity. *See* Dkt. No. 58-7 at 15. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted); *see also* Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).

As the undersigned concludes that, even when viewed in the light most favorable to plaintiff, he failed to demonstrate that defendant's conduct violated a constitutional right, the undersigned does not reach the question of qualified immunity. *See, e.g.,* Cucuta v. New York City, 25 F. Supp. 3d 400, 414 (S.D.N.Y. 2014) (noting that, where the plaintiff does not demonstrate a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity" because "where there is no viable constitutional claim, defendants have no need of an immunity shield.") (internal citations and quotation marks omitted).

### III. Conclusion

 *12  **WHEREFORE**, for the reasons set forth herein, it is hereby:

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 58) be **GRANTED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court**. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. See Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a). 6(e), 72. [7]

[7]     If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday Id. § 6(a)(1)(c).

**All Citations**

Slip Copy, 2023 WL 3322599

---

                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3051647
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Carlton WALKER, Plaintiff,

v.

Richard SENECAL, Defendant.

9:20-cv-0082 (AMN/CFH)

|

Signed April 24, 2023

**Attorneys and Law Firms**

CARLTON WALKER, 85-A-155920-82, Franklin
Correctional Facility, P.O. Box 10, Malone, NY 12953,
Plaintiff, Pro Se.

MARK G. MITCHELL, ESQ., Assistant Attorney General,
ATTORNEY GENERAL FOR THE STATE OF NEW
YORK, The Capitol, Albany, NY 12224-0341, Attorney for
Defendant.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

**\*1** On January 23, 2020, Plaintiff *pro se* Carlton Walker,
an inmate in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS"),
commenced this action pursuant to 42 U.S.C. § 1983, alleging
various violations of his constitutional rights at DOCCS
facilities, including Bare Hill Correctional Facility ("Bare
Hill C.F."). *See* Dkt. No. 1 ("Complaint" or "Compl."").
Plaintiff sought leave to proceed *in forma pauperis*, Dkt. No.
2, which was denied pursuant to the "three strikes" provision
of 28 U.S.C. § 1915(g). *See* Dkt. No. 6.

Following an initial review of the Complaint, the Court
dismissed all of the claims contained therein, except for the
First Amendment retaliation claims against Corrections
Officers Richard Senecal ("Senecal") and Brian Benware
("Benware") (collectively, the "Defendants"). *See* Dkt. No. 6.
Defendants filed a motion to dismiss on September 25, 2020.
*See* Dkt. No. 32. On July 19, 2021, Magistrate Judge Hummel
issued a Report-Recommendation and Order ("July 19, 2021
Report-Recommendation"), recommending that Defendants'

motion to dismiss be granted in part and denied in part.
Dkt. No. 38. On August 26, 2021, the Court adopted the
July 19, 2021 Report-Recommendation in its entirety. Dkt.
No. 42. Consequently, the Court dismissed Plaintiff's (i) First
Amendment retaliation claims against Senecal based on (a)
missed meals, (b) access to the mess hall, (c) pat frisks, and (d)
verbal harassment claims related to a diet card and recreation;
and (ii) First Amendment retaliation claim against Benware.
*See id.* Therefore, the only remaining claim in this action is
Plaintiff's First Amendment retaliation claim against Senecal
based on Senecal's alleged destruction of legal materials and
verbal threat to Plaintiff. *Id.*

On May 27, 2022, Defendant Senecal filed a motion for
summary judgment. Dkt. No. 58. Plaintiff filed his opposition
on July 8, 2022, Dkt. No. 62, and Senecal filed a reply
on July 29, 2022, Dkt. No. 63. On January 27, 2023,
Magistrate Judge Hummel issued a Report-Recommendation
and Order ("January 27, 2023 Report-Recommendation"),
recommending that Senecal's motion for summary judgment
be granted. Dkt. No. 67. Plaintiff filed a letter dated February
10, 2023, seeking an extension to file objections to the
January 27, 2023 Report-Recommendation, *see* Dkt. No. 68,
which the court granted on February 15, 2023, *see* Dkt. No.
69. Thereafter, Plaintiff timely submitted objections to the
January 27, 2023 Report-Recommendation, [1] *see* Dkt. No.
70, and Senecal filed a response on March 9, 2023, *see* Dkt.
No. 71.

[1]      In the future, Plaintiff is cautioned to comply with
        Local Rule 7.1(b)(1), which provides, "[n]o party
        shall file or serve a memorandum of law that
        exceeds twenty-five (25) pages in length, double-
        spaced, unless that party obtains leave of the
        judge hearing the motion prior to filing." Plaintiff's
        objections, while hand-written, exceed this page
        limit and Plaintiff failed to obtain leave of the Court
        before filing.

**\*2** Currently before this Court is Magistrate Judge
Hummel's January 27, 2023 Report-Recommendation,
Plaintiff's objections thereto, and Defendant Senecal's
response to Plaintiff's objections. Plaintiff objects to
Magistrate Judge Hummel's recommendation that the Court
grant Senecal's motion for summary judgment on a number
of grounds. [2] *See* Dkt. No. 70. Senecal argues in response
that (i) the Court should ignore Plaintiff's objections because
his objections exceeded 25 pages in length; and (ii) Plaintiff's
objections "largely reiterate[ ] the arguments" made in his

opposition to Senecal's motion for summary judgment. [3] Dkt. No. 71.

[2]    Broadly construing Plaintiff's objections, he principally objects to Magistrate Judge Hummel's analysis of the second and third prongs of the three-part test required to establish a First Amendment retaliation claim under 42 U.S.C. § 1983. Plaintiff also asserts various other arguments that are wholly unrelated to the analysis contained in the January 27, 2023 Report-Recommendation. To the extent that these additional arguments can be construed as objections to the January 27, 2023 Report-Recommendation, such objections merely reiterate allegations made in the Complaint, or are conclusory. Accordingly, the Court has reviewed the remainder of the January 27, 2023 Report-Recommendation for clear error and found none.

[3]    The Court disagrees with Senecal's position that all of Plaintiff's objections largely reiterate arguments raised in the opposition to the summary judgment motion. Given Plaintiff's *pro se* status and the special solicitude afforded therewith, the Court finds that Plaintiff identified specific portions of the January 27, 2023 Report-Recommendation that he contends are erroneous and has provided bases for his contentions. *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) ("[W]e liberally construe [submissions] by pro se litigants, reading such submissions to raise the strongest arguments they suggest.") (quotation marks omitted).

For the reasons stated herein, the Court adopts the recommendation in the January 27, 2023 Report-Recommendation, and orders that Defendant Senecal's motion for summary judgment is granted.

## II. BACKGROUND [4]

[4]    Plaintiff's factual allegations are detailed in the January 27, 2023 Report-Recommendation. *See* Dkt. No. 67 at 2-4. The Court has only included herein the relevant factual allegations necessary for its *de novo* review of the portions of the Report-Recommendation to which Plaintiff has specifically objected.

Plaintiff's allegations against Defendant Senecal stem from a single encounter by the entrance of the mess hall at Bare Hill C.F. on an unspecified date in September 2017. *See* Compl. at ¶ 435. Plaintiff alleges that he was carrying a "big stack" of legal materials in a net bag to the mess hall, at which point, Senecal, who was standing by the entrance of the mess hall, read through these legal materials to see if Plaintiff had another inmate's legal materials in his possession. *Id.* at ¶¶ 435, 437. According to Plaintiff, while Senecal was reading through the legal materials, he came across Plaintiff's "Civil Rights Complaint, which was pending in the United States District Court, Northern District of New York, before Hon. Thomas McAvoy, Senior United States District Judge," *id.* at ¶ 439, challenging the prison conditions and advancing an "innocence" claim, Dkt. No. 58-2 at 66, 72. Senecal proceeded to "rip[ ] out the first 18 Pages of the Plaintiff's 88 page[ ] Civil Rights Complaint, in which Acting Commissioner Annucci, and Superintendent Yelich are named defendants, challenging the prison's condition as unconstitutional, including the Messhall (sic), a post which Officer Senecal works." Compl. at ¶ 440. Plaintiff testified that the document Senecal allegedly partially destroyed was an amended complaint that he intended to file in a case pending before Judge McAvoy in this district. [5] Dkt. No. 58-2 at 72-73, 75. Plaintiff further testified that because Senecal ripped out the "first 18 Pages of [his] ... Civil Rights Complaint," his complaint was "invalidated" and "cost [him his case]." Compl. at ¶ 440; *see* Dkt. No. 58-2 at 73, 106-107. During the alleged destruction of the legal materials, Plaintiff informed Senecal that he intended to file a grievance "about the fact that [Senecal] ripped out Page 1 through 18 of [Plaintiff's] 88 Pages (sic) Civil Rights Complaint," to which Senecal allegedly responded by saying that if Plaintiff ever put his name on any grievances stating that Senecal ripped out those 18 pages, he would make sure that Plaintiff would "end up dead or in the Box." [6] *See* Compl. at ¶ 449. Plaintiff also testified that he filed a grievance regarding Senecal's verbal threat and destruction of legal materials. Dkt. No. 58-2 at 94-96.

[5]    On September 11, 2017, Plaintiff filed an 88-page amended complaint in the case *Walker v. Cuomo et al.*, 9:17-cv-00650, which is the only action brought by Plaintiff over which Judge McAvoy presided. That action was ultimately dismissed without prejudice for Plaintiff's failure to pay the filing fee.

6    The Court understands the "Box" to mean keeplock confinement. *See* Dkt. No. 58-2 at 95-96 (explaining that the "Box" is synonymous with the Special Housing Unit).

## III. STANDARD OF REVIEW

### A. Summary Judgment

**\*3** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). "The 'mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (emphasis in original). In other words, "a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (quotation omitted). Moreover, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *See Chambers*, 43 F.3d at 36-37 (quotation and citation omitted). Any assessments of credibility and all choices between available inferences are matters to be left for a jury, not matters to be decided by the Court on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (citing Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing, *inter alia*, *Anderson*, 477 U.S. at 255). Where a party is proceeding *pro se*, like here, the court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). "However, a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### B. Review of a Report-Recommendation

A district court reviews *de novo* those portions of a magistrate judge's report-recommendation that have been properly preserved with a specific objection. 28 U.S.C. § 636(b)(1)(C). "To be 'specific,' the objection must, with particularity, 'identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection.' " *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012) (alteration in original) (quoting N.D.N.Y. Local Rule 72.1(c)). When a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [previously] presented to the magistrate judge," the district court reviews a magistrate judge's report-recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322 (TJM) (DRH), 2011 WL 933846, at \*1 (N.D.N.Y. Mar. 16, 2011) (citations omitted); *accord Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (a "statement, devoid of any reference to specific findings or recommendations to which [the plaintiff] objected and why, and unsupported by legal authority, was not sufficient to preserve" a claim).

"[I]n a *pro se* case, like here, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (additional citations omitted). The Second Circuit has held that courts are obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan*, 289 F. Supp. 2d at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). That said, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...." *Machicote v. Ercole*, No. 06 Civ. 13320 (DAB)(JCF), 2011 WL 3809920, at \*2, (S.D.N.Y. Aug. 25, 2011) (citation omitted); *accord Caldwell v. Petros*, No. 1:22-cv-567 (BKS/CFH), 2022 WL 16918287, at \*1 (N.D.N.Y. Nov. 14, 2022). After appropriate review, "the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." 28 U.S.C. § 636(b)(1)(C).

## IV. DISCUSSION

**\*4** Plaintiff has specifically and timely objected to Magistrate Judge Hummel's recommendation that Defendant

2023 WL 3051647

Senecal's motion for summary judgment on Plaintiff's First Amendment claim be granted. Thus, the court reviews this recommendation *de novo*. Because Plaintiff's First Amendment retaliation claim against Senecal based on the alleged destruction of legal materials and verbal threat fails as a matter of law, the Court adopts Magistrate Judge Hummel's recommendation to grant Senecal's motion for summary judgment. Plaintiff's claim fails as a matter of law because he cannot establish—even if true—that Senecal's destruction of legal materials and verbal threat falls within the ambit of actionable First Amendment retaliation.

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (internal quotation marks and citations omitted). That is, to defeat summary judgment, Plaintiff "bears the burden of showing, first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted). "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." *Id.* (internal quotation marks omitted). Therefore, courts must approach claims of retaliation " 'with skepticism and particular care' " because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citations omitted).

### a. Destruction of Legal Materials

Plaintiff alleges that Senecal destroyed a portion of his legal materials—18 pages of a federal civil rights complaint—because Plaintiff intended to pursue a lawsuit challenging, among other things, the conditions at Bare Hill C.F. [7] Compl. at ¶ 440. To start, there is no dispute that Plaintiff's federal civil rights complaint challenging, among other things, prison conditions constitutes protected speech. Prisoners have a right to petition the government for redress of grievances, and prison officials may not retaliate against inmates for

exercising that right. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citation omitted). The right to petition the government for redress of grievances includes the right to file lawsuits as well as the right to pursue administrative grievances. *See Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988). Thus, Plaintiff has satisfied the first prong necessary to establish a retaliation claim under 42 U.S.C. § 1983. *See Hayes*, 976 F.3d at 272.

[7]    During his deposition, Plaintiff offered an alternative reason for Senecal's alleged destruction of his legal materials. Specifically, he testified that while Senecal was allegedly destroying his legal materials, Senecal stated that Plaintiff should not be using the prison law library to work on his own civil rights lawsuit because as an employee of the law library Plaintiff is only supposed to assist other inmates with their legal issues. *See* Dkt. No. 58-2 at 76-80.

As to the second prong, even if true, Senecal's alleged destruction of 18 pages of Plaintiff's federal civil rights draft amended complaint does not rise to the level of an adverse action. To be an "adverse action," retaliatory conduct must be the type that would deter "a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (internal quotation marks and citations omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). Courts "look to the specific circumstances in which retaliation claims arise, 'bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse.' " *Hayes*, 976 F.3d at 272 (quoting *Davis*, 320 F.3d at 353) (internal quotation marks and alterations omitted).

**\*5** Retaliatory destruction of a prisoner's personal property can qualify as an adverse action when there is at least a "substantial amount" of personal property destroyed. *See Smith v. City of New York*, No. 03-CV-7576(NRB), 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (finding adverse action where the defendant was missing "nine hundred dollars' worth of personal property" and a "substantial amount of his legal materials from his cell and locker," including criminal case materials such as motions drafted by defendant's attorney and grand jury minutes, as well as civil case materials including copies of his complaints in the actions, docket sheets, a *pro se* book, a jailhouse lawyer's

manual, and various motions). However, destruction of an inmate's property is not actionable where it is merely a *de minimis* act of retaliation. *See Davis v. Jackson*, 15-CV-5359, 2018 WL 358089, at *11 (S.D.N.Y. Jan. 8, 2018) ("The one-time taking of Plaintiff's belt [was] a de minimis action and does not constitute an adverse action."); *Fann v. Arnold*, No. 14-CV-6187, 2016 WL 2858927, at *2 (W.D.N.Y. May 16, 2016) (holding that the plaintiff's allegation of property destruction "constitute[d] a *de minimis* act of retaliation" where the plaintiff had alleged that "all of his property was thrown in the shower"). *De minimis* acts of retaliation do not chill the exercise of constitutional rights and are insufficient to support a First Amendment retaliation claim. *See Davidson v. Chestnut*, 193 F.3d 144, 150-51 (2d Cir. 1999).

The Court recognizes the effort required for an inmate to author a civil rights complaint, however, even with this recognition, the Court finds that the destruction of 18 pages of Plaintiff's draft amended complaint is *de minimis*. Apparently, Plaintiff was not deterred from filing his 88-page amended complaint, and the Court thinks it equally unlikely that an "individual of ordinary firmness" would have been deterred. *Davis*, 320 F.3d at 353. Therefore, because there is no legally cognizable adverse action, Plaintiff's First Amendment retaliation claim based on the alleged destruction of legal materials fails.

### b. Verbal Threat

Plaintiff's First Amendment retaliation claim based on Defendant Senecal's alleged verbal threat fares no better. Plaintiff contends that Senecal stated that he would make sure that Plaintiff would "end up dead or in the Box" if Plaintiff filed a grievance against him based on the alleged destruction of Plaintiff's legal materials. Compl. at ¶ 449. Because the filing of a grievance is protected speech, the first prong of the three-part test necessary to establish a retaliation claim under 42 U.S.C. § 1983 is met. *See Hayes*, 976 F.3d at 272.

However, with respect to the second prong, Plaintiff cannot establish that the alleged verbal threat constitutes an adverse action. When asserting a retaliation claim, "[a]n inmate has no right to redress simply because an officer made a hostile or derogatory comment about him." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 373 (S.D.N.Y. 2011) (quotation marks, alteration, and citation omitted). The line between a *de minimis* verbal threat and a retaliatory adverse action hinges on the specificity and seriousness of the words used. *See*

*Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights.").

For purposes of this analysis, the Court analyzes the alleged threat that Plaintiff "would end up dead" separately from the threat to place him in keeplock confinement. Starting with Senecal's alleged threat that Plaintiff would end up dead, the Court finds that this threat is insufficiently direct and specific to constitute an adverse action. Although there is no Second Circuit case directly on point, [8] district courts within the Second Circuit have found that similar threats do not constitute an adverse action. *See, e.g., Moreau v. Ellsworth,* 9:20-CV-124 (DNH/ATB), 2021 WL 3813172, at *11 (N.D.N.Y. July 15, 2021) (threat to "break plaintiff's neck if he saw [him] close [to] the Grievance Office" not an adverse action); *Tutora v. Gessner*, No. 17-CV-9517 (KMK), 2019 WL 1382812, at *7 (S.D.N.Y. Mar. 27, 2019) (finding threat of "I have a 16 inch rope with your name on it. I was a slave owner for Halloween" to be insufficiently specific, direct and detailed enough to state a First Amendment claim based on a verbal threat); *Terry v. Hulse*, No. 16-CV-252 (KMK), 2018 WL 4682784, at *11 (S.D.N.Y. Sept. 28, 2018) (granting summary judgment in an action where corrections officers allegedly threatened to "kill" plaintiff if he didn't drop the lawsuit); *Barnes v. Cnty. of Monroe*, 85 F. Supp. 3d 696, 740 (W.D.N.Y. 2015) (find that a threat to kill without any specifics is too general and not an adverse action); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (threat of "me and my boys ... going to get you while brandishing a copy of the grievance" not an adverse action); *Kemp v. LeClaire*, No. 03-CV-844S, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (threats like "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" are not adverse actions); *Bartley v. Collins*, No. 95 Civ. 10161 (RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action."); *Alicea v. Howell,* 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) ("alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance" not adverse action). *C.f. Quezada v. Roy*, No. 14 CIV. 4056 CM, 2015 WL 5970355, at *23 (S.D.N.Y. Oct. 13, 2015) (denying summary judgment in an action where a corrections officer threatened to kill plaintiff by allegedly stating "[y]ou get on my nerves and I will do something to put you out of circulation"); *Vincent v. Sitnewski,* F. Supp. 3d 329,

2023 WL 3051647

339-40 (S.D.N.Y. 2015) (denying summary judgment in an action where a corrections officer threatened to "jump" plaintiff in his cell); *Lunney v. Brureton*, No. 04 CIV. 2438 (LAK/ GWG), 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007), objections overruled, No. 04 CIV. 2438(LAK), 2007 WL 2050301 (S.D.N.Y. July 18, 2007) (verbal threat of "if you don't stop writing grievances I'm going to break your fuckin' neck" constituted an adverse action). Moreover, unlike the threat in *Ford v. Palmer*, the vagueness of the alleged threat in this action did not "enhance[ ] its effectiveness as a threat." 539 Fed. Appx. at 5 ("reasoning that 'not telling Ford when or how Officer Law planned to poison him' could have enhanced its effectiveness as a threat and increased the likelihood that a person of ordinary firmness would be deterred from filing additional grievances").

8    In *Hayes v. Dahlke*, the Second Circuit held that a verbal threat such as "maybe all of this would go away" if the Plaintiff stopped filing grievances was *de minimis* and did not constitute an adverse action. 976 F.3d at 266. In *Ford v. Palmer*, the Second Circuit found that the plaintiff had plead facts sufficient to establish that a verbal threat constituted an adverse action when he alleged that "the plaintiff was threaten (sic) by C.O. Law defendant, to put some kind of substance in plaintiff's hot water for writing compliance (sic) and grievances." 539 Fed. Appx. 5 (2d Cir. 2013). Neither *Hayes* nor *Ford* is on point here.

*6    Turning to Senecal's alleged threat to place Plaintiff in keeplock confinement, this threat does not amount to an adverse action either. "As a general matter, a single isolated threat to place an inmate in restrictive confinement for filing a grievance, without more, is not sufficient adverse action for purposes of a First Amendment retaliation claim[.]" *Sanchez v. Shanley*, No. 9:20-CV-0648 (GTS/ML), 2021 WL 365912, at *3 (N.D.N.Y. Feb. 3, 2021) (citing cases). Plaintiff does not contend that he was placed in keeplock confinement as a result of this interaction with Senecal. Therefore, this isolated threat to place plaintiff in keeplock confinement, unaccompanied by subsequent action, does not amount to an adverse action.

See *Wellington v. Langendorf*, No. 12-CV-1019 (FJS/DEP), 2013 WL 3753978, at *11 (N.D.N.Y. July 15, 2013) (finding no adverse action where the defendant made a vague verbal threat on one occasion, and did not repeat the threat or take any affirmative action to suggest that she would do anything to act on the threat); *Keitt v. New York State Dep't of Corr. and Cmty. Supervision,* No. 11-CV-0855 (LJV/MJR), 2017 WL 9471826, at *10 (W.D.N.Y. Jan. 4, 2017) (finding that an isolated threat to file a misbehavior report did not constitute an adverse action where the defendant never carried out that threat).

In summary, the Court adopts the Magistrate Judge's recommendation that Defendant Senecal's motion for summary judgment be granted because Plaintiff cannot show that Defendant Senecal's alleged actions constitute adverse action, which is necessary to prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983.

## V. CONCLUSION
Accordingly, the Court hereby

**ORDERS** that the recommendation in the January 27, 2023 Report-Recommendation, Dkt. No. 67, is **ADOPTED** for the reasons stated herein; and the Court further

**ORDERS** that the Defendant's motion for summary judgment, Dkt. No. 58, is **GRANTED**; and the Court further

**ORDERS** that the Clerk shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2023 WL 3051647

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.